**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| LORI WIGOD, on her own behalf and on behalf of all others similarly situated, | |
| Plaintiff, | Case No: |
| v. | Judge: |
| WELLS FARGO BANK, N.A. d/b/a WELLS FARGO HOME MORTGAGE, f/k/a WACHOVIA MORTGAGE, FSB, | **JURY TRIAL DEMANDED** |
| Defendant. | |

**CLASS ACTION COMPLAINT**

1.      Plaintiff Lori Wigod brings this suit on behalf of herself and a class of similarly situated homeowners nationwide ("Plaintiffs" or "Class"), as well as a Subclass of Illinois homeowners ("Subclass"), to challenge Defendant Wells Fargo Bank, N.A.'s d/b/a Wells Fargo Home Mortgage f/k/a Wachovia Mortgage, FSB ("Defendant" or "Wells Fargo") failure to honor its contractual obligations under its Trial Period Plan Agreements ("TPP Agreements") with its borrowers by offering such borrowers permanent loan modifications.  (See Plaintiff's "TPP Agreement," a true and accurate copy of which is attached as Exhibit A.)

2.      Under the Troubled Asset Relief Program ("TARP"), the United States Government loaned financial institutions nearly $700 billion in funds to address the current financial crisis.[1]  A key feature of TARP is the United States Treasury's Home Affordable Modification Program ("HAMP")—a program in which Wells Fargo received incentive payments for providing mortgage loan modifications programs and services to eligible borrowers

---

[1]      _See_ United States Department of the Treasury, Citizens Report on TARP, _available at_ URL http://www.financialstability.gov/ (follow "Citizens Report PDF" link) (last visited April 13, 2010).

3.      In or around April 2009, Wells Fargo Bank, N.A., accepted $25 billion in funds from the United States Government as part of TARP, 12 U.S.C. § 5211.  Six months before accepting this money, Wells Fargo Home Mortgage signed a contract with the U.S. Treasury agreeing to participate in HAMP.

4.      As a HAMP servicer, Wells Fargo entered into written TPP Agreements for temporary modifications with Plaintiff and other eligible Wells Fargo borrowers.  These TPP Agreements, which were form contracts, contained an express term requiring Wells Fargo to extend a formal offer for a permanent loan modification upon a borrower's completion of his or her respective trial period and continued compliance with the TPP Agreements' other terms.

5.      Plaintiff, as well as the members of the Class and Subclass, have complied with their contractual obligations under their TPP Agreements by submitting all required documentation, answering all questions truthfully, and by making their trial payments.  Despite Plaintiff's and the other putative class members' full performance, Defendant Wells Fargo has ignored its contractual obligation to extend offers for permanent modifications.

6.      While Defendant Wells Fargo enjoys $25 billion of taxpayer money through TARP, tens of thousands of Wells Fargo borrowers across the nation are being wrongfully deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes.  Defendant's actions thwart the very purpose of HAMP and are a breach of its contracts.

### JURISDICTION

7.      Jurisdiction is proper pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).  This claim is brought as a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from the Defendant.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as the unlawful

practices are alleged to have been committed in this District, Defendant regularly conducts

business in this District, and the named Plaintiff resides in this District.  This Court has

supplemental subject-matter jurisdiction over the pendent state law claims under 28 U.S.C. §

1367.

## PARTIES

9.      Plaintiff Lori Wigod is a natural person and a citizen of the state of Illinois.

Plaintiff Wigod resides in Chicago, Illinois.

10.     Wells Fargo Bank, N.A. is a national banking association chartered in Sioux Falls,

South Dakota and acts and operates as a mortgage lender with a principal place of business at

420 Montgomery Street, San Francisco, California 94104.

11.     Wells Fargo Home Mortgage is an operating unit of Wells Fargo Bank, N.A. and

is located in Des Moines, Iowa.

12.     Wachovia Mortgage FSB is a division of Wells Fargo Bank, N.A., and is located

in Raleigh, North Carolina.

## FACTUAL BACKGROUND

### *Congressional Response to National Foreclosure Crisis*

13.     Over the last three years, the United States has been in a foreclosure crisis.  A

congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in

foreclosure or default.[2]

14.     Increased foreclosures have a detrimental effect on borrowers who are at serious

risk of losing their homes.  Foreclosures also have a negative impact on the surrounding

---

[2]      Congressional Oversight Panel, Oct. 9, 2009 report at 3, *available at* URL
http://cop.senate.gov/ reports/library/report-100909-cop.cfm.  (last visited April 13, 2010).

neighborhoods that suffer decreased property values.  In addition, municipalities lose tax revenue as a result of foreclosures.

15.     On October 3, 2008, Congress passed the Emergency Economic Stabilization Act of 2008 and amended it on February 17, 2009, with the American Recovery and Reinvestment Act of 2009 (together, the "Act").  12 U.S.C. § 5201 *et. seq.* (2009).

16.     The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership."  12 U.S.C. § 5201.

17.     The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211.  Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions.  *Id.*

18.     In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

19.     The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures."  12 U.S.C. § 5219.

20.     The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." *Id.*

21.     The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures.  12 U.S.C § 5220.

22.     On February 18, 2009, pursuant to their authority under the Act, the Secretary of

the Treasury and the Director of the Federal Housing Finance Agency announced the Making

Home Affordable program.

23.     One aspect of this program is known as the Home Affordable Modification

Program, or HAMP.  It is this subprogram that is at issue in this case.

24.     HAMP is funded by the federal government primarily with TARP funds.  The

Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is

TARP money.

25.     Under HAMP, the federal government incentivizes participating servicers to enter

into agreements with struggling homeowners that will make adjustments to existing mortgage

obligations in order to make the monthly payments more affordable.  Servicers receive $1,000.00

for each HAMP modification and an additional $500 for modification of yet to be delinquent

loans which were in clear danger of imminent default.

*Servicer Participation in the HAMP program*

26.     The industry entities that perform the actual interface with borrowers – including

such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are

known as "servicers."  Servicers typically act as the agents of the entities that hold mortgage

loans.  Wells Fargo Home Mortgage (formerly Wachovia Mortgage FSB) is a servicer operated

by Wells Fargo Bank, N.A., and its actions described herein were made as agents for the entities

that hold mortgage loans.

27.     To participate in HAMP, a servicer must execute a Servicer Participation

Agreement ("SPA") with the federal government.

28.     On April 13, 2009, Michael J. Heid of Wells Fargo Home Mortgage executed an

SPA, thereby making Wells Fargo a participating servicer in HAMP.

29.     The SPA executed by Mr. Heid incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac, in connection with the duties of Participating Servicers.

30.     The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services."

31.     The Program Documentation requires Participating Servicers to evaluate *all loans* that are 60 or more days delinquent for HAMP modifications.  In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if HAMP is appropriate for the borrower.

*TPP Agreements*

32.     A HAMP Modification consists of two stages.  First, a Participating Servicer is required to gather a borrower's financial and other relevant information and, if the borrower qualifies, offer the borrower a TPP Agreement. Wells Fargo's form TPP Agreements require borrowers to make certain representations, provide relevant information, and make four consecutive trial period payments at a revised rate designed to keep the borrower in his or her home.

33.     Wells Fargo's TPP Agreements provide that Wells Fargo will extend offers for permanent modification to those homeowners who execute the TPP Agreement and fulfill the documentation and payment requirements.  Hence, if a homeowner executes the TPP Agreement, complies with all documentation and representation requirements, and makes all four TPP monthly payments, the second stage of the HAMP process is triggered in which the homeowner

is offered a permanent loan modification.  Despite full performance by its borrowers, Wells

Fargo routinely fails to offer permanent modifications to such borrowers.

34.     By failing to live up to its end of the TPP Agreements and offer permanent

modifications as required, Wells Fargo has left homeowners in limbo, threatened with the loss of

their homes.  Wells Fargo is also preventing borrowers from pursuing other avenues of

resolution, including using the money they are putting toward TPP Agreement trial payments to

fund bankruptcy plans, relocation costs, short sales or other means of curing their default.

## FACTS RELATING TO NAMED PLAINTIFF

35.     In September 2007, Ms. Wigod obtained a mortgage loan for her personal

residence located in Chicago, Illinois from Wachovia or from its affiliate entity.  In any event,

the loan was subsequently assumed by Wachovia which later became a division of Defendant

Wells Fargo.

36.     On April 3, 2009, Ms. Wigod contacted the loss mitigation department at Wells

Fargo and made a written request for a loan modification under the HAMP plan.  Ms. Wigod

also sent Wells Fargo the financial disclosures necessary to determine if she qualified for the

plan.

37.     Sometime in mid-May 2009, Ms. Wigod was informed that she qualified for a

temporary loan modification and that a Wells Fargo representative would be sending her the

required legal papers.

38.     On May 28, 2009, Ms. Wigod executed a TPP Agreement entitled "Home

Affordable Modification Program Trial Loan Period" and sent the executed TPP Agreement to

Wells Fargo.

39.     The first sentence of the TPP Agreement stated:  "If I am in compliance with this

Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage." (*See* Ex. A.)

40.     The TPP Agreement also states:  "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of the Plan if I qualify for the Offer or will send me written notice that I do not qualify for the offer." (*See* Ex. A.)

41.     On or about June 4, 2009, the TPP Agreement was signed by a representative of Wells Fargo.  (*See* Ex. A.)

42.     Also on June 4, 2009, Wells Fargo sent Ms. Wigod a letter congratulating her on entering into a Home Affordable Modification workout plan.  (See "June 4, 2009 Letter from Wells Fargo," a true and accurate copy of which is attached as Exhibit B).  Ms. Wigod also received a copy of the TPP Agreement signed by Wells Fargo.

43.     Ms. Wigod timely made each of the four payments of $1,756.14 required by the TPP Agreement.  (*See* "Proof of Trial Payments," true and accurate copies of which are attached as Exhibit C.)  Wells Fargo accepted these payments without qualification or protest of any kind.

44.     Ms. Wigod also fully complied with all other the terms and requirements of the TPP Agreement such as keeping her information accurate and submitting all necessary paperwork.

45.     Despite her compliance in all respects with the terms of the TPP Agreement, Wells Fargo failed to extend her an offer for permanent modification.

46.     On October 7, 2010, Ms. Wigod received a letter from Wells Fargo, informing her of an outstanding loan balance.  (See "Oct. 2, 2009 Letter from Wells Fargo," a true and accurate

copy of which is attached as Exhibit D).  This letter did not reflect the payments made by Ms. Wigod under the TPP Agreement.

47.     On November 13, 2009, Ms. Wigod received a letter from Wells Fargo informing her that Wells Fargo was "unable to adjust the terms of [her] mortgage."  (*See* "Nov. 13, 2009 Letter" from Wells Fargo, a true and accurate copy of which is attached as Exhibit E).

48.     On November 15, 2009, and despite Wells Fargo's acceptance of Ms. Wigod's trial payments under her TPP Agreement, Ms. Wigod received a letter from Wells Fargo informing her that her loan was in default.

49.     Over the next several months, Ms. Wigod attempted to get Wells Fargo to honor its end of the bargain and offer her a permanent modification as promised.  Wells Fargo refused, and continues to refuse, to offer her a permanent modification as required under the terms of the TPP Agreement.

50.     In response to Ms. Wigod's repeated requests for Wells Fargo to honor the TPP Agreement, Wells Fargo instead asked Ms. Wigod to re-submit documentation already provided by Ms. Wigod when she initially applied for a loan modification.

51.     As of the filing of this Complaint, Wells Fargo has not provided Ms. Wigod with an offer for permanent modification.

## CLASS ALLEGATIONS

52.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

53.     This class action is brought by the Plaintiff on behalf of a nationwide class and Illinois subclass as defined as follows:

**Nationwide Class**

All homeowners nationwide who have entered into a TPP Agreement with Wells Fargo

for the purposes of modifying their home mortgages and, despite having complied with all terms of the TPP Agreement, have not received from Wells Fargo an offer for permanent modification.

**Illinois Subclass**

All homeowners in Illinois who have entered into a TPP Agreement with Wells Fargo for the purposes of modifying their home mortgages and, despite having complied with all terms of the TPP Agreement, have not received from Wells Fargo an offer for permanent modification.

Excluded from the Class and Subclass is 1) any Judge or Magistrate presiding over this action and members of their families; 2) Defendant, Defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former, officers and directors; 3) persons who properly execute and file a timely request for exclusion from the class; and 4) the legal representatives, successors or assigns of any such excluded persons.

54.     Plaintiff sues on her own behalf and on behalf of the above-defined Class and Subclass under Rules 23(a) and (b) of the Federal Rules of Civil Procedure.

55.     Plaintiff does not know the exact size or identities of the members of the putative Class and Subclass, since such information is in the exclusive control of Defendant. Plaintiff believes that the Class and Subclass encompass hundreds of individuals whose identities can be readily determined from Defendant's books and records. Therefore, the proposed classes are so numerous that joinder of all members is impracticable.

56.     Based on the size of the modifications at issue, Plaintiff believes the amount in controversy exceeds $5 million.

57.     All members of the Class and Subclass have been subject to and affected by the same conduct.  The claims are based on form contracts and uniform loan modification processing requirements.  There are questions of law and fact that are common to the Class and Subclass that are subject to common proof and predominate over any questions affecting only individual members of the class.  These questions include, but are not limited to the following:

a.     Whether Wells Fargo's TPP Agreements required Wells Fargo to extend offers of permanent loan modifications when its borrowers complied with their requirements under the TPP Agreements;

b.     Whether Wells Fargo breached an express term of its TPP Agreements with Plaintiff and the Class members by failing to extend offers for permanent modification to Plaintiff and the Class members;

c.     Whether Wells Fargo breached an implied term of its TPP Agreements by failing to extend offers for permanent modification to Plaintiff and the Class members;

d.     Whether Wells Fargo breached the implied covenant of good faith and fair dealing by repeatedly requesting its borrowers produce documentation already in Wells Fargo's possession and by taking other steps to intentionally delay the extension of offers for permanent modification;

e.     Whether Plaintiff and the Class members reasonably relied on the material representations made by Defendant relating to the offer of a permanent loan modification, and whether Plaintiffs suffered damage as a result of their reasonable reliance;

f.     Whether the Court can order damages, and the amount of such damages; and

g.     Whether the Plaintiff and Class and Subclass members are entitled to injunctive

relief.

58.     The claims of the individual named Plaintiff are typical of the claims of the Class

and Subclass and do not conflict with the interests of any other members of the Class and

Subclass in that both the Plaintiff and the other members of the Class and Subclass were subject

to the same conduct, signed the same agreement, and were met with the same absence of a

permanent modification.

59.     The individually named Plaintiff will fairly and adequately represent the interests

of the Class and Subclass.  Plaintiff is committed to the vigorous prosecution of the Class's and

Subclass's claims and has retained attorneys who are qualified to pursue this litigation and have

experience in class actions.

60.     A class action is superior to other methods for the fast and efficient adjudication

of this controversy.  A class action regarding the issues in this case does not create any problems

of manageability.

61.     This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2)

and Fed. R. Civ. P. 23(b)(3).

62.     The Defendant has acted or refused to act on grounds that apply generally to the

Class and Subclass so that final injunctive relief or corresponding declaratory relief is

appropriate with respect to the Class and Subclass as a whole.

**COUNT I**
**Breach of Contract**
(on behalf of the Class)

63.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

64.     Plaintiff brings this claim on her own behalf and on behalf of each member of the

Nationwide Class described above.

65.     As described above, the TPP Agreement executed by Defendant and Plaintiff constitutes a valid contract.  (*See* Ex. A.)

66.     The TPP Agreement provided that "TIME IS OF THE ESSENCE under this Plan."  (*See* Ex. A, ¶ 2.)

67.     The TPP Agreement also provided that if the Plaintiff and the members of the Class made their payments and otherwise complied with the terms of their TPP Agreements, then "the lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary or reflect this new payment amount and waive any unpaid late charges accrued to date."  (*See* Ex. A, ¶ 3.)

68.     Plaintiff and the members of the Class made their temporary payments and otherwise complied with the TPP Agreements by making their required payments, keeping all information and representations true and accurate in all material respects, and by taking all such other steps necessary under the form TPP Agreements.

69.     Rather than treat the timing of its performance under the TPP Agreement as being "OF THE ESSENCE," Defendant intentionally and systematically delayed converting TPP Agreements into permanent modifications by repeatedly requesting documents already in its possession, falsely claiming it lacked materials actually in its possession, failing to implement adequate procedures and systems to respond to inquiries and complaints, and by otherwise dragging out and delaying its extension of offers for permanent loan modification.

70.     Rather than extend offers for permanent modification to Plaintiff and the Class members, Defendant, without justification, ultimately decided to treat the TPP Agreements as if they were null and void.  In Plaintiff's case, Wells Fargo ultimately ceased accepting payments altogether and has since threatened foreclosure.

71.     Insofar as Wells Fargo did not breach an express term of the TPP Agreement, Wells Fargo breach an implied term that required Wells Fargo to extend the offers for permanent modification within a reasonable period of time following Plaintiff's and the Class members' performance under the TPP Agreements.  Rather than do so, Wells Fargo intentionally and systematically delayed converting TPP Agreements into permanent modifications by repeatedly requesting documents already in its possession, falsely claiming it lacked materials actually in its possession, failing to implement adequate procedures and systems to respond to inquiries and complaints, and by otherwise dragging out and delaying its extension of offers for permanent loan modification, ultimately, without justification, treating the TPP Agreements as if they did not exist.

72.     As an actual and proximate result of Wells Fargo's breaches of these contractual terms, Plaintiff and the Class members have suffered harm and are threatened with additional harm from Defendant's breach.  Plaintiff and the Class members have been denied offers for permanent loan modifications, which they stand ready, willing and able to accept.

73.     Further, by entering into the TPP Agreement and making her payments both during and after the trial period, Plaintiff forewent pursuing other remedies that she might otherwise have pursued to save her home, such as restructuring her debt under the bankruptcy code, or pursuing other strategies to deal with their default, such as selling her home.

74.     On information and belief, some putative Class members have suffered additional harm and expense in the form of defending against foreclosure activity against their homes when, in reality, they should be several months into their modified permanent payment plans.

## COUNT II
### Breach of the Implied Covenant of Good Faith and Fair Dealing
(on behalf of the Subclass)

75.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

76.     Plaintiff brings this claim on her own behalf and on behalf of each member of the Illinois Subclass described above.

77.     Defendant is obligated by contract and common law to act in good faith and to deal fairly with each borrower.

78.     The purpose of the covenant of good faith and fair dealing is to guarantee that the parties remain committed to the intended and agreed-upon expectations of the parties in their performance.

79.     Defendant routinely and regularly breached this duty by:

a.      failing to perform loan servicing functions consistent with its responsibilities to Plaintiff;

b.      failing to properly supervise its agents and employees including, without limitation, its loss mitigation and collection personnel and its foreclosure attorneys;

c.      routinely demanding information already in its files;

d.      making inaccurate calculations and determinations of Plaintiffs' eligibility for HAMP; and

e.      unreasonably delaying the extension of offers for permanent modifications to borrowers who perform fully and faithfully under their TPP Agreements.

80.     On information and belief, Defendant engaged in the conduct as alleged in Paragraph 79 above, in a deliberate attempt to discourage borrowers from successfully

completing the loan modifications requirements and to minimize the total number of permanent loan modifications ultimately extended.

81.     As a result of these failures to act in good faith and the absence of fair dealing, Defendant caused Plaintiff harm.

## COUNT III
### Promissory Estoppel, in the alternative
(on behalf of the Class)

82.     Plaintiff repeats and re-alleges paragraphs 1 through 62 above as and for paragraph 82 of this Count III.

83.     Plaintiff brings this claim in the alternative to Counts I and II, on her own behalf and on behalf of each member of the Class described above.

84.     Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

85.     Defendant, by way of its TPP Agreements, represented to Plaintiff that if she executed and returned the TPP Agreement to Wells Fargo along with supporting documentation, and made her TPP payments, she would receive an offer for permanent modification.

86.     Defendant's TPP Agreement was intended to induce Plaintiff to rely on it and make monthly TPP payments.

87.     Plaintiff did indeed rely on Defendant's representation by submitting TPP payments and all necessary documentation.

88.     Given the language in the TPP Agreement, Plaintiff's reliance was reasonable.

89.     Plaintiff's reliance was to her detriment.  Plaintiff has yet to receive an offer for permanent modification and has lost the opportunity to fund other strategies to deal with her default and avoid foreclosure.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff respectfully request the following relief:

A.     Certify this case as a class action and appoint the named Plaintiff to be class representative and her counsel to be class counsel;

B.     Enter a judgment declaring the acts and practices of Defendant complained of herein to constitute breaches of contract and a breach of the covenant of good faith and fair dealing, as well as a declaration that they are required by the doctrine of promissory estoppel to offer permanent modifications to class members;

C.     Grant a permanent or final injunction enjoining Defendant's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiff and the members of the Class and Subclass;

D.      Order Defendant to adopt and enforce a policy that requires appropriate training of its employees and agents regarding their duties under the TPP Agreements;

E.     Order specific performance of Defendant's contractual obligations together with other relief required by contract and law;

F.     Award actual and punitive damages to the Plaintiff and the Class and Subclass;

G.     Award Plaintiff the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and

H.     Grant Plaintiff and the Class and Subclass such other and further relief as this Court finds necessary and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.

Dated:  April 15, 2010                    Respectfully submitted,

                                          **LORIE WIGOD**


                                          By: /s/ Rafey Balabanian
                                                One of Plaintiff's Attorneys


Jay Edelson
Email: jedelson@edelson.com
Steven Lezell
Email: slezell@edelson.com
Rafey S. Balabanian
Email: rbalabanian@edelson.com
Irina Slavina
Email: islavina@edelson.com
**EDELSON MCGUIRE, LLC**
350 N. LaSalle Ave, Suite 1300
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378