**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| LORI WIGOD, on her own behalf and on behalf of all others similarly situated, | |
| Plaintiff, | **Case No: 1:10-cv-2348** |
| v. | **Hon. Blanche Manning** |
| WELLS FARGO BANK, N.A. d/b/a WELLS FARGO HOME MORTGAGE, f/k/a WACHOVIA MORTGAGE, FSB | **JURY TRIAL DEMANDED** |
| Defendant. | |

## FIRST AMENDED CLASS ACTION COMPLAINT

1.      Plaintiff Lori Wigod ("Wigod" or "Plaintiff") brings this suit on behalf of herself and a class of similarly situated homeowners nationwide ("Plaintiffs" or "Nationwide Class"), as well as a Subclass of Illinois homeowners ("Illinois Subclass"), to challenge Defendant Wells Fargo Bank, N.A.'s d/b/a Wells Fargo Home Mortgage f/k/a Wachovia Mortgage, FSB ("Defendant" or "Wells Fargo") intentional and systematic failure to offer permanent loan modifications to qualified borrowers.

2.      In doing so, Wells Fargo has serially failed to honor its express and implied contractual obligations both under its Trial Period Plan Agreements ("TPP Agreements") as well as its borrowers' loan documents, has breached its Servicer Participation Agreement ("SPA") with the Federal National Mortgage Association ("Fannie Mae"), has failed to properly hire and supervise its employees, has made repeated misrepresentations of material fact, and has engaged in business practices that are immoral, unscrupulous, unfair, and oppressive.  (*See* "TPP Agreement" and "SPA," true and accurate copies of which are attached as Exhibits A and B respectively.)

3.      Under the Troubled Asset Relief Program ("TARP"), also known as the taxpayer

bailout, the United States Government provided the nation's largest financial institutions with

nearly $700 billion in funds to address what was widely accepted as an unprecedented financial

crisis. 12 U.S.C. § 5211.  In or around October 2008, Defendant Wells Fargo accepted $25

billion in TARP funds.

4.      A key feature of TARP is the Making Home Affordable Program, of which the

Home Affordable Modification Program ("HAMP" or "the HAMP") is a major component.

HAMP is a program under which Wells Fargo and other major banks receive incentive payments

for providing mortgage loan modifications to eligible borrowers such as Plaintiff Wigod and the

putative Class members.

5.      In April 2009, Wells Fargo Home Mortgage signed a contract with the U.S.

Treasury, through its agent, Fannie Mae, agreeing to participate in HAMP as an approved

HAMP servicer.  (*See* "SPA", Ex. B.)

6.      As a HAMP servicer, Wells Fargo entered into written TPP Agreements for

temporary modifications with Plaintiff and other eligible Wells Fargo borrowers.  These TPP

Agreements, which were form contracts, contained an express term requiring Wells Fargo to

extend a formal offer for a permanent loan modification upon a borrower's completion of his or

her respective trial period and continued compliance with the TPP Agreement's other terms.

7.      Plaintiff, as well as the members of the Class and Subclass, have complied with

their contractual obligations under their TPP Agreements by submitting all required

documentation, answering all questions truthfully, and by making their trial period payments.

Despite Plaintiff's and the other putative Class members' full performance, Wells Fargo has

ignored its obligations by refusing to extend offers for permanent modification to its eligible

2

borrowers as required under the program guidelines and its contracts.

8.     Wells Fargo's failure to extend offers for permanent modification is no accident. To the contrary, Wells Fargo has knowingly established a system designed to wrongfully deprive its eligible HAMP borrowers of an opportunity to modify their mortgages, pay their loans, and save their houses from foreclosure. Wells Fargo's actions, which serve only its interest in extracting as much money as possible from borrowers it deems are at risk of default, thwart the very purpose of HAMP, constitute express and implied breaches of its various contracts, and amount to immoral and unfair business practices under the Illinois Consumer Fraud and Deceptive Business Practices Act.

## JURISDICTION

9.     Jurisdiction is proper pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). This claim is brought as a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from the Defendant.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as the unlawful practices are alleged to have been committed in this District, Defendant regularly conducts business in this District, and the named Plaintiff resides in this District. This Court has supplemental subject-matter jurisdiction over the pendent state law claims under 28 U.S.C. § 1367.

## PARTIES

11.     Plaintiff Wigod is a natural person and a citizen of the state of Illinois. Plaintiff Wigod resides on Paulina Street in Chicago, Illinois and her home mortgage is the loan at issue in this lawsuit. At all times relevant, Plaintiff was qualified and eligible to participate in the

HAMP program under all applicable directives and guidelines, a conclusion Wells Fargo would have reached had it accurately applied such guidelines and directives.

12.     Wells Fargo Bank, N.A. is a national banking association chartered in Sioux Falls, South Dakota and acts and operates as a mortgage lender with a principal place of business at 420 Montgomery Street, San Francisco, California 94104. Wells Fargo Home Mortgage is an operating unit of Wells Fargo Bank, N.A. and is located in Des Moines, Iowa.

13.     Wachovia Mortgage FSB ("Wachovia") is a division of Wells Fargo Bank, N.A., and is located in Raleigh, North Carolina. At all times relevant, Wells Fargo operated and/or controlled Wachovia as its division and specifically represented to Plaintiff and the Class members that it would honor loan modifications and TPP Agreements originated by Wachovia.

## FACTUAL BACKGROUND

### *Congressional Response to National Foreclosure Crisis*

14.     Over the last three years, the United States has witnessed a foreclosure crisis. A congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in foreclosure or default.[1] Increased foreclosures have a detrimental effect on borrowers who are at serious risk of losing their homes. Foreclosures also have a negative impact on the surrounding neighborhoods that suffer decreased property values, and municipalities lose tax revenue as a result of foreclosures.

15.     On October 3, 2008, Congress passed the Emergency Economic Stabilization Act of 2008 and, on February 17, 2009, Congress amended the statute by passing the American Recovery and Reinvestment Act of 2009 (collectively the "Act"). 12 U.S.C. § 5201 *et. seq.* (2009). The purpose of the Act is to grant the Secretary of the Treasury the authority to restore

---

[1]     Congressional Oversight Panel, Oct. 9, 2009 report, *available at* URL http://cop.senate.gov/press/releases/release-100909-foreclosure.cfm (last visited June 23, 2010).

liquidity and stability to the financial system and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." 12 U.S.C. § 5201.

16. The Act grants the Secretary of the Treasury the authority to establish TARP. 12 U.S.C. § 5211. Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions. *Id.* In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

17. The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and that uses the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C. § 5219. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." *Id.* The Act further imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures. 12 U.S.C § 5220.

18. On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the HAMP program. Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000.00 for each HAMP modification.

### *Servicer Participation in the HAMP program*

19. The industry entities that perform the actual interface with borrowers – including

such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are known as "servicers." Servicers typically act as the agents of the entities that hold mortgage loans. Wells Fargo Home Mortgage (formerly Wachovia Mortgage FSB) is a servicer operated by Wells Fargo Bank, N.A., and its actions described herein were made as agents for the entities that hold mortgage loans.

20.     To participate in HAMP, a servicer must execute a Servicer Participation Agreement ("SPA") with the federal government.

21.     On April 13, 2009, Michael J. Heid of Wells Fargo Home Mortgage executed an SPA, thereby making Wells Fargo a participating servicer in HAMP.

22.     The SPA executed by Mr. Heid incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac, in connection with the duties of Participating Servicers.

23.     The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services."

24.     The Program Documentation requires Participating Servicers to evaluate *all loans* that are delinquent 60 days or greater for HAMP modifications. In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if HAMP is appropriate for the borrower.

### *TPP Agreements*

25.     A HAMP Modification consists of two stages. First, a Participating Servicer is required to gather a borrower's financial and other relevant information and, if the borrower

qualifies, offer the borrower a TPP Agreement. In some cases, banks may pre-qualify customers based on verbal representations of income and other information, instruct the customer to begin making the reduced temporary payment, and then confirmed eligibility following the borrower's submission of the required documents. As an alternative, in cases such as this one, banks may require that the borrower submit all necessary income information and documentation to confirm the borrower's eligibility prior to sending the borrower a signed TPP Agreement, which is not subject to later confirmation.

26. Wells Fargo's form TPP Agreements require borrowers to make certain representations, provide relevant information, and make trial period payments at a revised rate designed to keep the borrower in his or her home. Wells Fargo's TPP Agreements provide that Wells Fargo will extend offers for permanent modification to those homeowners who execute the TPP Agreement and fulfill the documentation, representation, and payment requirements.

27. If a homeowner executes the TPP Agreement, complies with all documentation and representation requirements, and makes all of the TPP monthly payments on time, the second stage of the HAMP process is triggered in which Wells Fargo is required to offer the home owner a permanent loan modification. This lawsuit challenges the fact that, despite full performance by its borrowers, Wells Fargo routinely fails to extend offers for permanent modifications to such borrowers.

28. By failing to live up to its end of the TPP Agreements and offer permanent modifications as required, Wells Fargo has deprived homeowners of their ability to save their homes, and has instead left them in a state of limbo, unsure of whether Wells Fargo is setting them up for foreclosure proceedings. Wells Fargo's conduct also prevents borrowers from pursuing other avenues of resolution, including using the money they are putting toward TPP

Agreement trial payments to fund bankruptcy plans, relocation costs, short sales, or other means of curing their default.

## FACTS RELATING TO NAMED PLAINTIFF

29.     On or about September 4, 2007, Wigod obtained a mortgage loan for her personal residence located in Chicago, Illinois from Wachovia, which later became a division operated by Defendant Wells Fargo.

30.     On April 3, 2009, Wigod contacted Defendant's loss mitigation department and made a written request for a loan modification under the HAMP plan.  Throughout April 2009, Wigod also sent Wells Fargo all of the financial disclosures necessary to determine if she qualified for the HAMP plan.  Wigod was not in default under her mortgage agreement at that time.

31.     Sometime in mid-May of 2009, one of Defendant's representatives informed Wigod that she qualified for a temporary loan modification and that Defendant would be sending her the required legal papers for her to execute.

32.     On May 28, 2009, Ms. Wigod executed a TPP Agreement entitled "Home Affordable Modification Program Trial Loan Period" and sent the executed TPP Agreement, along with any final documents Defendant deemed were necessary to determine her eligibility, to Wells Fargo.  (*See* "TPP Agreement", Ex. A.)

33.     The first sentence of the TPP Agreement states:  "If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."  (*See* Ex. A., 1)  Likewise, the TPP Agreement states:  "If I comply

with the requirements in Section 2 and my representations in Section 1 continue to be true in all

material respects, the Lender will send me a Modification Agreement for my signature which

will modify my Loan Documents as necessary to reflect this new payment amount and waive any

unpaid late charges accrued to date." (*See* Ex. A, § 3.)

34.　　The TPP Agreement also states: "I understand that after I sign and return two

copies of this Plan to the Lender, the Lender will send me a signed copy of the Plan if I qualify

for the Offer or will send me written notice that I do not qualify for the offer." (*See* Ex. A.)

34.　　Defendant verified Wigod's financial and other information and determined that

she qualified for a HAMP TPP Agreement.  This was not a case, as sometimes observed in the

modification process, where the bank sends the customer a TPP Agreement prior to verifying the

customer's eligibility through submitted documents and then verifies the borrower's eligibility

by comparing verbal representations of income to supporting documentation.  To the contrary, in

Wigod's and the proposed Class members' cases, Wells Fargo verified and approved their

eligibility for the HAMP program prior to executing their respective TPP Agreements.

35.　　On or about June 4, 2009, having reviewed Wigod's documentation and

determining she was eligible for HAMP, a representative of Defendant signed the TPP

Agreement and sent the signed TPP Agreement to Wigod.  (*See* Ex. A, 3.)

36.　　Also on or about June 4, 2009, Defendant sent Ms. Wigod a letter congratulating

her on entering into a Home Affordable Modification workout plan.  (*See* "June 4, 2009 Letter

from Wells Fargo," a true and accurate copy of which is attached as Exhibit C).  Included in the

June 4, 2009 Letter that Ms. Wigod received was a copy of the TPP Agreement signed by

Defendant's representative.

37.　　Ms. Wigod timely made each of the four payments of $1,756.14 required by the

TPP Agreement. (*See* "Proof of Trial Payments," true and accurate copies of which are attached as Exhibit D.) Wells Fargo accepted these payments without qualification or protest of any kind.

38.     Ms. Wigod also fully complied with all other the terms and requirements of the TPP Agreement such as keeping her information accurate and submitting all necessary paperwork.

39.     Despite her full compliance in all respects with the terms of the TPP Agreement, Wells Fargo failed to send her a modification agreement for her signature or otherwise extend her an offer for permanent modification.

40.     On October 7, 2010, Ms. Wigod received a letter from Wells Fargo, informing her of an outstanding loan balance. (*See* "Oct. 7, 2010 Letter from Wells Fargo," a true and accurate copy of which is attached as Exhibit E.) This letter indicated that Wells Fargo had assessed late charges to Wigod's account. Further, the letter did not reflect the payments made by Ms. Wigod under the TPP Agreement.

41.     On November 13, 2009, Ms. Wigod received a letter from Wells Fargo informing her that Wells Fargo was "unable to adjust the terms of [her] mortgage" due to unexplained "investor guidelines." (*See* "Nov. 13, 2009 Letter" from Wells Fargo, a true and accurate copy of which is attached as Exhibit F).

42.     On November 15, 2009, and despite Wells Fargo's acceptance of Ms. Wigod's trial payments and her full compliance with the TPP Agreement, Wigod received a letter from Wells Fargo informing her that her loan was considered by Wells Fargo to be in default.

43.     Over the next several months, Ms. Wigod attempted to get Wells Fargo to honor its end of the bargain and offer her a permanent modification as promised. Discussions with various Wells Fargo representatives revealed that Wells Fargo had improperly re-evaluated

Wigod's eligibility, had erroneously calculated her property taxes, and had wrongfully concluded that she did not qualify for an offer for permanent modification. Despite repeatedly explaining to various Wells Fargo representatives that the bank had improperly subjected to her to reevaluation and, in the process, had performed various miscalculations, Wells Fargo refused, and continues to refuse, to offer her a permanent modification or send her a modification agreement for her signature as required under the terms of the TPP Agreement. Rather, Wells Fargo has asked Ms. Wigod to re-submit documentation already in Wells Fargo's possession.

44. As of the filing of this Amended Complaint, Wells Fargo has not provided Wigod with a permanent modification agreement for her signature or otherwise extended her an offer for permanent modification. To the contrary, Wells Fargo has sent monthly notices to Plaintiff threatening to foreclose on her home if she does not pay the total amount of delinquency (created by Wells Fargo itself) within 30 days while accepting her continued tender of reduced payments per the terms of the TPP Agreement.

## CLASS ALLEGATIONS

45. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

46. This class action is brought by Plaintiff on behalf of a Nationwide class and Illinois Subclass as defined as follows:

47. **Nationwide Class:** All homeowners nationwide who have entered into a TPP Agreement with Wells Fargo for the purposes of modifying their home mortgages and, despite having complied with all terms of the TPP Agreement, have not received from Wells Fargo an offer for permanent modification.

48. **Illinois Subclass**: All homeowners in Illinois who have entered into a TPP Agreement with Wells Fargo for the purposes of modifying their home mortgages and, despite

having complied with all terms of the TPP Agreement, have not received from Wells Fargo an offer for permanent modification.

Excluded from the Class are 1) any Judge or Magistrate presiding over this action and members of their families; 2) Defendant, Defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which Defendant or its parent companies have a controlling interest and their current or former officers and directors; 3) persons who properly execute and file a timely request for exclusion from the Class or Subclass; and 4) the legal representatives, successors or assigns of any such excluded persons. Plaintiff anticipates that amending the Class and Subclass definition may become proper following discovery.

49.     Plaintiff sues on her own behalf and on behalf of the above-defined Class and Subclass under Rules 23(a) and (b) of the Federal Rules of Civil Procedure.

50.     Plaintiff does not know the exact size or identities of the members of the proposed Class and Subclass, since such information is in the exclusive control of Defendant. Plaintiff believes that the class encompasses hundreds of individuals whose identities can be readily determined from Defendant's books and records. Therefore, the proposed classes are so numerous that joinder of all members is impracticable.

51.     Based on the size of the modifications at issue, Plaintiff believes the amount in controversy exceeds $5 million.

52.     All members of the Class and Subclass have been subject to and affected by the same conduct. The claims are based on form contracts and uniform loan modification processing requirements. There are questions of law and fact that are common to the Class and Subclass that are subject to common proof and predominate over any questions affecting only individual members of the Class. These questions include, but are not limited to the following:

a.  Whether Wells Fargo's TPP Agreements required Wells Fargo to extend modification agreements or otherwise offer permanent loan modifications when its borrowers complied with their requirements under the TPP Agreements;

b.  Whether Wells Fargo breached an express term of its TPP Agreements with Plaintiff and the Class members by failing to extend offers for permanent modification to Plaintiff and the Class members;

c.  Whether Wells Fargo breached an implied term of its TPP Agreements by failing to extend offers for permanent modification to Plaintiff and the Class members;

d.  Whether Wells Fargo breached the implied covenant of good faith and fair dealing by repeatedly requesting its borrowers produce documentation already in Wells Fargo's possession and by taking other steps to delay or prevent the extension of offers for permanent modification;

e.  Whether Plaintiff and the Class members reasonably relied on the material representations made by Defendant relating to the offer of a permanent loan modification, and whether Plaintiff and the Class suffered damage as a result of their reasonable reliance;

f.  Whether Plaintiff and the Class members are third-party beneficiaries of Wells Fargo's SPA with Fannie Mae;

g.  Whether Wells Fargo failed to reasonably hire and supervise its employees who oversaw the implementation of the loan modification process;

h.  Whether Wells Fargo made false statements of material facts or concealed material facts, and whether Plaintiff and the Class members reasonably relied on such misrepresentations to their detriment;

i.      Whether the Court can order damages, and the amount of such damages; and

j.      Whether Plaintiff and Class and Subclass members are entitled to injunctive

relief.

53.     The claims of the individual named Plaintiff are typical of the claims of the Class

and Subclass and do not conflict with the interests of any other members of the Class and

Subclass in that both Plaintiff and the other members of the Class and Subclass were subject to

the same conduct, signed the same agreement, and were met with the same absence of any offer

for permanent modification.

54.     The named Plaintiff will fairly and adequately represent the interests of the Class

and Subclass.  Plaintiff is committed to the vigorous prosecution of the Class's and Subclass's

claims and has retained attorneys who are qualified to pursue this litigation and have experience

in class actions.

55.     A class action is superior to other methods for the fast and efficient adjudication

of this controversy.  A class action regarding the issues in this case does not create any problems

of manageability.

56.     This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2)

and Fed. R. Civ. P. 23(b)(3).

57.     Defendant has acted or refused to act on grounds that apply generally to the Class

and Subclass so that final injunctive relief or corresponding declaratory relief is appropriate with

respect to the Class and Subclass as a whole.

**COUNT I**
**Breach of Contract**
(on behalf of the Nationwide Class)

58.     Plaintiff repeats and re-alleges the allegations in paragraphs 1-57 above as if set

forth herein in full.

59.     Plaintiff brings this claim on her own behalf and on behalf of each member of the

Nationwide Class described above.

*Contract Formation: Offer and Acceptance*

60.     As described above, the TPP Agreement executed by Defendant and Plaintiff

constitutes a valid contract. (*See* Ex. A.)

61.     Wells Fargo's sending of the TPP Agreement to Plaintiff was an offer, and

Plaintiff accepted this offer by executing the TPP Agreement and sending it back to Wells Fargo

along with any outstanding necessary documentation to verify her eligibility.

62.     In the alternative, Wells Fargo's sending of the TPP Agreement to Plaintiff was

an invitation to deal. Plaintiff's execution of the TPP Agreement and sending to Defendant any

outstanding necessary documentation to verify her eligibility constituted an offer. Defendant

accepted the offer by verifying her eligibility, determining she qualified for HAMP, and sending

her an executed copy of the TPP Agreement on June 4, 2009 along with a letter congratulating

her on her entry into the program. (*See* Ex. C.)

*Contract Formation: Consideration*

63.     The TPP Agreement is supported by consideration in the form of an exchange of

mutual promises. Wigod promised to keep her information current and to make the temporary

payments on time. In exchange, Wells Fargo promised to send Plaintiff a permanent

modification agreement for her signature in exchange for her completion of the TPP Agreement.

64.     In addition or in the alternative, the TPP Agreement is supported by further

consideration in the form of each party foregoing legal obligations and rights. Plaintiff forewent

alternative avenues she could have pursued including, by way of example, bankruptcy or listing

the property. Wells Fargo agreed to forego foreclosure proceedings and late fees. Both sides benefited from the exchange in that Plaintiff was presented with an opportunity to save her home and Wells Fargo enjoyed the ability to keep customers, receive incentive payments from the government for performing the modification, and avoid or mitigate the costs and risks associated with foreclosure.

65.     In the alternative, and explained in Count II and as incorporated fully herein, Plaintiff's justifiable reliance serves as a substitute for any lack of consideration.

*Plaintiff's Performance*

66.     Plaintiff and the Class members made their temporary trial payments and otherwise complied with the TPP Agreements by making and continuing to make their required payments, keeping all information and representations true and accurate in all material respects, and by taking all such other steps necessary under their respective TPP Agreements.

*Express Contract Terms*

67.     The TPP Agreement provided that "TIME IS OF THE ESSENCE under this Plan." (*See* Ex. A, ¶ 2.)

68.     The TPP Agreement also provided that if Plaintiff and the Class members made their payments, and otherwise complied with the terms of their TPP Agreements, then "the lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary or reflect this new payment amount and waive any unpaid late charges accrued to date." (*See* Ex. A, ¶ 3.)

*Defendant's Breach of Express Terms*

69.     Rather than treat the timing of its performance under the TPP Agreement as being "OF THE ESSENCE", Defendant intentionally and systematically delayed converting TPP

Agreements into permanent modifications by falsely claiming it lacked and repeatedly requesting documents and information already in its possession, improperly re-evaluating Plaintiff's eligibility, using incorrect inputs and miscalculating the "waterfall" and other factors for determining HAMP eligibility, failing to implement adequate procedures and systems to respond to inquiries and complaints, and by otherwise dragging out and delaying its extension of offers for permanent loan modification.

70.     Rather than extending offers for permanent modification to Plaintiff and the Class members, Defendant, improperly and without justification, ultimately decided to treat the TPP Agreements as if they were null and void, ultimately threatening foreclosure.

*Implied Contract Terms*

71.     Insofar as Wells Fargo did not breach an express term of the TPP Agreement, Wells Fargo breach an implied term that required Wells Fargo to extend the offers for permanent modification within a reasonable period of time following Plaintiff's and the Class members' performance under the TPP Agreements.

72.     The TPP Agreement, like all contracts entered into in Illinois, contained an implied duty of good faith and fair dealing.  Insofar as the TPP Agreement placed discretion and broad authority in Wells Fargo to determine HAMP eligibility and to administer the HAMP modification program, Wells Fargo had a duty to perform consistent with its duty of good faith and fair dealing.

*Defendant's Breach of Implied Terms*

73.     The Defendant routinely and regularly breached these implied duties by:

a.      failing to perform loan servicing functions consistent with its responsibilities to Plaintiff and high professional standards of care;

b.      failing to properly supervise its agents and employees including, without

17

limitation, its loss mitigation and collection personnel and its foreclosure attorneys or otherwise use individuals with suitable training, education, experience and skills to perform loan servicing functions;

c.     routinely demanding information already in its files and otherwise filing to implement an appropriate and functioning document management system;

d.     providing false justifications for refusing to extend offers for permanent modification;

e.     systematically making inaccurate calculations and determinations of Plaintiff's and the Class members' eligibility for HAMP;

f.     unreasonably delaying the extension of offers for permanent modifications to borrowers who perform fully and faithfully under their TPP Agreements as described in Paragraph 70, above; and

g.     acting in a manner that otherwise constitutes an abuse of discretion or authority under the TPP Agreement or taking such other steps to frustrate Plaintiff's ability to receive the benefit of her bargain under the TPP Agreement.

*Causation and Damages*

74.     As an actual and proximate result of Wells Fargo's breaches of these express and implied contractual terms described herein, Plaintiff and the Class members have suffered harm and are threatened with additional harm. Plaintiff and the Class members have been damaged insofar as they have been improperly denied offers for permanent loan modifications, which they stand ready, willing and able to accept.

75.     Plaintiff and the Class members have further been damaged in the form of lost time and opportunity costs. By entering into the TPP Agreement and making her payments both during and after the trial period, Plaintiff spent monies on a plan that could have gone towards other potential remedies that she might otherwise have pursued to save her home. Plaintiff also lost the opportunity to restructure her debt under the bankruptcy code, sell her home on favorable terms, pursue refinancing with other lenders, or take other steps to address her financial hardship and threatened loss of her home.

76.     On information and belief, some putative Class members have suffered additional harm and expense in the form of defending foreclosures of their homes when, in reality, they should have been extended offers for permanent modifications of their mortgage loans and several months into their modified permanent payment plans.

**COUNT II**
**Promissory Estoppel, In the Alternative to Count I**
(on behalf of the Nationwide Class)

77.     Plaintiff repeats and re-alleges the allegations of paragraphs 1-57 above as if set forth herein in full.

78.     Plaintiff brings this claim on her own behalf and on behalf of each member of the Nationwide Class described above.

79.     Defendant, by way of its TPP Agreements, unambiguously promised to Plaintiff that if she executed and returned the TPP Agreement to Wells Fargo along with supporting documentation, and made her TPP payments, she would receive an offer for permanent modification in the form of a permanent modification agreement for her signature.

80.     Defendant's promise was intended to induce Plaintiff to rely on it and make monthly TPP payments and otherwise perform.

81.     Plaintiff indeed relied on Defendant's promise by submitting TPP payments and all necessary documentation and otherwise fully performing under the TPP Agreement.

82.     Given the language in the TPP Agreement, Plaintiff's reliance was reasonable.

83.     Plaintiff's reliance was to her detriment.  Plaintiff has yet to receive a permanent modification agreement for her signature or any other offer for permanent modification, has lost the value of the TPP payments, and has lost the opportunity to fund other strategies to deal with her default and avoid foreclosure.

## COUNT III
### Breach of Servicer Participation Agreement as
### Intended Third-Party Beneficiary
(on behalf of the Nationwide Class)

84.     Plaintiff repeats and re-alleges the allegations of paragraphs 1-83 above as if set forth herein in full.

85.     Plaintiff and the Class members were intended, as opposed to incidental, beneficiaries of the SPA between Wells Fargo and Fannie Mae.  The SPA was entered into for their direct benefit.  (*See* Ex. B.)

86.     The SPA and the directives it incorporates require Wells Fargo to offer permanent modifications for mortgages held by eligible borrowers such as Plaintiff and the Class members upon successful completion of the TPP Agreement.  The Directives expressly provide that "If the borrower complies with the terms and conditions of the Trial Period Plan, the loan modification will become effective on the first day of the month following the trial period as specified in the Trial Period Plan."  HAMP Supplemental Directive 09-01, at 18 (effective April 6, 2009).

87.     Under applicable guidelines in effect when Plaintiff was to be considered for HAMP eligibility, Plaintiff was at all times eligible for HAMP and Wells Fargo would have concluded the same had Wells Fargo properly performed the waterfall and other applicable calculations as provided for under applicable program directives.

88.     As represented by Wells Fargo, Fannie Mae was the investor on Plaintiff's mortgage.  Accordingly, during all times relevant, Wells Fargo was neither authorized nor required to run a net present value ("NPV") test on Plaintiff's property to determine her eligibility for participation in the HAMP program.

89.     In the alternative, Wells Fargo misrepresented the investor on Plaintiff's mortgage and the investor was not Fannie Mae.  On information and belief, had Wells Fargo been required

to run an NPV test, and had Wells Fargo accurately and properly done so, Wells Fargo would have determined that the NPV was "positive" under the applicable guidelines. Accordingly, Wells Fargo would have been required to offer Plaintiff a permanent modification upon her successful completion of the TPP Agreement.

90. Wells Fargo breached the SPA by failing to offer permanent modification agreements to Plaintiff and other eligible borrowers, by failing: (i) to exercise a high professional standards of care, and degree of attention used in a well managed operation, (ii) to use qualified individuals with suitable training, education, experience, and skills, (iii) to maintain appropriate document management system, (iv) to institute systems and procedures for the handling and processing of customer inquiries and complaints, and (v) to offer permanent modifications to borrowers in accordance with the HAMP.

91. As an actual and proximate result of Wells Fargo's breaches of the SPA, Plaintiff and the Class members have suffered damages in the form described in paragraphs 74-76 above.

**COUNT IV**
**Negligent Hiring and Supervision**
(on behalf of the Nationwide Class)

92. Plaintiff repeats and re-alleges the allegations of paragraphs 1-91 above as if set forth herein in full.

*Negligent Hiring*

93. Rather than hire employees with suitable training, education, experience, and skills to determine HAMP eligibility and perform other loan modification services, Wells Fargo routinely hired temporary workers and other persons who lacked such training, education, and experience. Furthermore, on information and belief, Wells Fargo routinely replaced employees with experience and training with employees who lacked such skills.

94.     Wells Fargo further failed to train new employees, often providing mere days of training as to how to perform relatively complex calculations and use unfamiliar computer programs designed to compute and determine the HAMP eligibility.

95.     Based on these failures, Wells Fargo knew or should have known that its loan modification employees had a particular unfitness for the position so as to create a danger of harm to third persons such as Plaintiff and the Class members insofar as such employees would provide false information to borrowers, would improperly perform calculations under the HAMP directives to determine eligibility, and would fail to properly use the software and computer programs Wells Fargo employed to assist in the determination of eligibility.

96.     Such particular unfitness was known or should have been known to Wells Fargo at the time of the employees' hiring or retention. On information and belief, Wells Fargo preferred to utilize employees that lacked the requisite education, experience, and training so that borrowers would become too frustrated to pursue their modifications and to correct Wells Fargo's numerous errors. The result was that Wells Fargo was able to collect additional monies prior to instituting foreclosure proceedings from borrowers who otherwise would not have paid such monies.

97.     Wells Fargo's hiring and employment of particularly ill-suited employees directly and proximately caused Plaintiff and the Class members to suffer damages in the form of being wrongfully denied offers for permanent modifications for which they were actually eligible.

*Negligent Supervision*

98.     As described above, Wells Fargo knew or should have known that its employees had a particular unfitness for acting as loan modification servicers so as to create a danger of harm to third persons such as Plaintiff and the Class members.

22

99.     Wells Fargo failed to safeguard Plaintiff against this particular unfitness—to the contrary, it fostered and encouraged it.  On information and belief, Wells Fargo instituted a "one call resolution" policy designed to ensure that borrowers only spoke to a particular customer service representative on one occasion, and never to the same representative twice.  This would ensure that borrowers would have to constantly "start over" each time the customer called Wells Fargo to check on the status of their modification because the representative had no familiarity with the progress or status of the borrower's application.

100.     Likewise, on information and belief, when Wells Fargo reviewed employees for bonuses, raises, and other employee compensation, Wells Fargo would consider "drop time," or the average length of time it took a customer service representative to get a complaining or inquiring borrower off of the telephone.  The shorter the "drop time," the more compensation the employee would receive or become eligible for.

101.     As a result of these incentives and policies, Wells Fargo ensured that aggrieved borrowers would become too frustrated to pursue their modifications, complain, or otherwise protest Wells Fargo's decisions—no matter how erroneous.

102.     Wells Fargo's failure to safeguard its HAMP-eligible borrowers from these practices actually and proximately caused Plaintiff and Class members to suffer damages by being wrongfully denied offers for permanent modification and by being stripped of their ability to contest Wells Fargo's improper determinations and miscalculations without the assistance of counsel.

### COUNT V
### Fraudulent Misrepresentation/Concealment
(on behalf of the Nationwide Class)

103.     Plaintiff repeats and re-alleges the allegations of paragraphs 1-102 above as if set

forth herein in full.

*Misrepresentation*

104.     In its TPP Agreement that it signed and sent to Plaintiff on June 4, 2009, Defendant intentionally misrepresented to Plaintiff that:  "If [plaintiff] compl[ied] with the requirements in Section 2 and [her] representations in Section 1 continue[d] to be true in all material respects," that Defendant would send her "a Modification Agreement for [her] signature which w[ould] modify [her] Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date." (*See* Ex. C.)

105.     Defendant knew this representation was false at the time it sent the TPP Agreement to Plaintiff.  Defendant had absolutely no intention to modify Plaintiff's mortgage. This statement was also material insofar as Plaintiff would not have entered into the TPP Agreement or otherwise wasted time attempting to comply with its terms had she known Defendant had no intention to offer her a permanent modification.

106.     Defendant made this false representation to induce Plaintiff to enter into the TPP Agreement and make the temporary payments.

107.     Plaintiff reasonably relied on Defendant's false representations by entering into and complying with the terms of the TPP Agreement.

108.     Plaintiff's reliance on this false statement actually and proximately caused her to suffer damages in that she never received a permanent modification of her mortgage loan, she paid TPP payments using money that could have been used to pursue other avenues of relief, lost time, and she lost the opportunity to pursue other avenues for saving her home and credit.

*Concealment I – Failure to Disclose Participation Renders Borrower in Default*

109.     At the time the TPP Agreement was entered into, Plaintiff was not in default or

otherwise behind in her payments under the original mortgage agreement or note on her property.  Defendant considered and, on information and belief has reported Plaintiff as being in default for not having made her full mortgage payments during the time she was performing under the TPP Agreement.

110.     Defendant intentionally never disclosed to Plaintiff that by her entering into and complying with the TPP Agreement, Defendant would consider and report her as being in default on her mortgage, in direct violation of the applicable directives.  Defendant should have disclosed this material fact to her at the time she entered into and began performing under the TPP Agreement.  Had Plaintiff known Defendant would consider her as having been in default by virtue of her participation in HAMP, Plaintiff would have pursued other available options for saving her home.

111.     Defendant concealed this material fact so as to induce Plaintiff to enter into the TPP Agreement and make the temporary payments.

112.     Plaintiff reasonably relied on Defendant's concealment by entering into and complying with the terms of the TPP Agreement.

113.     Plaintiff's reliance on this concealment has actually and proximately caused her to suffer damages in that she never received a permanent modification of her mortgage loan, she made TPP payments using money that could have been used to pursue other avenues of relief, lost time, damage to her credit, and she lost the opportunity to pursue other avenues for saving her home and credit.

*Concealment II – Failure to Disclose Potential for Reconsideration*

114.     At the time Plaintiff entered into the TPP Agreement, Defendant intentionally failed to disclose that it would fail to adhere to applicable HAMP guidelines and directives and

would, in contravention of those directives, re-evaluate the Plaintiff's eligibility using different standards and calculations than those required under the directives.

115.    Defendant concealed this fact with the intention of inducing Plaintiff to enter into the TPP Agreement and to make the temporary payments.

116.    Plaintiff would not have entered into the TPP Agreement or made the temporary payments had Defendant disclosed its true intentions to re-evaluate her using improper standards and calculations.

117.    Plaintiff reasonably relied on the Defendant's silence to her detriment by entering into the TPP Agreement and complying with its provisions, including making the temporary payments.

118.    Plaintiff's reliance on this concealment has actually and proximately caused her to suffer damages including without limitation:  (a) Plaintiff never received a permanent modification agreement for her signature, (b) her credit score was negatively impacted, (c) her credit cards were either cancelled or the available credit was reduced, (d) she made TPP payments using money that could have been used to pursue other avenues of relief, lost time, and she lost the opportunity to pursue other avenues for saving her home and credit.

**COUNT VI**
**Negligent Misrepresentation/Concealment**
**In the Alternative to Count V**
(on behalf of the Nationwide Class)

119.    Plaintiff repeats and re-alleges the allegations of paragraphs 1-118 above as if set forth herein in full.

120.    In the alternative, Defendant's misrepresentations and concealments described in Count V were made or concealed carelessly or negligently, without a reasonable basis for believing them to be true.

121. Given the circumstances of the loan modification process, Defendant had a duty to communicate accurate information to Plaintiff, which it failed to do.

122. As described above, these false statements and concealments of material fact actually and proximately caused Plaintiff to suffer damages in that she never received a permanent modification agreement for her signature or any other offer for permanent modification, she made TPP payments using money that could have been used to pursue other avenues of relief, lost time, damage to her credit, and she lost the opportunity to pursue other avenues for saving her home and credit.

**COUNT VII**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**("Consumer Fraud Act") 815 ILCS 505/1 *et seq*.**
(on behalf of the Illinois Subclass)

123. Plaintiff repeats and re-alleges the allegations of paragraphs 1-122 above as if set forth herein in full.

*Fraudulent Conduct*

124. Plaintiff expressly repeats and re-alleges the allegations of paragraphs 103-118 above as if set forth herein in full. Defendant's intentional misrepresentation and concealment of material facts constitute prohibited fraudulent conduct under the Illinois Consumer Fraud Act.

125. Plaintiff has suffered actual damages as an actual and proximate result of the Defendant's intentional misrepresentation and concealment of material facts in that she never received a permanent modification agreement for her signature or any other offer for permanent modification, she made TPP payments using money that could have been used to pursue other avenues of relief, lost time, and she lost the opportunity to pursue other avenues for saving her home and credit.

*Unfair, Immoral and Unscrupulous Practices*

126.    Defendant's conduct as described throughout this Amended Complaint constitutes unfair, immoral and unscrupulous business practices that harmed not only Plaintiff and the Class and Subclass members, but the general public as well.  Defendant's immoral and unscrupulous practices, which were implemented so as to extract as much money as possible from borrowers Defendant identified as being at risk for default prior to foreclosure, included but were not limited to:

a.    Defendant knowingly designed and maintained a loan modification system that was riddled with flaws and intentionally staffed with employees who lacked the training, experience, education or skill to accurately perform their obligations.

b.    Defendant incentivized its employees to rush customers off of the telephone as quickly as possible so as to frustrate customers, the intended result being that instead of complaining, the customers would give up and accept Wells Fargo's faulty eligibility determinations.  Defendant also ensured further frustration by implementing a "one call resolution" policy under which customers would never speak to the same service representative twice.

c.    With respect to former Wachovia Bank customers in particular, Wells Fargo routinely lost their loan documents, modification papers, and other necessary materials to evaluate eligibility and routinely rejected these customers' completely performed TPP Agreements on false and incorrect grounds.

d.    Defendant routinely required borrowers to submit and re-submit documents and financial information already in its possession claiming that it would not review a borrower for an eligibility until and unless these documents are submitted time

and again.

e.     Defendant routinely and systematically made incorrect calculations and determinations at improper times during the modification process, falsely claimed that it was permitted to do so under applicable directives and that it was unable to achieve target income to payment ratios, and routinely provided customers with other false, pre-textual reasons for refusing to extend eligible borrowers their offers for permanent modification.

f.     While continuing to accept Class members' modified mortgage payments, Defendant sends Class members monthly letters threatening the borrowers with foreclosure if the entire balance due is not paid within 30 days, while these borrowers in fact should have received offers for permanent modification.

g.     Defendant routinely provided false information regarding its processes and standards, refused to put statements in writing when asked,

h.     Defendant routinely conducted its loan modification processes and delayed processing modifications on the false premise that it could not perform the required calculations unless the documents in its possession were no greater than 30 days old, when in reality the applicable directives allow Defendant to consider documents older than 30 days.

i.     Engaged in other conduct designed to extract money from "at risk" borrowers as opposed to actually helping such borrowers – who were at all times HAMP eligible – achieve modified loan terms.

127.     Defendant's conduct described herein actually and proximately caused Plaintiff and the Class members to suffer damages as described throughout this Amended Complaint.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

A.    Certify this case as a class action and appoint named Plaintiff to be Class representative and her counsel to be Class counsel;

B.    Award Plaintiff and the Class members actual and compensatory damages for breach of contract and breach of the implied covenant of good faith and fair dealing in an amount to be determined at trial;

C.    Award actual and compensatory damages and order other equitable relief as justice requires, including requiring Defendant to extend Plaintiff and the Class members offers for permanent loan modifications on the theory of promissory estoppel;

D.    Award Plaintiff and the Class members actual and compensatory damages for Wells Fargo's breach of its Servicer Participation Agreement on the theory that Plaintiff was an intended third-party beneficiary;

E.    Award actual and compensatory damages caused to Plaintiff and the Class members by Defendant's negligent hiring and supervision of its employees in an amount to be determined at trial, punitive damages to punish the Defendant and deter such conduct in the future, as well as attorneys fees and costs; grant a permanent injunction enjoining Defendant's agents and employees from continuing to harm Plaintiff and the Class members, and enter an Order requiring Defendant to adopt and enforce a policy that requires appropriate training and supervision of its employees and agents regarding their duties and obligations with respect to effectuating the loan modifications under the HAMP;

F.    Award actual, compensatory, and punitive damages for Defendant's fraudulent and/or negligent misrepresentations and/or concealment of material fact, as well as interest, and attorneys' fees and costs in the amount to be determined at trial;

G.       Enter an Order preliminarily and permanently enjoining Wells Fargo's fraudulent, unlawful and unfair business practices as alleged herein, requiring Defendant to extend Plaintiff and the Class members permanent modifications of their loans as required by the HAMP, and award actual, compensatory and punitive damages for Defendant's violations of the Illinois Consumer Fraud Act, along with interest and attorneys' fees and costs;

H.       Order specific performance of Defendant's contractual obligations together with other relief required by contract, equity and law;

I.       Award actual and punitive damages to the Plaintiff and the Class and Subclass;

J.       Award Plaintiff the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees;

K.       Enter an Order preliminarily and permanently enjoining Defendant from initiating or proceeding with any foreclosure proceeding without first fairly and accurately determining whether the borrower named in the foreclosure proceeding is eligible for a HAMP or other modification; and

L.       Grant Plaintiff and the Class and Subclass such other and further relief as this Court finds necessary and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: June 23, 2010

By: /s/ Irina Slavina
One of Plaintiff's attorneys

Jay Edelson
Steven Lezell
Rafey Balabanian
Irina Slavina
Edelson McGuire, LLC
350 N. LaSalle Ave
Suite 1300
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378

## CERTIFICATE OF SERVICE

I, Irina Slavina, hereby certify that on June 23, 2010, I electronically filed the foregoing

*Plaintiff's First Amended Class Action Complaint* with the Clerk of the Court using the CM/ECF

system. Notice of this filing is sent to the following parties by operation of the Court's electronic

filing system:

**Irene C. Freidel**
**David D. Christensen**
**Kristin Ann Davis**
Kirkpatrick & Lockhart Preston Gates Ellis LLP.
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Phone: (617) 261-3100
Fax: 617-261-3175
irene.freidel@klgates.com
david.christensen@klgates.com
kristin.davis@klgates.com

**Jessica Ann Baer**
**Michael Joseph Hayes**
K&L Gates
70 W. Madison, Suite 3100
Chicago, IL 60602
(312) 807-4396
jessica.baer@klgates.com
michael.hayes@klgates.com

/s/ Irina Slavina_____