# EXHIBIT F

# Home Affordable Modification Program Guidelines
## March 4, 2009

*Trial loan modifications consistent with these Guidelines may be offered to homeowners beginning on this date, March 4, 2009, and may be considered for acceptance into the Home Affordable Modification Program upon completion of the trial period and other conditions. These Guidelines, however, do not constitute a contract offer binding on the Department of the Treasury.*

## Program Elements Described in the Guidelines

| | |
|---|---|
| **Monthly Payment Reduction Cost Share:** | Treasury will partner with financial institutions to reduce homeowners' monthly mortgage payments. The lender will have to first reduce payments on mortgages to no greater than 38% Front-End Debt-to-Income (DTI) ratio. Treasury will match further reductions in monthly payments dollar-for-dollar with the lender/investor, down to a 31% Front-End DTI ratio for the borrower. |
| **Servicer Incentive Payments and Pay for Success Fees:** | Servicers will receive an up-front Servicer Incentive Payment of $1,000 for each eligible modification meeting guidelines established under this initiative. Servicers will also receive Pay for Success payments –as long as the borrower stays in the program – of up to $1,000 each year for up to three years. <br><br> Similar incentives will be paid for Hope for Homeowner refinances. |
| **Borrower Pay-for-Performance Success Payments:** | Borrowers are eligible to receive a Pay-for-Performance Success Payment that goes straight towards reducing the principal balance on the mortgage loan as long as the borrower is current on his or her monthly payments. Borrowers can receive up to $1,000 of Pay-for-Performance Success Payments each year for up to five years. |
| **Current Borrower One-Time Bonus Incentive:** | One-time bonus incentive payments of $1,500 to lender/investors and $500 to servicers will be provided for modifications made while a borrower is still current on mortgage payments. The servicer will be required to maintain records and documentation evidencing that the Trial Period payment arrangements were agreed to while the borrower was less than 30 days delinquent. The servicer must comply with any express pooling and servicing contractual restrictions for modifying current loans. |

1

| Program Payment Conditions | No payments under the program to the lender/investor, servicer, or borrower will be made unless and until the servicer has entered into the program agreements with Treasury's financial agent. Servicers must enter into the program agreements with Treasury's financial agent no later than December 31, 2009. |
|---|---|

## Eligibility Requirements

| Pooling and Servicing Agreements: | The program guidelines reflect usual and customary industry standards for mortgage loan modifications contained in typical servicing agreements, including pooling and servicing agreements (PSAs) governing private label securitizations. Participating servicers are required to consider all eligible loans under the program guidelines unless prohibited by the rules of the applicable PSA and/or other investor servicing agreements. Participating servicers are required to use reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties. |
|---|---|
| Origination Date of Loan Subject to Modification: | The mortgage to be modified must have been originated on or before January 1, 2009. |
| Program Expiration: | New borrowers will be accepted until December 31, 2012. Program payments will be made for up to five years after the date of entry into a Home Affordable Modification. Monitoring will continue through the life of the program. |
| Qualification Terms: | • The home must be an owner occupied, single family 1-4 unit property (including condominium, cooperative, and manufactured home affixed to a foundation and treated as real property under state law).<br>• The home must be a primary residence (verified with tax return, credit report, and other documentation such as a utility bill).<br>• The home may not be investor-owned.<br>• The home may not be vacant or condemned.<br>• Borrowers in bankruptcy are not automatically eliminated from consideration for a modification.<br>• Borrowers in active litigation regarding the mortgage loan can qualify for a modification without waiving their legal rights.<br>• First lien loans must have an unpaid principal balance (prior to capitalization of arrearages) equal to or less than:<br>  o 1 Unit: $729,750<br>  o 2 Units: $934,200 |

2

| | |
|---|---|
| | o  3 Units: $1,129,250<br>o  4 Units: $1,403,400 |
| **In Foreclosure Process:** | Any foreclosure action will be temporarily suspended during the trial period, or while borrowers are considered for alternative foreclosure prevention options.  In the event that the Home Affordable Modification or alternative foreclosure prevention options fail, the foreclosure action may be resumed. |
| **Current LTV:** | There is no minimum or maximum LTV ratio for eligibility purposes. |
| **Loan Type Exclusions:** | Loans can only be modified under the Home Affordable Modification program once. |
| **Subordinate Financing:** | Subordinate liens are not included in the Front-End DTI calculation, but they are included in the Back-End DTI calculation. |
| **Solicitation to Borrowers/ Incoming Inquiries:** | Servicers should follow any existing express contractual restrictions with respect to solicitation of borrowers for modifications. |

**Underwriting Analysis**

| | |
|---|---|
| **Front-End DTI Target:** | Front-End DTI is the ratio of PITIA to Monthly Gross Income.  PITIA is defined as principal, interest, taxes, insurance (including homeowners insurance and hazard and flood insurance) and homeowners association and/or condominium fees.  Mortgage insurance premiums are excluded from the PITIA calculation.<br><br>The Front-End DTI Target is 31%.  The Standard Waterfall step that results in a Front-End DTI closest to 31%, without going below 31%, will satisfy the Front-End DTI Target.  There is no restriction on reducing Front-End DTI below 31%, but any portion of the reduction below 31% will not be covered by the Payment Reduction Cost Share. |
| **Property Value:** | The servicer may use, at its discretion, either one of the government sponsored enterprises (GSEs) automated valuation model (AVM) – provided that the AVM renders a reliable confidence score – or a broker price opinion (BPO). |

| | |
|---|---|
| | As an alternative, the servicer may rely on the AVM it uses internally provided that (i) the servicer is subject to supervision by a Federal regulatory agency, (ii) the servicer's primary Federal regulatory agency has reviewed the model and/or its validation and (iii) the AVM renders a reliable confidence score.<br><br>If the GSE or servicer AVM is unable to render a value with a reliable confidence score, the servicer must obtain an assessment of the property value utilizing a property valuation method acceptable to the servicer's Federal regulatory agency, *e.g.* in accordance with the Interagency Appraisal and Evaluation Guidelines (as though such guidelines apply to loan modifications), or a BPO.<br><br>In all cases, the property valuation may not be more than 60 days old. |
| **Income and Asset Validation:** | The borrower's income will be verified by requiring a signed Form 4506-T (Request for Transcript of Tax Return) and obtaining the most recent tax return on file for each borrower on the note. For wage earners, the two most recent pay stubs for each wage earner on the note will also be required. For self-employed borrowers or for non-wage income, the borrower's income will be verified by obtaining other third party documents that provide reasonably reliable evidence of income.<br><br>Borrowers must also represent and warrant that they do not have sufficient liquid assets to make their monthly mortgage payments. |
| **Monthly Gross Income:** | The borrower's Monthly Gross Income is the amount before any payroll deductions includes wages and salaries, overtime pay, commissions, fees, tips, bonuses, housing allowances, other compensation for personal services, Social Security payment, including Social Security received by adults on behalf of minors or by minors intended for their own support, annuities, insurance polices, retirement funds, pensions, disability or death benefits, unemployment benefits, rental income and other income.<br><br>Monthly net income can be used for preliminary screening and qualification. If used, the servicer will need to multiply net income by 1.25 to get to an estimate of Monthly Gross Income. |
| **Back-End DTI:** | The Back-End DTI is the ratio of the borrower's total monthly debt payments (such as Front-End PITIA, any mortgage insurance premiums, payments on all installment debts, monthly payments on all junior liens, alimony, car lease payments, aggregate negative net rental income from |

| | |
|---|---|
| | all investment properties owned, and monthly mortgage payments for second homes) to the borrower's Monthly Gross Income. The servicer must validate monthly installment, revolving debt and secondary mortgage debt by pulling a credit report for each borrower or a joint report for a married couple. The servicer must also consider information obtained from the borrower orally or in writing concerning incremental monthly obligations.<br><br>Borrowers who otherwise qualify for a modification under this program, but who would have a post-modification Back-End DTI greater than or equal to 55%, will be provided with a letter stating that they are required to work with a HUD-approved counselor and the modification will not take effect until they provide a signed statement indicating that they will obtain counseling. |
| **Reasonably Foreseeable / Imminent Default:** | Every potentially eligible borrower who calls or writes in to their servicer in reference to a modification must be screened for hardship. This screen must ascertain whether the borrower has had a change in circumstances that causes financial hardship, or is facing a recent or imminent increase in the payment that is likely to create a financial hardship (payment shock). If the borrower reports a material change in circumstances, the servicer must ask about current income and assets, and current expenses as well as the specific circumstances relating to the claimed financial hardship. Each of these elements shall be verified through documentation.<br><br>If the servicer determines that a non-defaulted borrower facing a financial hardship is in Imminent Default and will be unable to make his or her mortgage payment in the immediate future, the servicer must apply the NPV Test. |
| **Required Modifications and Optional Modifications:** | A standard NPV Test will be required on each loan that is in Imminent Default or is at least 60 days delinquent under the MBA delinquency calculation. This NPV Test will compare the net present value (NPV) of cash flows expected from a modification to the net present value of cash flows expected in the absence of modification. If the NPV of the modification scenario is greater, the NPV result is deemed positive.<br><br>The NPV Test applies to the Standard Waterfall only and does not require consideration of principal forgiveness. However, the servicer may choose to forgive principal if the servicer determines that principal forgiveness improves the likelihood of loan performance and the value of modification. Required parameters for the NPV Test will be published separately. |

| | If the NPV Test generates a positive result when applying the Standard Waterfall, the servicer is required to offer a Home Affordable Modification to the borrower. If the NPV Test generates a negative result, modification is optional, unless prohibited under contract. The monthly payment reduction incentive is available for any Home Affordable Modification, whether or not NPV positive, that meets the eligibility requirements and is performed according to the waterfall described below.<br><br>If the NPV Test result is negative and a Home Affordable Modification is not pursued, the lender/investor must seek other foreclosure prevention alternatives, including alternative modification programs, deed-in-lieu and short sale programs. |
|---|---|

## **Loan Modification and Standard Waterfall**

| | |
|---|---|
| **Overview:** | Servicers will follow the Standard Waterfall described below to reduce monthly payments to the 31% Front-End DTI Target defined above. The initiative will reimburse lenders/investors for one half of the cost of reducing monthly payments from a level consistent with a 38% Front-End DTI Ratio (or less, if the unmodified DTI is less than 38%) down to a level consistent with a 31% Front-End DTI Ratio. This Payment Reduction Cost Share can last for up to five years. |
| **Hope for Homeowners:** | Servicers will be required to consider a borrower for refinancing into the Hope for Homeowners program when feasible. Servicer incentive payments will be paid for Hope for Homeowner refinances.<br><br>If the underwriting process for a Hope for Homeowners refinance would delay eligible borrowers from receiving a modification offer, servicers will use the Standard Waterfall to begin the Home Affordability Modification and work to complete the Hope for Homeowners refinance during the Trial Modification Period.<br><br>Consideration for a Hope for Homeowners refinance should not delay eligible borrowers from receiving a modification offer and beginning the Trial Modification Period. |
| **Standard Waterfall Process:** | Step 1a: Request Monthly Gross Income as specified above.<br><br>Step 1b: Validate total first lien debt and monthly payments (PITIA). For |

6

purposes of making a provisional modification offer during the trial modification period, the borrower's unverified income and debt payments can be used. Provisional information and modification terms will be verified in a timely manner.

Step 2: Capitalize arrearage. Servicers may capitalize accrued interest, past due real estate taxes and insurance premiums, delinquency charges paid to third parties in the ordinary course of servicing and not retained by the servicer, any required escrow advances already paid by the servicer and any required escrow advances by the servicer that are currently due and will be paid by the servicer during the Trial Period. Late fees are not capitalized.

Step 3: Target a Front-End DTI of 31%. The lender/investor shall follow steps 4, 5, and 6 to reduce the borrower's payment to the level corresponding to the Front-End DTI Target.

Step 4: Reduce the interest rate to reach the Front-End DTI Target (subject to a floor of 2%). The note rate should be reduced in increments of 0.125 %, and should bring the monthly payment as close as possible to the Front-End DTI Target without going below 31%. If the resulting modified interest rate is at or above the Interest Rate Cap, this modified interest rate will be the new note rate for the remaining loan term. If the resulting modified interest rate is below the Interest Rate Cap, this modified interest rate will be in effect for the first five years, followed by annual increases of 1% (100 basis points) per year or such lesser amount as may be needed until the interest rate reaches the Interest Rate Cap, at which time it will be fixed for the remaining loan term.

Step 5: If the Front-End DTI Target has not been reached, extend the term of the loan up to 40 years. If term extension is not permitted extend amortization. The 40-year term begins at the start of the modification (after the borrower successfully completes the Trial Period). Note that the servicer should only extend to a term that is necessary to reach the Front-End DTI Target; there is no requirement to extend to a 40-year term.

Step 6: If the Front-End DTI Target has not been reached, forbear principal. If there is a principal forbearance amount, a balloon payment of that forbearance amount is due on the maturity date, upon sale of the property, or upon payoff of the interest bearing balance. If the modification does not pass the NPV Test and the servicer chooses to modify the loan, the modified balance must be no lower than the current property value.

| Principal Reduction Option: | There is no requirement to use principal reduction under the Home Affordable Modification program; however, servicers may forgive principal to achieve the Front-End DTI Target. |
|---|---|
| | Principal forgiveness can be used on a standalone basis or before any step in the Standard Waterfall process. If principal forgiveness is used, subsequent steps in the Standard Waterfall may not be skipped. If principal is forgiven and the rate is not reduced, the rate will be frozen at its existing level and treated as a modified rate for the purposes of the Interest Rate Cap. |
| | In the event of principal forgiveness, the Payment Reduction Cost Share continues to be based on the change in the borrower's monthly payment from 38% to 31% Front-End DTI ratio and is limited to five years. |

## Modification Terms

| Interest Rate Floor: | The Interest Rate Floor for modified loans is 2%. |
|---|---|
| Interest Rate Cap: | The modified interest rate must remain in place for five years, after which time the interest rate will be gradually increased 1% (100 basis points) per year or such lesser amount as may be needed until it reaches the Interest Rate Cap. |
| | The Interest Rate Cap for the modified loan is the lesser of (i) the fully indexed and fully amortizing original contractual rate or (ii) the Freddie Mac Primary Mortgage Market Survey rate for 30-year fixed rate conforming mortgage loans, rounded to the nearest 0.125%, as of the date that the modification document is prepared. |
| | If the modified rate exceeds the Freddie Mac Primary Mortgage Market Survey rate in effect on the date the modification document is prepared, the modified rate will be the new note rate for the remaining loan term. |

| Principal Forbearance: | No interest will accrue on the forbearance amount.<br><br>If the option to forebear principal is selected, the servicer shall forbear on collecting the deferred portion of the Capitalized Balance until the earliest of (i) the maturity of the modified loan, (ii) a sale of the property, or (iii) a pay-off or refinancing of the loan. |
|---|---|
| Redefaulting Loans: | A loan will be considered to have redefaulted when the borrower reaches a 90-day delinquency status under the MBA delinquency calculation. Redefaulting Loans will be terminated from the program, and no further payments of any kind will be made to the lender/investor, servicer, or borrower.  Redefaulting Loans should be considered for other loss mitigation programs prior to being referred to foreclosure. |

## Approval Conditions

| Trial Period Required: | Successful completion of the trial modification period and entry into program agreements between the servicer and Treasury's financial agent are prerequisites for any payments to the lender/investor, servicer, or borrower.<br><br>Modification is effective the first calendar month following the successful completion of the Trial Period.  Successful completion means that the borrower is current (under the MBA delinquency calculation) at the end of the Trial Period.<br><br>Borrowers in foreclosure restart states will be considered to have failed the Trial Period if they are not current at the time the foreclosure sale is scheduled.<br><br>No payments under the program to the lender/investor, servicer, or borrower will be made during the Trial Period.  No payments under the program to the lender/investor, servicer, or borrower will be made if the Trial Period is not completed successfully.   No payments under the program to the lender/investor, servicer, or borrower will be made unless and until the servicer has entered into the program agreements with Treasury's financial agent. |
|---|---|
| Length of Trial Period: | The Trial Period will last 90 days (three payments at modified terms) or longer if necessary to comply with investor contractual obligations.  The |

|  | borrower must be current at the end of the Trial Period to obtain a Home Affordable Modification. |
|---|---|
| **Escrows:** | Servicers are required to escrow for modified borrowers' real estate taxes and mortgage-related insurance payments immediately if they have the capability of processing these payments or are already using a third-party vendor for this purpose. Servicers who do not have this capacity must implement an escrow process within six months of the program agreement. |
| **Counseling Requirements:** | For borrowers with a Back-End DTI of 55% or higher, the servicer must inform the borrower of the availability and advantages of counseling and provide a list of local HUD-approved counselors. The servicer must provide the borrower with a letter stating that counseling is a requirement of the modification terms. This letter may be required by counselors in order to begin counseling. The modification will not take effect until the borrower represents in writing that he or she will obtain counseling. |
| **Assumable:** | If the modified loan was assumable prior to modification, a Home Affordable Modification cancels this feature. |

**Fees/Charges**

| **Modification Fees and Charges to Borrower:** | There are no modification fees or charges borne by the borrower. |
|---|---|
| **Modification Fees and Charges Reimbursable by Investor:** | Modification fees and charges to the servicer will be reimbursable by the investor. These include notary fees, property valuation and other required fees. Servicer reimbursement by the investor will take place within the normal process between the servicer and the investor. |
| **Unpaid Late Fees Waived:** | Unpaid late fees will be waived for the borrower. These include late fees prior to the start of the Trial Period and accrued during the period. |
| **Credit Report:** | The servicer will cover the cost of the credit report. |

## Compensation

| Servicer Compensation: | Compensation is provided to the servicer that performs the loss mitigation or modification activities. Upon modification following successful completion of the Trial Period, and contingent on signing the program servicer agreement, the servicer will receive an incentive fee of $1,000 for each eligible modification meeting Home Affordable Modification guidelines. |
|---|---|
| | Servicers will also receive Pay for Success fees – payable 12 months from the effective date of the Trial Period as long as the borrower continues in the program – of up to $1,000 each year for three years. Servicers will no longer receive Pay for Success incentive payments for Redefaulting Loans or for loans that have paid off subject to certain *de minimis* constraints (discussed below). |
| | For loans modified while still current under the MBA delinquency calculation, the servicer will receive a Current Borrower One-Time Incentive of $500 following successful completion of the Trial Period. |
| | Lenders that service their own loans are eligible for these incentives. Throughout this document the term "servicer" means the party that is responsible for performing the modification activities. |
| | Similar incentives will be paid for Hope for Homeowner refinances. |
| **Borrower Cash Contribution:** | The investor may not require the borrower to contribute cash. |
| **Lender/Investor Compensation:** | Lenders/investors will be compensated only in the event that the Front-End DTI Target or a lower Front-End DTI is achieved. Lenders/investors will follow the Standard Waterfall specified above to reach a monthly payment that satisfies the Front-End DTI Target. As described above, Treasury will provide compensation based on one half of the dollar difference between the monthly payment for a 31% Front-End DTI Ratio and the lesser of (i) the monthly payment for a 38% Front-End DTI Ratio or (ii) the borrower's current monthly payment. This compensation will be provided for up to five years or until the loan is paid off. |
| | Upon a modification becoming effective following successful completion of the Trial Period by a borrower who was current prior to the start of the Trial Period, lenders/investors will be paid a $1,500 Current Borrower One-Time Incentive, subject to certain *de minimis* constraints (discussed below). |

11

| | |
|---|---|
| | No monthly lender/investor payments will be made during the Trial Period. Monthly lender/investor payments will begin after the Trial Period is successfully completed, the servicer signs a service agreement with Treasury, and formal modification begins. No monthly lender/investor payments will be made if the Trial Period is not completed successfully. |
| **Borrower Compensation:** | Borrowers will be eligible to accrue up to $1,000 each year in Pay-for-Performance Success Payments for up to five years, a total of up to $5,000 over five years, subject to certain *de minimis* constraints (discussed below). Accruals are based on on-time payment performance. The first annual principal balance reduction will be effective 12 months after entering the Trial Period as long as the borrower is not terminated from the program. In any given month, the borrower's mortgage payment must be made on time, accounting for standard servicer grace periods, in order to accrue the monthly Pay for Performance Success Payment. The borrower will receive information on a monthly basis regarding the accrual of these payments.

The payment will be directed to the servicer, who will reduce the principal balance by the payment amount (but not by more than $1,000 per year) for five years if the borrower continues in the program. Payments are to be applied directly and entirely to reduce the principal balance, and any applicable prepayment penalties on partial principal prepayment made by the government must be waived. The equivalent of three months of Pay-for-Performance Success Payments will be made upon successful completion of the Trial Period, contingent upon the servicer signing a service agreement with the Treasury.

Borrowers who are terminated from the program lose their right to outstanding accruals. |
| ***De Minimis* Constraint:** | To qualify for servicer Pay for Success payments and borrower Pay for Performance Success Payments, the modification must reduce the monthly payment by a minimum of 6 %. The monthly payment is the PITIA payment, as used in defining DTI, with the loan fully indexed and fully amortized.

When paid, servicer annual Pay for Success payments and borrower Pay for Performance Success Payments will be the lesser of (i) $1,000 or (ii) half the reduction in the borrower's annualized monthly payment.

The *de minimis* constraint does not apply to the up-front Servicer |

|  | Incentive Payment, the Payment Reduction Cost Share, or the Home Price Depreciation Reserve Payment. |
|---|---|

## Consumer Protection

| Disclosure | When promoting or describing loan modifications, servicers should provide borrowers with information designed to help them understand the modification terms that are being offered and the modification process. Servicers also must provide borrowers with clear and understandable written information about the material terms, costs, and risks of the modified mortgage loan in a timely manner to enable borrowers to make informed decisions. |
|---|---|
| Fair Lending | Servicers' modifications under this program must comply with the Equal Credit Opportunity Act and the Fair Housing Act, which prohibit discrimination on a prohibited basis in connection with mortgage transactions. Loan modification programs are subject to the fair lending laws, and servicers and lenders should ensure that they do not treat a borrower less favorably than other borrowers on grounds such as race, religion, national origin, sex, marital or familial status, age, handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit redlining. |
| Consumer Inquiries and Complaints | Servicers should have procedures and systems in place to be able to respond to inquiries and complaints relating to loan modifications. Servicers should ensure that such inquiries and complaints are provided fair consideration, and timely and appropriate responses and resolution. |

## Monitoring

| Documentation: | Servicers will be required to maintain records of key data points for verification/compliance reviews. These documents may include, but are not limited to, borrower eligibility and qualification, underwriting criteria, and incentive payments. These documents also include a hardship affidavit, which every borrower is required to execute.

Borrowers will be required to provide declarations under penalty of perjury attesting to the truth of the information that they have provided to the servicer to allow the servicer to determine the borrower's eligibility for entry into the Home Affordable Modification Program. |
|---|---|

13

| | |
|---|---|
| | Detailed guidance on data requirements will be released separately. |
| **Anti-Fraud Measures:** | Measures to prevent and detect fraud, such as documentation and audit requirements, will be described in the servicer guidelines and the program guidelines in the financial agency agreements with Fannie Mae and Freddie Mac. Additional fraud protection measures will be announced by Treasury.<br><br>Participating servicers and lenders/investors are not required to modify the loan if there is reasonable evidence indicating the borrower submitted false or misleading information or otherwise engaged in fraud in connection with the modification. Servicers should employ reasonable policies and/or procedures to identify fraud in the modification process. |
| **Data Collection:** | Servicers will be required to collect and transmit borrower and property data in order to ensure compliance with the program as well as to measure its effectiveness. Data elements may include data needed to perform underwriting analysis, loan modification and waterfall analysis, and modification terms. In addition, borrower profiles and property level information may be included. Detailed guidance on data requirements will be released separately. |
| **Accounting and Legal:** | The provisions of the Program should not be construed to override, void or in any way modify the responsibility of the management of lenders and servicers for preparing financial statements and regulatory reports in accordance with all applicable generally accepted accounting principles, including standards such as Statement of Financial Accounting Standards (SFAS) No. 15, *Accounting by Debtors and Creditors for Troubled Debt Restructurings,* SFAS No. 114, *Accounting by Creditors for Impairment of a Loan,* SFAS No. 133, *Accounting for Derivative Instruments and Hedging* Activities, SFAS No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities,* and AICPA Statement of Position 03-3, *Accounting for Certain Loans or Debt Securities Acquired in a Transfer,* and their related amendments and interpretations. |

## Other Program Features

| | |
|---|---|
| **Home Price Depreciation Payments:** | To encourage lenders/investors to modify more mortgages, compensation will be provided to partially offset probable losses from home price declines. This will be structured as a simple cash payment on each modified loan while the loan remains active in the program. |

| | |
|---|---|
| **Payments for Short Sales and Deeds-in-Lieu:** | Compensation will be provided to servicers and borrowers in order to facilitate short sales or deeds-in-lieu in those cases in which borrowers either fail the net present value (NPV) test (described below) or fail to qualify for, or default under, the modification program. |
| **Second Lien Elimination Payments:** | To reduce the borrower's overall indebtedness and improve loan performance, additional incentives will be provided to extinguish junior liens on homes with first-lien loans that are modified under the program. |
| **Government Loan Programs:** | FHA, VA and rural housing loans will be addressed through standalone modification programs run by those agencies. FHA's Hope for Homeowners refinancing program will also be included in a parallel incentive program. |

## Net Present Value Model Parameters

| NPV Test: | An NPV Test will be required on each loan that is in Imminent Default or is at least 60 days delinquent under the MBA delinquency calculation. This NPV test will compare the net present value (NPV) of cash flows expected from a modification to the net present value of cash flows expected in the absence of modification. If the NPV of the modification scenario is greater, the NPV result is deemed positive, and the servicer must modify the loan (absent fraud, etc.) However, an "NPV positive" result is not necessary to qualify a loan for a Home Affordable Modification and the associated lender/investor, servicer, and borrower payments. |
|---|---|
| Standard NPV Model: | To provide a consistent and industry-wide approach to the required NPV Tests, Treasury will set forth a Standard NPV Model with parameters specified below. Complete details on each component outlined below are forthcoming. |
| Discount Rate: | The program allows the servicer to choose the Discount Rate to use in the NPV Model, subject to a program-determined ceiling that will be sensitive to the market-determined cost of funds. The ceiling on the allowable Discount Rate for the NPV Test is the Freddie Mac Primary Mortgage Market Survey rate (PMMS), plus a spread of 2.5 percentage points. The PMMS is the conventional mortgage rate published in the Federal Reserve's H.15 bulletin.<br><br>The servicer may choose a different Discount Rate for loans in portfolio versus loans in investor pools, but may not otherwise apply different rates to different loans in the servicing book. For example, it may choose to use a Discount Rate equal to the PMMS + 2.0 percent for its investor pools and a Discount Rate equal to the PMMS for its loans in portfolio. |
| Cure Rate and Redefault Rate: | The Cure Rates and Redefault Rates will be obtained from a default equation with parameters based on GSE analytics and program portfolio data except where servicers use custom parameters (see below). Treasury, in consultation with an inter-agency team of government officials, will update these tables periodically based on incoming data. |
| Property Value: | Property value will be determined in accordance with the Guidelines. |

| Incentive Payments: | Incentive payments, including the Payment Reduction Cost Share, annual borrower performance bonus payments toward principal, and Current Borrower One-Time Bonus Incentive, will be determined in accordance with the Guidelines. |
|---|---|
| Other Parameters: | The remaining parameters will come from data sets held or produced by the Federal Housing Finance Agency: home price forecast, valuation of the house price depreciation reserve, foreclosure timelines, and foreclosure costs and REO stigma |
| NPV Test Customization: | Servicers having at least a $40 billion servicing book will have an option to substitute a set of Cure Rates and Redefault Rates estimated based on the experience of their own aggregate portfolios. A servicer using this option should take into account, as feasible, current LTV, current DTI, current credit score, delinquency status, and other relevant variables the servicer identifies.<br><br>The Cure and Redefault Rates must be empirically validated where possible. Servicer judgment regarding the effect of DTI is expected, given the limited data available and the likelihood that the new program will materially affect Cure and Redefault Rates. However, all assumptions must be tested as program data become available and revised as appropriate.<br><br>A servicer who chooses to use customized Cure and Redefault Rates must apply the same assumptions for Cure and Redefault Rate to the entire servicing portfolio, without distinguishing between loans in portfolio and investor pools.<br><br>Models and assumptions will be subject to review by federal bank supervisory agencies where applicable, and in all cases by Freddie Mac as program compliance agent.<br><br>A servicer not meeting the size threshold may apply for permission to apply Cure Rates and Redefault Rates estimated based on the servicer's portfolio experience. |
| Mortgage Insurance: | For loans that have mortgage insurance (MI) coverage, the NPV Test will incorporate the value of the contingent claim payment in the event of default when evaluating projected foreclosure or modification scenarios. If the modification does not pass the NPV Test, then it will be referred to the appropriate MI company. The major MI companies have agreed to develop a mechanism by which they will pay partial claims where they deem appropriate to avoid foreclosure. |

17