**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| LORI WIGOD, DAN FINLINSON and SANDRA FINLINSON, on behalf of themselves and all others similarly situated, | **Case No: 10-cv-2348** |
| Plaintiffs, | |
| v. | **Hon. Blanche Manning** |
| WELLS FARGO BANK, N.A. d/b/a WELLS FARGO HOME MORTGAGE, f/k/a WACHOVIA MORTGAGE, FSB and d/b/a America's Servicing Company, | **JURY TRIAL DEMANDED** |
| Defendants. | |

### SECOND AMENDED CLASS ACTION COMPLAINT

1.      Plaintiffs Lori Wigod ("Wigod"), Dan Finlinson and Sandra Finlinson (the "Finlinsons") (collectively the "Plaintiffs") bring this suit on behalf of themselves and two classes of similarly situated homeowners nationwide ("Nationwide Classes"), as well as Subclasses of Illinois homeowners ("Illinois Subclass") and Indiana homeowners ("Indiana Subclass") to challenge Defendant Wells Fargo Bank, N.A.'s d/b/a Wells Fargo Home Mortgage f/k/a Wachovia Mortgage, FSB, and d/b/a America's Servicing Company's ("ASC") (collectively "Defendant" or "Wells Fargo") intentional and systematic failure to offer permanent loan modifications to qualified borrowers.

2.      In doing so, Wells Fargo has serially failed to honor its express and implied contractual obligations under its Trial Period Plan Agreements ("TPP Agreements"), has made repeated misrepresentations of material fact, and has engaged in business practices that are deceptive, immoral, unscrupulous, unfair, and oppressive under Illinois and Indiana law.  (*See* "TPP Agreements" attached as Group Exhibit A.)

1

3.      Under the Troubled Asset Relief Program ("TARP"), also known as the taxpayer bailout, the United States Government provided the nation's largest financial institutions with nearly $700 billion in funds to address what was widely accepted as an unprecedented financial crisis. 12 U.S.C. § 5211.  In or around October 2008, Defendant Wells Fargo accepted $25 billion in TARP funds.

4.      A key feature of TARP is the Making Home Affordable Program, of which the Home Affordable Modification Program ("HAMP" or "the HAMP") is a major component. HAMP is a program under which Wells Fargo and other major banks receive incentive payments for providing mortgage loan modifications to eligible borrowers such as Plaintiff Wigod and the putative Class members.

5.      In April 2009, Wells Fargo Home Mortgage signed a contract with the U.S. Treasury, through its agent, Fannie Mae, agreeing to participate in HAMP as an approved HAMP servicer.  (*See* "SPA", Ex. B.)

6.      As a HAMP servicer, Wells Fargo entered into written TPP Agreements for temporary modifications with Plaintiffs and other eligible Wells Fargo borrowers.  These TPP Agreements, which were form contracts, contained an express term requiring Wells Fargo to extend a formal offer for a permanent loan modification upon a borrower's completion of his or her respective trial period and continued compliance with the TPP Agreement's other terms.

7.      Plaintiffs, as well as the members of the Classes and Subclasses, have complied with their contractual obligations under their TPP Agreements by submitting all required documentation, answering all questions truthfully, keeping their representations true and accurate, and by making their trial period payments.  Despite Plaintiffs' and the other members of the putative Classes full performance, Wells Fargo has ignored its obligations by refusing to

extend offers for permanent modification to its eligible borrowers as required under the program guidelines and its contracts.

8.      Wells Fargo's failure to extend offers for permanent modification is no accident. To the contrary, Wells Fargo has knowingly established a system designed to wrongfully deprive its eligible HAMP borrowers of an opportunity to modify their mortgages, pay their loans, and save their houses from foreclosure. Wells Fargo's actions, which serve only its interest in extracting as much money as possible from borrowers it deems are at risk of default, thwart the very purpose of HAMP, constitute express and implied breaches of its various contracts, and amount to immoral and unfair business practices under the Illinois Consumer Fraud and Deceptive Business Practices Act and the Indiana Deceptive Consumer Sales Act.

## JURISDICTION

9.      Jurisdiction is proper pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).  This claim is brought as a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from the Defendant.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as unlawful practices are alleged to have been committed in this District, Defendant regularly conducts business in this District, and one of the named Plaintiffs resides in this District.  This Court has supplemental subject-matter jurisdiction over the pendent state law claims under 28 U.S.C. § 1367.

## PARTIES

11.     Plaintiff Wigod is a natural person and a citizen of the state of Illinois.  Plaintiff Wigod resides on Paulina Street in Chicago, Illinois and her home mortgage is one of the loans at

3

issue in this lawsuit.  At all times relevant, Wigod was pre-verified, qualified and eligible to participate in the HAMP program under all applicable directives and guidelines, a conclusion Wells Fargo would have reached had it accurately applied such guidelines and directives.

12.     Plaintiffs Dan and Sandra Finlinson reside on State Road 44 in Martinsville, Indiana and their mortgage with Wells Fargo is one of the loans at issue in this lawsuit. At all times relevant, the Finlinsons were pre-verified, qualified and eligible to participate in the HAMP program under all applicable directives and guidelines, a conclusion Wells Fargo would have reached had they accurately applied such guidelines and directives.

13.     Wells Fargo Bank, N.A. is a national banking association chartered in Sioux Falls, South Dakota and acts and operates as a mortgage lender with a principal place of business at 420 Montgomery Street, San Francisco, California 94104.  Wells Fargo Home Mortgage is an operating unit of Wells Fargo Bank, N.A. and is located in Des Moines, Iowa. America's Servicing Company is a division of Wells Fargo Home Mortgage that services loans that are originated and underwritten by Wells Fargo and other lenders.

14.     Wachovia Mortgage FSB ("Wachovia") is a division of Wells Fargo Bank, N.A., and is located in Raleigh, North Carolina.  At all times relevant, Wells Fargo operated and controlled Wachovia as its division and specifically represented to Plaintiff Wigod and the Pre-June 1, 2010 Class members that it would honor loan modifications and TPP Agreements originated by Wachovia.

## FACTUAL BACKGROUND

### *Congressional Response to National Foreclosure Crisis*

15.     Over the last three years, the United States has witnessed a foreclosure crisis.  A congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in

foreclosure or default.[1] Increased foreclosures have a detrimental effect on borrowers who are at serious risk of losing their homes. Foreclosures also have a negative impact on the surrounding neighborhoods that suffer decreased property values, and municipalities lose tax revenue as a result of foreclosures.

16.     On October 3, 2008, Congress passed the Emergency Economic Stabilization Act of 2008 and, on February 17, 2009, Congress amended the statute by passing the American Recovery and Reinvestment Act of 2009 (collectively the "Act"). 12 U.S.C. § 5201 *et. seq.* (2009). The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." 12 U.S.C. § 5201.

17.     The Act grants the Secretary of the Treasury the authority to establish TARP. 12 U.S.C. § 5211. Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions. *Id.* In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

18.     The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and that uses the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C. § 5219. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." *Id.* The Act further imposes parallel mandates to implement plans to maximize assistance to homeowners and

---

[1]     Congressional Oversight Panel, Oct. 9, 2009 report, *available at* URL http://cop.senate.gov/press/releases/release-100909-foreclosure.cfm (last visited June 23, 2010).

to minimize foreclosures.  12 U.S.C § 5220.

19.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the HAMP program.  Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable.  Servicers receive $1,000.00 for each HAMP modification.

***Servicer Participation in the HAMP program***

20.     The industry entities that perform the actual interface with borrowers – including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are known as "servicers."  Servicers typically act as the agents of the entities that hold mortgage loans.  Wells Fargo Home Mortgage (formerly Wachovia Mortgage FSB) and ASC are servicers operated by Wells Fargo Bank, N.A., and their actions described herein were made as agents for the entities that hold mortgage loans.

21.     To participate in HAMP, a servicer must execute a Servicer Participation Agreement ("SPA") with the federal government.

22.     On April 13, 2009, Michael J. Heid of Wells Fargo Home Mortgage executed an SPA, thereby making Wells Fargo a participating servicer in HAMP. (*See* Ex. B.)

23.     The SPA executed by Mr. Heid incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac, in connection with the duties of Participating Servicers.

24.     The SPA mandates that a Participating Servicer "shall perform" the activities

6

described in the Program Documentation "for all mortgage loans it services."

25.     The Program Documentation requires Participating Servicers to evaluate *all loans* that are delinquent 60 days or greater for HAMP modifications.  In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if HAMP is appropriate for the borrower.

***TPP Agreements***

26.     A HAMP Modification consists of two stages.  First, a Participating Servicer is required to gather a borrower's financial and other relevant information and, if the borrower qualifies, offer the borrower a TPP Agreement.  Wells Fargo's form TPP Agreements require borrowers to make certain representations, provide relevant information, and make trial period payments at a revised rate designed to keep the borrower in his or her home. (*See* Group Exhibit A.)

27.     Wells Fargo's TPP Agreements provide that Wells Fargo will extend offers for permanent modification to those homeowners who execute the TPP Agreement and fulfill the documentation and payment requirements. (*Id.*)  If a homeowner executes the TPP Agreement[2], complies with all documentation and representation requirements, and makes all of the TPP monthly payments on time, the second stage of the HAMP process is triggered in which Wells Fargo is required to offer the home owner a permanent loan modification.  This lawsuit challenges the fact that, despite full performance by its borrowers, Wells Fargo routinely fails to extend offers for permanent modifications to such borrowers.

28.     By failing to live up to its end of the TPP Agreements and offer permanent

---

[2]  On October 8, 2009, the HAMP Supplemental Directive 09-07 adopted the new form of the TPP Agreement that no longer required a borrower's signature.

modifications as required, Wells Fargo has deprived homeowners of their ability to save their homes, and has instead left them in a state of limbo, unsure of whether Wells Fargo is setting them up for foreclosure proceedings. Wells Fargo's conduct also prevents borrowers from pursuing other avenues of resolution, including using the money they are putting toward TPP Agreement trial payments to fund bankruptcy plans, perform an efficient breach, relocation costs, short sales, or other means of curing their default or preventing imminent default.

## FACTS RELATING TO NAMED PLAINTIFFS

### *Lori Wigod*

29.      On or about September 4, 2007, Wigod obtained a mortgage loan for her personal residence located in Chicago, Illinois from Wachovia, which later became a division operated by Defendant Wells Fargo.

30.      On April 3, 2009, Wigod contacted Defendant's loss mitigation department and made a written request for a loan modification under the HAMP plan. Throughout April 2009, Wigod also sent Wells Fargo all of the financial disclosures necessary to determine if she qualified for the HAMP plan. Wigod was not in default under her mortgage agreement at that time.

31.      Sometime in mid-May of 2009, one of Defendant's representatives informed Wigod that she qualified for a temporary loan modification and that Defendant would be sending her the required legal papers for her to execute.

32.      On May 28, 2009, Ms. Wigod executed a TPP Agreement entitled "Home Affordable Modification Program Trial Loan Period" and sent the executed TPP Agreement, along with certain additional documents Defendant had requested to Wells Fargo. (*See* Group Ex. A.)

33.     The first sentence of the TPP Agreement states:  "If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."  (*See* Group Ex. A., Wigod's TPP Agreement, p. 1)  Likewise, the TPP Agreement states:  "If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date."  (*Id.*, § 3.)

34.     The TPP Agreement also states:  "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of the Plan if I qualify for the Offer or will send me written notice that I do not qualify for the offer."  (*Id.*)

35.     Defendant verified Wigod's financial and other information and determined that she qualified for a HAMP TPP Agreement.  This was not a case, as sometimes observed in the modification process prior to June 1, 2010, where the bank sends the customer a TPP Agreement prior to verifying the customer's eligibility through submitted documents and then verifies the borrower's eligibility by comparing verbal representations of income to supporting documentation.  To the contrary, in Wigod's and the proposed Class members' cases, Wells Fargo verified and approved their eligibility for the HAMP program prior to executing their respective TPP Agreements.

36.     On or about June 4, 2009, having reviewed Wigod's documentation and determining she was eligible for the HAMP, a representative of Defendant signed the TPP Agreement and sent the signed TPP Agreement to Wigod.  (*Id.*, p. 3.)

37.     Also on or about June 4, 2009, Defendant sent Ms. Wigod a letter congratulating her on entering into a Home Affordable Modification workout plan.  (*See* "June 4, 2009 Letter from Wells Fargo," a true and accurate copy of which is attached as Exhibit C).  Included in the June 4, 2009 Letter that Ms. Wigod received was a copy of the TPP Agreement signed by Defendant's representative.

38.     Ms. Wigod timely made each of the four payments of $1,756.14 required by the TPP Agreement.  (*See* "Proof of Trial Payments," true and accurate copies of which are attached as Exhibit D.)  Wells Fargo accepted these payments without qualification or protest of any kind.

39.     Ms. Wigod also fully complied with all other the terms and requirements of the TPP Agreement such as keeping her information accurate and submitting all necessary paperwork.

40.     Despite her full compliance in all respects with the terms of the TPP Agreement, Wells Fargo failed to send her a modification agreement for her signature or otherwise extend her an offer for permanent modification.

41.     On October 7, 2010, Ms. Wigod received a letter from Wells Fargo, informing her of an outstanding loan balance.  (*See* "Oct. 7, 2010 Letter from Wells Fargo," a true and accurate copy of which is attached as Exhibit E).  This letter indicated that Wells Fargo had assessed late charges to Wigod's account.  Further, the letter did not reflect the payments made by Ms. Wigod under the TPP Agreement.

42.     On November 13, 2009, Ms. Wigod received a letter from Wells Fargo informing her that Wells Fargo was "unable to adjust the terms of [her] mortgage" due to unexplained "investor guidelines."  (*See* "Nov. 13, 2009 Letter" from Wells Fargo, a true and accurate copy of which is attached as Exhibit F).

43. On November 15, 2009, and despite Wells Fargo's acceptance of Ms. Wigod's trial payments and her full compliance with the TPP Agreement, Wigod received a letter from Wells Fargo informing her that her loan was considered by Wells Fargo to be in default.

44. Over the next several months, Ms. Wigod attempted to get Wells Fargo to honor its end of the bargain and offer her a permanent modification as promised. Discussions with various Wells Fargo representatives revealed that Wells Fargo had improperly re-evaluated Wigod's eligibility, had erroneously calculated her property taxes, and had wrongfully concluded that she did not qualify for an offer for permanent modification. Despite repeatedly explaining to various Wells Fargo representatives that the bank had improperly subjected to her to reevaluation and, in the process, had performed various miscalculations, Wells Fargo refused, and continues to refuse, to offer her a permanent modification or send her a modification agreement for her signature as required under the terms of the TPP Agreement. Rather, Wells Fargo has asked Ms. Wigod to re-submit documentation already in Wells Fargo's possession.

45. As of the filing of this Amended Complaint, Wells Fargo has not provided Wigod with a permanent modification agreement for her signature or otherwise extended her an offer for permanent modification. To the contrary, Wells Fargo sends Plaintiff monthly notices threatening to foreclose on her home if she does not pay the total amount of delinquency (created by Wells Fargo itself) within 30 days.

**_Dan and Sandra Finlinson_**

46. Whereas prior to June 1, 2010, the HAMP directives allowed servicers like Wells Fargo to either pre-verify borrowers for the HAMP or to place borrowers into TPPs without first verifying their eligibility, on June 1, 2010 the HAMP directives officially changed to require that all borrowers be "pre-verified" prior to commencing their HAMP trial plans.

11

47.     As alleged above, Wells Fargo pre-verified Wigod's eligibility for the HAMP notwithstanding the fact that it had had the option at that time under the HAMP directives to not have pre-verified her for the HAMP. On information and belief, Wells Fargo made the switch to only pre-verifying customers for the HAMP sometime in March 2010, ahead of the directive's official June 1, 2010 deadline for doing so.

48.     In or around March 2006, the Finlinsons obtained a mortgage loan on their primary residence in Martinsville, Indiana in the amount of $400,000 from Accredited Home Lenders, Inc., a lender that was subsequently acquired by Wells Fargo.

49.     Sometime in late 2009 – early 2010, the Finlinsons fell behind on their mortgage payments due to a financial hardship. In June or July 2010, after having unsuccessfully tried to work out an internal loan modification with ASC, the Finlinsons applied for a loan modification under the HAMP by submitting an application, hardship affidavit, and all other documents that ASC required to determine their eligibility for the HAMP. After all the required documents were submitted, an ASC representative instructed the Finlinsons that if they were qualified, the HAMP paperwork would arrive shortly.

50.     Sometime in August or September 2010, the Finlinsons followed up with ASC on the status of their application and were told to re-submit all their financial documentation again, which they promptly did.

51.     For the next several months, the Finlinsons repeatedly followed up with ASC and had to explain their situation to a new representative every time they called. The Finlinsons were repeatedly told to re-submit the financial documents again.

52.     When Mr. Finlinson would point out to ASC representatives that he had already submitted (multiple times) the required financial information to ASC, the representatives would

12

respond either that they could not locate a specific document or that the documents were too old and needed to be updated.

53.     Finally, in or around December 2010, ASC pre-verified the Finlinsons for their HAMP trial plan by determining that they were eligible and sent them a TPP Agreement that outlined the terms of their trial plan. The Finlinsons' TPP Agreement stated: "Congratulations, You are approved to enter into a trial period plan under the Home Affordable Modification Program." (*See* Group Ex. A, the Finlinsons' TPP.)

54.     The Finlinsons made each of the required trial period payments as set forth in their TPP Agreement within the time allowed. The Finlinsons otherwise fully complied with the terms of the TPP Agreement.

55.     Notwithstanding the fact that they fully complied with the terms of their TPP Agreement, Wells Fargo has refused to permanently modify the Finlinsons' mortgage loan. Instead, in May 2012, Wells Fargo denied the Finlinsons' application due to supposed issues involving an IRS tax lien recorded on their property. (*See* May 1, 2012 Denial Letter attached as Exhibit G.) The Finlinsons had disclosed the tax lien on their HAMP application in June 2010, well prior to being verified for the program and receiving their TPP Agreement from ASC. Furthermore, Wells Fargo denied the application despite the fact that ASC had been informed that the IRS was willing to either subordinate the lien prior to the modification or to release it altogether after the modification takes effect.

56.     On or around May 3, 2012, Wells Fargo sent the Finlinsons the acceleration letter stating that Wells Fargo will foreclose on their home if the delinquency of $89,516.18 Wells Fargo claimed was due was not paid within 30 days. (*See* May 3, 2012 Acceleration Letter attached as Exhibit H.) The letter also indicated that Wells Fargo assessed $3,898.44 in late fees

and $410 in "other" unspecified fees. (*Id.*)

## CLASS ALLEGATIONS

57.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

58.     This class action is brought by Plaintiffs on behalf of two Nationwide Classes, an Illinois Subclass, and an Indiana Subclass defined as follows:

59.      **"Pre-June 1, 2010" Class:**  All homeowners nationwide who, prior to June 1, 2010 (or such other date that Wells Fargo changed its policy to only place pre-verify borrowers into TPP Agreements), entered into a TPP Agreement with Wells Fargo for the purposes of modifying their home mortgages, whose eligibility for the HAMP had been verified prior to commencing the TPP Agreement, and who, despite having complied with all terms of the TPP Agreement, have not received from Wells Fargo an offer for permanent modification.

60.      **"Post-June 1, 2010" Class:**  All homeowners nationwide who, after to June 1, 2010 (or such other date that Wells Fargo changed its policy to only place pre-verify borrowers into TPP Agreements), entered into a TPP Agreement with Wells Fargo for the purposes of modifying their home mortgages, whose eligibility for the HAMP had been verified prior to commencing the TPP Agreement, and who, despite having complied with all terms of the TPP Agreement, have not received from Wells Fargo an offer for permanent modification.

61.     **Illinois Subclass**:  All pre-verified homeowners in Illinois who have entered into a TPP Agreement with Wells Fargo for the purposes of modifying their home mortgages and, despite having complied with all terms of the TPP Agreement, have not received from Wells Fargo an offer for permanent modification.

62.     **Indiana Subclass**:  All pre-verified homeowners in Indiana who have entered into a TPP Agreement with Wells Fargo for the purposes of modifying their home mortgages

and, despite having complied with all terms of the TPP Agreement, have not received from Wells Fargo an offer for permanent modification.

63. Excluded from the Classes and Subclasses are 1) any Judge or Magistrate presiding over this action and members of their families; 2) Defendant, Defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which Defendant or its parent companies have a controlling interest and their current or former officers and directors; 3) persons who properly execute and file a timely request for exclusion from the Classes or Subclasses; and 4) the legal representatives, successors or assigns of any such excluded persons. Plaintiffs anticipate that amending the definitions of the Classes and Subclasses may become proper following discovery.

64. Plaintiffs sue on their own behalf and on behalf of the above-defined Classes and Subclasses under Rules 23(a) and (b) of the Federal Rules of Civil Procedure.

65. Plaintiffs do not know the exact size or identities of the members of the proposed Classes and Subclasses, since such information is in the exclusive control of Defendant. Plaintiffs believe that the classes encompass at bottom hundreds of individuals whose identities can be readily determined from Defendant's books and records. Therefore, the proposed classes are so numerous that joinder of all members is impracticable.

66. Based on the size of the modifications at issue, Plaintiffs believe the amount in controversy exceeds $5 million.

67. All members of the Classes and Subclasses have been subject to and affected by the same conduct. The claims are based on form contracts and uniform loan modification processing requirements. There are questions of law and fact that are common to the Classes and Subclasses that are subject to common proof and predominate over any questions affecting only

individual members of the Classes. These questions include, but are not limited to the following:

a.      Whether Wells Fargo's TPP Agreements required Wells Fargo to extend modification agreements or otherwise offer permanent loan modifications when its pre-verified borrowers complied with the requirements of the TPP Agreements;

b.      Whether Wells Fargo breached an express term of its TPP Agreements with Plaintiffs and the members of the Classes by failing to extend offers for permanent modification to Plaintiffs and the members of the Classes;

c.      Whether Wells Fargo breached an implied term of its TPP Agreements by failing to extend offers for permanent modification to Plaintiffs and the members of the Classes;

d.      Whether Wells Fargo breached the implied covenant of good faith and fair dealing by repeatedly requesting its borrowers produce documentation already in Wells Fargo's possession and by taking other steps to delay or prevent the extension of offers for permanent modification;

e.      Whether Plaintiffs and the Classes reasonably relied on the material representations made by Defendant relating to the offer of a permanent loan modification, and whether Plaintiffs and the Classes suffered damage as a result of their reasonable reliance;

f.      Whether the members of the Classes and Subclasses were "pre-verified" prior to commencing their TPP Agreements;

g.      Whether Wells Fargo made false statements of material facts and whether Plaintiffs and the Classes reasonably relied on such misrepresentations to their

detriment;

h.      Whether Wells Fargo is responsible for any mistakes made when determining borrower eligibility for the HAMP;

i.      Whether the members of the Classes and Subclasses complied fully with their TPP Agreements;

j.      Whether the Court can order damages, and the amount of such damages;

k.      Whether an award of damages would be an adequate remedy to compensate Plaintiffs for the harm caused by Defendant's conduct as alleged herein;

l,      Whether Defendant's actions violated Illinois Consumer Fraud Act;

m.      Whether Defendant's actions violated Indiana Deceptive Sales Practices Act; and

n.      Whether Plaintiffs and the Classes are entitled to injunctive relief.

68.     The claims of the individual named Plaintiffs are typical of the claims of the Classes and Subclasses and do not conflict with the interests of any other members of the Classes and Subclasses in that both Plaintiffs and the other members of the Classes and Subclasses were subject to the same conduct, signed the same form agreements, and were met with the same absence of any offer for permanent modification.

69.     The named Plaintiffs will fairly and adequately represent the interests of the Classes and Subclasses.  Plaintiffs are committed to the vigorous prosecution of the Classes' and Subclasses' claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions.

70.     A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

71.     This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

72.     Defendant has acted or refused to act on grounds that apply generally to the Classes and Subclasses so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Classes and Subclasses as a whole.

**COUNT I**
**Breach of Contract**
(on behalf of Wigod and the "Pre-June 1, 2010 Class" and the Finlinsons and the "Post-June 1, 2010 Class")

73.     Plaintiffs repeat and re-allege the allegations in paragraphs 1-72 above as if set forth herein in full.

74.     Plaintiffs bring this claim on their own behalves and on behalf of each member of the Pre-June 1, 2010 Class and the Post-June 1, 2010 Class described above.

*Contract Formation:  Offer and Acceptance*

75.     As described above, the TPP Agreement executed by Defendant and Plaintiff Wigod constitutes a valid contract.  (*See* Group Ex. A.) Likewise, the TPP Agreement sent to Sandra Finlinson dated December 2, 2010, constitutes a valid contract. (*Id.*)

76.     Wells Fargo's sending of the TPP Agreement to Plaintiff Wigod was an offer, and Plaintiff accepted this offer by executing the TPP Agreement and sending it back to Wells Fargo along with any outstanding necessary documentation to verify her eligibility. In the alternative, Wells Fargo's sending of the TPP Agreement to Plaintiff Wigod was an invitation to deal. Plaintiff's execution of the TPP Agreement and sending to Defendant any outstanding necessary documentation to verify her eligibility constituted an offer.  Defendant accepted the offer by verifying her eligibility, determining she qualified for HAMP, and sending her an executed copy of the TPP Agreement on June 4, 2009 along with a letter congratulating her on her entry into the

18

program.  (*See* Ex. C.)

77.     Wells Fargo offered the Finlinsons a TPP Agreement which constituted an offer that the Finlinsons accepted by making the required payments. In the alternative, the Finlinsons' sending in of all their required documentation constituted an offer which Defendant accepted by verifying their eligibility, determining they qualified for the HAMP, and sending them a copy of the TPP Agreement on December 2, 2010 in a letter congratulating them on their entry into the program.  (*See* Group Ex. A.)

*Contract Formation: Consideration*

78.     The TPP Agreement is supported by consideration in the form of an exchange of mutual promises.  In addition to making temporary trial payments on time, Plaintiffs promised to open new escrow accounts, to undergo credit counseling (if asked), and to provide financial information and vouch for its truth. In exchange, Wells Fargo promised to send Plaintiffs an agreement for permanent modification upon their completion of the TPP Agreement.

79.     In addition or in the alternative, the TPP Agreement is supported by further consideration in the form of each party foregoing legal obligations and rights.  Plaintiffs forewent alternative avenues they could have pursued including, by way of example, bankruptcy or listing the property.  Wells Fargo agreed to forego foreclosure proceedings and late fees.  Both sides benefited from the exchange in that Plaintiffs were presented with an opportunity to save their home at a reduced payment and receive incentive payments from the government, while Wells Fargo enjoyed the ability to keep a paying customer, receive incentive payments for performing the modification from the government, and avoid the costs and risks associated with foreclosure.

80.     In the alternative, and explained in Count II and as incorporated fully herein,

Plaintiffs' justifiable reliance serves as a substitute for any lack of consideration.

*Plaintiffs' Performance*

81.     Plaintiffs and the members of the Classes made their temporary trial payments and otherwise complied with the TPP Agreements by keeping all information and representations true and accurate in all material respects, and by taking all such other steps necessary under their respective TPP Agreements.

*Express Contract Terms*

82.     Wigod's TPP Agreement provided that "TIME IS OF THE ESSENCE under this Plan."  (*See* Group Ex. A, Wigod TPP Agreement ¶ 2.) The Finlinsons' TPP Agreement made clear that payments must be received on time or the "loan will not be modified under the Making Home Affordable program." (*See* Group Ex. A, Finlinson TPP Agreement.)

83.     Wigod's TPP Agreement also provided that if Wigod and the Pre-June 1, 2010 Class members made their payments and otherwise complied with the terms of their TPP Agreements, then "the lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary or reflect this new payment amount and waive any unpaid late charges accrued to date."  (*See* Wigod TPP Agreement ¶ 3.) The Finlinsons' TPP Agreement also provided that if the Finlinsons and the Post-June 1, 2010 Class members timely made their payments and if they "submitted all the required documents, your mortgage would then be permanently modified." (*See* Finlinson TPP Agreement.)

*Defendant's Breach of Express Terms*

84.     Rather than treat the timing of its performance under the TPP Agreement as being "OF THE ESSENCE", Defendant intentionally and systematically delayed converting TPP Agreements into permanent modifications by falsely claiming, repeatedly, that it lacked

documents and information already in its possession that borrowers had mailed in multiple times, improperly re-evaluating Plaintiffs' eligibility, using incorrect inputs and miscalculating the "waterfall" and other factors for determining HAMP eligibility, failing to implement adequate procedures and systems to respond to inquiries and complaints, and by otherwise dragging out and delaying its extension of offers for permanent loan modification.

85.     Rather than extending offers for permanent modification to Plaintiffs and the members of the Classes, Defendant, improperly and without justification, ultimately decided to treat the TPP Agreements as if they were null and void. Each instance where Wells Fargo dishonored the TPP Agreements of pre-verified borrowers who complied with the terms of the TPP Agreements constituted a breach of contract, causing each borrower to suffer damages in losing their permanent modification, a negative impact on their credit scores, late fees and other fees assessed by Wells Fargo as a result of a denial of permanent modification, lost opportunities to pursue other avenues for saving their homes, and the lost ability to collect government incentive payments for HAMP compliance. Additionally, Defendant accepted Plaintiffs' reduced payments while threatening foreclosure.

*Implied Contract Terms*

86.     In addition, Wells Fargo breached an implied term that required Wells Fargo to extend the offers for permanent modification within a reasonable period of time following Plaintiffs' and the Classes' performance under the TPP Agreements.

87.     The TPP Agreement, like all contracts entered into in Illinois and Indiana, contained an implied duty of good faith and fair dealing.  Insofar as the TPP Agreement placed discretion and broad authority in Wells Fargo to determine HAMP eligibility and to administer the HAMP modification program, Wells Fargo had a duty to perform consistent with its duty of

good faith and fair dealing.

*Defendant's Breach of Implied Terms*

88.     The Defendant routinely and regularly breached these implied duties by:

a.      failing to perform loan servicing functions consistent with its responsibilities to Plaintiffs using acceptable professional standards of care;

b.      failing to properly supervise its agents and employees including, without limitation, its loss mitigation and collection personnel and its foreclosure attorneys or otherwise use individuals with suitable training, education, experience and skills to perform loan servicing functions;

c.      routinely demanding information already in its files and otherwise filing to implement an appropriate and functioning document management system;

d.      providing false justifications for refusing to extend offers for permanent modification;

e.      systematically making inaccurate calculations and determinations of Plaintiffs' and the Classes' eligibility for HAMP;

f.      unreasonably delaying the extension of offers for permanent modifications to borrowers who perform fully and faithfully under their TPP Agreements as described in Paragraph 70, above; and

g.      acting in a manner that otherwise constitutes an abuse of discretion or authority under the TPP Agreement or taking such other steps to frustrate Plaintiffs' ability to receive the benefit of their bargain under the TPP Agreement.

*Causation and Damages*

89.     As an actual and proximate result of Wells Fargo's breaches of these express and implied contractual terms described herein, Plaintiffs and the Classes have suffered harm and are threatened with additional harm.  Plaintiffs and the Classes have been damaged insofar as they have been improperly denied offers for permanent loan modifications, which they stand ready, willing and able to accept.

90.     Plaintiffs and the Classes have further been damaged in the form of lost time and opportunity costs. By entering into the TPP Agreement and making their payments both during

and after the trial period, Plaintiffs spent monies on a plan that could have gone towards other potential remedies that they might otherwise have pursued to save their home. Plaintiffs also lost the opportunity to restructure their debt under the bankruptcy code, sell their home on favorable terms, pursue refinancing with other lenders, take other steps to address their financial hardship and threatened loss of their home, perform efficient breaches to cut their losses, or receive program incentive payments. In addition, Plaintiffs suffered negative impact on their credit scores and paid late fees and other fees assessed as a result of their removal from the HAMP.

91.     On information and belief, some putative Class members have suffered additional harm and expense in the form of defending foreclosures of their homes or lost their homes altogether, when, in reality, they should have been extended offers for permanent modifications of their mortgage loans several months into their modified permanent payment plans.

92.     An award of damages, may be inadequate remedy to compensate the members of the Classes for the harm caused to them by Defendant's breach of contract. As such, Plaintiffs, on their own behalf and on behalf of the members of the Classes additionally seek injunctive relief in the form of an order compelling Defendant to specifically perform under its TPP Agreements and extend the members of the Classes the offers for permanent modification they had been promised.

93.     An order of specific performance may be warranted in this case because damages may not make the Plaintiffs whole and the risk of under-compensation is high, the TPP Agreements are specific enough and are capable of being performed by Wells Fargo with minimal judicial supervision, according to the terms of the applicable HAMP Directives.

94.     In the alternative, if the Court determines that an award of damages will be a sufficient remedy, Plaintiffs, on their own behalf and on behalf of the members of the Classes

seek damages for Defendant's breach of contact to the maximum extent allowed by law, and, in any case, interest, costs, and attorneys' fees in an amount to be determined at trial.

**COUNT II**
**Promissory Estoppel, In the Alternative to Count I**
(on behalf of Wigod and the "Pre-June 1, 2010 Class" and the Finlinsons and the "Post-June 1, 2010 Class")

95. Plaintiffs repeat and re-allege the allegations of paragraphs 1-72 above as if set forth herein in full.

96. Plaintiffs bring this claim on their own behalf and on behalf of each member of both Nationwide Classes described above.

97. Defendant, by way of its TPP Agreements, unambiguously promised to Plaintiffs that if they made their TPP payments on time and otherwise fully complied with the terms of their TPP Agreements, they would receive an offer for permanent modification in the form of a permanent modification agreement for their signature (*see* Wigod TPP Agreement) or that their mortgage loans will be permanently modified (*see* the Finlinsons TPP Agreement).

98. Defendant's promise was intended to induce Plaintiffs to rely on it and make monthly TPP payments and otherwise perform.

99. Plaintiffs indeed relied on Defendant's promise by submitting TPP payments and all necessary documentation and otherwise fully performing under their TPP Agreements.

100. Given the language in the TPP Agreement, Plaintiffs' reliance was reasonable.

101. Plaintiffs' reliance was to their detriment. Plaintiffs have yet to receive a permanent modification agreement for their signature or any other offer for permanent modification, have lost the value of the TPP payments, have lost the opportunity to fund other strategies to deal with their default and avoid foreclosure or perform an efficient breach to cut their losses, have experienced adverse effects on their credit scores, incurred damages while

defending against unjustified foreclosure proceedings, lost government incentive payments that are provided the first 5 years of successful completion of the program, and paid late fees and other fees assessed as a result of their removal from the Program.

102.    An award of damages, however, may ultimately be an inadequate remedy to compensate the members of the Classes for the harm caused to them by Defendant's breach of promises regarding extending loan modifications. As such, Plaintiffs, on their own behalf and on behalf of the members of the Classes, seek injunctive relief in the form of an order compelling Defendant to honor its promises to the members of the Classes and extend the members of the Classes offers for permanent modification on the terms consistent with the applicable HAMP Directives.

103.    As the HAMP was specifically enacted to help struggling homeowners to stay in their homes, justice requires that Wells Fargo be ordered to deliver on its promises to the members of the Classes. Minimal, if any, judicial supervision will be required with regard to the specific performance of the promises since they can be performed under the terms and conditions of the applicable HAMP Directives.

104.    In the alternative, if the Court determines that an award of damages is a sufficient remedy to make the Plaintiffs whole or that the risk of under-compensation is high, Plaintiffs, on their own behalf and on behalf of the members of the Classes seek damages for Defendant's breach of promises to extend permanent modifications to the members of the Classes to the maximum extent allowed by law, as well as all interest, costs, and attorneys' fees in the amount to be determined at trial.

**Count III**
**Fraudulent Misrepresentation**
(on behalf of Wigod and the "Pre-June 1, 2010 Class" and the Finlinsons and the "Post-June 1, 2010 Class")

105.    Plaintiffs repeat and re-allege the allegations of paragraphs 1-104 above as if set forth herein in full.

*Misrepresentation*

106.    In its TPP Agreement that it signed and sent to Plaintiff Wigod on June 4, 2009, Defendant intentionally misrepresented to Plaintiff that:  "If [plaintiff] compl[ied] with the requirements in Section 2 and [her] representations in Section 1 continue[d] to be true in all material respects," that Defendant would send her "a Modification Agreement for [her] signature which w[ould] modify [her] Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date."  (*See* Group Ex. A.)

107.    Similarly, in its TPP Agreement that it sent to Sandra Finlinson, Defendant represented that "After all trial period payments are timely made and you have submitted all the required documents, your mortgage would then be permanently modified." (Group Ex. A, Finlinson TPP Agreement, p.1.)

108.    Defendant knew these representations were false at the time it sent the respective TPP Agreements to Plaintiffs. Defendant had absolutely no intention to modify Plaintiffs' mortgage. Instead, it devised and implemented a scheme whereby it stood to extract as much money as possible from defaulting homeowners for as long as possible while receiving hefty fees for servicing their loans without ever extending the promised loan modifications.

109.    These representations were also material insofar as Plaintiffs would not have entered into the TPP Agreement or otherwise wasted time and recourses attempting to comply with its terms had they known Defendant had no intention to offer them a permanent

modification.

110.    Defendant made these false representations to induce Plaintiffs and the members of the Classes to enter into the TPP Agreements and make the temporary payments for as long as possible.

111.    Plaintiffs reasonably relied on Defendant's false representations by entering into and complying with the terms of their TPP Agreements.

112.    Plaintiffs' and the members' of the Classes reliance on these false statements actually and proximately caused them to suffer damages in that they never received a permanent modification of their mortgage loans, they made TPP payments using money that could have been used to pursue other avenues of relief, lost time, paid late fees and other fees assessed by Defendant after dropping Plaintiffs from the Program, suffered adverse effect on their credit scores, lost incentive payments for complying with the program, and lost the opportunity to pursue other avenues for saving their home and credit.

113.    Plaintiffs, on their own behalf and on behalf of the Nationwide Classes, seek actual damages caused by Defendant's false misrepresentations, punitive damages, interests, costs, and attorneys' fees in the amount to be determined at trial, as well as an order compelling Defendant to extend offers for permanent modification to the members of the Classes according to the terms of their TPPs and the applicable HAMP directives and to cease proceeding with respect to its TPP Agreements as if they are illusory.

**Count IV**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**("Consumer Fraud Act") 815 ILCS 505/1 *et seq*.**
(on behalf of Plaintiff Wigod and the Illinois Subclass)

114.    Plaintiff Wigod repeats and re-alleges the allegations of paragraphs 1-113 above as if set forth herein in full.

*Fraudulent Conduct*

115.     Plaintiff expressly repeats and re-alleges the allegations of paragraphs 105-113 above as if set forth herein in full. Defendant's intentional misrepresentations constitute prohibited fraudulent conduct under the Illinois Consumer Fraud Act.

116.     Plaintiff has suffered actual damages as an actual and proximate result of the Defendant's intentional misrepresentation in that she never received a permanent modification agreement for her signature or any other offer for permanent modification, she made TPP payments using money that could have been used to pursue other avenues of relief, suffered damage to her credit, lost time, and lost the opportunity to pursue other avenues for saving her home and credit.

*Unfair, Immoral and Unscrupulous Practices*

117.     Defendant's conduct as described throughout this Amended Complaint constitutes unfair, immoral and unscrupulous business practices that harmed not only Plaintiff and the Illinois Subclass members, but the general public as well. Defendant's immoral and unscrupulous practices, which were implemented so as to extract as much money as possible from borrowers Defendant identified as being at risk for default prior to foreclosure, included but were not limited to:

a.     Defendant knowingly designed and maintained a loan modification system that was riddled with flaws and intentionally staffed with employees who lacked the training, experience, education or skill to accurately perform their obligations.

b.     Defendant incentivized its employees to rush customers off of the telephone as quickly as possible so as to frustrate customers, the intended result being that instead of complaining, the customers would give up and accept Wells Fargo's faulty

eligibility determinations.  Defendant also ensured further frustration by implementing a "one call resolution" policy under which customers would never speak to the same service representative twice.

c.      With respect to former Wachovia Bank customers in particular, Wells Fargo routinely lost their loan documents, modification papers, and other necessary materials to evaluate eligibility and routinely rejected these customers' completely performed TPP Agreements on false and incorrect grounds.

d.      Defendant routinely required borrowers to submit and re-submit documents and financial information already in its possession claiming that it would not review a borrower for an eligibility until and unless these documents are submitted time and again.

e.      Defendant routinely and systematically made incorrect calculations and determinations at improper times during the modification process, falsely claimed that it was permitted to do so under applicable directives and that it was unable to achieve target income to payment ratios, and routinely provided customers with other false, pre-textual reasons for refusing to extend eligible borrowers their offers for permanent modification.

f.      While continuing to accept the Illinois Subclass members' modified mortgage payments, Defendant sends Subclass members monthly letters threatening the borrowers with foreclosure if the entire balance due is not paid within 30 days, while these borrowers in fact should have received offers for permanent modification.

g.      Defendant routinely provided false information regarding its processes and standards, refused to put statements in writing when asked,

h.      Defendant routinely conducted its loan modification processes and

delayed processing modifications on the false premise that it could not perform the required calculations unless the documents in its possession were no greater than 30 days old, when in reality the applicable directives allow Defendant to consider documents older than 30 days.

       i.      Engaged in other conduct designed to extract money from "at risk" borrowers as opposed to actually helping such borrowers – who were at all times HAMP eligible – achieve modified loan terms.

118.    Defendant's conduct described herein actually and proximately caused Plaintiff Wigod and the Illinois Subclass members to suffer damages as described throughout this Amended Complaint.

119.    Plaintiff Wigod, on her own behalf and on behalf of the Illinois Subclass members seeks actual damages caused by Defendant's deceptive and unfair conduct in violation of the ICFA, statutory and punitive damages, interest, costs and attorneys' fees in an amount to be determined at trial, as well as an order enjoining Defendant from further violations of the ICFA and compelling Defendant to extend loan modifications to the Illinois Subclass members in accordance with their TPP Agreements and the applicable HAMP directives.

**Count V**
**Violation of the Indiana Deceptive Consumer Sales Act ("Consumer Sales Act")**
**Ind. Code § 24-5-0.5-1 *et seq.***
(on behalf of the Finlinsons and the Indiana Subclass)

120.    Plaintiffs repeat and re-allege the allegations of paragraphs 1-119 as if fully set forth herein.

121.    Entering into the TPP Agreements under the HAMP with the Subclass members constitutes a consumer transaction as defined by IC § 24-5-0.5-2(a)(1).

122.    Wells Fargo is a supplier as defined by IC § 24-5-0.5-2(a)(3).

123.    As fully alleged above, Defendant committed incurable deceptive acts, as defined in IC § 24-5-0.5-2(a)(8), by devising and implementing a scheme to defraud or mislead the Indiana Subclass members – the most vulnerable homeowners seeking assistance with their mortgage payments under the HAMP.

124.    Despite its clear representations to the contrary, Defendant never intended to offer the Indiana Subclass members permanent loan modifications. Instead, Defendant misrepresented that entering into the TPP Agreements and complying with all their terms will have a benefit that it did not actually have – the resultant offer for a permanent modification or the actual permanent loan modification, in violation of IC § 24-5-0.5-3(a)(1).

125.    Further, or in the alternative, Defendant misrepresented that the subject of the consumer transaction was of a particular standard, *i.e.*, a temporary loan modification that would result in the permanent modification if the consumer met all the TPP requirements, when Defendant knew or should have reasonably known that it was not the case, in violation of IC § 24-5-0.5-3(a)(2).

126.    Defendant misrepresented to the Indiana Subclass members that all TPPs would be converted into permanent modifications if the Subclass members complied with their obligations under the TPP Agreements, while it was not the case, which resulted in a significantly fewer permanent modifications than the TPPs where the borrowers fully complied with their end of the bargain. As such, Defendant violated IC § 24-5-0.5-3(a)(4) in misrepresenting that the subject of the consumer transaction will be supplied to the public in greater quantity than Wells Fargo intended.

127.    Defendant additionally violated the Indiana Consumer Sales Act by engaging in an unscrupulous and immoral scheme to deny permanent modifications to Plaintiffs' and

31

thousands of other borrowers to whom it had promised to permanently modify their loans.

128. The Finlinsons, on their own behalf and on behalf of the Indiana Subclass members seek actual damages caused by Defendant's deceptive sales practices in violation of the Consumer Sales Act, statutory and punitive damages, interest, costs and attorneys' fees in an amount to be determined at trial, as well as an order enjoining Defendant from further violations of the Consumer Sales Act and compelling Defendant to extend loan modifications to the Indiana Subclass members in accordance with their TPP Agreements and the applicable HAMP directives.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests the following relief:

A. Certify this case as a class action and appoint named Plaintiffs to be Class representatives and their counsel to be Class counsel;

B. Award Plaintiff and the Class members actual and compensatory damages for breach of contract and breach of the implied covenant of good faith and fair dealing in an amount to be determined at trial, or, in the alternative, order Wells Fargo to specifically perform under its TPP Agreements or enjoin Wells Fargo from treating its TPP Agreements as if they impose no binding obligations on the bank;

C. Award actual and compensatory damages and order other equitable relief as justice requires, including requiring Defendant to extend Plaintiffs and the Classes offers for permanent loan modifications on the theory of promissory estoppel;

D. Award actual, compensatory, and punitive damages for Defendant's fraudulent misrepresentations of material fact, as well as interest, and attorneys' fees and costs in the amount to be determined at trial;

E.  Enter an Order preliminarily and permanently enjoining Wells Fargo's fraudulent, unlawful and unfair business practices as alleged herein, requiring Defendant to extend Plaintiffs and the members of Indiana and Illinois Subclasses permanent modifications of their loans as required by the HAMP, and award actual, statutory, compensatory and punitive damages for Defendant's violations of the Illinois Consumer Fraud Act and Indiana Consumer Sales Act, along with interest and attorneys' fees and costs;

F.  Order specific performance of Defendant's contractual obligations together with other relief required by contract, equity and law;

G.  Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees;

H.  Enter and Order preliminarily and permanently enjoining Defendant from initiating or proceeding with any foreclosure proceeding without first fairly and accurately determining whether the borrower named in the foreclosure proceeding is eligible for a HAMP or other modification; and

I.  Grant Plaintiffs and the Classes and Subclasses such other and further relief as this Court finds necessary and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

Dated: July 3, 2012

By: /s/ Irina Slavina
One of Plaintiff's attorneys

Jay Edelson
Steven Lezell Woodrow
Rafey Balabanian
Irina Slavina
Edelson McGuire, LLC
350 N. LaSalle Ave
Suite 1300
Chicago, Illinois 60654
Tel: (312) 589-6370 / Fax: (312) 589-6378

## CERTIFICATE OF SERVICE

I, Irina Slavina, an attorney, hereby certify that on July 3, 2012, I electronically filed the

foregoing *Second Amended Class Action Complaint* with the Clerk of the Court using the

CM/ECF system. Notice of this filing is sent to the following parties by operation of the Court's

electronic filing system:

**Irene C. Freidel**
**David D. Christensen**
**Kristin Ann Davis**
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Phone: (617) 261-3100
Fax: 617-261-3175
irene.freidel@klgates.com
david.christensen@klgates.com
kristin.davis@klgates.com

**Jessica Ann Baer**
**Michael Joseph Hayes**
K&L Gates
70 W. Madison, Suite 3100
Chicago, IL 60602
(312) 807-4396
jessica.baer@klgates.com
michael.hayes@klgates.com


/s/ Irina Slavina_____