**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LORI WIGOD, DAN FINLINSON and SANDRA FINLINSON, on behalf of themselves and all others similarly situated, | |
| | Case No: 10-cv-02348 |
| Plaintiffs, | |
| | Honorable Blanche M. Manning |
| v. | |
| WELLS FARGO BANK, N.A. d/b/a WELLS FARGO HOME MORTGAGE, f/k/a WACHOVIA MORTGAGE, FSB, and d/b/a AMERICA'S SERVICING COMPANY, | Honorable Maria Valdez |
| Defendant. | |

**PLAINTIFFS' OBJECTIONS TO AND MOTION TO MODIFY
MAGISTRATE JUDGE'S ORDER OF NOVEMBER 15, 2012 (DKT. 194)**

Jay Edelson
Steven Lezell Woodrow
Rafey S. Balabanian
Irina Slavina
**EDELSON MCGUIRE, LLC**
350 North LaSalle Street, Suite 1300
Chicago, IL 60654
Phone: (312) 589-6370
Fax: (312) 589-6378
swoodrow@edelson.com
rbalabanian@edelson.com
islavina@edelson.com

*Counsel for Plaintiffs and Putative Class*

## <u>TABLE OF CONTENTS</u>

I. INTRODUCTION .................................................................................................1

II. PROCEDURAL BACKGROUND ........................................................................2

    A. The Slow Pace of Discovery Following the Referral................................2

    B. Plaintiffs' 25 Interrogatories and Wells Fargo's Litany of Objections .......................3

    C. The Referral Court's Order Denying Plaintiffs' Motion to Compel ...........................4

III. ARGUMENT ........................................................................................................4

    A. Preliminary and Critical Matter: The Difference Between Having A Verified TPP Versus A Stated TPP, Its Impact On A Bank's Ability To Reevaluate Verified Borrowers, And Its Centrality To This Case...................................5

    B. The Referral Court Committed Clear Error By Refusing To Compel Wells Fargo To Identify The Supposed "Investor Guidelines" It Used When Dropping Wigod From the Program.................................9

        1. Investor guidelines expressly govern how a servicer like Wells Fargo is supposed to evaluate loans for modification under HAMP ...................................11

        2. Wells Fargo has repeatedly invoked—but failed to identify—investor criteria supposedly applicable to Wigod's loan that the bank claims it used to re-evaluate her after her trial had started and to terminate her Verified TPP ...................................12

        3. The Referral Court erred in concluding that the Plaintiffs seek Wells Fargo's opinion or the application of law to fact about which guidelines the bank could've used to evaluate Wigod's loan—Wigod seeks the actual investor guidelines the bank used, which, it turns out, don't even exist...............13

    C. The Order Commits Clear Error By Misunderstanding The Connection Between Class Membership And The Form Documents Governing Each Borrower ...................................15

        1. The Referral Court clearly erred in deleting the requirement that borrowers have a Verified TPP from the Class Definition and by using this new definition to discount the relevance of information bearing both on the size and scope of the Class ...................................17

**2.  The Referral Court committed clear error by failing to understand the importance of determining the number of borrowers who moved through each phase of the process or who did not comply with any particular term** ...... 18

**3.  The Order erred in accepting Wells Fargo's assertion that the bank wouldn't have information about borrowers who failed to comply with the TPP's non-payment related requirements** ............................................................ 19

**4.  The Order gave too much credit to the data Wells Fargo has produced thus far** ................................................................................................................ 20

**IV. CONCLUSION** ................................................................................................................ 20

# TABLE OF AUTHORITIES

**UNITED STATES CIRCUIT COURT OF APPEALS CASES**

*Weeks v. Samsung Heavy Indus. Co., Ltd.*, 126 F.3d 926 (7th Cir. 1997)...................................4, 5

*Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012)......................................... *passim*

**UNITED STATES DISTRICT COURT CASES**

*Avevedo v. Citimortgage, Inc.*, No. 11 C 4877, 2012 WL 3134222 (N.D. Ill. July 25, 2012) .............................................................................................................................8

*Haroco, Inc. v. Am. Nat. Bank & Trust Co. of Chicago*, 121 F.R.D. 664 (N.D. Ill. 1988) ...........18

*Menagerie Prods. v. Citysearch*, No. CV 08-4263, 2009 WL 3770668 (C.D. Cal. Nov. 9, 2009) .......................................................................................................................18

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Civ. P. 72................................................................................................................. 4, 5

## I.  INTRODUCTION

As this Court is aware, this putative class action challenges Wells Fargo's conduct under the federal Home Affordable Modification Program ("HAMP" or the "Program"). The Seventh Circuit, in reversing dismissal, held that Plaintiff Wigod[1] alleged viable claims against Wells Fargo for breach of her (and the putative class's) HAMP Trial Period Plan Agreements ("TPPs"), unjust enrichment, and common law and consumer fraud. At its most basic, Wigod alleges that the bank is liable for improperly reevaluating borrowers whose eligibility for the Program had been verified prior to the start of their Trial Plans ("Verified Borrowers") and for refusing to extend such Verified Borrowers offers for permanent modification as required by their Verified TPPs and the HAMP Directives.[2] (*See* SAC, Dkt. 117.)

On May 16, 2012, this case was referred to the Honorable Magistrate Judge Maria Valdez (the "Referral Court") for discovery. (Dkt. 80.) Notwithstanding Judge Ripple's statement in his concurring opinion that "prompt resolution of this matter is necessary not only for the good of the litigants but for the good of the Country," 673 F.3d at 586, Wells Fargo has stifled reasonable efforts to obtain basic discovery regarding its HAMP policies.

Specific to the instant Objections and Motion to Modify, Wells Fargo has refused to provide

---

[1] On June 28, 2012, the Court granted Plaintiffs' unopposed motion for leave to file an amended complaint adding Dan and Sandra Finlinson as co-plaintiffs. (Dkt. 115.)

[2] As explained by the Seventh Circuit, and more fully set forth in Section III(A), *infra*, there is a difference between Verified TPPs, like those the Plaintiffs allege they had, and Stated Trial Plans ("Stated TPPs"). At its core, the Seventh Circuit held that Wells Fargo had *no* authority to reevaluate the eligibility of borrowers with Verified TPPs. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 562 (7th Cir. 2012). Accordingly, the class members in this case include solely Verified Borrowers who, like Plaintiffs, made their payments on time but were never provided offers for permanent modifications (as promised and required under the Program). (*See* the Class definition, Second Amended Complaint ("SAC"), Dkt. 117, ¶ 59-60.) To date, discovery has uncovered a class of approximately 9,000 such Verified Borrowers (an estimated 1,000 from Wachovia and 8,000 from Wells Fargo) though the Parties are refining these numbers as the discovery process continues. (Declaration of Attorney Steven Woodrow attached hereto as Exhibit B ("Woodrow Decl.") ¶ 5.)

information regarding the supposed "investor guidelines" it used when terminating Wigod's TPP as well as data about the number of putative class members and the form HAMP documents (trial plans, notices, and related papers) that the bank used. (Dkt. 161.) Though this discovery bears on both class certification and the merits, the Referral Court denied Plaintiffs' Motion to Compel Further Answers to Interrogatories (the "Order")[3]—committing clear error in the process.

As explained below, the Order misunderstands the importance of having Wells Fargo promptly identify the investor guidelines that the bank has repeatedly represented—to Wigod, thousands of other homeowners, this Court, and the Seventh Circuit—allowed it to re-evaluate and terminate Verified Borrowers. Likewise, the Order critically misunderstands the difference between Verified TPPs and Stated TPPs, as well as Plaintiffs' need for data regarding the Class members' form contracts, the size of the class, and related information.

This Court should modify the Referral Court's Order and compel Wells Fargo to provide further responses to Interrogatory Nos. 1, 4, 12-13 and 15-18 accordingly.

## II. PROCEDURAL BACKGROUND

### A. The Slow Pace of Discovery Following the Referral

This case was referred for discovery purposes to the Referral Court on May 16, 2012. (Dkt. 80.) Given that much of the information needed for class certification and merits purposes involves the specific number of individuals processed at particular points in time (*i.e.*, when Wells Fargo was placing borrowers into Verified TPPs, instead of Stated TPPs) Plaintiff Wigod filed a Motion for Leave to Propound 150 Interrogatories. (Dkt. 74.) Shortly following the referral, and due to the fact that thousands of individuals have relevant knowledge about the bank's HAMP operations (indeed, over 30 employees had worked on Wigod's modification

---

[3] For this Court's convenience, the Order is attached hereto as Exhibit A.

alone), Plaintiffs also sought leave to take up to 50 witness depositions and to enlarge the time

limitation for the Rule 30(b)(6) witnesses from 7 hours to 21 hours. (Dkt. 101.) Plaintiffs

additionally propounded 297 Requests for Admission, hoping the litigation could be streamlined

by getting the bank's position with respect to numerous issues in the case.[4] (Dkt. 93.)

Wells Fargo opposed all of this discovery and, on June 28, 2012, the Referral Court denied

Plaintiffs' requests—restricting them to the same discovery limits imposed on litigants in

individual cases. (Dkt. 115.) In doing so, the Referral Court further ordered that "discovery [is]

to proceed under the following structure: document production and interrogatories will be

completed first, followed by requests to admit and Rule 30(b)(6) deposition(s)." (*Id.*)

**B.  Plaintiff Wigod' 25 Interrogatories and Wells Fargo's Litany of Objections**

Following the June 28, 2012 Order, Ms. Wigod propounded 25 interrogatories as limited by

the Referral Court. Wells Fargo "responded" with a list of objections. Relevant to the instant

Objections and Motion to Modify, Wells Fargo objected to identifying the supposed investor

criteria that it has repeatedly asserted allowed it to terminate Wigod from the Program, claiming

that such requests improperly seek its contentions. (*See* Wells Fargo's Objections and Responses

to Interrogatories attached hereto as Exhibit C.) Likewise, Wells Fargo objected to providing

information about Class members such as the number who received the same form agreement as

Plaintiffs, the number who received the "Congratulations Letter" Wigod received, the number

---

[4] Plaintiffs also propounded document requests that have been the subject of a rolling production. (Woodrow Decl. ¶ 4.) The Parties have reached disagreements along the way that have been brought to the attention of the Referral Court and await rulings. (Dkts. 140, 167, 175.) To date, and despite the fact that the document production in this case could readily eclipse one million pages, Wells Fargo has merely provided approximately 13,000 documents and has agreed to provide a sampling of 100 total files from populations identified as likely containing the Class members as presently defined. (Woodrow Decl. ¶ 4.) Wells Fargo has indicated that it continues to search for relevant policy and procedure documents though it is unable to provide a time when this undertaking may be completed. (*Id.* ¶ 9.)

3

whose plans were terminated based on a claim that their TPP representations no longer remained true and correct, and related information. (*Id.*) Wells claimed that providing such data was unduly burdensome and would require a file-by-file review of all class members. (*Id.*)

### C. The Referral Court's Order Denying Plaintiffs' Motion to Compel

After attempts to resolve the bank's objections through meet and confers proved unsuccessful, on September 28, 2012, Plaintiffs moved to compel further responses. (Dkt. 161.) On November 15, 2012, the Referral Court largely sided with Wells Fargo, denying the entirety of the Motion to Compel except for Plaintiff's Interrogatory asking Wells Fargo to identify the number of TPPs it had signed. (Order at 8-9.) Otherwise, the Referral Court found that Plaintiffs' questions seeking to have Wells Fargo identify the supposed investor guidelines that it used to kick Wigod out of the Program sought the bank's opinion about the facts of the case and that— although disclosure was preferred "as soon as the bank is able"—the bank could defer answering until "near the end of discovery." (*Id.* at 5.) Likewise, the Referral Court found that the Plaintiffs hadn't explained their need for information about the number of borrowers subject to Wells Fargo's different form contracts or the number that received certain notices because supposedly membership under the class definition doesn't rely on type of form contract used. (*Id.* at 6-8.) As explained below, these conclusions are clearly erroneous.

## III.    ARGUMENT

The District Court's review of any discovery-related decisions made by the magistrate judge is governed by Rule 72(a) of the Federal Rules of Civil Procedure, which provides: "The district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." *Weeks v. Samsung Heavy Indus. Co., Ltd.*, 126 F.3d 926, 943 (7th Cir. 1997) (citing Fed. R. Civ.

P. 72(a))). The standard allows the district court to overturn the magistrate judge's ruling where

it reaches the "firm conviction that a mistake has been made." *Weeks*, 126 F.3d at 943.

This standard is easily met here. The Referral Court committed error in allowing Wells Fargo

to delay identifying the investor guidelines or criteria that supposedly allowed it to re-evaluate

and terminate Wigod's TPP. Likewise, the Referral Court overlooked that the Class Definition

expressly limits membership to Verified Borrowers. Before addressing these errors, however, it

is critical to first understand the difference between Verified TPPs and Stated TPPs and the

Seventh Circuit's holding regarding a servicer's inability to reevaluate Verified Borrowers.

**A. Preliminary and Critical Matter: the Difference Between Having a Verified TPP Versus a Stated TPP, Its Impact on a Bank's Ability to Reevaluate Verified Borrowers, and Its Centrality to This Case.**

Critical to this discovery dispute—and to the greater litigation as a whole—is understanding

the factual and legal differences between Verified Borrowers like Wigod and the Finlinsons on

the one hand and Stated Borrowers on the other. As the Seventh Circuit explained:

> At th[e] time [Wigod entered her trial plan], Treasury's original guidelines were still in force,[5] so Wells Fargo could choose whether (A) to offer Wigod a trial modification based on unverified oral representations, or (B) to require her to provide documentary proof of her financial information before commencing the trial plan. ***Wigod alleges that Wells Fargo took option (B). Only after Wigod provided all required financial documentation did Wells Fargo, in mid-May 2009, determine that Wigod was eligible for HAMP and send her a TPP Agreement***.

673 F.3d at 558 (emphasis added.) Thus, whereas Verified Borrowers have their eligibility

determined *prior* to the start of their trial plans based on documentation, the eligibility of Stated

Borrowers is determined based on oral information of income that is specifically subject to

verification through documents after the trial plan has started.

---

[5] Treasury's Supplemental Directive ("SD") 10-01, issued January 28, 2010, directed that effective June 1, 2010, banks could no longer place borrowers into Stated TPPs at all. *See* SD 10-01 *available at* https://www.hmpadmin.com//portal/programs/docs/hamp_servicer/sd1001.pdf (last visited Nov. 29, 2012). Wells claims to have voluntarily implemented this change earlier, and as of March 1, 2010 only used Verified TPPs to process borrowers. (*See* Ex. C, p. 20.) Thus, the Finlinsons, having started their TPP in December 2010, are Verified Borrowers.

The legal effect couldn't be greater. As the Seventh Circuit specifically held—while assuming the truth of Wigod's allegations that "Wells Fargo took option (B)" (*i.e.*, that she was a Verified Borrower)—Wells Fargo had absolutely no authority under her trial plan or the HAMP directives to reevaluate her eligibility. *See Wigod*, 673 F.3d at 562 ("Wells Fargo insists that its obligation to modify Wigod's mortgage was also contingent on its determination, after the trial period began, that she qualified under HAMP guidelines. ***That theory conflicts with the plain terms of the TPP.***") (emphasis added); *see also id.* at 578-79 (upholding ICFA claims based on Wells Fargo's alleged "fail[ure] to disclose that it was going to reevaluate her eligibility for a permanent modification—***contrary to the terms of both her TPP and HAMP program guidelines***….") (emphasis added). Thus, the Seventh Circuit has made clear: if Wigod was a Verified Borrower, Wells Fargo had no authority under the TPP or HAMP directives to reevaluate her eligibility after her trial plan started.[6] Even more emphatic, during oral argument the following exchange occurred between Judge Hamilton and Wigod's counsel:

> JUDGE HAMILTON: Rebuttal Mr. Woodrow? Mr. Woodrow, did Ms. Wigod pre-qualify or not…get pre-verified or not?
>
> MR. WOODROW: Yes your honor, we absolutely allege that she was pre-qualified in paragraphs 34-36 of the amended complaint. Not only was she pre-qualified, your honor, she sent in her documents and her signed TPP agreement and the bank sent back as we allege in paragraph 35 and 36, its signed copy, along with a letter congratulating her on entry into the program.

---

[6] Given the import of having a Verified TPP, the Class and Subclass definitions in this case include *only* Verified Borrowers. The SAC defines the Class as:

> All homeowners nationwide who, [prior to or after] June 1, 2010 (or such other date that Wells Fargo changed its policy to only place preverify borrowers into TPP Agreements), entered into a TPP Agreement with Wells Fargo for the purposes of modifying their home mortgages, **whose eligibility for the HAMP had been verified prior to commencing the TPP Agreement**, and who, despite having complied with all terms of the TPP Agreement, have not received from Wells Fargo an offer for permanent modification.

(SAC ¶ 59-60) (emphasis added).

6

JUDGE HAMILTON: If she didn't get pre-verified, then we are all wasting a lot of time here, aren't we?

MR. WOODROW: Correct, which is why our pleading was careful to state that she was indeed pre-qualified. Again, that's amended complaint 34-36.

(Transcript of the Oral Argument (the "Transcript"), *available at* http://www.ca7.uscourts.gov/ fdocs/docs.fwx?caseno=111423&submit=showdkt&yr=11&num=1423 at 29:10 (last visited Nov. 29, 2012.)) Thus, whether Wigod had a Verified TPP was a central question for the Seventh Circuit, as having one prevented the bank from reevaluating her.

Because the Seventh Circuit has expressly prohibited reevaluating Verified Borrowers, Wells Fargo must show either that: (1) Wigod didn't have a Verified TPP in the first instance, such that the bank was permitted to re-review her eligibility, or (2) some other directives or investor guidelines, unknown to the appellate court, allowed it to reevaluate Verified Borrowers. Wells argues both. In addition to claiming that Wigod wasn't a Verified Borrower[7], Wells Fargo

---

[7] As will be explained more fully at the appropriate time, both Wigod and the Finlinsons were Verified Borrowers. (Woodrow Decl. ¶ 7.) With respect to Wigod, Wachovia apparently only used Verified TPPs. (*Id.*) As the Seventh Circuit has explained, "In its program directives, the Department of the Treasury set forth the exact mechanisms for determining borrower eligibility and for calculating modification terms—namely, the waterfall method and the NPV test." *Wigod*, 673 F.3d at 565. Wachovia verified Wigod's eligibility on May 21, 2009 after performing both a passing waterfall analysis and positive NPV. *Id.* Wachovia thereafter sent the TPP Agreement to Wigod, received it back with Wigod's signature, countersigned it on June 4, 2009, and then mailed it to her with the Congratulations Letter. (Dkt. 117-1, 118-1.) The TPP was thereafter enforceable, assuming Wigod made her payments on time:

> Wigod signed two copies of the Plan on May 29, 2009, and returned them along with additional financial documentation to Wells Fargo. ***Under the terms of the TPP Agreement, then, that moment was Wells Fargo's opportunity to determine whether Wigod qualified. If she did not, it could have and should have denied her a modification on that basis. Instead, Wells Fargo countersigned on June 4, 2009 and mailed a copy to Wigod with a letter congratulating her on her approval for a trial modification.*** In so doing, Wells Fargo communicated to Wigod that she qualified for HAMP and would receive a permanent "Loan Modification Agreement" after the trial period, provided she was "in compliance with this Loan Trial Period and [her] representations ... continue[d] to be true in all material respects." TPP ¶ 1.)

has repeatedly claimed that special investor guidelines permitted it to re-evaluate her. (*See* Wells

Fargo letters to Wigod attached hereto as Group Exhibit E.) It follows then that two inquiries at

the center of the case ask: (1) Did the Plaintiffs and the class members have Verified TPPs, and

(2) if so, did Wells Fargo improperly re-review them, or can the bank identify investor guidelines

that allowed it to reevaluate and terminate their plans?

In framing the Parties' dispute, the Seventh Circuit expressly rejected Wells Fargo's bare

assertions that unidentified investor criteria had allowed it to reevaluate verified borrowers:

> According to Wigod, Wells Fargo improperly re-evaluated her for HAMP after it
> had already determined that she was qualified and offered her a trial modification,
> and that it erroneously determined that she was ineligible for a permanent
> modification by miscalculating her property taxes. ***Wells Fargo responds that
> Treasury guidelines then in force allowed the servicer to verify, after initiating a
> trial modification, that the borrower satisfied all government and investor
> criteria for a permanent modification, and that Wigod did not. In the course of
> this proceeding, however, Wells Fargo has not identified the specific criteria
> that Wigod failed to satisfy, except to say that it could not craft a permanent
> modification plan for her that would be consistent with its investor guidelines.
> Because we are reviewing a Rule 12(b)(6) dismissal, we disregard Wells Fargo's
> effort to contradict the complaint.***

*Wigod*, 673 F.3d at 558-59 (emphasis added). Hence, the Seventh Circuit recognized that the

---

*Wigod,* 673 F.3d at 562, 578-79 (emphasis added). Thus, if Wigod hadn't qualified, the bank shouldn't have countersigned the TPP and mailed it back to her—as the facts show it did. (Dkt. 117-1.)

As for the Finlinsons, Wells Fargo verified their eligibility based on written documents on December 1, 2010, reaching a passable DTI and positive NPV. (Woodrow Decl. ¶ 8.) Importantly, their trial plan was verified using new HAMP forms that the Treasury introduced in October 2009 (which banks were to substantially adopt by March 1, 2010) that got rid of the signature requirement. (*See* SD 09-07 attached hereto as Exhibit D.) Indeed, SD 09-07's switch to different form contracts set forth two types of model agreements: those for "Verified Trial Plans" and those for "Stated Trial Plans," neither of which contain signature lines. (*See* Ex. D., Form TPP Agreements.) The Finlinsons' form is identical to the Verified Trial Plan (which specifically omits language that is present in the "stated" form allowing the bank to reevaluate borrowers). (*Compare* Finlinsons' TPP Agreement, Dkt. 117-1 *with* form Verified TPP, Ex. D, p. 20.) Thus, while this Court has previously found signing the TPP to be mandatory for borrowers with Wigod's form trial plan, *Avevedo v. Citimortgage, Inc*., No. 11 C 4877, 2012 WL 3134222 (N.D. Ill. July 25, 2012) that requirement shouldn't extend to borrowers who, like the Finlinsons, commenced their Verified TPPs under the more recent, no-signature forms.

specific investor criteria the bank used to reject Wigod presented a factual question that Wells Fargo had failed to answer as it could have by identifying them during the course of the appeal.

As explained below, the Interrogatories denied by the Referral Court had asked that Wells Fargo identify these supposed investor guidelines and state the number of borrowers who also had the same form contracts and other documents as were provided to the Plaintiffs. The Referral Court committed clear error in denying such discovery.

### B. The Referral Court Committed Clear Error by Refusing to Compel Wells Fargo to Identify the Supposed "Investor Guidelines" It Used When Dropping Wigod From the Program.

Interrogatory No. 4 requested that Wells Fargo:

> IDENTIFY specifically each and every HAMP Directive, program requirement, or TPP or TPP AGREEMENT provision, or investor guideline that you claim WIGOD or the FINLINSONS failed to satisfy together with all support for your contentions that such HAMP Directives, program requirements, TPP or TPP AGREEMENT provisions, or investor guidelines applied to any of the Plaintiffs.

(*See* Ex. C, p. 22.) Wells Fargo refused to answer, insisting that it is a "contention" interrogatory and that, per Federal Rule 33(a)(2), any response would be provided, if at all, at some point down the road. (*Id.*) Similarly, Plaintiffs asked that Wells Fargo explain each step it took to evaluate Wigod during her trial plan.[8] (Interrog. No. 1, Ex. C, p. 10.) In response, Wells Fargo stated that it had re-evaluated Wigod when her loan was transferred from Wachovia in October 2009 "as required by applicable HAMP guidelines and Wells Fargo investor requirements." (*Id.* p. 12.) When Plaintiffs asked Wells Fargo to specify which "investor requirements" allowed for such reevaluations—considering that the Seventh Circuit had already held the bank had no legal

---

[8] Plaintiffs also asked that the bank identify the requirement(s) that the Finlinsons supposedly failed to meet, and, unlike Wigod, the bank has done so, claiming the Finlinsons neglected to obtain a subordination agreement from the IRS regarding a tax lien on their property. (Ex. C, p.14-15.) Whether the bank took the steps required of it under HAMP to assist the Finlinsons in obtaining such an agreement remains an issue of fact and the subject of continued discovery.

right to re-evaluate Verified Borrowers—Wells Fargo objected, again claiming it called for the bank's contentions and that any answer would be provided later on in the case. (*Id.* p. 22.)

Plaintiffs moved to compel but the Referral Court sided with Wells Fargo, finding that Interrogatory No. 4[9] was a contention interrogatory that "ask[ed] for an opinion that relates to fact and/or the application of law to fact" and that there was no reason to require Wells Fargo to answer "until near the end of discovery."[10] (Order at 4-5.)

This is flatly incorrect. Plaintiffs don't seek Wells Fargo's opinion about any facts or its application of law to any facts. As made exhaustively clear through the Parties' meet and confers and Plaintiffs' briefing, Plaintiffs merely seek the actual guidelines that Wells Fargo used when it reevaluated and terminated Wigod from the Program. This is distinct from the directives or guidelines that, looking back with 20/20 hindsight and a fleet of expensive lawyers, the bank can now claim could've justified its decision to end her trial plan.

Wells Fargo has repeatedly represented—to Wigod, its other homeowners, this Court, and the Seventh Circuit—that investor guidelines and criteria both applied to Wigod's loan and allowed it to re-evaluate and terminate her from the Program. (*See, e.g.*, Ex. E.) As explained below, it turns out that these representations were patently false—no such investor guidelines exist, and Wells Fargo merely wants to avoid admitting as much. To prove otherwise, Wells

---

[9] The Referral Court rejected the notion that a further response to Interrogatory No. 1 was warranted on the supposed grounds that Interrogatory No. 1 hadn't specifically asked the bank to identify the directives it had used to terminate Wigod or the Finlinsons from the Program. (Order at 2-3.) The problem with this reasoning is that Wells Fargo chose to assert in its response to Interrogatory No. 1 that it had re-evaluated Wigod and the Finlinsons per investor guidelines. (Ex. C. p. 12, 14.) In light of such an answer, requesting that the bank identify the guidelines supposedly applicable to Wigod's loan (as it has already done with respect to the Finlinsons) was plainly warranted.

[10] Somewhat surprisingly, the Referral Court's refusal to set a deadline for Wells Fargo to provide such a response was made despite the Referral Court's acknowledgment that, "in order to narrow the issues in the case at the earliest opportunity, Defendant is urged to respond to the interrogatory as soon as it is able." (Order at 5.)

10

Fargo should be required to identify the supposedly applicable investor guidelines promptly.

**1. Investor guidelines expressly govern how a servicer like Wells Fargo is supposed to evaluate loans for modification under the HAMP.**

On March 4, 2009, the Department of Treasury published the HAMP Program Guidelines that, together with supplemental directives, have established the basic rules of the Program. (*See* "Initial Program Directives" available at http://rohrabacher.house.gov/uploadedfiles/ modification_program_guidelines.pdf (last visited Nov. 29, 2012)). These guidelines make clear that participating servicers like Wells Fargo "are required to consider all eligible loans under the program guidelines unless prohibited by the rules of the applicable PSA [(pooling and servicing agreement)] and/or other investor servicing agreements." (*Id.* at 2; *see also* SD 09-01, *available at* https://www.hmpadmin.com//portal/programs/docs/hamp_servicer/sd0901.pdf, p. 2 (same).) Likewise, servicers are required to execute Servicer Participation Agreements ("SPAs") with the Treasury that provide:

> Servicer shall perform the Services for all mortgage loans it services, whether it services such mortgage loans for its own account or for the account of another party, including any holders of mortgage-backed securities (each such other party, an "<u>Investor</u>"). Servicer shall use reasonable efforts to remove all prohibitions or impediments to its authority, and use reasonable efforts to obtain all third party consents and waivers that are required, by contract or law, in order to effectuate any modification of a mortgage loan under the Program.

(Wells Fargo SPA § 2A, Dkt. 118.) Furthermore:

> Notwithstanding subsection A, if (x) Servicer is unable to obtain all necessary consents and waivers for modifying a mortgage loan, or (y) the pooling and servicing agreement or other similar servicing contract governing Servicer's servicing of a mortgage loan prohibits Servicer from performing the Services for that mortgage loan, Servicer shall not be required to perform the Services with respect to that mortgage loan…."

(*Id.*, § 2B.) Thus, the rules that Wells Fargo must follow are outlined in the HAMP Program Directives and its SPA with the Treasury, <u>both</u> of which provide that ***for loans owned by a third-***

*party investor*, the bank must further adhere to all applicable investor rules.

Indeed, in this very case Wigod's co-plaintiffs, the Finlinsons, had a loan that was owned by a third-party investor and subject to a pooling and servicing agreement. Unlike Wigod, Wells Fargo has had no trouble identifying the Finlinsons' "investor rules"— the "Lehman Brothers Bank Flow Subservicing Agreement." (*See* "Finlinson PSA" at 3, attached hereto as Exhibit F.)

> **2. Wells Fargo has repeatedly invoked—but failed to identify—investor criteria supposedly applicable to Wigod's loan that the bank claims it used to re-evaluate her after her trial had started and to terminate her Verified TPP.**

Wells has repeatedly represented to Wigod, this Court, and the Seventh Circuit that supposed "investor guidelines" applicable to Wigod's loan had allowed it to re-evaluate and drop her from the Program. Before Wigod's lawsuit was filed, the bank provided Wigod demonstrably false reasons for terminating her trial plan—several of which referenced "investor guidelines" and directives without actually citing any specifically:

- On November 13, 2009, Wells Fargo sent Wigod a letter claiming that she had "not been approved for a mortgage loan modification because we were unable to get you to a modified payment amount that you could afford *per the investor guidelines on your mortgage*." (Ex. E, p. 2) (emphasis added);

- On December 23, 2009, Wells Fargo wrote that ***"[Y]our application for a Home Affordability Modification Program (HAMP) was denied due to Investor Guidelines and the loan was removed from the modification process*** . . . Our goal is to get the mortgagors between 31% and 38% Month/Debt to Income Ratio (M/DTI), which would constitute an affordable payment based on the gross income . . . Unfortunately, even with reducing the rate and extending the term, your M/DTI was at 54%."[11] (*Id.*, p. 3) (emphasis added); and

- On March 2, 2010, Wells Fargo wrote to Wigod that "Following the receipt of the payments due under the Trial Period Plan and your updated proof of income, WFHM conducted an additional review as required under the Home Affordable Modification Program. Regrettably, after a thorough review of the updated financial information you provided, we are unable to offer you a loan modification. We are unable to approve a loan modification because we are unable to get you to a revised payment amount that you could afford *per the investor guidelines on your mortgage*." (*Id.*, p. 4) (emphasis

---

[11] This reevaluation in December 2009 was of course improper, as Wells Fargo had no authority to re-review Wigod or any other borrower who made all payments timely under a Verified TPP. It is also incorrect insofar as it re-calculated Wigod's eligibility under directives issued subsequent (and inapplicable) to her Verified TPP.

added).

Wells repeated these assertions when urging this Court to dismiss the case, as well as to the Seventh Circuit, which again specifically recognized in reversing dismissal that "Wells Fargo has not identified the specific criteria that Wigod failed to satisfy, except to say that it could not craft a permanent modification plan for her that would be consistent with its investor guidelines." *Wigod*, 673 F.3d at 558-59. And Wells's tune hasn't changed since remand: its answer to Interrogatory No. 1 indicated—without identifying any directive or guidelines by name or date— that it had reevaluated Wigod under "applicable HAMP guidelines and Wells Fargo investor requirements." (Ex. C, p. 12.) Likewise, the bank asserts as an affirmative defense that it properly removed Wigod from HAMP based on investor guidelines. (*See* "Wells Fargo Aff. Defense No. 6" (Wells Fargo complied with all directives and guidelines).) (Dkt. 117).

Thus, Wells Fargo has repeatedly insisted that it was allowed to reevaluate Wigod under investor criteria that she ultimately failed to meet. That Wells Fargo should be required to identify these investor rules prior to "near the end of discovery" so that Plaintiffs can prepare their case is so basic it lays bare the clear error in the Referral Court's Order. Moreover, and as explained below, it now appears these supposed investor guidelines don't even exist in any case.

> **3. Contrary to the Referral Court's finding that Interrogatory No. 4 asked for Wells Fargo's opinions, Wigod seeks the actual investor guidelines the bank used to drop Wigod from the Program, which, it turns out, don't even exist.**

The Order allows Wells Fargo to delay identifying any supposedly applicable investor guidelines because, purportedly, Plaintiffs seek the bank's opinion about the facts of the case or its application of law to fact. (Order at 4.) This is simply incorrect. Plaintiffs do not seek Wells Fargo's opinion about the investor guidelines it could've used now looking back after several years—rather, Plaintiffs seek the <u>actual</u> investor guidelines the bank <u>in fact used</u> to re-evaluate Wigod and drop her from the Program. Contrary to the Referral Court's reasoning, the actual

investor guidelines that the bank used won't change as more discovery is produced—since the question is about past conduct, the guidelines the bank actually used in 2009/2010 should remain constant no matter how many documents are unearthed or witnessed are deposed. And again, these are the very investor guidelines that the Seventh Circuit found Wells Fargo had touted but ultimately failed to identify during the course of the appeal. Thus, all the Order does is allow Wells to continue hiding the investor criteria for no apparent reason.

Moreover, compelling a response now would materially advance the litigation. Plaintiffs need to know what the supposed investor guidelines are before deposing the bank's witnesses about them. As the bank has already identified and produced the relevant investor guidelines for the Finlinsons, that deposition can proceed. The bank has offered no reason why the depositions with respect to Wigod's loan should proceed without first identifying these critical rules.

Unfortunately, it now appears that the reason Wells Fargo doesn't want to answer is that it has been misleading Plaintiffs, this Court, and the Seventh Circuit all along. It turns out that no investor guidelines or investor criteria applied to the bank's conduct with respect to Wigod's loan. Indeed, in an attempt to explain away its repeated misrepresentations, Wells Fargo now argues that it was free to consider its own internal policies, which mirror the standard HAMP directives, to be "investor guidelines." (*See* Nov. 26, 2012 Letter from I. Freidel attached as Exhibit G) ("As to investor guidelines, I do not understand why you reject the fact that Wells Fargo may consider its own HAMP credit policies and HAMP policies and procedures as its "investor guidelines" for Wells Fargo-owned loans."). This is of course absurd. Because the bank's SPA with the Treasury and HAMP Directives require that it process borrowers under the HAMP rules unless prohibited by applicable investor guidelines, allowing the bank to craft its own internal rules and call them "investor guidelines" would provide it a mechanism to avoid

modifying any loan (by making up internal "investor rules" that prohibit this or that otherwise approvable modification).[12]

Thus, it appears that Wells Fargo misrepresented to the Seventh Circuit that investor guidelines had allowed it to reevaluate and terminate Wigod's Verified TPP. With the truth now exposed, no investor rules allowed for the reevaluation of Verified TPPs, leaving the bank to obstinately argue that it was free to call the HAMP directives "investor guidelines."

Given that it appears there are no applicable investor guidelines, the Referral Court committed clear error in allowing the bank to continue this charade. Accordingly, this Court should compel Wells Fargo to fully answer Interrogatory Nos. 4 and 1.

### C. The Order Commits Clear Error By Misunderstanding The Connection Between Class Membership And The Form Documents Governing Each Borrower.

In addition to erring by refusing to compel Wells Fargo to identify the supposed investor guidelines that applied to Wigod's loan, the Referral Court also committed error by refusing to compel answers regarding the number of people in the Class. Given that the Class consists of Verified Borrowers who made their payments and otherwise complied with their Verified TPPs but were not offered permanent modifications, Plaintiffs requested that Wells Fargo identify:

- The number of signed TPP Agreements Wells Fargo received from borrowers (Interrog. 12),

- The number of borrowers who submitted their financial information along with their signed TPP Agreements (Interrog. 13),

- The number of such TPP Agreements the bank counter-signed and returned to those

---

[12] That Wells Fargo can't grasp why referring to its internal policies as "investor criteria" could be confusing to borrowers is not credible. Judge Hamilton specifically asked Plaintiffs' counsel during oral argument to explain the role of investor guidelines in this dispute. *See* Transcript at 8:35 (JUDGE HAMILTON: "Can you enlighten me as to what the actual dispute is here and in particular about the role of investor guidelines in determining an individual homeowner's eligibility for relief?") If Judge Hamilton had questions, it is obvious the average borrower would not be clear as to the term's meaning.

15

borrowers who had sent the bank their signed TPP Agreements along with their financial information (Interrog. 14),

- The number of such borrowers to whom the bank sent the Congratulations Letter along with their fully executed TPP Agreements (Interrog. 15),

- The number of such borrowers who received the same fully executed TPP Agreement and Congratulations letter as Plaintiff Wigod, made at least three timely payments and received an offer for permanent modification (Interrog. 16),

- The number of borrowers who received the same HAMP documents as Plaintiff Wigod, fully complied with their TPP Agreements and never received an offer for a permanent modification (Interrog. 17), and

- The number of borrowers who received the same TPP Agreement as the Finlinsons, complied with its terms and were never extended an offer for permanent modifications (Interrog. 18).

(Ex. C, pp. 30-39). In response, Wells Fargo objected, claiming that it didn't track these data points during the course of its HAMP operations and that, therefore, gathering the answers would require a costly and burdensome file-by-file review. (*Id.*) Wells further asserted that it would instead be able to identify Verified Borrowers who had made at least 3 of their required trial payments but who "didn't convert" to a permanent modification. (*Id.* p. 39.)

As with Plaintiffs' other Interrogatories, the Referral Court decided in favor of Wells Fargo. Finding that the proposed cost, which supposedly exceeded $133,000, outweighed any benefit that could be derived from the information sought, the Referral Court stated:

> The classes are defined as those who entered into a TPP Agreement with Wells Fargo, complied with its terms, and did not receive an offer for permanent modification. Plaintiffs have not explained the need to explore the "contours" of the class by identifying of the numbers of customers who did or did not move through each stage of the process, or who did or did not comply with any particular term. Moreover, Plaintiffs do not offer any reason why they need to identify class members whose form documents were identical to Plaintiffs'. The exact language of the documents is not referenced in the class definition. This tenuous relevance therefore does not justify the admittedly substantial burden of reviewing all the loan files to obtain the information.

16

(Order at 8.)[13] The Referral Court further found the burden of production excessive in light of the data the bank has supposedly already disclosed regarding the number of Verified Borrowers.

Such reasoning is mistaken on several fronts. First, it reads the language limiting membership to Verified Borrowers right out of the Class Definition, and then, based on this misread, concludes that the "exact language of the documents is not referenced in the class definition" such that the information Plaintiffs sought was of "tenuous relevance." Likewise, understanding the number of borrowers who made it through the different stages helps identify stages of the process where the bank serially fell short. Finally, the Court placed too much faith in the data Wells Fargo has already provided. This Court should modify the Order accordingly.

      **1.   The Referral Court clearly erred in deleting the requirement that borrowers have a Verified TPP from the Class Definition and by using this new definition to discount the relevance of information bearing both on the size and scope of the Class.**

First, the Referral Court committed error in finding that "The classes are defined as those who entered into a TPP Agreement with Wells Fargo, complied with its terms, and did not receive an offer for permanent modification." (Order at 8.) This significantly, and without any explanation, redefines the Classes (and Subclasses) by deleting the requirement that class members be Verified Borrowers by omitting the phrase "whose eligibility for the HAMP had been verified prior to commencing the TPP Agreement" from the definitions. (SAC ¶¶ 59-60.)

Again, whether Wigod and other borrowers had Verified TPPs is a central issue in this case. By redefining the class the Referral Court erroneously includes Stated TPPs and ignores the significance of the type of form agreement the borrower had. Again, following the issuance of

---

[13] In light of this Court's *Avevedo* decision, the Referral Court did compel Wells Fargo to provide the number of borrowers who received executed TPP Agreements back from the bank. Rather than require the bank perform a file-by-file review, however, the Referral Court directed the Parties to determine a way to obtain this information through sampling, which the Parties are presently meet and conferring regarding. (Order at 8-9.)

SD 09-07, the bank could either place borrowers into Stated TPPs using the Stated TPP form or

Verified TPPs using a Verified TPP form. (*See* Ex. D.) The number of borrowers who received

the same form agreement and Congratulations Letter as Wigod (Interrogs. 15-17) and the

Finlinsons (Interrog. 18) and who made their payments but were never offered permanent

modifications is thus directly probative of the number of class members.[14] Without this

information, the Court may know the number of TPPs that the bank executed (which, for

borrowers with Wigod's form contract, suggests they were verified) but not the number that were

actually verified because a significant number had the Finlinsons' form agreement.

In short, by glossing over the Class Definition's requirement that borrowers need to have had

their eligibility for the HAMP verified prior to commencing their TPPs, the Referral Court

misunderstood the importance of the number of borrowers subject to the form documents used.

This resulted in clear error warranting this Court's modification.

> **2. The Referral Court committed clear error by failing to understand the importance of determining the number of borrowers who moved through each phase of the process or who did not comply with any particular term.**

With respect to Interrogatories 12 – 14, the Referral Court found the Plaintiffs hadn't

explained why information about the number of borrowers who reached each stage of the process

was needed. (Order at 7-8.) This was also a mistake. Knowing the difference between the

number of borrowers who signed their TPPs but didn't send in financial documents versus the

number who sent in their documents will help show the rate at which borrowers responded with

---

[14] Of course, and as will be further explained at the appropriate time, form contracts, such as those used by Wells Fargo in the HAMP context, tend "to present the classic case for treatment as a class action." *Haroco, Inc. v. Am. Nat. Bank & Trust Co. of Chicago*, 121 F.R.D. 664, 669 (N.D. Ill. 1988); *see also Menagerie Prods. v. Citysearch*, No. CV 08-4263, 2009 WL 3770668, at *10 (C.D. Cal. Nov. 9, 2009) ("When viewed in light of Rule 23, claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such.").

documents. Likewise, distinguishing between the number of borrowers like Wigod who received an offer for permanent modification (Interrog. 16) and the number who didn't (Interrog. 17) helps show the success rate the bank had for Verified Borrowers. Knowing the size of the class (*i.e.*, who never received the offers due them) in a vacuum, while useful, is hardly as informative as knowing the proportion such borrowers represent of all Verified Borrowers.

As alleged, Wells Fargo has engaged in a widespread pattern of fraud relating to the Program. (SAC, Dkt. 117.) That the bank violated the rules with respect to a significant percent of its Verified Borrowers helps show numerosity and commonality and is probative of the extent of its violations and related issues. Allowing the bank to withhold the number of borrowers who made it through each stage of the process deprives the record of relevant information.

### 3. The Order erred in accepting Wells Fargo's assertion that the bank wouldn't have information about borrowers who failed to comply with the TPP's non-payment related requirements.

Wigod's form TPP required her to keep her representations in Section 1 of the TPP Agreement true and correct throughout the trial period.[15] In declining to compel Wells Fargo's response to Interrogatory No. 17 asking for the number of borrowers who complied with this term, the Court found that "Defendant logically argues that it would not have access to this information unless the truth of a customer's representations were brought to its attention." (Order at 6, n.2.) The Court is mistaken. Wells Fargo could've obtained the information on its own through credit reports and title searches. And Wells Fargo, which coded its reasons for denying customers, should know whether it terminated anyone based on the borrower's representations no longer being true. If it didn't, it should simply say so. Accepting the bank's arguments that

---

[15] The representations include that the borrower is unable to pay his mortgage, that the borrower lives in the property as his primary residence, that there has been no change in the ownership of the property since the borrower applied, that the borrower has provided correct documents, and that the borrower will undergo credit counseling, if required. (Ex. A to SAC, Dkt. 117-1.)

logically it wouldn't have the information—as opposed to assessing such a claim after the bank has performed an appropriate search of its records and produced competent evidence indicating such denial codes don't exist—was clear error.

**4. The Order puts too much faith into the data Wells Fargo has produced thus far.**

Finally, the Referral Court also erred in accepting Wells Fargo's argument that requiring it to answer the Interrogatories would be unduly burdensome because it has supposedly already provided the number of Verified Borrowers who made their trial payments but who did not "convert" to permanent modification. This data is over-inclusive. At present, the number may include borrowers who failed to accept offers for permanent modification that the bank extended, or borrowers who, for example, sold their home after having made the trial payments. As these borrowers aren't members of the Class, they render Wells's data inaccurate.

Second, even if the data were reflective of the number of Class members, the Referral Court ignored the fact that, without knowing how Wells Fargo obtained this number, Plaintiffs are left in the dark as to how it was derived and tracked and remain at the mercy of Wells Fargo to assume that it has accurately gathered and reported the information.

Third, Wells has continuously revised its numbers, further undermining Plaintiffs' ability to rely on them. (Woodrow Decl. ¶ 5.) Accordingly, the Order shouldn't have found that Plaintiffs' need for the information sought was lessened by the data Wells has provided to date.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court modify or set aside the Referral Court's Order dated November 15, 2012 and compel Wells Fargo to fully respond to Interrogatories Nos. 1, 4, 12, 13, 15, 16, 17, and 18.

Dated: November 29, 2012

Respectfully submitted,

PLAINTIFFS LORI WIGOD, DAN
FINLINSON, SANDRA FINLINSON

By: /s/ Steven L. Woodrow
      One of Plaintiffs' attorneys

Steven Lezell Woodrow
swoodrow@edelson.com
Rafey S. Balabanian
rbalabanian@edelson.com
Irina Slavina
islavina@edelson.com
**EDELSON MCGUIRE, LLC**
350 North LaSalle Street, Suite 1300
Chicago, IL 60654

*Counsel for Plaintiffs and Putative Class*

21

**CERTIFICATE OF SERVICE**

I, Irina Slavina, hereby certify that on November 29, 2012, I electronically filed the foregoing *Plaintiffs' Objections to and Motion to Modify the Magistrate Judge's Order Dated November 15, 2012 (Dkt. 194)* with the Clerk of the Court using the CM/ECF system. Notice of this filing is sent to all counsel of record by operation of the Court's electronic filing system.

/s/ Irina Slavina