**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LORI WIGOD, on behalf of herself and all others similarly situated, | |
| Plaintiff, | Case No: 10-cv-02348 |
| v. | Honorable Elaine E. Bucklo |
| WELLS FARGO BANK, N.A. d/b/a WELLS FARGO HOME MORTGAGE, f/k/a WACHOVIA MORTGAGE, FSB, and d/b/a AMERICA'S SERVICING COMPANY, | |
| Defendant. | |

**PLAINTIFF WIGOD'S MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT**

Jay Edelson
jedelson@edelson.com
Steven L. Woodrow
swoodrow@edelson.com
Megan Lindsey (Admitted *Pro Hac Vice*)
mlindsey@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiff and the Settlement Class*

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................1

II.    NATURE OF THE LITIGATION ..............................................................3

    A.     The collapse of the housing market and the introduction of HAMP ................3

    B.     Wigod received a verified HAMP trial plan from Wachovia and complied with its terms but didn't receive an offer for permanent modification ........................................................................5

    C.     Wigod files suit and the District Court dismisses her First Amended Complaint with prejudice. ........................................................6

    D.     The Seventh Circuit reverses dismissal as to Plaintiff Wigod's breach of contract, promissory estoppel, ICFA, and fraudulent misrepresentation claims.. ................................................................6

    E.     Following remand, the Parties engage in substantial motion practice and discovery ..............................................................7

    F.     The Parties engage in a formal mediation process overseen by the Honorable Morton J. Denlow (Ret.) of JAMS that included three formal mediation sessions and a series of telephonic conferences ....................8

    G.     Wells Fargo's position ........................................................9

III.   TERMS OF THE SETTLEMENT AGREEMENT ......................................9

    A.     Class Definition ................................................................9

    B.     The Settlement Benefits ......................................................10

        1.     Relief to Settlement Group 1 Class Members ...........................10

        2.     Relief to Settlement Group 2 Class Members ...........................11

        3.     Relief to Settlement Group 3 Class Members ...........................12

        4.     Foreclosure Holds for Groups 1 and 2 ..................................13

    C.     Holistic Credit Counseling ..................................................13

    D.     Other Relief and Pertinent Provisions ......................................14

        1.     Payment of Notice and Administrative Fees ............................14

2.  *Compensation to the Class Representative* ................................................. 14

3.  *Payment of Attorneys' Fees and Expenses* ................................................. 14

4.  *Document Submission and Review Process* .............................................. 14

5.  *Class Member Appeals and Dispute Resolution Process* ......................... 14

E.  **The Release** ................................................................................................... 15

IV.  **THE PROPOSED SETTLEMENT CLASS SHOULD BE CERTIFIED** ................... 15

A.  **The Proposed Settlement Class is Ascertainable and Numerous** ................... 16

B.  **The Settlement Class Shares Common Issues of Law and Fact** ..................... 17

C.  **Wigod's Claims are Typical of Those of the Settlement Class** ...................... 19

D.  **Proposed Class Counsel and Wigod Have and Will Continue to Fairly and Adequately Represent the Interests of the Class** ........................................ 20

E.  **The Proposed Settlement Class Meets the Requirements of Rule 23(b)(3)** ........................................................................................................... 22

1.  *Common questions of law and fact predominate* ...................................... 22

2.  *This class action, and especially this class action Settlement, presents the superior method for adjudicating the Class's HAMP claims* ........................................................................................................ 23

IV.  **THE COURT SHOULD APPOINT WIGOD'S ATTORNEYS AS CLASS COUNSEL** ....................................................................................................... 24

IV.  **THE PROPOSED SETTLEMENT FALLS WITHIN THE RANGE OF FINAL APPROVAL AND THUS WARRANTS PRELIMINARY APPROVAL** ........ 25

A.  **The Settlement Produces Exceptional Results for the Class When Compared with the Relative Strength of Wigod's Claims** ............................. 26

1.  *Damages recoverable at trial* ................................................................... 27

2.  *Hurdles to success: certification and Wells Fargo's defenses* ................. 29

3.  *The value of the settlement* ....................................................................... 33

a.  *Loan Modification Reviews* ............................................................ 33

|   |   | b. | Cash Payments | 34 |
|   |   | c. | Foreclosure Holds | 35 |
|   |   | d. | Holistic Credit Counseling | 36 |
|   |   | e. | Other Relief | 36 |

**B.** **A Trial in this Case Would be Complex in Both Procedure and Substance** ........................................................................................ 37

**C.** **The Length and Expense of the Litigation to Date Favors Settlement** ........... 38

**D.** **Meaningful Opposition to the Settlement is Unlikely** ....................................... 39

**E.** **Proposed Class Counsel Readily Support the Settlement** ................................. 39

**F.** **The Stage of Proceedings and Discovery Conducted Warrant Approval** ........................................................................................ 40

**VII.** **THE PROPOSED PLAN OF CLASS NOTICE SATISFIES DUE PROCESS AND SHOULD BE APPROVED** ........................................................................ 41

**A.** **U.S. Mail Notice** ................................................................................................ 41

**B.** **Internet Publication** .......................................................................................... 42

**C.** **CAFA Notice** ..................................................................................................... 42

**VIII.** **CONCLUSION** ................................................................................................... 43

**TABLE OF AUTHORITIES**

**UNITED STATES SUPREME COURT CASES:**

*Amchem Prods. Inc. v. Windsor*, 521 U.S. 591(1997)..........................................15, 16, 20, 22, 23

**UNITED STATES CIRCUIT COURT OF APPEALS CASES:**

*Armstrong v. Board of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305 (7th Cir. 1980)..........25, 26

*In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002)........................................23

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996).................................................................26

*Lemon v. Int'l Union of Operating Eng'rs*, 216 F.3d 577 (7th Cir. 2000) ..................................22

*Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006)............................................ 23, 29 n.13

*Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672 (7th Cir. 2001)...................................................16

*Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584 (7th Cir. 1993)............................16

*Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992).........................................................17

*Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012).........................................*passim*

*Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748 (7th Cir. 2000)........................................16

**UNITED STATES DISTRICT COURT CASES:**

*Burton v. Nationstar*, No. 13-CV-307 (E.D. Cal.)............................................................25

*Fletcher v. OneWest Bank, N.A.*, No. 10-CV-4682 (N.D. Ill.) ....................................................25

*Fletcher v. ZLB Behring LLC*, 245 F.R.D. 328 (N.D. Ill. 2006)..................................................22

*Franks v. MKM Oil, Inc.*, No. 10-CV-00013, 2012 WL 3903782, (N.D. Ill. Sept. 7, 2012) ........16

*Gaudin v. Saxon Mortg. Servs., Inc.*, 297 F.R.D. 417 (N.D. Cal. 2013) ......................................29

*G.M. Sign, Inc. v. Group C Commc'ns, Inc.*, No. 08-CV-4521,
2010 WL 744262 (N.D. Ill. Feb. 25, 2010) ........................................................16

*Gomez v. Ill. State Bd. of Educ.*, 117 F.R.D. 394 (N.D. Ill. 1987)................................................20

*Hamilton v. Wells Fargo Bank, N.A.*, No. 09-cv-04152 (N.D. Cal. May 11, 2012)......................21

*Haroco, Inc. v. Am. Nat. Bank & Trust Co. of Chicago*, 121 F.R.D. 664 (N.D. Ill. 1988) ..........18

*Harris v. City of Chicago*, No. 96-CV-2406, 96-CV-7526, 1998 WL 59873
(N.D. Ill. Feb. 9, 1998)..........................................................................19

*Heartland Commc'ns Inc. v. Sprint Corp.*, 161 F.R.D. 111 (D. Kan. 1995) ................................18

*Herkert v. MRC Receivables Corp.*, 254 F.R.D. 344 (N.D. Ill. 2008)............................................16

*Hinman v. M and M Rental Ctr., Inc.*, 545 F. Supp. 2d 802 (N.D. Ill. 2008) ..............................17

*In re Bank of Am. Home Affordable Modification Program (HAMP) Contract Litig.*,
    MDL 10-2193-RWZ, 2013 WL 4759649 (D. Mass. Sept. 4, 2013)........................... 29-30

*In re JP Morgan Chase Bank Equity Line of Credit Litig.*, No. 10-cv-03647
    (N.D. Ill. July 16, 2010).................................................................................................21

*In re Kentucky Grilled Chicken Coupon Mktg. & Sales Practices Litig.*, 280 F.R.D. 364,
    (N.D. Ill. 2011)................................................................................................................36

*Kessler v. Am. Resorts Int'l*, No. 05 C 5944, 2007 WL 4105204 (N.D. Ill. Nov. 14, 2007)........26

*Kleiner v. First Nat'l Bank of Atlanta*, 97 F.R.D. 683 (N.D. Ga. 1983).......................................18

*Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298 (S.D. Fla. 2005) ...........................................33

*Maxwell v. Arrow Fin. Servs., LLC,* No. 03-CV-1995, 2004 WL 719278,
    (N.D. Ill. March 31, 2004)..............................................................................................17

*Menagerie Prods. v. Citysearch*, No. 08-CV-4263, 2009 WL 3770668,
    (C.D. Cal. Nov. 9, 2009).................................................................................................18

*Mezyk v. U.S. Bank Pension Plan*, No. 09-CV-384, 2012 WL 2913213,
    (S.D. Ill. July 16, 2012)..................................................................................................17

*Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424 (N.D. Ill. 2003).......................19, 22

*Redd v. Arrow Fin. Servs., LLC*, No. 03 C 1341, 2004 WL 1117844
    (N.D. Ill. Mar. 31, 2004) ................................................................................................16

*Scata v. Nationstar Mortg. LLC*, No. 14-CV-189 (D. Colo.) ........................................................25

*Scholes v. Stone, McGure, & Benjamin*, 143 F.R.D. 181 (N.D. Ill. 1992) ...................................18

*Schulken v. Washington Mut. Bank*, No. 09-CV-02708, 2012 WL 28099,
    (N.D. Cal. Jan. 5, 2012).................................................................................................21

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011)

*Smith v. Nike Retail Servs., Inc.*, 234 F.R.D. 648 (N.D. Ill. 2006) ..............................................36

*Whitten v. ARS Nat'l Servs. Inc.*, No. 00-CV-6080, 2001 WL 1143238,
    (N.D. Ill. Sept. 27, 2001) ...............................................................................................17

**STATUTES:**

Fed. R. Civ. P. 23 ...................................................................................17, 19, 20, 22, 24, 41

Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 ........................6

**MISCELLANEOUS:**

5 James Wm. Moore et al., Moore's Federal Practice (3d ed. 2001).............................................16

Conte & Newberg, 4 *Newberg on Class Actions*, § 11-25 (4th Ed. 2002) ...................................25

Discounted Present Value Calculator, *available at* http://www.aqua-calc.com/
    page/discounted-present-value-calculator (last visited June 11, 2014) ...................33 n.17

Homeownership Preservation Foundation, http://www.995hope.org/
    (last visited June 3, 2014) ...........................................................................................13 n.9

Making Home Affordable, Program Performance Report Through February 2014, 14,
    *available at* http://portal.hud.gov/hudportal/documents/huddoc?id=
    February2014MHAReport.pdf (last visited June 11, 2014) .....................................34 n.19

*Manual for Complex Litigation*, § 21.632 (4th Ed. 2004) .......................................................15, 26

Neil Mayer, Peter A. Tatian, Kenneth Temkin, and Charles A. Calhoun,
    *NeighborWorks® America National Foreclosure Mitigation Counseling*
    *Program Evaluation*, 99 (2011).................................................................................36 n.21

Paul Kiel, *Our FAQ on the National Foreclosure Settlement and Independent*
    *Foreclosure Review*, ProPublica (Nov. 4, 2011, 8:37 a.m.),
    http://www.propublica.org/article/our-faq-on-the-foreclosure-reviews
    (last visited June 12, 2014) ..........................................................................................8 n.5

## I.       INTRODUCTION

The instant class action settlement agreement ("Agreement" or "Settlement")[1] favorably resolves the claims of former Wachovia borrowers against Wells Fargo under the Home Affordable Modification Program ("HAMP" or the "Program")—restoring benefits valued in excess of $10 million to Settlement Class Members and representing a true victory for aggrieved borrowers. As this Court is aware, the historic financial meltdown and collapse of the U.S. housing market in late 2008 gave rise to a tidal wave of foreclosures—the effects of which are unfortunately still being felt today. The federal government's early response was to unveil HAMP, a process designed to lower borrowers' monthly mortgage payments down to an affordable level by providing loan modifications to distressed homeowners.

Though HAMP's framework was relatively straightforward, its implementation can charitably be described as a disaster. Shortly after its introduction in April/May 2009, thousands of borrowers began reporting complaints about their lenders' violations of HAMP directives, including claims that their banks had miscalculated their income and loan payments, misapplied the HAMP directives, repeatedly claimed to have lost their paperwork, and ultimately refused, without proper justification, to modify their loans.

The result was an onslaught of putative class actions, individual lawsuits, and counterclaims in foreclosure proceedings challenging the banks' mishandling of borrowers' HAMP applications. Most of these early lawsuits were unsuccessful: courts around the country routinely dismissed claims that were viewed as attempts by borrowers to enforce the HAMP directives, though HAMP provides no private right of action. Plaintiff Wigod, a borrower who

---

[1]        (*See* Settlement Agreement, attached as Exhibit 1.) Unless otherwise specified, capitalized terms herein have the same meanings as defined in the Settlement Agreement. The Parties anticipate having a signed Settlement Agreement to present to the Court prior to the Preliminary Approval hearing.

entered into a HAMP trial plan with Wachovia before it was sold to Wells Fargo, had filed such a Complaint. On January 25, 2011, the District Court, the Honorable Blanche Manning presiding, dismissed the case with prejudice, finding that Wigod's claims represented an improper "end run" around HAMP's lack of a private right of action. (Dkt. 59.)

On March 7, 2012, the Seventh Circuit issued its watershed decision reversing dismissal and reinstating Wigod's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and fraudulent misrepresentation. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012). The opinion is widely regarded as a leading decision in the country on borrower rights under HAMP.

Following remand, the Parties engaged in significant discovery, including the production and review of hundreds of thousands of pages of documents, the deposition of Mark Deskus, the Wachovia Vice President who oversaw Wachovia's loan modification operations, and the depositions of other fact witnesses. Plaintiff Wigod also filed a Second Amended Complaint and the Parties litigated over twenty substantive motions. As discovery progressed, counsel for the Parties began discussing the potential for settlement. These talks led to a formal mediation overseen by the Honorable Morton J. Denlow (Ret.) of JAMS that included three formal face-to-face sessions over the course of ten months, together with numerous telephonic discussions.

As a result of the mediation process, and with Judge Denlow's significant help and oversight, the instant Settlement provides substantial benefits to the Settlement Class. In addition to awarding Settlement Class Members with the opportunity to have their loans reviewed for permanent modifications—potentially saving them tens of thousands of dollars over the life of their loans and making their monthly payments more affordable—the Agreement also makes millions of dollars available for aggrieved borrowers. Homeowners whose loans are currently

2

held or serviced by Wells Fargo may be reviewed for all available loan modifications and, if

ineligible, can receive cash benefits. And Settlement Class Members whose loans are no longer

with Wells Fargo may also file claims for cash. All told, Settlement Class Members will receive

millions of dollars worth of loan modifications and cash relief under the Agreement—more than

the present-day value of their claims.[2]

Accordingly, and as explained further below, the instant Settlement falls well within the

range of final approval and should be preliminarily approved by this Court.

## II. NATURE OF THE LITIGATION

### A. The collapse of the housing market and the introduction of HAMP.

Late 2008 witnessed a devastating collapse of the U.S. (and global) financial markets. In

its wake, the already-growing tide of mortgage defaults and foreclosure actions flooding the

courts reached a crisis point. Congress responded by passing the Emergency Economic

Stabilization Act, as amended by the American Recovery and Reinvestment Act, 12 U.S.C.

§ 5201 *et seq.* (2010), which authorized the Treasury Department to enter into Servicer

Participation Agreements ("SPAs") with lenders and mortgage servicers to "facilitate loan

modifications and prevent avoidable foreclosures." *See* 12 U.S.C. § 5219 (2010).

The Treasury responded to this mandate by introducing HAMP, which was designed to

provide qualified borrowers with more affordable monthly mortgage payments. The process is

relatively simple: backed by government incentives, banks place homeowners into trial period

plans ("TPPs") that call for three or four monthly reduced trial payments (down to a target of

approximately 31% of borrowers' monthly income). (*See* Supplemental Directive 09-01,

---

[2]    As discussed in Section VI *infra*, such relief appears to be more generous than the
benefits contemplated under the only other nationwide class action settlement seeking to resolve
borrower HAMP claims against a national bank. *See In re JPMorgan Chase Bank, N.A.
Mortgage Modification Litig.*, No. 1:11-md-02290-RGS (D. Mass.).

attached as Exhibit 2.) When homeowners successfully complete their TPPs, the bank is to offer

them permanent modifications with monthly payments at or close to the trial payment amount.

The problem for borrowers is that the banks allegedly fell short of their duties while

administering the Program. Since the start of HAMP, thousands of formal and informal

complaints have been lodged—by homeowners, State Attorneys General, the Treasury

Department, and others—accusing HAMP servicers of routinely dragging out the process,

making gross calculation errors when determining borrower income and repayment thresholds,

claiming (often falsely) to have lost paperwork, ignoring borrower protests and explanations, and

improperly denying modifications to otherwise qualified borrowers. (Declaration of Steven L.

Woodrow ("Woodrow Decl.") ¶ 4, attached as Exhibit 3.)

The impact of such abuses has been felt most significantly by aggrieved homeowners.

Due to servicer errors, many borrowers have lost the very homes the Program was supposed to

help them save, have ended up paying more than they were required to, and have spent months,

if not longer, in a state of insecure limbo—not knowing whether they will become homeless at

any moment. (*See* Expert Report of Donald Frankenfeld ("Frankenfeld Report"), at 3–4, attached

as Exhibit 4.) Moreover, those borrowers who have managed to avoid foreclosure have had to

rely on more expensive financing alternatives, while other borrowers have had their credit

ruined. Many have missed out on HAMP incentives they otherwise would've received. (*Id.*)

Central to the instant case is that when HAMP was first introduced, servicers had a

choice with respect to placing borrowers into HAMP TPPs: the bank could either determine

borrower eligibility for the Program based on documents submitted by the borrower *before* the

start of the TPP, known as a "verified" trial plan, or servicers could approve a borrower based on

the borrower's oral representations of income that would be subject to later verification (known

as a "stated" trial plan). *Wigod*, 673 F.3d at 558. Discovery and other evidence gathered suggests that prior to its merger with Wells Fargo, Wachovia Bank, F.S.B. *only* used verified TPPs when processing HAMP applications. (Woodrow Decl. ¶ 6.) The distinction is critical, as borrowers in verified plans were not to be re-evaluated after the start of their verified trial plans. *Wigod*, 673 F.3d at 562 ("Wigod signed two copies of the Plan on May 29, 2009, and returned them along with additional financial documentation to Wells Fargo. Under the terms of the TPP Agreement, then, that moment was Wells Fargo's opportunity to determine whether Wigod qualified. If she did not, it could have and should have denied her a modification on that basis.").

### B. Wigod received a verified HAMP trial plan from Wachovia and complied with its terms but didn't receive an offer for permanent modification.

Plaintiff Wigod had a mortgage loan with Wachovia and applied for a HAMP modification within the first few weeks of its introduction. Following persistent calls to Wachovia's departments, Wigod was eventually approved for a verified TPP. On June 4, 2009, Wigod received from Wachovia a TPP signed by the bank that promised to provide her with an offer for permanent modification in the event she complied with its terms. (Third Amended Class Action Complaint ("TAC") ¶ 35.)

Wigod thereafter timely made each of the four trial payments required by her TPP. (*Id.* ¶ 37.) Before Wachovia permanently modified her loan, however, Wachovia was purchased by Wells Fargo. Upon transfer, Wells Fargo refused to recognize the Wachovia TPP, ultimately telling Wigod that it considered her loan to be in default. (*Id.* ¶¶ 39–42.) Plaintiff alleges that through repeated and persistent phone calls to Wells Fargo for months she eventually learned that Wells Fargo had reevaluated her eligibility for the Program following transfer of the loan from Wachovia and that, in the process, the bank had made several errors when calculating her rental income, taxes, and housing assessments. (Woodrow Decl. ¶ 5; TAC ¶ 43.) Ultimately,

Plaintiff alleges that Wells Fargo refused to modify her loan, asserting it could not reach an affordable payment under the then-current Program directives. (TAC ¶ 43.)

### C. Wigod files suit and the District Court dismisses her First Amended Complaint with prejudice.

Her attempts to secure a loan modification proving fruitless, Wigod filed her original class action complaint on April 15, 2010, alleging claims for breach of contract, violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 LCS 505/1 *et seq.* ("ICFA"), and common law fraud against Wells Fargo related to its alleged refusal to provide her with a loan modification as promised by Wachovia. (Dkt. 1.) On May 12, 2010, Wells Fargo moved to dismiss. (Dkt. 13.) In response, on June 23, 2010, Wigod filed her First Amended Class Action Complaint ("FAC") setting forth greater factual support for her claims related to Wells' alleged re-evaluation of her TPP. (Dkt. 23.) On July 23, 2010, Wells Fargo again moved to dismiss, arguing that Wigod's claims represented an impermissible "end run" around HAMP's lack of a private right of action. (*See* Dkt. 29.) On January 25, 2011, the District Court, the Honorable Blanche Manning presiding, dismissed Wigod's FAC with prejudice, agreeing with Wells Fargo that her claims were barred under the "end run" doctrine. (*See* Dkt. 59.)

Wigod thereafter timely appealed the dismissal to the Seventh Circuit.

### D. The Seventh Circuit reverses dismissal as to Plaintiff Wigod's breach of contract, promissory estoppel, ICFA, and fraudulent misrepresentation claims.

On March 7, 2012, the Seventh Circuit reversed the District Court's dismissal of Wigod's FAC, allowing her claims for breach of contract, promissory estoppel, and fraud to proceed. In doing so, it became the first federal circuit court of appeals to recognize homeowner rights under

HAMP. The decision's importance and precedential value cannot be seriously questioned.[3]
According to Westlaw, since its issuance it has been examined, relied on, or cited 837 times—
including 294 citations by courts all across the nation. (Woodrow Decl. ¶ 9.) And critically,
whereas borrower claims that banks had violated HAMP agreements were routinely dismissed
with prejudice prior to the decision, homeowners have enjoyed greater success in their lawsuits
and in ultimately securing permanent loan modifications since the opinion was handed down.
(*Id.* ¶ 10.) In short, the appellate decision is widely regarded as one of the leading authorities in
the country governing the contours of borrower rights and servicer obligations under HAMP.

      **E.**     **Following remand, the Parties engage in substantial motion practice and discovery.**

      Following the appeal, the Parties heavily litigated the case. During this time, the Parties
exchanged and analyzed over 200,000 pages of documents (including thousands of pages
covering Wells Fargo's HAMP policies and procedures, internal audit results, key witness emails
and ESI, and a sample of 100 complete borrower files), and counsel met and conferred over two
dozen times (often conferencing for over an hour) in addition to exchanging hundreds of emails.
(*Id.* ¶ 11.) At last count, the Parties had filed and briefed twenty-one significant motions,
including motions to dismiss, to strike affirmative defenses, to compel, limit, and bifurcate
discovery, and for a host of other relief[4] (not to mention ten motions to file under seal and to file

---

[3]     As Judge Ripple explained in his concurring opinion, "Prompt resolution of this matter is
necessary not only for the good of the litigants but for the good of the Country." *Wigod*, 673 F.3d
at 586 (Ripple, J., concurring).

[4]     Not including the instant brief and other papers to be filed in support of the Settlement,
Plaintiffs have drafted and filed the following twenty substantive briefs: (1) Sept. 2, 2010:
Response in Opposition to Motion to Dismiss and Woodrow Declaration in Support (Dkts. 42–
43); (2) April 27, 2012: Motion for Leave to Serve Additional Interrogatories (Dkt. 74); (3) May
29, 2012: Motion to Strike Affirmative Defenses (Dkt. 81); (4) May 29, 2012: Motion For Leave
to File Second Amended Complaint (Dkt. 83); (5) May 29, 2012: Motion for Class Certification
or Deferred Ruling (Dkt. 87); (6) June 13, 2012: Motion to Compel Rule 30(b)(6) Deposition

oversized briefs, ten agreed motions and stipulations, and four scheduling orders). (*Id.* ¶ 12.) The

Parties also attended eighteen court appearances, and subpoenas were issued to the Internal

Revenue Service ("IRS"), the Office of the Comptroller of the Currency ("OCC"), and

Promontory Financial.[5] Finally, experts have been consulted, and three deponents have been

produced and examined (with at least ten more noticed). (*Id.* ¶ 13.) Overall, the discovery

conducted following remand was extensive.

> **F.    The Parties engage in a formal mediation process overseen by the Honorable
> Morton J. Denlow (Ret.) of JAMS that included three formal mediation
> sessions and a series of telephonic conferences.**

As the discovery process continued to unfold, counsel for the Parties began discussing the

potential for resolving the case. (*Id.* ¶ 14.) Eventually the Parties agreed to engage in a formal

mediation process overseen by the Honorable Morton J. Denlow of JAMS in Chicago. (*Id.*)

Counsel for the Parties engaged in three full-day mediation sessions (on July 18, 2013, October

30, 2013, and March 25, 2014) in addition to several telephonic conferences both separately and

---

(Dkt. 101); (7) June 21, 2012: Opposition to Motion by Wells Fargo for a Protective Order (Dkt. 105); (8) July 13, 2012: Response to Motion by Wells Fargo regarding Limited Bifurcation of Discovery (Dkt. 127) and the Expert Report of D. Frankenfeld in Support (Dkt.129); (9) Aug. 15, 2012: Motion to Strike Affirmative Defenses (Dkt. 133); (10) Aug. 24, 2012: Motion to Compel Response to Document Requests (Dkt. 140); (11) Sept. 10, 2012: Motion to Overrule Defendant's Claims of Privilege (Dkt. 152); (12) Sept. 11, 2012: Reply in Support of Motion to Strike Affirmation Defenses (Dkt. 156); (13) Sept. 24, 2012: Reply in Support of Motion to Overrule Defendant's Claims of Privilege (Dkt. 159); (14) Sept. 28, 2012: Motion to Compel Further Answers to Interrogatories (Dkt. 161); (15) Oct. 8, 2012: Reply in Support of Motion to Compel Response to Document Requests (Dkt. 175); (16) Nov. 12, 2012: Reply in Support of Motion to Compel Further Answers to Interrogatories (Dkt. 191); (17) Nov. 29, 2012: Objections to and Motion to Modify Magistrate Judge Order (Dkt. 201); (18) Jan 9, 2013: Reply in Support of Objections to and Motion to Modify Magistrate Judge Order (Dkt. 219); (19) Feb. 20, 2013: Motion to Compel Documents and Enlarge Depositions (Dkt. 224); and (20) May 1, 2013: Motion to Compel (Dkt. 236). (*Id.* ¶ 12.)

[5]    Promontory Financial acted as Wells Fargo's third-party reviewer for the Independent Foreclosure Review under the settlement reached as part of the National Mortgage Settlement. *See* Paul Kiel, *Our FAQ on the National Foreclosure Settlement and Independent Foreclosure Review*, ProPublica (Nov. 4, 2011, 8:37 a.m.), http://www.propublica.org/article/our-faq-on-the-foreclosure-reviews (last accessed June 12, 2014); (Woodrow Decl. ¶ 13 n.1.)

together with the Mediator's involvement and oversight. (*Id.* ¶ 15.) The mediation process not only allowed the Parties to discuss the framework of a negotiated settlement, it provided an atmosphere that facilitated a meaningful exchange of information regarding the composition of the proposed Settlement Class. (*Id.* ¶ 15.) Wells Fargo provided specific data to enable proposed Class Counsel to determine whether such borrowers were previously offered different modifications, the comparative strength of such offers' terms, and whether the borrower defaulted on any prior offer. (*Id.* ¶ 16.) Armed with this data, the Parties were able to negotiate the proposed relief for the settlement groups that comprise the Settlement Class. (*Id.* ¶¶ 15–17.)

Importantly, only after an agreement with respect to such relief was reached in principal did the Parties formally negotiate an incentive award for the Class Representative, Ms. Wigod, and reasonable attorneys' fees for Class Counsel. (*Id.* ¶ 17.) When the negotiations reached a standstill, Judge Denlow ultimately bridged the impasse through a mediator's proposal.[6] (*Id.*)

### G.  Wells Fargo's position.

Wells Fargo has denied and continues to deny that it committed or attempted to commit any of the wrongful acts alleged in Plaintiff's pleadings or that it has engaged in any other wrongdoing. (*See* Agreement §§ 2.4, 11.4.) Wells Fargo maintains that it properly considered all borrowers, that it has defenses to any claims, and that it was and is prepared to defend the case. Nevertheless, Wells Fargo has agreed to settle the case on the terms set forth in the Settlement.

Against this factual backdrop, the key terms of the proposed Settlement follow.

## III.  TERMS OF THE SETTLEMENT AGREEMENT

### A.  Class Definition. For the purposes of effectuating the Settlement only, the Parties

agree to the following Class Definition:

---

[6]  It should be noted that Plaintiff's preference was to have the fees decided by the Court or through binding arbitration. (Woodrow Decl. ¶ 17.)

> All borrowers (1) who received a HAMP TPP from Wachovia/Raleigh between March 1, 2009 and October 15, 2009 based on verified financial documentation, (2) whose HAMP TPP was signed by both the borrower and Wachovia (Raleigh), (3) who made all scheduled payments and satisfied all conditions set forth in the TPP and required by HAMP, (4) whose loan was transferred to Wells Fargo Home Mortgage for servicing in October 2009, and (5) who did not receive a permanent HAMP modification at any time after the transfer of servicing.

Excluded from the Class are any Judge or Magistrate presiding over this Action and members of their immediate families, officers and directors (and members of their immediate families) of Defendant, Defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which Defendant or its parent companies have a controlling interest, Persons who properly execute and file a timely Request for Exclusion from the Class, Persons who have already released their claims against Wells Fargo that are covered by this Settlement, and the legal representatives, successors or assigns of any such excluded persons. (*Id*. § 1.5.)

**B.    The Settlement Benefits.**

The Settlement Benefits come in four forms: evaluations for loan modification offers, cash payments, Foreclosure Holds, and holistic credit counseling. To begin, Settlement Class Members are divided into three groups. The first group, Settlement Group 1, consists of borrowers whose loans are still with Wells Fargo and are considered either in default or at risk of default. The borrowers in the second group, Settlement Group 2, also have loans that are still held or serviced by Wells Fargo, but are presently considered to be "current" with respect to those loans. Finally, Settlement Group 3 Class Members no longer have loans with Wells Fargo due to a foreclosure, deed-in-lieu of foreclosure, short-sale, loan payoff, or servicing transfer. The relief made available under the Agreement to each group is set forth below.

1.    *Relief to Settlement Group 1 Class Members.*

Class Members whose loans are deemed to be either in default or at risk of default as of fifteen days following Preliminary Approval will be eligible to be reviewed and considered for a

permanent loan modification that would lower their monthly mortgage payments. If approved following the submission of the required documents, Settlement Group 1 Class Members will receive an offer for a permanent loan modification that they may accept by signing and returning the offer to Wells Fargo. (*Id.* § 3.1.)

Settlement Group 1 Class Members who, following the submission of all required documents, are deemed ineligible for any loan modification will become eligible to enter into a relocation agreement in exchange for a cash payment. (*See* Sample Relocation Agreement, attached as Exhibit E to the Agreement.) (*Id.* § 3.1(b).) The total amount made available under the Settlement for such cash payments is $700,000, and each agreement will require that the borrower relocate within ninety days. (*Id.* §§ 3.1(c), 8.1(a).) Per-borrower payout amounts shall be subject to an individual Settlement Class Member maximum in an amount determined by Class Counsel based upon objective criteria, including whether the Settlement Class Member had previously received any loan modification offer and the terms of any such offer. (*Id.* § 3.1(c).)[7] Any amounts awarded under the Agreement will be offset by any monies received by the Settlement Class Member through the Independent Foreclosure Review process, the National Mortgage Settlement, or any other comparable agreement or enforcement action. (*Id.* § 8.1.)

2.    *Relief to Settlement Group 2 Class Members.*

Settlement Group 2 Class Members are those whose loans are still held by Wells Fargo and who are deemed to be "current" on their mortgage obligation as of fifteen days following Preliminary Approval. (*Id.* § 1.21.) Settlement Group 2 Class Members have options under the Agreement. First, Settlement Group 2 Class Members may submit a Claim Form together with necessary documentation to be considered for Offers for Permanent Loan Modifications. Group

---

[7]    All payments to Settlement Class Members are subject to maximum per-loan caps as set forth in a separate side letter that the Parties are prepared to share with the Court. (*Id.* § 3.5.)

2 Class Members who qualify for a modification will receive offers to modify their loans that they may accept by signing and returning to Wells Fargo. (*Id.* § 3.2.)

Group 2 Class Members who are deemed ineligible or who reject the offered terms shall be sent a Monetary Benefit Request Form. Settlement Group 2 Class Members who sign and return the Monetary Benefit Request Form shall be evaluated for an appropriate cash award. The total amount made available under the Settlement for such cash payments is $100,000. Per-borrower payout amounts shall be determined by Class Counsel, subject to objective criteria and per-loan caps.

Settlement Group 2 Class Members may also bypass the loan modification consideration process and opt to receive a streamlined monetary payment of $250. (*Id.* § 3.2.) As with other groups, any amounts awarded under the Agreement will be offset by any monies received by the Settlement Class Member through the Independent Foreclosure Review process, the National Mortgage Settlement, or any other comparable agreement or enforcement action. (*Id.* § 8.1.)

3. *Relief to Settlement Group 3 Class Members.*

Settlement Group 3 consists of Class Members whose loans are no longer serviced or held by Wells Fargo as a result of a foreclosure, short sale, or deed-in-lieu of foreclosure, the transfer of the mortgage servicing rights for the loan from Wells Fargo to a new mortgage servicer, or through a payoff of the loan by the borrower. (*Id.* §§ 1.22, 1.28.) Since such Class Members no longer have loans serviced by Wells Fargo, the bank cannot permanently modify their loans. As such, the Settlement makes cash payments available to this group. (*Id.* § 3.3.) For borrowers who experienced a foreclosure or short-sale, or handed Wells Fargo the deed to their home to avoid foreclosure (deed-in-lieu), the Settlement provides cash relief in a collective amount not to exceed $2,000,000 upon the submission of a simple claim form. (*Id.* § 3.3.) As with other cash payments under the Agreement, individual payment amounts will be determined

12

by Class Counsel based upon objective criteria, subject to per-loan caps. (*Id.*)

4.    *Foreclosure Holds For Groups 1 and 2.*

For Group 1 and Group 2 Settlement Class Members, Wells Fargo agrees to implement Foreclosure Holds with respect to their loans during "the time when Wells Fargo is reviewing any Class Member's application for a loan modification under th[e] Agreement up through thirty (30) days following a Notice of Denial, or where a Class Member appeals, up through thirty (30) days following a final notice of the appeals decision." (*Id.*§ 3.1(d).) This means that Wells Fargo will suspend any scheduled foreclosure sale, will not refer any loan to foreclosure, record a notice of default, notice of trustee's sale, or similar notice, move for foreclosure judgment or order of sale, or seek a foreclosure sale while the hold is in place. (*Id.* § 1.19.)[8]

**C.    Holistic Credit Counseling**

As an additional Settlement benefit, Wells Fargo will make holistic credit counseling available to all Class Members at Wells Fargo's expense. (Agreement § 3.4.) The counseling service will be provided through the Homeownership Preservation Foundation network[9] and is designed to help borrowers work through, as needed, debt management plans, budget counseling, housing counseling, bankruptcy education, and credit report reviews. (*Id.*) Any Class Member who elects to obtain credit counseling through the Settlement may indicate his or her election in the appropriate section of the Claim Form. (*Id.*)

---

[8]    It is worth noting that to facilitate settlement negotiations, Wells Fargo has already implemented a foreclosure hold with respect to the Settlement Class Members. As such, certain Settlement Class Members in Group 1 have already benefitted from the litigation for over a year while their scheduled or potential foreclosures have been suspended. (Woodrow Decl. ¶ 16.)

[9]    The Homeownership Preservation Foundation is an independent national nonprofit dedicated to guiding consumers on to the path of sustainable homeownership and improving their overall financial health. Since 2007, the foundation has served more than five million distressed homeowners who depend upon it as a trusted, neutral source of information and assistance. *See* Homeownership Preservation Foundation, http://www.995hope.org/ (last visited June 3, 2014).

D.    **Other Relief and Pertinent Provisions**

1.    *Payment of Notice and Administrative Fees*: All settlement administration expenses will be paid by Wells Fargo. (*Id.* § 7.3.)

2.    *Compensation to the Class Representative*: Wells Fargo has agreed to pay, subject to approval of the Court, an incentive award to Ms. Wigod consisting of a permanent loan modification. (*Id.* § 9.3.)

3.    *Payment of Attorneys' Fees and Expenses*: Under the Settlement, Wells Fargo has agreed to not oppose proposed Class Counsel's request for $3,500,000 for reasonable attorneys' fees and reimbursement of expenses. (*Id.* § 9.1.) The requested fees and expenses are subject to Court approval, and proposed Class Counsel will provide appropriate support for the request at least two weeks prior to the objection deadline.

4.    *Document Submission and Review Process*: The Settlement provides a mechanism for Settlement Class Members in Groups 1 and 2 to submit the paperwork necessary to be considered for a loan modification offer. A Document Checklist will be posted on the Settlement Website and included in the Notice and Claim Forms to such Settlement Class Members. (*Id.* § 1.13.) Claimants will first submit their completed Claim Form to the Settlement Administrator, and any required documents will be submitted to Wells Fargo for processing and consideration. If at any point in the process it becomes apparent that documents are incomplete or missing, the Settlement Class Member will be provided with a letter specifying the missing or inaccurate documents. Such Settlement Class Members will have thirty (30) days to submit the missing documents. (*Id.* §§ 1.39, 3.1(a)(1).)

5.    *Class Member Appeals and Dispute Resolution Process*: The Settlement also provides a mechanism by which Settlement Class Members can dispute: (1) their classification as belonging to a particular Settlement Group, (2) Wells Fargo's decision to deny

14

them an Offer for Permanent Loan Modification, (3) the terms of any loan modification offered, (4) any Request For Additional Documents, and (5) any other dispute contemplated by the Agreement. Settlement Class Members may initiate such disputes by following the instructions contained in any Notice of Approval or Notice of Denial, which will track the process established by the Consumer Financial Protection Bureau. (*Id.* §§ 1.25, 3.1(a)(5), 3.2(b)). If the dispute is not resolved in the Class Member's favor, the Class Member may escalate the dispute for a binding decision by the Mediator, Judge Denlow. (*Id.* §§ 1.25, 3.1(a)(5).)

### E. The Release

In exchange for the relief provided above, and upon the entry of a final order approving this Settlement, Wells Fargo and each of its related affiliates and entities will be released from any claims, whether know or unknown, arising out of or relating to Wells Fargo's actions in connection with HAMP and servicing of borrower loans, including its HAMP policies, systems, standards, procedures, and performance, its compliance with HAMP directives and guidelines, and its actions with respect to any HAMP trial plans, permanent modification agreements, or other HAMP paperwork that were or could have been alleged in the Complaint. (*See id.* §§ 1.37, 4, 11.3 for the full release.)

### IV. THE PROPOSED SETTLEMENT CLASS SHOULD BE CERTIFIED.

Granting preliminary approval of a class action settlement requires class certification for settlement purposes. *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Manual for Complex Litigation* (Fourth) § 21.632. Federal Rule of Civil Procedure 23(a) requires that a class may be certified only if "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the

representative parties will fairly and adequately protect the interests of the class." *Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 760 (7th Cir. 2000). As shown below, the proposed Settlement Class meets each of Rule 23(a)'s requisites to certification.

Upon meeting the requirements of Rule 23(a), the proposed class must also satisfy one of the three provisions of Rule 23(b). For the Settlement Class here, certification is sought pursuant to Rule 23(b)(3), which requires that common questions of law or fact predominate over issues affecting only individual members and that the maintenance of the lawsuit as a class action is superior to other methods for the fair and efficient adjudication of the controversy. *Amchem*, 521 U.S. at 615 (1997); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001).

When determining whether to certify a class action for settlement purposes a court may consider matters beyond the pleadings to determine if the claims are suitable for resolution on a class-wide basis. *See Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993); *Redd v. Arrow Fin. Servs, LLC*, No. 03 C 1341, 2004 WL 1117844, at *1 (N.D. Ill. Mar. 31, 2004)*. As explained below, both the pleadings and the discovery produced show that all of the prerequisites for certification are met here with respect to the proposed Settlement Class.

### A. The Proposed Settlement Class is Ascertainable and Numerous.

The first requirement for certification is that the proposed class is ascertainable. *Herkert v. MRC Receivables Corp.*, 254 F.R.D. 344, 348 (N.D. Ill. 2008). A class must be "identifiable as a class, and membership must be determinable through application of objective criteria." *G.M. Sign, Inc. v. Group C Commc'ns, Inc.*, No. 08-CV-4521, 2010 WL 744262, at *2 (N.D. Ill. Feb. 25, 2010); *see also* 5 James Wm. Moore et al., Moore's Federal Practice*, ¶ 23.21[1] (3d ed. 2001) (same). Objective criteria may include a defendant's business records. *See, e.g., Franks v. MKM Oil, Inc.*, No. 10-CV-00013, 2012 WL 3903782, at *5 (N.D. Ill. Sept. 7, 2012) (class is

"easily ascertainable" through "ADP pay records"); *Mezyk v. U.S. Bank Pension Plan*, No. 09-CV-384, 2012 WL 2913213, at *1 (S.D. Ill. July 16, 2012) (certification appropriate where "class members are ascertainable through Defendants' records").

Relatedly, once ascertained, the class must be so "numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). No specific number is required to satisfy this factor, nor is a plaintiff required to state the exact number of class members. *Smith v. Nike Retail Servs., Inc.*, 234 F.R.D. 648, 659 (N.D. Ill. 2006). Generally, "[t]he court is permitted to make common-sense assumptions that support a finding of numerosity." *Maxwell v. Arrow Fin. Servs., LLC,* No. 03-CV-1995, 2004 WL 719278, at *2 (N.D. Ill. March 31, 2004). A plaintiff need not provide an exact number, but membership must "be ascertained by reference to objective criteria and may be defined by reference to defendant's conduct." *Hinman v. M and M Rental Ctr., Inc.*, 545 F. Supp. 2d 802, 806 (N.D. Ill. 2008).

In this case the number of Class Members readily exceeds forty and satisfies the numerosity requirement. (Woodrow Decl. § 16.) Further, the Settlement calls for a Class List setting forth each Class Member's loan and group. (Agreement § 1.6.) It is clear that joining all Settlement Class Members in this lawsuit would be impracticable, if not impossible, and that the numerosity and ascertainability requirements are met here.

## B.   The Settlement Class Shares Common Issues of Law and Fact.

The second threshold to class certification requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality is present where a "common nucleus of operative fact" exists, even if as to one question of law or fact, *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992), and is often found where "defendants have engaged in standardized conduct toward members of the proposed class." *Whitten v. ARS Nat'l Servs. Inc.*,

No. 00-CV-6080, 2001 WL 1143238, at *3 (N.D. Ill. Sept. 27, 2001) (internal quotations omitted). The question of commonality is a readily surmountable hurdle. *See Scholes v. Stone, McGure, & Benjamin*, 143 F.R.D. 181, 185 (N.D. Ill. 1992).

The central common questions in this litigation concern the contractual rights of verified Wachovia borrowers. As the Seventh Circuit noted, Wells Fargo's assertions that Wigod was not qualified for a loan modification and that the bank was therefore permitted under HAMP directives to re-evaluate her eligibility after the trial plan had been initiated raises a question of fact. *Wigod*, 673 F.3d at 559 n.3. It is a common question of fact because Wells Fargo allegedly acted as if it could re-evaluate the loans of *each* of its verified borrowers. (TAC ¶¶ 51(f), 66; Woodrow Decl. ¶ 7.) As a result, Wigod's and the Settlement Class Members' claims are all premised on the same common allegations: as verified borrowers under HAMP, their TPP agreements were valid and binding contracts that, notwithstanding the homeowners' full compliance with their contractual obligations, Wells Fargo routinely breached by re-evaluating them and refusing to provide them with permanent modifications. (TAC ¶¶ 55–69.)

Form contracts, such as those used by Wachovia and Wells Fargo in the HAMP context, tend "to present the classic case for treatment as a class action." *Haroco, Inc. v. Am. Nat. Bank & Trust Co. of Chicago*, 121 F.R.D. 664, 669 (N.D. Ill. 1988); *see also Menagerie Prods. v. Citysearch*, No. 08-CV-4263, 2009 WL 3770668, at *10 (C.D. Cal. Nov. 9, 2009) ("When viewed in light of Rule 23, claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such.") (quoting *Kleiner v. First Nat'l Bank of Atlanta*, 97 F.R.D. 683, 691 (N.D. Ga. 1983)); *see also Heartland Commc'ns Inc. v. Sprint Corp.*, 161 F.R.D. 111 (D. Kan. 1995) (certifying class seeking recovery of underpaid commissions based upon the defendant's uniform

18

erroneous interpretation of the contract and use of computer program that under-reported the actual revenue generated).

Wells Fargo allegedly interpreted and applied the HAMP directives and TPP agreements the same way with respect to each member of the Class: as if they were not binding contracts that required the bank to extend offers of permanent modification to homeowners who complied with their terms. (Woodrow Decl. ¶ 7.) The issues in the case thus present a classic fact pattern for class certification. As such, this litigation implicates several common questions of law and fact.

### C. Wigod's Claims Are Typical of Those of the Settlement Class.

Rule 23 next requires that Plaintiff's claims be typical of those of the proposed Class. Fed. R. Civ. P. 23(a)(3). Typicality is closely related to commonality and is satisfied if a plaintiff's claims arise from "the same event or practice or course of conduct that gives rise to the claims of other class members and . . . are based on the same legal theory." *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 432 (N.D. Ill. 2003) (quotations omitted). Factual differences will not preclude a finding of typicality. The claims of a named plaintiff need only share "the same essential characteristics" as those of the class. *Id.* Indeed, "'[s]imilarity of legal theory is more important than factual similarity." *Id.* (quoting *Harris v. City of Chicago,* Nos. 96-CV-2406, 96-CV-7526, 1998 WL 59873, at *5 (N.D. Ill. Feb. 9, 1998)).

In this case, and although it is not required, Wigod's central legal theory is identical to the legal theories of the members of the proposed Class. Again, the legal claim hinges on the allegation that she was a verified borrower. As the Seventh Circuit recognized, verified borrowers who made their trial payments and complied with their TPP agreements can state valid claims for breach of contract, promissory estoppel, fraud, and consumer fraud when a servicer refuses to extend them offers for permanent modification. *Wigod*, 673 F.3d at 557–59, 585–86. In other words, if the borrowers were pre-verified and made their payments on time, the bank

19

breached their TPP agreements by re-evaluating them and failing to permanently modify their loans. Wigod's facts are typical too. Again, Wigod's and the Settlement Class Members' TPPs contained identical language and terms, and Wells Fargo allegedly (mis)applied the HAMP directives in the same manner with respect to each of them. And just like the Settlement Class Members, Wigod was a Wachovia borrower with a verified trial plan who Wells Fargo allegedly re-evaluated following the transfer of the servicing of her loan to Wells Fargo. (TAC ¶ 43.)

As her factual claims and legal theories are nearly identical to those of the Settlement Class Members, demonstrating typicality here presents no hurdle to certification.

> **D.      Proposed Class Counsel and Wigod Have and Will Continue to Fairly and Adequately Represent the Interests of the Class.**

The final Rule 23(a) prerequisite requires that the representative parties have and will continue to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. Plaintiff, as the class representative, must establish that: (i) her claims are not antagonistic or in conflict with those of the proposed class, (ii) she has sufficient interests in the outcome of the case, and (iii) she is represented by experienced, competent counsel. *Hinman*, 545 F. Supp. 2d at 807. It is persuasive evidence of the adequacy of proposed class counsel that they have been found adequate in other cases. *Gomez v. Ill. State Bd. of Educ.*, 117 F.R.D. 394, 401 (N.D. Ill. 1987).

In this case, Wigod stands ready and able to competently serve the interests of the Class. Proof of her commitment can readily be found in her service of the Class's interests over the past four years, including her refusal to accept a lucrative loan modification proposal that could've been used to moot her claims and strip absent Class Members of their ability to obtain injunctive relief. (Woodrow Decl. ¶ 14.) Ms. Wigod is dedicated to the fair and efficient prosecution of the

case and has fully and promptly responded to all discovery served upon her. Furthermore, Wigod's claims are sufficiently similar to those of the rest of the Class such that she has no actual conflicts with any Settlement Class Members. (TAC ¶ 52.)

Proposed Class Counsel are also adequate to serve the Class. Proposed Class Counsel, attorneys from Edelson PC, successfully prosecuted the appeal to the Seventh Circuit in this matter, and obtained a landmark decision providing comprehensive guidance not only to this Court, but to hundreds of courts across the country faced with similar claims. (Woodrow Decl. ¶ 20.) The appeal is the first decision by any federal court of appeals to analyze the rights of homeowners under HAMP and is recognized as one of the leading opinions with respect to a borrower's ability to state claims related to lender HAMP abuses. (*Id*.) Furthermore, proposed Class Counsel—specifically, the lawyers in the firm's Banking and Financial Services Practice Group—have extensive experience litigating complex class actions against national banks related to mortgage issues (*id*. ¶ 21), leading other courts to appoint proposed Class Counsel as lead counsel in such cases. *See Schulken v. Washington Mut. Bank*, No. 09-CV-02708, 2012 WL 28099, at *15 (N.D. Cal. Jan. 5, 2012); *see also Hamilton v. Wells Fargo Bank, N.A.*, No. 09-cv-04152 (Dkt. 108) (N.D. Cal. May 11, 2012); *In re: JP Morgan Chase Bank Home Equity Line of Credit Litig*., No. 10-cv-03647 (N.D. Ill. July 16, 2010).

Against this backdrop, proposed Class Counsel are committed to devoting the resources necessary to effectively see this Settlement through to completion using the highest standards of competency. (Woodrow Decl. ¶ 18.) Indeed, Class Counsel have already expended almost $60,000 in litigation expenses alone, with a significant risk that such amounts would never be recovered. (*Id.*) Accordingly, adequacy of representation is also satisfied.

### E.     The Proposed Settlement Class Meets the Requirements of Rule 23(b)(3).

Following satisfaction of Rule 23(a), the Class is required to meet the rigors of at least

one of the provisions of Rule 23(b). As explained above, certification here is sought pursuant to

Rule 23(b)(3). Rule 23(b)(3) requires that the common issues of law and fact predominate and

that the class mechanism represent a superior and manageable way to adjudicate the controversy.

*See* Fed. R. Civ. P. 23(b)(3); *see also Fletcher v. ZLB Behring LLC*, 245 F.R.D. 328, 331–32

(N.D. Ill. 2006). The Settlement Class meets this standard.

### 1.     *Common questions of law and fact predominate.*

The focus of the predominance requirement is whether the proposed class is sufficiently

cohesive to warrant adjudication by representation. *Amchem*, 521 U.S. at 623. "Each class

member must share common questions of law or fact with the rest of the class, therefore making

class-wide adjudication of the common questions efficient compared to the repetitive individual

litigation of the same question." *Lemon v. Int'l Union of Operating Eng'rs*, 216 F.3d 577, 581

(7th Cir. 2000). The predominance requirement is a "more demanding" standard than the

commonality requirement of Rule 23(a). *Amchem*, 521 U.S. at 623–24. While the common issues

must predominate, however, they need not be exclusive. *Radmanovich*, 216 F.R.D. at 435.

The common questions at the heart of this case—whether verified borrowers who

complied with their TPP agreements could succeed on their claims for breach of contract,

promissory estoppel, and fraud arising out of Wells Fargo's alleged re-evaluation of their

eligibility—predominate over any other issues. (*See* TAC ¶ 51.) Furthermore, as recognized by

the Seventh Circuit, Plaintiff's fraud claims are based on a common scheme, the central focus of

which alleges that Wells Fargo failed to honor its TPP agreement with her and thousands of other

borrowers. *Wigod*, 673 F.3d at 571 ("Wigod alleges that Wells Fargo made and broke promises

of permanent modifications to her and to thousands of other potential class members as well. If true, such a widespread pattern of deception could reasonably be considered a scheme under Illinois law and thus actionable as promissory fraud."). Such claims, which arise out of the same scheme, are "sufficiently cohesive" so as to warrant certification.

Accordingly, predominance of common issues is met here.

2.      *This class action, and especially this class action Settlement, presents the superior method for adjudicating the Class's HAMP claims.*

Certification of the Settlement Class is superior to any other method available to fairly, adequately, and efficiently resolve the claims of the Class Members. Superiority focuses on whether class treatment will increase efficiency in the litigation and is satisfied where class members have uniform claims governed by the same law. *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002); *see also Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006) (In cases where "the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate . . . society may gain from the deterrent effect of financial awards" on a class basis.).

Absent a class action, members of the proposed Class would find the cost of litigating their claims to be prohibitive and, moreover, such individual actions would be judicially inefficient. (Woodrow Decl. ¶ 22.) Also, as the matter presents a proposed settlement, issues of manageability attendant to trial are avoided. *See Amchem*, 521 U.S. at 620 (citation omitted) ("[C]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems.").

And although governmental and quasi-governmental bodies, including the OCC, Freddie Mac, and the Consumer Financial Protection Bureau are charged in different capacities with monitoring servicer compliance in connection with HAMP, these entities have been unable to prevent servicer abuse. Likewise, although State Attorneys General reached a national settlement

with major HAMP servicers, widespread reports indicate that banks haven't honored their terms—which apparently didn't address the distinction between verified and stated borrowers in any case. As such, this proceeding is superior because governmental enforcement—though it exists—has been unable to protect the interests of the Settlement Class Members.

Finally, and as Judge Ripple expressed in his concurring opinion in this case, "prompt resolution of this matter is necessary not only for the good of the litigants but for the good of the Country." *Wigod*, 673 F.3d at 586 (Ripple, J., concurring). Given this sentiment, it would seem out of place for the Seventh Circuit to have envisioned that an individual settlement would've been sufficient to resolve this litigation nationwide.

Accordingly, common questions predominate and a class action is the superior method of adjudicating this controversy for the Settlement Class, in satisfaction of Rule 23(b)(3).

## V.     THE COURT SHOULD APPOINT WIGOD'S ATTORNEYS AS CLASS COUNSEL.

Following certification, Rule 23 requires a court to appoint class counsel that will fairly and adequately represent the class members. Fed. R. Civ. P. 23(g)(1)(B). In doing so, the Court must consider counsel's: (1) work in identifying or investigating potential claims, (2) experience in handling class actions or other complex litigation, and the types of claims asserted in the case, (3) knowledge of the applicable law, and (4) resources committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i-iv).

As explained above and as evidenced by their firm resume (*see* Edelson PC Firm Resume, attached as Exhibit A to the Woodrow Declaration) proposed Class Counsel have advocated vigorously on behalf of the Settlement Class Members over the past four years. Proposed Class Counsel have expended almost $60,000 pursuing the claims and were the first attorneys to distinguish between verified borrowers and stated borrowers—a distinction that has

proved critical to the success of HAMP lawsuits across the country. (Woodrow Decl. ¶¶ 18–21).

Proposed Class Counsel were also the first attorneys in the nation to successfully appeal a district

court order dismissing a putative HAMP class action complaint to a federal court of appeals.

Class Counsel's dedication to the Settlement Class Members is also evident from the

comparative strength of the Settlement. During negotiations in this case the parties in the Chase

HAMP litigation reached a tentative class action settlement agreement that provides no cash

payments. Rather, settlement class members in that case may apply for new loan modifications.

Borrowers whose loans are no longer with Chase or who lost their homes receive little if any

value. Notwithstanding such terms, proposed Class Counsel persisted in getting Wells Fargo to

provide meaningful cash payments here.

Furthermore, proposed Class Counsel have experience litigating and settling national

consumer-based class actions against the nation's largest banks generally, and with respect to

putative HAMP class actions in particular. *See, e.g., Fletcher v. OneWest Bank, N.A.*, No. 10-

CV-4682 (N.D. Ill.); *Burton v. Nationstar*, No. 13-CV-307 (E.D. Cal.); *Clark v. Green Tree*

*Servicing LLC*, 13-CV-2646 (D. Colo.); *Scata v. Nationstar Mortg. LLC*, No. 14-CV-189 (D.

Colo.). (Woodrow Decl. ¶ 21.)

In light of the foregoing, the Court should have little difficulty approving Wigod's

attorneys, specifically Jay Edelson, Steven Woodrow, and Megan Lindsey, as Class Counsel.

## VI.     THE PROPOSED SETTLEMENT FALLS WITHIN THE RANGE OF FINAL APPROVAL AND THUS WARRANTS PRELIMINARY APPROVAL.

The Court must also determine whether the Settlement falls within the range of final

approval using a well-established two-step process. Conte & Newberg, 4 *Newberg on Class*

*Actions*, §11.25, at 38–39 (4th Ed. 2002); *see also Armstrong v. Board of Sch. Dirs. of City of*

*Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas*,

134 F.3d 873 (7th Cir. 1998). The first step is a preliminary, pre-notification hearing to determine whether the proposed settlement is "within the range of possible approval." *Newberg*, §11.25, at 38–39; *Armstrong*, 616 F.2d at 314. This is not a fairness hearing, but rather, it is a hearing "to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing." *Armstrong*, 616 F.2d at 314. The preliminary approval stage is thus an "initial evaluation" of the proposed settlement's fairness based on the submissions and argument of the settling parties. *Manual for Complex Litigation,* § 21.632 (4th ed. 2004). If the Court finds a settlement proposal "within the range of possible approval," the case proceeds to the second step—the final fairness hearing. *Newberg*, §11.25, at 38–39.

There are strong judicial and public policies favoring the settlement of class actions. *Isby v. Bayh*, 75 F.3d 1191, 1198 (7th Cir. 1996). Although the standards of preliminary approval "are ultimately questions for the fairness hearing that comes after a court finds that a proposed settlement is within approval range, a more summary version of the same inquiry takes place at the preliminary phase." *Kessler v. Am. Resorts Int'l*, No. 05 C 5944, 2007 WL 4105204, at *5 (N.D. Ill. Nov. 14, 2007) (citing *Armstrong*, 616 F.2d at 314). These factors include: (i) the strength of the plaintiff's case compared to the value of the settlement, (ii) an assessment of the likely complexity of a trial, (iii) the length and expense of the litigation, (iv) the amount of opposition to settlement, (v) the opinion of competent counsel, and (vi) the stage of the proceedings and amount of discovery completed. *Id.* (citing *Isby,* 75 F.3d at 1199).

## A. The Settlement Produces Exceptional Results for the Class When Compared with the Relative Strength of Wigod's Claims.

The Settlement delivers strong benefits relative to the overall value of the claims. Calculating the value of the claims requires an assessment of the damages suffered when borrowers were denied loan modifications, weighed against the probability of the Court granting

class certification (and refusing to decertify the class), and discounted in light of the strength of the bank's likely defenses on the merits. As explained below, proposed Class Counsel project that the settlement relief to Settlement Class Members returns more to the Class than the present value of pursuing the case through judgment trial, as challenged on any motion practice or through any potential appeal.

1.    *Damages recoverable at trial.*

The Seventh Circuit identified several categories of potential damages, including that Wigod could have "incurred costs and fees, lost . . . opportunities to save her home, suffered a negative impact to her credit, never received a Modification Agreement, and lost her ability to receive incentive payments during the first five years of the modification." *Wigod*, 673 F.3d at 575. In addition to these categories, Plaintiff's expert, Donald Frankenfeld, a Harvard-trained economist, has identified twelve categories of damages that Class Members may have suffered, including:

- Being denied the value of the offer for permanent modification they should have received (the value of lower monthly payment multiplied by the probability that the borrower would accept and honor the offer);

- Being denied the opportunity to collect Pay-for-Performance Success payments from the government;

- Being denied the opportunity to obtain a modification of their second lien mortgage through the 2MP (the HAMP program that allows for modification of second liens);

- Being denied the opportunity to collect Pay-for-Performance Success payments from the government under the 2MP;

- Being charged late fees before and during the trial period and having their monthly trial payments improperly used to service those fees;

- Being charged appraisal fees, fees for "broker price opinions," and other valuation and administrative fees during the modification process, and having their monthly trial payments improperly used to service those fees;

- Being reported improperly as having a series of delinquent payments to the credit bureaus once their modifications were improperly denied or after they

refused to make additional trial payments (beyond the three or four required payments);

- Being deprived of the opportunity to refinance their homes, or seek other means to mitigate losses;

- Being subject to the insufficient application of their trial payments to principal and interest on their loans, leading to excess interest charges;

- Being forced to send and re-send bank documents including large packets of information, either via fax or mail, at the borrowers' expense, in response to the bank's routine claims of lost or outdated information,

- Being caused to suffer emotional distress as a result of banks dragging out the HAMP process, sending default letters, claiming to have never received documents, providing false justifications for denying permanent modifications, and instituting foreclosure proceedings even though the borrowers had satisfied their TPPs and were owed offers for permanent modification; and

- Being foreclosed upon even though they should have received offers of permanent modification.

(Frankenfeld Report at 4–5.)[10]

Following the analysis set forth in Frankenfeld's Report, Proposed Class Counsel[11]

projects that 493 Settlement Class Members would be eligible to be considered for a loan

modification, which he values as being the adjusted monthly reduction in payments (which he

explains is approximately $510 on average) multiplied by the number of months the borrower

receives the reduced payment (between 120 and 144 months) less a 25% discount for present

---

[10]     Mr. Frankenfeld's analysis is subject to revision should additional data with respect to the Settlement Class Members become available to him. Further, though his data set included Wells Fargo borrowers, such borrowers are not included in the Settlement based on information learned during the mediation process.

[11]     To be clear, all projections made in this Section VI.A.1-3 are made by Plaintiff and Class Counsel for the purposes of evaluating the Settlement only. Aside from the number of borrowers in each Settlement Group, none of the figures presented purports to reflect any agreement or view held by Wells Fargo and it is likely that Wells Fargo disagrees with Plaintiff and Class Counsel's projections.

value. This results in a value of approximately $45,900 per modification.[12] Added to this are the missed pay-for-performance benefits (approximately $3,000 per Class Member), the addition of improper late fees (an average of $2,358.50), improper appraisal charges (approximately $350), harm to borrower credit[13] ($1,000), increased interest from the misapplication of funds ($1,000 - $3,500), mail and fax charges ($75) and other damages. When totaled, each borrower could likely show approximate damages of $53,683.50.

Given these projections, when applied to the members of the Settlement Class, the maximum total value of the case if the Class were certified, none of Wells Fargo's defenses succeeded, all damages were awarded, and the Class wasn't decertified, would be approximately $44,825,722.50. As discussed below, this figure is subject to a number of risk factors.

2. *Hurdles to success: certification and Wells Fargo's defenses.*

The first hurdle the Class would face through litigation would be obtaining class certification. To date, courts have reached differing conclusions with respect to the certifiability of HAMP claims. Whereas a class was certified in HAMP litigation against Saxon Mortgage, *see Gaudin v. Saxon Mortg. Servs., Inc.*, 297 F.R.D. 417, 419 (N.D. Cal. 2013), certification was denied in the HAMP MDL formed against Bank of America. *In re Bank of Am. Home Affordable*

---

[12]     Frankenfeld's estimates find support in the Expert Report of Michael S. Barr, a Professor of Law at the University of Michigan Law School, filed in support of the settlement in the JPMorgan Chase Bank HAMP MDL, No. 1:11-md-02290-RGS (Dkt. 402.) Professor Barr testifies, following a similar analysis to Frankenfeld's report, that the average benefit conferred through a modification would be $49,183.20. (*See* Expert Report of Michael S. Barr ("Barr Report"), ¶ 33, attached as Exhibit 5.) Professor Barr also estimates comparable sums for foreclosure avoidance, credit counseling services, and waived late fees. (*Id.* ¶ 68.)

[13]     Frankenfeld projects an average of $1,000 per borrower, which is the maximum statutory penalty under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681n. Of course, the FCRA provides for statutory damages precisely because quantifying such harm is difficult. *See Murray*, 434 F.3d at 953.

*Modification Program (HAMP) Contract Litig.*, MDL 10-2193-RWZ, 2013 WL 4759649, at *14 (D. Mass. Sept. 4, 2013) (holding that "Plaintiffs' claims may well be meritorious; but they rest on so many individual factual questions that they cannot sensibly be adjudicated on a classwide basis."). Because the putative Class in this case would focus solely on pre-verified Wachovia borrowers, the balance tips in Wigod's favor. For that reason, a fair handicap under the circumstances is 35%, corresponding to a 65% chance that the Court would certify the class.[14]

Assuming certification was granted, the second hurdle the Class could face would be Wells Fargo's defenses. Wells Fargo alleged fourteen affirmative defenses in its Answer to Wigod's claims in the Second Amended Complaint. (Dkt. 131.) Eleven were stricken in response to Plaintiff's Motion to Strike Affirmative Defenses (though six were stricken with leave to replead). (Dkt. 133.) In its Amended Affirmative Defenses, however, Wells only set forth three final defenses pertaining to Wigod: (1) the voluntary payment doctrine, (2) failure to mitigate, and (3) Wells Fargo's compliance with all HAMP rules. (Dkt. 190.)

Wells Fargo's voluntary payment defense seeks to undercut the claims for damages premised upon the making of trial payments. Wells Fargo claims that "[b]ecause plaintiffs voluntarily made their TPP payments to Wells Fargo, and Wells Fargo had a right to those payments under the binding terms of plaintiffs' mortgages and notes, any claim by plaintiffs that seeks the recovery of the TPP payments made to Wells Fargo is barred by the voluntary payment doctrine," and contends that HAMP forbids the return of trial payments to the borrower. (Dkt. 190 at 2 n.1 (citing MHA Handbook for Servicers of Non-GSE Mortgages (v.3.0), at 78.).) This

---

[14]     Notwithstanding these projections, Plaintiff maintains that she would have successfully achieved adverse class certification and would have defeated any motion to decertify. These estimates are provided in light of the reality that if a class were not certified, or were decertified, the Settlement Class Members would be unable to recover anything as their individual claims are not sufficient enough, standing alone, to prosecute with the assistance of counsel.

defense is negligible because the damages sought do not include any trial payments made.

Wells Fargo's second affirmative defense to Wigod's claims is that she failed to mitigate her damages by seeking to sell her home, pay monies into escrow, engage in a short-sale or deed in lieu, pay her real estate taxes, or accept a modification offer from Wells Fargo.[15] (Dkt. 190 at 2–3.) It is true that Wigod pressed ahead to compel performance of what she was entitled to instead of losing her home to a short sale or other alternative. She also attempted to make payments, which were refused. Nevertheless, there is a risk that Plaintiff could be found incorrect on the law and would have been obligated to take more proactive steps to mitigate. There is also the chance that Wells would seek to apply this defense to the other Class Members. As such, Plaintiff places a 30% discount on her overall damages claims in light of this defense.

With respect to the third defense—whether Wells Fargo complied with all HAMP rules— the Seventh Circuit recognized certain defenses available to Wells Fargo, including "that Wigod was not actually qualified . . . [and] that . . . it would be a complete defense that Wells Fargo did follow HAMP guidelines as they were incorporated into the terms of Wigod's TPP, but that also presents a factual issue." *Wigod*, 673 F.3d at 579. Wells Fargo has never been able to articulate which HAMP guidelines Wigod didn't satisfy, though given the density of the directives it would certainly raise several issues and argue for their retroactive application. Wigod would need to defeat each of these arguments. Given her confidence in her interpretation of the

---

[15]   With respect to Wigod's acceptance of a modification offer, Wigod repeatedly explained that she could not accept a modification offer because it could potentially threaten her ability to represent the Class members, arguing it would literally leave the putative Class out in the cold. The Parties debated this issue at length during the Court's February 26, 2013 hearing, and the Court questioned whether Wigod could accept a modification and still pursue the right of specific performance with respect to the putative Class members so others could get their loans modified. (Feb. 26, 2013 Hearing Transcript at 44:12.) ("I think I'm not sure she can accept it.").

directives (and her argument that the Court would only need to apply the directives in place at the time she was processed),[16] Wigod ascribes only a 20% discount to this affirmative defense.

Two additional and related issues pertaining to these affirmative defenses impact the value of the lawsuit. First, Wells Fargo would likely argue that it would have the ability to raise these defenses with respect to each Class Member such that the Class should be decertified. Second, data produced during the mediation process suggests that many Settlement Class Members were offered permanent loan modifications once the servicing of their loans was transferred to Wells Fargo and that calculating damages would require a comparison of the modification offered by Wells Fargo to the one originally offered by Wachovia. Under the circumstances, Plaintiff would anticipate needing to litigate a motion to decertify the Class. A fair discount attributable to the potential success of such a motion is 35%.

When the above considerations are collectively applied to the average Class Member damages, the total value of the claims is $10,605,765.94, or $12,701.52 per Class Member, calculated as follows:

> $53,683.50 (average Class Member damages) x 835 (Settlement Class Members) x .65 (likelihood of certification) x .70 (30% discount for mitigation affirmative defense) x .80 (20% discount for compliance affirmative defense) x .65 (likelihood that Class is not decertified).

In this respect it must be recalled that any decision following class certification would likely face motions to reconsider and a potential interlocutory appeal. Likewise, a trial on the merits would be subject to appeals. Given the complexity and nature of this case, it could be six to nine years before any judgment were actually paid. *See In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 72 (D.

---

[16]    It is important to recall that at the time Wigod and the Class members were processed, HAMP's principal reduction alternative had not been implemented. As such, at trial, applying the directives in effect at the time, none of the Class members would be eligible for the principal reductions they may receive in connection with this Settlement.

Mass. 2005) (finding that "the complexity, expense and likely duration of the litigation . . . weighs heavily in favor of this [s]ettlement."); *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005) ("[I]t has been held proper to take the bird in hand instead of a prospective flock in the bush."). Adjusting for this time factor, and assuming a rate of inflation of 3%, if paid in six to nine years the judgment would be worth between $8,882,161.64 (if paid in six years) and $8,128,436.14 (if paid in nine years).[17]

In light of this temporal component, the present value of the claims if pursued successfully through to trial and all appeals equals between $9,734.65 and $10,637.32 per Class Member. As discussed below, the Settlement will likely restore greater benefits.

3.  *The value of the Settlement.*

As described above in Section III, the Settlement provides four types of primary benefits: loan modification reviews, cash payments, Foreclosure Holds, and holistic credit counseling services. The value of each, as well as the other benefits conferred by the Settlement, is discussed briefly below.

a.  *Loan Modification Reviews*

Both Group 1 and Group 2 Settlement Class Members are eligible to be reviewed for loan modification offers. For Group 1, Class Counsel projects that at least 40%[18] of the roughly 129 Settlement Class Members will seek to be reviewed in connection with the Settlement. Of these,

---

[17]    *See* Discounted Present Value Calculator, *available at* http://www.aqua-calc.com/page/discounted-present-value-calculator (last visited June 11, 2014.).

[18]    Notably, Professor Barr, who testified regarding the value of the JPMorgan Chase HAMP settlement, projected that 40% of the settlement class would apply for modifications in accordance with the settlement in that case. (*See* Barr Report, ¶¶ 16, 21.) There is little reason to believe that the claims rate would be lower in this case.

80%[19] should be determined eligible for either a HAMP or proprietary modification. These modifications confer between approximately $60,000 and $70,000 in benefits upon each recipient ($65,000 on average) given the bank's flexibility in finding tools to reduce borrower payments.[20] Assuming between 35 and 45 Group 1 Settlement Class Members ultimately receive modifications, the value of such relief would be $2,275,000 and $2,925,000.

For Settlement Group 2, the Class Members are current and are thus admittedly less likely to receive loan modifications (which require that the borrower experience a financial hardship). If twenty such Class Members received modifications, the value would be $1,300,000. Accordingly, the projected value of the loan modification reviews for Group 1 and Group 2 Class Members falls between $3,575,000 and $4,225,000.

b. *Cash Payments*

As explained above, the Settlement provides cash relief available to Settlement Group 1 Class Members who receive Relocation Agreements, Group 2 Class Members who elect to receive cash, and Group 3 Class Members who file claims. The total maximum cash payout is $2,800,000. Class Counsel must apply objective criteria in determining the payout, and each group's payments are subject to a per-borrower cap as set forth in the separate letter agreement the Parties are prepared to share with the Court. (Agreement § 3.5.) Class Counsel is committed to maximizing the payouts subject to these limits and believes that there should be sufficient

---

[19]     As of February 2014, Wells Fargo had a 92% conversion rate. Making Home Affordable, Program Performance Report Through February 2014, 14, *available at* http://portal.hud.gov/hudportal/documents/huddoc?id=February2014MHAReport.pdf (last visited June 11, 2014).

[20]     The reason that modifications are more valuable under the Settlement is because, unlike the modifications that the Settlement Class Members contracted for in their TPPs, the modern loan modifications that are to be employed under the Agreement can include principle write-downs and reductions.

claims filed to support such payouts. As such, Class Counsel anticipate expending a minimum of

80% of the cash relief under the Agreement, which equals $2,240,000.

c. *Foreclosure Holds*

This relief applies generally to Group 1 Settlement Class Members, each of whom is in

default and potentially subject to foreclosure. As indicated above, Wells Fargo instituted

Foreclosure Holds with respect to all 129 Group 1 Class Members at least going back to June

2013. The Foreclosure Holds will stay in place for ninety days following the last timely

submission of a Request for Relocation Agreement. Given the potential for appeals, this could

occur six to nine months following Final Approval, which would likely fall in or around July

2015. As such, borrowers who ultimately receive Relocation Agreements would have benefitted

from Foreclosure Holds (which went into effect June/July 2013) of nearly two years each. As

indicated above, Plaintiff projects that at least 40% of the 129 Group 1 Settlement Class

Members will apply for a loan modification and that, of these, Class Counsel is hopeful that

Wells Fargo will be able to offer to modify 80% of these loans, or around forty loans. For the

other ninety borrowers who will be eligible to receive Relocation Agreements, assuming an

average monthly mortgage obligation of $1,500, and given the likelihood that such borrowers,

being in default, will not continue to make monthly payments, the 20 to 24-month Foreclosure

Holds will have saved each of them between $30,000 and $36,000 on average, or $2,700,000 to

$3,240,000 total. The other forty borrowers will have received approximately twelve to eighteen

months of Foreclosure Holds, or between $18,000 to $27,000 each (between $720,000 to

$1,080,000 total).

To be conservative, adding the low end of these figures together, the Foreclosure Holds

have a collective value to Group 1 Settlement Class Members of $3,420,000.

d.    *Holistic Credit Counseling*

The credit counseling services offered under the Agreement have value both in the cost to Wells Fargo and in the potential future saving and credit repair for Class Members. The services cost approximately $480 per borrower. Thus, if 25% of the Settlement Class Members were to elect this relief, the cost to Wells Fargo would be approximately $100,000. In terms of savings and credit repair, each Settlement Class Member could potentially save thousands of dollars going forward.[21] A fair approximation would be $1,500 in future savings, or an average of $990 per Class Member. If 25% of the Class elected this relief, the projected value of the credit counseling services would be $226,662.50 (approximately $226,500).

e.    *Other Relief*

In addition to the direct relief, the Agreement also requires Wells Fargo to pay the costs of notice and administration. *See In re Kentucky Grilled Chicken Coupon Mktg. & Sales Practices Litig.,* 280 F.R.D. 364, 386 (N.D. Ill. 2011) (Costs of notice and claims administration are properly considered part of the fund, as are attorneys' fees) (citing *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 582-83 (N.D. Ill. 2011)).[22] Given the complexity of the Agreement, the involvement of the Settlement Administrator in processing claims, documents, and appeals, and the requirement that a website be erected and maintained, such notice and administration

---

[21]    Professor Barr explained in his report that a recent study of mortgage delinquency concluded that 17% of homeowners with counseling received a modification compared to 9% without counseling. (Barr Report ¶ 55) (citing Neil Mayer, Peter A. Tatian, Kenneth Temkin, and Charles A. Calhoun, *NeighborWorks® America National Foreclosure Mitigation Counseling Program Evaluation*, 99 (2011)).

[22]    It should be noted that Wells Fargo has also agreed to modify Ms. Wigod's loan, which, similar to the loan modifications to be made available under the Settlement, will feature a level of principal forgiveness. Furthermore, Wells Fargo has agreed to pay reasonable attorneys' fees as approved by the Court up to $3,500,000. Such amounts, and perhaps higher amounts, would be sought should the case proceeded successfully through to trial.

costs will equal approximately $350,000. Further, that the Settlement awards fees and expenses indicates they are properly considered when calculating the overall benefits conferred on the Settlement Class Members, though they will be omitted here for comparative purposes.[23]

Adding all the Settlement Benefits together ($3,575,000 and $4,225,000 in loan modifications + $2,240,000 in cash payments + $3,420,000 in Foreclosure Holds + $226,500 in credit counseling + $350,000 in notice/administrative costs and other relief) the sum produces a range between $9,811,500 and $10,461,500 collectively or between $11,750.30 and $12,528.74 per Settlement Class Member. Such a range exceeds the present-day value of the claims, as set forth above ($9,734.65 to $10,637.32 per Settlement Class Member).

As such, the Settlement provides a substantial recovery that exceeds the present-day value of the claims.

### B.    A Trial in This Case Would be Complex in Both Procedure and Substance.

As indicated above, a trial in this case would be extraordinarily complex, as Plaintiff would need to demonstrate that the entire Class prevails on the merits and that Class Members are entitled to specific performance, damages, or both. This would necessarily entail several days of testimony to properly establish both the existence and uniformity of Wells Fargo's HAMP servicing practices with respect to Wigod and the other former Wachovia borrowers. Evidence of systemic issues would likely require calling specific Class Members to the stand to testify regarding their experiences with Wells Fargo specific to the handling of their HAMP applications. As some of these borrowers battled with Wells Fargo for several months, if not

---

[23]    Given that a fee award at trial would likely come out of any fund established to pay Class Member damages, Plaintiff omits attorneys' fees when calculating the benefits conferred by the Settlement so that the comparison of the present value of the claims to the value of the Settlement benefits is apples to apples. If they were included, the Settlement would confer a range of benefits of $13,311,500 and $13,961,500 (between $15,941.92 and $16,720.36 per Settlement Class Member).

years, this testimony would likely consume several weeks—particularly in light of Wells Fargo's desire to cross-examine each of them. A trial would also require expert testimony, certainly as to the modeling and forecasting of the Class's aggregate damages (an exercise that requires consideration of each of the categories of harm identified by Plaintiff's expert to date) but also potentially to issues of liability as well (i.e., an expert in HAMP directives and compliance would likely be called to assist the trier of fact in understanding the duties of HAMP servicers and the ways loans are to be modified under the HAMP). Of course, Wells Fargo's defense witnesses would also require several days of live testimony.

In short, a trial in this case would be exceedingly complicated when compared to the relative ease of the loan modification and claim form review process established under the Settlement. This factor thus also supports approval.

### C. The Length and Expense of the Litigation to Date Favors Settlement.

That a trial would be complex is evident from the length and expense of the litigation to date. This case is now over four years old, and the Parties have invested significant time and resources to this litigation prior to, during, and following the appeal. (Woodrow Decl. ¶¶ 11–12, 18.) As will be explained in Class Counsel's papers filed in support of any request for reasonable attorneys' fees, Class Counsel's lodestar is based on thousands of hours of attorney time that have been invested to date, such that a nominal multiplier—if any—is likely. (*Id.* ¶ 18.) Class Counsel have also incurred significant costs and expenses without any guarantee of recovery. Given that further litigation would cost several million dollars given the size and scope of the case, the need for experts, and the complexity of the claims, this Court should find this factor weighs in favor of approval—especially since a trial would be unlikely to produce more meaningful results for Class Members.

**D.    Meaningful Opposition to the Settlement is Unlikely.**

Generally speaking, the Court measures this factor, which analyzes the opposition to the Settlement, at the final approval stage—following the submission of requests for exclusion and the consideration of any objections. But even at the preliminary approval stage it is prudent to consider whether the Settlement Class Members are likely to support or oppose the deal. Here, it is doubtful, given the strength of the Settlement and the inability of borrowers to individually pursue their claims against Wells Fargo to achieve a greater judgment or resolution, that many Settlement Class Members will object. Rather, it is far more likely that Settlement Class Members in Groups 1 and 2 will submit claims and documents to be considered for loan modifications, and that, for all Settlement Groups, the monetary relief will ultimately be exhausted. Given that per-borrower payouts will be set by Class Counsel based on objective criteria, including whether Wells Fargo ever previously provided the Settlement Class Member with a loan modification, the terms of that modification compared to what the borrower was slated to receive from Wachovia, and the result of the Wells modification (i.e., did the borrower default on a better modification offer?), the Settlement Class Members who receive payments will receive just and proportionate amounts commensurate with their circumstances.

**E.    Proposed Class Counsel Readily Support the Settlement.**

Class Counsel support the Settlement, which as explained, achieves exceptional results for Class Members. Again, the Agreement reached in this case not only provides millions of dollars of relief to aggrieved homeowners in the form of considering borrowers for permanent loan modification offers, the instant Settlement also makes millions of dollars in cash collectively available. With respect to former borrowers, they are left out of the settlement in the JPMorgan Chase HAMP case, and no settlement class members—despite the fact that there are a projected 55,000 to 60,000 of them—will receive a penny under the terms of that deal if they

39

don't qualify for a loan modification (aside from potentially waived late fees). That stands in stark contrast to the instant Settlement, where a discrete group of aggrieved homeowners will share real relief in the form of loan modifications or cash payments of up to $2,800,000 in the aggregate. Additionally, this Settlement was reached after almost a year of hard-fought negotiations overseen by Judge Denlow, a well-respected mediator. The resulting deal represents the best the Class could have hoped to achieve.

Accordingly, proposed Class Counsel support the Agreement as providing fair, reasonable, and adequate relief for the Class Members.

**F.  The Stage of Proceedings and Discovery Conducted Warrant Approval.**

As a final consideration here, and as explained above, proposed Class Counsel have engaged in sufficient discovery to allow them to objectively evaluate the Agreement's fairness, adequacy, and reasonableness. This includes formal discovery, which covered over 200,000 pages of documents (including thousands of pages pertaining to Wells Fargo's HAMP policies and procedures, internal audit results, key witness emails and ESI, and 100 sample borrower files), as well as informal and confirmatory information disclosed in connection with the Parties' mediation process. (Woodrow Decl. ¶¶ 11, 16.) This wealth of information has allowed proposed Class Counsel to soberly evaluate not only the likelihood of success facing the Settlement Class Members' claims, but also the relative harm suffered by individual Class Members.

Consequently, it can hardly be argued that proposed Class Counsel lacked sufficient information to allow them to negotiate a favorable resolution for the Class Members. To the contrary, the level of discovery performed is demonstrative of the Settlement's overall fairness and weighs in favor of approval.

## VII.    THE PROPOSED PLAN OF CLASS NOTICE SATISFIES DUE PROCESS AND SHOULD BE APPROVED.

As a final consideration, Rule 23 and Due Process require that "[f]or any class certified under Rule 23(b)(3), the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). Rule 23(e)(1) similarly says "[t]he court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise." Fed. R. Civ. P. 23(e)(1). Notice is "adequate if it may be understood by the average class member." Newberg, § 11:53 at 167. The substance of the class notice must describe the nature of the action, the definition of the class to be certified, and the class claims and defenses at issue, as well as explain that settlement class members may enter an appearance through counsel if so desired, request to be excluded from the settlement class, and that the effect of a class judgment shall be binding on all class members. *See* Fed. R. Civ. P. 23 (c)(2)(B).

In this case, the Settlement Agreement contemplates a comprehensive Notice Plan designed to reach as many potential Class Members as possible. (Agreement § 5.)

### A.    U.S. Mail Notice

No later than thirty (30) days following Preliminary Approval, Wells Fargo is to provide Class Counsel with the Class List, which will contain each Settlement Class Member's status as belonging to Settlement Group 1, 2, or 3 as of the date the Motion for Preliminary Approval is filed. Thereafter, and in any event no later than forty-five (45) days following Preliminary Approval, Wells Fargo will cause the Settlement Administrator to send a traditional "short form" mail notice, together with the appropriate Claim Form, to all Settlement Class Members via First Class U.S. Mail to the address Wells Fargo has on file for each borrower, as updated using the

National Change of Address Registry. As demonstrated from the short form notices themselves, they contain an efficient summary of the Settlement's key terms, include the appropriate Claim Forms, and direct Settlement Class Members to Class Counsel, the Settlement Administrator, and the Settlement Website for further information. This plainly comports with due process.

### B. Internet Publication

Within fourteen days of Preliminary Approval, the traditional "long form" notice will be posted to the Settlement Website at a domain name to be agreed upon by the Parties, most likely www.WigodHAMPSettlement.com. (*See id.* § 5.2(b); Long Form Notice, attached as Exhibit C to the Agreement.) The Settlement Website shall contain key dates and deadlines as well as important documents and filings available for download, including the Notices, Claim Forms, and other form documents, the Settlement Agreement, this Motion for Preliminary Approval, and pertinent orders of the Court. (Agreement § 5.2(b).) Members of Settlement Group 2 and 3 shall also have the ability through the Settlement Website to file Claim Forms to receive the Agreement's cash benefits. (*Id.*)

### C. CAFA Notice

The Settlement Agreement further requires Wells Fargo to comply with the requirements of the Class Action Fairness Act, 28 U.S.C. § 1715 ("CAFA"), by serving notice of the proposed Settlement along with all other required documentation to any appropriate state and federal government officials. (*Id.* § 5.2(c).) No later than fourteen days before the Final Fairness Hearing, Wells Fargo and the Settlement Administrator are required by the Settlement Agreement to provide affidavits to Class Counsel confirming that the notices were sent in accordance with the Court's anticipated order granting preliminary approval. (*Id.* § 5.3.)

The format and language of each form of notice has been drafted so that it is in plain language, easy to read, and will be readily understood by the members of the proposed Class. (*See* Short Form Notice, attached as Exhibit B to the Agreement; Long Form Notice.) Accordingly, the proposed notice comports with Rule 23 and the requirements of Due Process and should be approved.

## VIII.   CONCLUSION

The instant Settlement, like the litigation more generally, was hard-fought. After three years of litigating and over a year of mediation with Judge Denlow, the end result is something Class Counsel is genuinely proud to be a part of. Settlement Class Members will receive real relief in this case that will allow them to save their homes—fulfilling the entire purpose of the HAMP. Likewise, borrowers who no longer have loans with Wells aren't forgotten. To the contrary, the Agreement calls for real cash relief to compensate them for the bank's alleged HAMP failures. Accordingly, preliminary approval should be granted.

WHEREFORE the Plaintiff, Lori Wigod, respectfully requests that this Honorable Court grant preliminary approval to the Settlement, appoint Wigod as Class Representative and her counsel as Class Counsel, order that notice be disseminated to the Settlement Class Members in accordance with the terms of the Settlement, establish deadlines for submitting claims, requests for exclusion, and objections, set a date for a Final Fairness Hearing, and award such additional relief as the Court deems necessary, reasonable, and just.

Dated: June 17, 2014

Respectfully submitted,

LORI WIGOD, on behalf of herself and all others similarly situated,

By: /s/ Steven L. Woodrow
      One of Plaintiff's attorneys

Jay Edelson

jedelson@edelson.com
Steven L. Woodrow
swoodrow@edelson.com
Megan Lindsey (Admitted *Pro Hac Vice*)
mlindsey@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiff and the Settlement Class*

## CERTIFICATE OF SERVICE

I, Steven L. Woodrow, hereby certify that on June 17, 2014, I electronically filed the foregoing *Plaintiff Wigod's Motion for Preliminary Approval of Class Action Settlement* with the Clerk of the Court using the CM/ECF system. Notice of this filing is sent to all counsel of record by operation of the Court's electronic filing system.


/s/ Steven L. Woodrow