# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| LORI WIGOD, on her own behalf and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, N.A. d/b/a WELLS FARGO HOME MORTGAGE, f/k/a WACHOVIA MORTGAGE, FSB,<br><br>Defendant. | Case No: 1:10-cv-02348<br><br>Honorable Blanche M. Manning<br><br>Honorable Maria Valdez |

**EXPERT REPORT OF DON FRANKENFELD**

I. **INTRODUCTION**

Plaintiffs Lori Wigod and Dan and Sandra Finlinson are plaintiffs in the matter of *Wigod v. Wells Fargo Bank, N.A.*, a potential class action alleging Wells Fargo's failure to provide permanent loan modifications to borrowers under the Home Affordable Modification Program ("HAMP" or "the Program"). I have been asked to estimate damages suffered by the prospective class, assuming the allegations are true. My calculations are thus based upon damages potentially suffered by borrowers who should have been offered permanent HAMP modifications but were not. I understand the class size will ultimately be approximately 3,850 borrowers, 3,000 from Wells Fargo and about 850 from Wachovia.

Below is an outline of the categories of damages I have identified which I believe can be modeled on a class-wide/aggregate basis. Note that my estimates are based upon the best currently-available information, and that Defendants apparently are in possession of both statistical and documentary information that, were it in my possession, would allow greater accuracy. Note also that some identified categories of damages have not yet been evaluated, also owing to a relative lack of information. Therefore, while I am prepared to testify to my estimate with a reasonable degree of economic certainty, within a range of plus- or minus-twenty percent, I believe I can ultimately refine my estimate to a greater degree of precision should additional appropriate information be provided by Defendants.

II. **QUALIFICATIONS**

I am a graduate of Yale University (AB 1970) and Harvard Business School (MBA 1975). In 1987 I became a Bush Foundation Fellow and returned to Harvard, where I studied at Harvard Law

School, Harvard Business School, and the Kennedy School of Government, earning an MPA degree in 1988. I have worked over the years as a securities analyst, portfolio manager, investment economist, brokerage firm branch office manager, accountant, state senator, and securities arbitrator. Since 1984 I have accepted testimonial or consulting engagements as a forensic economist and financial expert. I have testified more than 80 times in state and federal courts and in securities arbitrations throughout the United States.

I have particular expertise in computer modeling of economic damages. In 2002, I developed a damage calculation model, available online at no charge to claimants before the federal September 11th Victim Compensation Fund. The model became the most widely used economic tool for claimants, employed in the evaluation of approximately 1,000 claims. In addition, I appeared before the Victim Compensation Fund as a testimonial expert approximately 70 times, more than any other damages expert.

Initially, my forensic engagements were exclusively on behalf of defendants. In recent years, my engagements have been proportioned about one-third to defense cases and two-thirds to plaintiffs.

III. ANALYSIS

    A. **HAMP is a Federal Program Designed to Aid Struggling Homeowners By Reducing Their Monthly Mortgage Payments.**

This matter arises from Wells Fargo's alleged systematic failure to comply with applicable rules and fulfill contractual obligations under the HAMP. Plaintiffs claim Wells Fargo breached their Trial Period Plan ("TPP") Agreements, engaged in fraudulent misrepresentation, and violated state consumer protection laws because Wells Fargo failed to provide them and other similarly situated borrowers with offers to permanently modify their mortgages, even though the borrowers made their trial payments and otherwise complied with the terms of their TPP Agreements.

HAMP is a federal program created in the wake of the collapse of the housing market. It is intended to help distressed homeowners avoid foreclosure by lowering the monthly principal and interest payments on their mortgages. This is typically accomplished by applying a Net Present Value ("NPV") algorithm. To participate in the Program, mortgage Servicers enter into a Servicer Participation Agreement ("SPA") with the Treasury. The SPA requires Servicers (like Wells Fargo) to comply with HAMP guidelines and directives and provides Servicers with the right to receive government incentives in exchange for their participation in the HAMP. The SPA further provides that for loans "owned" by a third-party investor, the Servicer must also comply with additional "Investor Guidelines." Once in the Program, the Servicer identifies borrowers with eligible loans and considers customers who apply on their own. As explained in greater detail below, the Servicer aims to place eligible borrowers into TPP Agreements that require the borrower to make three or four reduced monthly payments (down to a target of 31% of the borrower's monthly DTI). For certain borrowers who make all their payments on

2

time, the bank is required to extend them offers for permanent modification at or near the reduced payment amount.

Since March 2009, the Treasury Department has periodically published guidelines and directives that govern the Program. (*See* HAMP Guidelines and Supplemental Program Directives, attached hereto as Group Exhibit A). In particular, the March 4, 2009 Guidelines and Supplemental Directives 09-01, 09-07, and 10-01 establish many of the policies and procedures applicable to the calculation of damages. As explained below, certain relevant policies and procedures changed over time from the initial rules (March 4, 2009 Guidelines and SD 09-01) to the later rules (SD 09-07, SD 10-01). For example, SD 09-01, published in April 2009, provided that a borrower's rental income should be considered at 75% of gross income to account for potential losses. SD 09-07, introduced in October 2009, modified this rule so as to take into account the risk of loss, and it further required rental income to be considered net of applicable property expenses.

### B. Determining Borrower Eligibility Requires that the Bank Perform the HAMP Waterfall and NPV Tests.

Borrowers must pass two major financial tests to qualify for a modification: the "Waterfall" analysis and the Net Present Value ("NPV") test. The Waterfall is a debt-to-income ("DTI") calculation, which takes into account the borrower's income, primary mortgage, and other specific property-related expenses. The Servicer implements a series of steps: (1) reduces the interest rate in 0.125% intervals down to a floor of 2%, (2) extends the term of the loan up to 480 months, (3) forbears on principal to reduce the monthly DTI to as close to 31% as possible. Borrowers originally passed the Waterfall if the resulting DTI was between 31% and 38%. The Program later required that the DTI actually hit 31% or lower. A full description of the Waterfall is available in SD 09-01, starting on page 8.

Loans that pass the Waterfall are run through the NPV test. The NPV is a financial model that determines the value of a borrower's loan under a "modification" versus "no modification" scenario. Basically it compares the projected costs to the Servicer of performing a modification to the cost of not performing one. If the NPV is positive (i.e. the Servicer/Investor stands to make more from performing the modification) than the Servicer *must* modify the loan if the borrower satisfies the trial plan. If the NPV is negative, then the Servicer has the option of modifying the mortgage at its discretion. For mortgages serviced on behalf of third party investors, the Servicer may not modify a loan with a negative NPV without the express consent of the investor.

Borrowers who pass the Waterfall and NPV are placed in a TPP whereby they must make three or four reduced monthly payments (close to 31% monthly DTI). The borrower is also required to begin contributing to a tax escrow (if they weren't already). The rules provide that trial payments may be placed in a suspense account where they accumulate until there are enough funds to service one pre-modification payment. Funds should then be removed from the suspense account and applied to the mortgage in accord with the terms of the Note.

3

Provided the borrower makes the three or four trial payments, the Servicer is to provide the borrower an offer to permanently modify his mortgage within one month of completing the TPP.

### C. This Lawsuit Involves Verified Borrowers Whose Eligibility for the Program the Bank Improperly Reevaluated Following the Start of Their Trial Plans.

It is important to distinguish between Verified Borrowers and Stated Borrowers. When HAMP was first rolled out, Servicers could either use "Stated TPPs" or "Verified TPPs." "Stated Borrowers" (those with Stated TPPs) provided financial information orally to the Servicer (income, HOA dues, insurance, taxes, etc.), which the Servicer used to pre-qualify borrowers and place them into Stated TPPs. The Servicer thereafter, during the trial period while the borrower was still making trial payments, collected the borrowers' financial documents and used those documents to verify the borrowers' eligibility for the Program.

In contrast, Verified Borrowers provided financial documents to the Servicer prior to the start of the trial plan, which the Servicer used to confirm the borrowers' eligibility. The rules changed effective June 2010 and Servicers began to only offer TPPs to Verified Borrowers. Stated Borrowers have been specifically excluded from this lawsuit. This distinction is important because the lawsuit claims that for Verified Borrowers—as apart from Stated Borrowers—the bank wasn't allowed to re-evaluate their eligibility for the Program by re-running the Waterfall or NPV tests.

Plaintiffs have alleged that, unfortunately for Verified Borrowers, rather than honor their Verified TPPs, Wells Fargo re-evaluated their eligibility—often applying rules that were not in effect when the borrowers originally applied and demanding additional documents borrowers had either already provided or weren't required to give the bank in the first place.

Thus, the lawsuit claims that, rather than re-determining their eligibility and dropping them from the Program, the bank should have extended offers for permanent modification to its Verified Borrowers who made their trial payments on time.

### IV. CATEGORIES OF DAMAGES

Borrowers who should have been provided offers for permanent loan modifications have suffered significant damages, including some or all of the following:

1. Being denied the value of the offer for permanent modification they should have received (value of lower monthly payment times the probability that the borrower would accept and honor the offer),

2. Being denied access to the HAMP's Principal Reduction Alternative Program,

3. Being denied the opportunity to collect Pay-for-Performance Success payments from the government,

4

4. Being denied the opportunity to obtain a modification of their second lien mortgage through the 2MP (the HAMP Program that allows for modification of second liens),

5. Being denied the opportunity to collect Pay-for-Performance Success payments from the government under the 2MP,

6. Being charged late fees before and during the trial period and having their monthly trial payments improperly used to service those fees,

7. Being charged appraisal fees, fees for "broker price opinions," and other valuation and administrative fees during the modification process and having their monthly trial payments improperly used to service those fees,

8. Being reported improperly as having a series of delinquent payments to the credit bureaus once their modifications were improperly denied or after they refused to make additional trial payments (beyond the three or four required payments),

9. Being deprived of the opportunity to refinance their homes, or seek other means to mitigate losses,

10. Being subject to the insufficient application of their trial payments to principal and interest on their loan, leading to excess interest charges,

11. Being forced to send and re-send the bank documents including large packets of information, either via fax or mail, at the borrowers' expense, in response to the bank's routine claims of lost or outdated information,

12. Being caused to suffer emotional distress by dragging out the HAMP process, sending default letters, claiming to have never received documents, providing false justifications for denying permanent modifications, and instituting foreclosure proceedings even though the borrowers had satisfied their TPPs and were owed offers for permanent modification,

13. Being foreclosed upon even though they should have received offers of permanent modification. These categories are discussed in greater detail below.

**A. Value of the Offer for Permanent Modification (Value of Lower Monthly Payment X Probability That Would Accept Offer)**

Borrowers were harmed because they were denied the value of offers for permanent modifications that they could have accepted (and based on OCC and other government sources, I project that a very high percentage would have accepted, given the benefits to the borrower).

5

For example, assume that under the original note the borrower was required to pay $1,500 per month P&I. However, after applying the Waterfall test, the borrower is only required to pay $950 per month. Under this example, the "harm" to the borrower would be $550 per month for five years (consistent with OCC estimates), and a somewhat smaller amount for the remaining months left under the terms of the original mortgage,[1] because the interest rate discount would decline over the next five years, while lower payments from principal reductions and extended terms would remain. If the borrower has a 30-year mortgage with 28 years remaining, then maximum damages from this quarter could be $6,600 ($550 x 12 months) annually x 28 years = $184,800 over the remaining course of the loan.[2] Rather than the maximum amount, which I believe is unlikely to eventuate in most cases, I assume an average adjusted reduction of $510 per month, with a maximum duration of 12 years.[3]

Given the design of the HAMP Program, certain variables must be taken into consideration when determining an appropriate model for calculating mathematically-appropriate class damages, including: (1) the probability that a borrower will accept an offer for permanent modification, (2) the probability that a borrower will default and cure permanent non-modification and modification payments, (3) the applicable discount rate for future cash flows, (4) variations in the characteristics of borrowers' original notes and (5) variations in the permanent modifications that were supposed to be offered (with their capitalized expenses, modified interest rates, extended loan periods, and principle forbearance/ forgiveness). These variables are explained below.

1. **The Probability That a Borrower Will Accept an Offer for Permanent Modification**

The HAMP TPP Agreement requires that Servicers provide Verified Borrowers who satisfy the terms of the Agreement with an <u>offer</u> for permanent modification. The borrower may then accept that offer by signing the applicable modification agreement and returning it to the bank. Thus, there's a chance that a slim number of people won't accept modification offers for whatever reason. Plaintiffs have requested data regarding the number of Permanent Modification Offers and the number of Accepted Offers, which may be used to determine an appropriate Probability of Acceptance. For this analysis, I assume that effectively all offers would have been accepted, as that is the rational response for nearly all borrowers. This assumption may be modified if Defendants supply evidence that contradicts it.

2. **The Discount Rate for Future Cash Flows**

Of course, the monthly savings are not the same thing as present day cash. To determine present day value of future cash flow (i.e. future savings), we need to use a discount rate. SIGTARP published a report stating that for its own NPV, Wells Fargo uses the maximum allowable Discount Rate under the HAMP, which is calculated using the Freddie Mac Primary Mortgage Market Survey (PMMS) + 2.5%.[4] I understand that Plaintiffs have sought relevant information from Wells Fargo and Government Agencies regarding default and cure rates incorporated into the NPV model.

6

I have run multiple simulations using various combinations of absolute discount rate and loan duration to estimate the magnitude of any reduction to present value. Using 12 years as a median duration, I conclude that the absolute damages owing from reduced payments will be reduced by about 25%.

### 3. Variations in the Characteristics of Modified Loans

There are several factors that impact the modified note, which may affect damages to the class as a whole. These factors generally follow the path of the HAMP Waterfall. First, all outstanding payments due, late fees and other charges are to be capitalized and added to the principle balance. Second, the interest rate for modified loans is determined by reducing the borrowers' interest rate according to a formula. The rate is fixed for five years, after which it goes up by 1% per year until the interest rate reaches an Interest Rate Cap. Third, the Waterfall permits Servicers to increase the term of the loan or to extend the amortization schedule for 480 months. (SD 09-01.) Fourth, the Waterfall permits services to forbear on principal, within certain limitations. (SD 09-01). I have subjectively taken these factors into account in my analysis, but the ultimate aggregate effect can be judged with precision only if more detailed information is provided by Defendants.

### 4. Variations in the Characteristics of Borrower's Original Notes

The mathematical model used to calculate damages on a class-wide basis may also potentially need to normalize or address variations in the borrowers' original notes. For example, it could be necessary to project an appropriate "pre-modification" versus "post-modification" scenario for the borrowers. HAMP is available to First Lien mortgages where the principal balance is equal or less than:

- $729,750 for 1-Unit Buildings
- $934,200 for 2-Unit Buildings
- $1,129,250 for 3-Unit Buildings
- $1,403,400 for 4-Unit Buildings

There is no minimum or maximum LTV. The Note may have a fixed or floating rate and the loan may be amortizing or interest only. There are no amortization or term limits. These factors could potentially need to be considered when determining what the "average" no-modification scenario looks like. No adjustment has been made for these variations in this analysis, pending the receipt of more information from Defendants.

### 5. The Probability That the Borrower Will Default and Cure

Finally, there's also the probability that any borrower who was to accept a modification would default even on the modified terms. And there's a need to account for the probability that the borrower may cure this default. The bank's HAMP NPV test uses assumed values for the probability that a borrower will default under a no-modification scenario (higher monthly

7

payment, higher probability) and under a modification scenario (lower monthly payment, lower probability) and likewise the probability that the borrower will then cure. As with other potential adjustments to my analysis, more information from Defendants would be very helpful.

### B. Principal Reduction Alternative Program

In addition to losing out on the value of the modified loans they were promised (and instead being stuck with the terms of their original mortgages and notes), borrowers who are improperly denied loan modifications also miss out on the Principal Reduction Alternative Program (PRA). The PRA allows borrowers to earn principal reduction over time for making on-time permanent modification payments. (SD 10-05.) Servicers are entitled to incentive compensation for each loan modified under the PRA.

### C. Pay-For-Performance Success Payments

Borrowers that enter into a permanent modification are eligible to receive Pay-for-Performance success payments from the Treasury upon making timely post-modification payments. (March 4, 2009 Guidelines at 1, 12; SD 09-01 at 24, FAQs Q2206, Q2402.) Because Plaintiffs were not provided their offer for permanent modification, and therein could not accept an offer and enter the permanent modification, they were denied the opportunity to obtain these benefits.

The payments accrue on a monthly basis and are paid on an annual basis for five years after the borrower enters into a permanent modification. Qualified borrowers may receive the lesser of (1) $1,000 per year for 5 years ($5,000 total) or (2) one-half of the reduction in the borrower's annualized monthly payment for each month a timely payment is made. To qualify, the borrower's monthly mortgage payment must be reduced by 6% or more under HAMP by applying the "Waterfall."

Benefits only accrue when the borrower makes on-time payments, and the borrower loses the right to accrue payments when the borrower ceases to be in good standing. Once lost, good standing cannot be restored.

### D. Second Lien Modification Program (2MP) – Non-GSE Second Lien Loans

Borrowers wrongly denied modifications of their first mortgages also miss out on the 2MP Program. The 2MP provides borrowers the opportunity to obtain a modification of their second lien mortgage, provided the borrower is able to obtain a permanent modification of the first lien mortgage. (SD 09-05.) Therefore, borrowers (like Wigod) who maintained second liens on their homes were denied the benefit of the 2MP when they were denied an offer to permanently modify their first mortgage.

8

Determining the "value" of the second lien modification will be similar to the process used for determining the "value" of modifying the first lien mortgage. However, more information is required from Defendants.

### E. 2MP Pay-For-Performance Success Payments

The 2MP Pay-For-Performance Success Payments are similar to the success payments for the first lien mortgage. Because borrowers were denied the opportunity to enter the 2MP, they were likewise denied a chance to benefit from the 2MP Success Payments. The borrower is eligible to receive up $250 per year for up to five years.

### F. Late Fees

Under HAMP guidelines, all unpaid late fees owned by the borrower will be waived upon successful completion of the trial period. This includes fees that accrued prior to the start of the trial period and fees that accrued during the trial period. (March 4, 2009 Guidelines at 10, SD 09-01 at 22.) Note, the Rules say upon "completion of the Trial Program"—not necessarily entering into a permanent loan modification. This did not happen. Rather, borrowers continued to accrue late fees and Wells Fargo allegedly used borrowers' trial payments to improperly pay itself those late fees.

Funds received during the trial period are supposed to be applied in accord with the terms of the mortgage. As SD 09-01 explains, if permitted by the loan documents, a Servicer may accept and hold in a suspense account funds which do not constitute a full monthly PITI payment (as applicable) and apply those funds once a full months' payment has accumulated. As WF explained in a letter to Wigod, funds were to be applied in the following order:

| | | |
|---|---|---|
| First: | Interest / All Accrued Interest |
| Second: | Principal / Fund application to the principal balance |
| Third: | Escrow / If applicable, funds are applied to the escrow account |
| Fourth: | Late Charges / If there are any outstanding late fees |
| Fifth: | Additional Principal / Applied once all of the above applications are complete |

This was not the process for Wigod and the Finlinsons, and further sampling may confirm whether WF was misapplying payments for other WF borrowers as well. Rather, it appears that WF serially collected trial payments and applied those payments to late fees prior to satisfying accrued interest and currently owed principal. For the moment, I have extrapolated the Wigod and Finlinson experience to the class. It would, of course, be helpful to obtain additional information regarding the precise amount of late fees charged to borrowers, and whether such fees were being consistently charged on a monthly basis, along with an average amount of late fees balance that borrowers carried prior to entering the trial period.

Records indicate that WF was charging Wigod a monthly late fee of $204.89. Wigod did not have any late fees prior to entering the Program, but WF began assessing late fees when it took over servicing her loan. As of March 7, 2010, WF reported that Wigod had no

9

outstanding late fees because WF has used her trial payments to clear such fees. The April 11, 2010 statement reflects a late fee balance of $819.56. The June 6, 2010 statement reflects a $0.00 late fee balance, suggesting that WF used trial payments to pay themselves late fees, even after Wigod had lodged a formal complaint and had such practices reversed.

As of May 3, 2012, the Finlinsons owed $3,898.44 in late fees. (WFB-WIGOD 005665.) This may not include other late fees that were assessed and already paid.

To more precisely calculate damages related to late fees on a classwide basis, it will be necessary to receive from Defendants the following information:

1. Average late fee balance prior to starting the modification
2. Average monthly late fee charged
3. Average number of months in Program / months accumulated late fees improperly

The damages from charging such fees are two-fold. First, there is the amount of the fees themselves. Second, that trial payments were used to cover the late fees means that less money was paid towards principal and interest than otherwise should have been paid. As a result, the borrower not only faces the fees but increased principal and attendant interest amounts as well.

### G. Appraisal Fees and Other Administrative Fees

The HAMP Directives provide that all other fees and charges must be covered by the servicer and cannot be assessed against the borrower, including notary fees, property valuation fees, and credit report fees. (March 4, 2009 Guidelines at 10; SD 09-01 at 22.) WF allegedly violated this provision by assessing administrative and other fees against both Wigod and the Finlinsons. The Plaintiffs therefore suffered damages in the amount of other fees improperly charged and, as seen with late fees, increased principal and interest amounts as well as trial payments were used to cover such fees.

For example, throughout the course of the HAMP process, Wigod was charged:

- $15.00 property inspection fee assessed 1/05/09 and 3/2/10. Loan activity shows fee paid immediately w/ trial payment. (WFB-WIGOD 000273 - 000274)
- $90.00 fee (no description) imposed 11/15/09. Loan activity shows fee paid immediately w/ trial payment. (WFB-WIGOD 00273)
- $60.00 other fees (WFB-WIGOD 006889)
- $105.00 other fees (WFB-WIGOD 006913)

Likewise, the Finlinsons were charged $410.00 in other fees as of 5/3/12. (WFB-WIGOD 005665.)

10

Appropriate sampling can reveal the magnitude of various fees Wells Fargo was assessing against its borrowers.

### H. Harm to Credit

Borrowers that enter a trial plan are—for the duration of the trial—not required to make the full monthly payment in accordance with their loan documents. (SD 09-01 at 22; WFB-WIGOD 000834.) The HAMP directives provide that, for borrowers who enter the HAMP trial, the Servicer should continue to report a "full file" status to the major credit repositories. "Full-file" reporting means that the servicer must describe the exact status of each mortgage it is servicing as of the last business day of each month. There are two potential types of borrowers:

1. **Borrowers who are current when they enter the trial period** – Servicer should report the borrower current but on a modified payment if the borrower makes timely trial payments during the trial period, as well as report when the modification is completed.

2. **Borrowers who are delinquent when they enter the trial period** – Servicer should continue to report the borrowers delinquency and workout status following usual and customary reporting standards.

Wigod was current on her mortgage when she entered the HAMP trial. (WFB-WIGOD 006196.) Wigod made her trial payments up and until February 2010 when Wigod ceased making payments. As of February 25, 2010, WF reported Wigod six-months delinquent. (WFB-WIGOD 000313, 006196.) Once this happened, Wigod began receiving notices from credit card companies that her credit lines had been suspended or revoked. For other people who were also reported delinquent when the loan modification was improperly denied, potential types of harm related to credit include:

1. Delinquent mortgage payments result in direct decline of credit score,
2. Reduction in credit score results in restricted access to other sources of credit (e.g., credit cards), which pushes up the borrowers' ratios of outstanding debt to available credit, in turn further harming their credit score,
3. Loss of access to/increased cost of alternative credit sources,
4. Lost ability to seek/increased cost of alternative home financing, and
5. Lost access to employment opportunities.

### I. Lost Opportunity to Refinance Mortgage or Seek Other Means to Mitigate Losses

Because Wells Fargo represented that the borrowers would indeed receive an offer for permanent modification if they complied with the TPP Agreement, borrowers were deprived of the opportunity to refinance their home or seek other means to mitigate losses. By staying in the HAMP, borrowers may have become delinquent on their loans or suffered harm to

11

their credit, and may have missed chances to refinance their debt and/or obtain a modification through Wells Fargo's internal modification program.

### J. Increased Interest From Misapplication of Funds

Within one month of completing the trial plan, the Servicer is expected to provide the borrower an offer for permanent modification. This did not happen in many circumstances. Instead, borrowers continued to make trial payments for many months (sometimes years) after the trial period had ended, and thereby fell further and further behind on their mortgages and thus were penalized large late fees.

For example, if the pre-modification monthly payment is $3,000, and the trial monthly payment is $1,000, the first two trial payments will be placed in a holding account until the third trial payment is made. The $3,000 worth of trial payments is then to be applied as a single pre-modification payment. If for nine months a borrower is making a $1,000 trial payment (rather than $3,000 normal payment), at the end of the nine-month period the borrower is $18,000 behind on his mortgage. If Wells Fargo then denies the permanent modification and accelerates the loan (as it did for many borrowers), the already distressed homeowner has no means to pay the $18,000, plus late fees, and may be thrown into foreclosure. Borrowers had been informed that any delinquencies would be capitalized when they entered the permanent modification and that late fees would be waived.

As explained above, Servicers are required to collect and apply funds in accordance with the mortgage and note terms. The Servicer was permitted to collect funds and hold them in a suspense account. Instead, the funds were often held for extended periods and/or applied to late fees and other charges, rather than to principle and interest.

For borrowers with amortizing products, by misapplying the trial payments (either applying to fees or excessively holding in a suspense account), WF caused those borrowers to accrue additional interest. In other words, Wells Fargo continued to apply the contract-interest rate to the outstanding principal balance, even though the borrower had funds being held in suspense that could have been applied to reduce that balance (and reduce the interest payment).

### K. Hard Costs Related to Faxing and Mailing Documents

Borrowers were often required to send their documents to WF on multiple occasions. Sometimes Wells Fargo claims to have lost the documents, and sometimes WF demanded (on multiple occasions) that the borrower send new documents so WF could (improperly) re-assess the borrowers' eligibility. Many borrowers were required to visit stores like Kinkos to fax documents to Wells Fargo. Others faced expenses related to mailing or expressing documents. Attendant costs often exceeded $100 per borrower.

12

### L. Emotional Distress

While difficult to quantify, borrowers suffered emotional distress (often times severe) due to delinquency letters, threats of foreclosure, and the frustration associated with a confusing modification process whereby the borrower received false information, including claims by Wells Fargo that it had never received the borrowers' paperwork even though the paperwork had been sent (and receipt confirmed) on many occasions. Many borrowers have expressed that the modification process became a daily burden that extended well beyond the three or four-month trial period. Borrowers oftentimes went months or years without having a solid answer as to whether their loan would be modified. This, combined with Wells Fargo's misrepresentations, claims to have never received paperwork, and general chaotic process caused significant amounts of stress and anxiety. Non-economic damages and punitive damages may pertain.

### M. Foreclosure

Further sampling may show that hundreds of borrowers who should have received offers for permanent modification but were denied them were subsequently foreclosed upon. For these people, damages may include the net value of the property, emotional distress and harm to credit.

### III. CONCLUSION AND SUMMARY

The table below summarizes my conclusions. Adjustments may be required as more information becomes available. I state my conclusions as to the categories evaluated with a reasonable degree of economic certainty, with a confidence interval of plus or minus 20%.

I conclude that total damages from those elements currently subject to calculation total from $229,261,442—$278,079,442.

I have omitted a possible offset related to an extended term under HAMP. Given that most homeowners sell or refinance before the term of their loan has expired, a projected offset is speculative absent more information.

13

| Damage Element | Amount | Comment |
| --- | --- | --- |
| A: Value of offer for permanent modification | $176,715,000--$212,058,000 | 3850 class members X $510 adjusted average HAMP monthly benefit X 120-144 months average duration, less 25% for present value discount |
| B: Principal Reduction Alternative Program | $22,589,592 | 3850 members X 8% Eligibility [5] X $73,344 forbearance [6] (Information from Defendants required) |
| C: Pay for Performance | $11,550,000 | 3850 members X $5,000 benefit X 60% non-default rate |
| D: Second Lien Modification | N/A | Insufficient information |
| E: 2MP Success Payments | N/A | Insufficient information |
| F: Late Fees | $9,080,225 | (($3,898 (Finlinson) + $819 (Wigod))/2)*3850 (Information from Defendants required) |
| G: Appraisal and Administrative Fees | $1,337,875 | (($410 (Finlinson) + 285 (Wigod))/2)*3850 (Information from Defendants required) |
| H: Harm to Credit | $3,850,000--$7,700,000 | Not all applicants harmed. Estimate average of from $1,000 to $2,000. (Information from Defendants required) |
| I: Lost Opportunity to Mitigate | N/A | (Information from Defendants required) |
| J: Increased Interest from Misapplication of Funds | $3,850,000--$13,475,000 | Initial estimate of $1,000 to $3,500 (Information from Defendants required) |
| K: Hard Costs for Faxing and Mailing | $288,750 | Est. $75 X 3850 |
| L: Emotional Distress | N/A | A significant factor, but best determined by finder of fact |
| M: Foreclosure | N/A | (Information from Defendants required) |
| Total (Minimum) | $229,261,442--$278,079,442 | This amount is minimum, as several damage elements are omitted owing to insufficient information; confidence interval for categories evaluated is plus or minus 20%. |

Executed this 8th day of July, 2013.

14

---

[1] After the months left on the original note run out, the benefit to the borrower is no longer $500 per month because, if the borrower had been stuck with the original note, there would be no payment due those months because the loan would have already been paid off. However, because most borrowers sell their houses within about 12 years, according to the National Association of Homebuilders), I regard this offset as speculative. Thus it is not included in this preliminary analysis, pending the possible receipt of more information from Defendants.

[2] Of course, these are payments made over time, and projecting their present day value requires the use of a "discount rate." As explained below, as part of the NPV test the bank is required to project the future cash flows from a modification versus the cash flows expected from no modification. To do so, I understand that Wells Fargo uses a discount rate equal to 2.5% plus the PMMS rate.

[3] How Long Buyers Remain in their Homes, National Association of Home Builders, 2/11/2009

[4] *See also* http://www.freddiemac.com/pmms/.

[5] Making Home Affordable Program Performance Report, U.S. Treasury, February 2013, p 10.

[6] Making Home Affordable Program Performance Report, U.S. Treasury, February 2013, p 4.

15

This report was prepared by me on July 8, 2013.

Don Frankenfeld
Forensic Economist