# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | |
|---|---|
| LORI WIGOD, on behalf of herself and all others similarly situated, | |
| Plaintiff, | Case No: 1:10-cv-2348 |
| v. | Hon. Elaine E. Bucklo |
| WELLS FARGO BANK, N.A. d/b/a WELLS FARGO HOME MORTGAGE, f/k/a WACHOVIA MORTGAGE, FSB, | JURY TRIAL DEMANDED |
| Defendant. | |

**THIRD AMENDED CLASS ACTION COMPLAINT**

1.      Plaintiff Lori Wigod ("Wigod") ("Plaintiff") brings this suit on behalf of herself and a Class of similarly situated homeowners nationwide to challenge Defendant Wells Fargo Bank, N.A.'s d/b/a Wells Fargo Home Mortgage f/k/a Wachovia Mortgage, FSB (collectively "Defendant" or "Wells Fargo") intentional and systematic failure to offer permanent loan modifications to qualified borrowers.

2.      In doing so, Wells Fargo has serially failed to honor its express and implied contractual obligations under its Trial Period Plan Agreements ("TPP Agreements"), has made repeated misrepresentations of material fact, and has engaged in business practices that are deceptive, immoral, unscrupulous, unfair, and oppressive under Illinois law.  (*See* "TPP Agreement" attached as Exhibit A.)

3.      Under the Troubled Asset Relief Program ("TARP"), also known as the taxpayer bailout, the United States Government provided the nation's largest financial institutions with nearly $700 billion in funds to address what was widely accepted as an unprecedented financial

1

crisis. 12 U.S.C. § 5211. In or around October 2008, Defendant Wells Fargo accepted $25 billion in TARP funds.

4.      A key feature of TARP is the Making Home Affordable Program, of which the Home Affordable Modification Program ("HAMP") is a major component.  HAMP is a program under which Wells Fargo and other major banks receive incentive payments for providing mortgage loan modifications to eligible borrowers such as Plaintiff Wigod and the putative Class members.

5.      In April 2009, Wells Fargo Home Mortgage signed a contract with the U.S. Treasury, through its agent, Fannie Mae, agreeing to participate in HAMP as an approved HAMP servicer. (*See* Servicer Participation Agreement "SPA", attached as Exhibit B.)

6.      As a HAMP servicer, Wells Fargo entered into written TPP Agreements for temporary modifications with Plaintiff and other eligible Wells Fargo borrowers. These TPP Agreements, which were form contracts, contained an express term requiring Wells Fargo to extend a formal offer for a permanent loan modification upon a borrower's completion of his or her respective trial period and continued compliance with the TPP Agreement's other terms.

7.      Plaintiff, as well as the members of the Class, has complied with her contractual obligations under her TPP Agreements by submitting all required documentation, answering all questions truthfully, keeping her representations true and accurate, and by making her trial period payments. Despite Plaintiff's and the other members of the putative Class' full performance, Wells Fargo has ignored its obligations by refusing to extend offers for permanent modification to its eligible borrowers as required under the program guidelines and its contracts.

8.      Wells Fargo's failure to extend offers for permanent modification is no accident. To the contrary, Wells Fargo has knowingly established a system designed to wrongfully deprive

its eligible HAMP borrowers of an opportunity to modify their mortgages, pay their loans, and

save their houses from foreclosure. Wells Fargo's actions, which serve only its interest in

extracting as much money as possible from borrowers it deems are at risk of default, thwart the

very purpose of HAMP and constitute express and implied breaches of its various contracts.

## JURISDICTION

9.      Jurisdiction is proper pursuant to the Class Action Fairness Act, 28 U.S.C. §

1332(d)(2). This claim is brought as a putative class action in which the amount in controversy

exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member

of the class of plaintiffs is a citizen of a State different from the Defendant.

10.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as unlawful

practices are alleged to have been committed in this District, Defendant regularly conducts

business in this District, and the named Plaintiff resides in this District.

## PARTIES

11.      Plaintiff Wigod is a natural person and a citizen of the state of Illinois.  Plaintiff

Wigod resides on Paulina Street in Chicago, Illinois and her home mortgage is one of the loans at

issue in this lawsuit.  At all times relevant, Wigod was pre-verified, qualified and eligible to

participate in the HAMP program under all applicable directives and guidelines, a conclusion

Wells Fargo would have reached had it accurately applied such guidelines and directives.

12.      Wells Fargo Bank, N.A. is a national banking association chartered in Sioux Falls,

South Dakota and acts and operates as a mortgage lender with a principal place of business at

420 Montgomery Street, San Francisco, California 94104.  Wells Fargo Home Mortgage is an

operating unit of Wells Fargo Bank, N.A. and is located in Des Moines, Iowa.

13.      Wachovia Mortgage FSB ("Wachovia") is a division of Wells Fargo Bank, N.A.,

and is located in Raleigh, North Carolina.  At all times relevant, Wells Fargo operated and

controlled Wachovia as its division and specifically represented to Plaintiff Wigod and the Class

members that it would honor loan modifications and TPP Agreements originated by Wachovia.

## FACTUAL BACKGROUND

### *Congressional Response to National Foreclosure Crisis*

14.     The United States has experienced a persistent foreclosure crisis for the past

several years.  A congressional oversight panel noted in 2009 that one in eight U.S. mortgages

were in foreclosure or default.[1] Increased foreclosures have a detrimental effect on borrowers

who are at serious risk of losing their homes.  Foreclosures also have a negative impact on the

surrounding neighborhoods that suffer decreased property values, and municipalities lose tax

revenue as a result of foreclosures.

15.      On October 3, 2008, Congress passed the Emergency Economic Stabilization Act

of 2008 and, on February 17, 2009, Congress amended the statute by passing the American

Recovery and Reinvestment Act of 2009 (collectively the "Act").  12 U.S.C. § 5201, *et seq.*

(2009). The purpose of the Act is to grant the Secretary of the Treasury the authority to restore

liquidity and stability to the financial system and ensure that such authority is used in a manner

that "protects home values" and "preserves homeownership." 12 U.S.C. § 5201.

16.     The Act grants the Secretary of the Treasury the authority to establish TARP.  12

U.S.C. § 5211. Under TARP, the Secretary may purchase or make commitments to purchase

troubled assets from financial institutions.  *Id.* In exercising its authority to administer TARP, the

Act mandates that the Secretary "shall" take into consideration the "need to help families keep

their homes and to stabilize communities."  12 U.S.C. § 5213(3).

17.     The Act further mandates, with regard to any assets acquired by the Secretary that

---

[1] Congressional Oversight Panel, Oct. 9, 2009 report, *available at* URL
http://cop.senate.gov/press/releases/release-100909-foreclosure.cfm (last visited June 23, 2010).

are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and that uses the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C. § 5219. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." *Id.* The Act further imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures. 12 U.S.C § 5220.

18.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the HAMP program. Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable.  Servicers receive $1,000.00 for each HAMP modification.

*Servicer Participation in the HAMP program*

19.     The industry entities that perform the actual interface with borrowers – including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are known as "servicers."  Servicers typically act as the agents of the entities that hold mortgage loans.  Wells Fargo Home Mortgage (formerly Wachovia Mortgage FSB) is a servicer operated by Wells Fargo Bank, N.A. and its actions described herein were made as agents for the entities that hold mortgage loans.

20.     To participate in HAMP, a servicer must execute a Servicer Participation Agreement ("SPA") with the federal government.

21.     On April 13, 2009, Michael J. Heid of Wells Fargo Home Mortgage executed an SPA, thereby making Wells Fargo a participating servicer in HAMP. (*See* Ex. B.)

22.     The SPA executed by Mr. Heid incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac, in connection with the duties of Participating Servicers.

23.     The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services."

24.     The Program Documentation requires Participating Servicers to evaluate *all loans* that are delinquent 60 days or greater for HAMP modifications.  In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if HAMP is appropriate for the borrower.

***TPP Agreements***

25.     A HAMP Modification consists of two stages.  First, a Participating Servicer is required to gather a borrower's financial and other relevant information and, if the borrower qualifies, offer the borrower a TPP Agreement.  Wells Fargo's form TPP Agreements require borrowers to make certain representations, provide relevant information, and make trial period payments at a revised rate designed to keep the borrower in his or her home. (*See* Ex. A.)

26.     Wells Fargo's TPP Agreements provide that Wells Fargo will extend offers for permanent modification to those homeowners who execute the TPP Agreement and fulfill the documentation and payment requirements. (*Id.*) If a homeowner executes the TPP Agreement[2], complies with all documentation and representation requirements, and makes all of the TPP monthly payments on time, the second stage of the HAMP process is triggered in which Wells Fargo is required to offer the home owner a permanent loan modification.  This lawsuit

---

[2]  On October 8, 2009, the HAMP Supplemental Directive 09-07 adopted the new form of the TPP Agreement that no longer required a borrower's signature.

challenges the fact that, despite full performance by its borrowers, Wells Fargo routinely fails to extend offers for permanent modifications to such borrowers.

27.     By failing to live up to its end of the TPP Agreements and offer permanent modifications as required, Wells Fargo has deprived homeowners of their ability to save their homes and has instead left them in a state of limbo, unsure of whether Wells Fargo is setting them up for foreclosure proceedings. Wells Fargo's conduct also prevents borrowers from pursuing other avenues of resolution, including using the money they are putting toward TPP Agreement trial payments to fund bankruptcy plans, relocation costs, short sales, or other means of curing their default or preventing imminent default.

### FACTS RELATING TO NAMED PLAINTIFF LORI WIGOD

28.     On or about September 4, 2007, Wigod obtained a mortgage loan for her personal residence located in Chicago, Illinois from Wachovia, which later became a division operated by Defendant Wells Fargo.

29.     On April 3, 2009, Wigod contacted Defendant's loss mitigation department and made a written request for a loan modification under the HAMP plan.  Throughout April 2009, Wigod also sent Wells Fargo all of the financial disclosures necessary to determine if she qualified for the HAMP plan. Wigod was not in default under her mortgage agreement at that time.

30.     Sometime in mid-May of 2009, one of Defendant's representatives informed Wigod that she qualified for a temporary loan modification and that Defendant would be sending her the required legal papers for her to execute.

31.     On May 28, 2009, Ms. Wigod executed a TPP Agreement entitled "Home Affordable Modification Program Trial Loan Period" and sent the executed TPP Agreement, along with certain additional documents Defendant had requested to Wells Fargo.  (*See* Ex. A.)

32.     The first sentence of the TPP Agreement states:  "If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage." (*See* Ex. A., p. 1)  Likewise, the TPP Agreement states: "If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date."  (*Id.*, § 3.)

33.     The TPP Agreement also provides that:  "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of the Plan if I qualify for the Offer or will send me written notice that I do not qualify for the offer."  (*Id.*)

34.     Defendant Wachovia verified Wigod's financial and other information and determined that she qualified for a HAMP TPP Agreement.  This was not a case, as sometimes observed in the modification process prior to June 1, 2010, where the bank sends the customer a TPP Agreement prior to verifying the customer's eligibility through submitted documents and then verifies the borrower's eligibility by comparing verbal representations of income to supporting documentation. To the contrary, in Wigod's and the proposed Class members' cases, Wachovia verified and approved their eligibility for the HAMP program prior to executing their respective TPP Agreements.

35.     On or about June 4, 2009, having reviewed Wigod's documentation and determining she was eligible for the HAMP, a representative of Defendant Wachovia signed the TPP Agreement and sent the signed TPP Agreement to Wigod.  (*Id.*, p. 3.)

8

36.     Also on or about June 4, 2009, Wachovia sent Ms. Wigod a letter congratulating her on entering into a Home Affordable Modification workout plan. (*See* "June 4, 2009 Letter from Wells Fargo," attached as Exhibit C). Included in the June 4, 2009 Letter that Ms. Wigod received was a copy of the TPP Agreement signed by Defendant's representative.

37.     Ms. Wigod timely made each of the four payments of $1,756.14 required by the TPP Agreement. (*See* "Proof of Trial Payments," attached as Exhibit D.) Wachovia and/or Wells Fargo accepted these payments without qualification or protest of any kind.

38.     Ms. Wigod also fully complied with all other the terms and requirements of the TPP Agreement such as keeping her information accurate and submitting all necessary paperwork.

39.     Despite her full compliance in all respects with the terms of the TPP Agreement, Wells Fargo failed to send her a modification agreement for her signature or otherwise extend her an offer for permanent modification.

40.     Wells Fargo thereafter acquired Wigod's and the Class Members' loans and modification agreements through its acquisition of or merger with Wachovia, and Wells Fargo thereafter stepped into the shoes of Wachovia. On October 7, 2009, Ms. Wigod received a letter from Wells Fargo informing her of an outstanding loan balance. (*See* "Oct. 7, 2009 Letter from Wells Fargo," attached as Exhibit E). This letter indicated that Wells Fargo had assessed late charges to Wigod's account. Further, the letter did not reflect the payments made by Ms. Wigod under the TPP Agreement.

41.     On November 13, 2009, Ms. Wigod received a letter from Wells Fargo informing her that Wells Fargo was "unable to adjust the terms of [her] mortgage" due to unexplained "investor guidelines." (*See* "Nov. 13, 2009 Letter" from Wells Fargo, attached as Exhibit F).

42.     On November 15, 2009, and despite Wells Fargo's acceptance of Ms. Wigod's trial payments and her full compliance with the TPP Agreement, Wigod received a letter from Wells Fargo informing her that her loan was considered by Wells Fargo to be in default.

43.     Over the next several months, Ms. Wigod attempted to get Wells Fargo to honor its end of the bargain and offer her a permanent modification as promised. Discussions with various Wells Fargo representatives revealed that Wells Fargo had improperly re-evaluated Wigod's eligibility, had erroneously calculated her property taxes, and had wrongfully concluded that she did not qualify for an offer for permanent modification. Despite repeatedly explaining to various Wells Fargo representatives that the bank had improperly subjected to her to reevaluation and, in the process, had performed various miscalculations, Wells Fargo refused, and continues to refuse, to offer her a permanent modification or send her a modification agreement for her signature as required under the terms of the TPP Agreement. Rather, Wells Fargo has asked Ms. Wigod to re-submit documentation already in Wells Fargo's possession.

44.     As of the filing of the original Complaint, Wells Fargo had not provided Wigod with a permanent modification agreement for her signature or otherwise extended her an offer for permanent modification.

## CLASS ALLEGATIONS

45.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

46.     This class action is brought by Plaintiff on behalf of a Nationwide Class defined as follows:

> All borrowers (1) who received a HAMP TPP from Wachovia/Raleigh between March 1, 2009 and October 15, 2009 based on verified financial documentation, (2) whose HAMP TPP was signed by both the borrower and Wachovia (Raleigh), (3) who made all scheduled payments and satisfied all conditions set forth in the TPP and required by HAMP, (4) whose loan was transferred to Wells Fargo Home Mortgage for servicing in October 2009, and (5) who did not receive a permanent HAMP modification at any time after the transfer of servicing.

47.     Excluded from the Class are 1) any Judge or Magistrate presiding over this action and members of their families; 2) Defendant, Defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which Defendant or its parent companies have a controlling interest and their current or former officers and directors; 3) persons who properly execute and file a timely request for exclusion from the Class; and 4) the legal representatives, successors or assigns of any such excluded persons. Plaintiff anticipates that amending the definitions of the Class may become proper following discovery.

48.     Plaintiff sues on her own behalf and on behalf of the above-defined Class under Rules 23(a) and (b) of the Federal Rules of Civil Procedure.

49.     Plaintiff does not know the identities of the members of the proposed Class, since such information is in the exclusive control of Defendant. Plaintiff believes that the Class encompass 835 individuals whose identities can be readily determined from Defendant's books and records. Therefore, the proposed Class is so numerous that joinder of all members is impracticable.

50.     Based on the size of the modifications at issue, Plaintiff believes the amount in controversy exceeds $5 million.

51.     All members of the Class have been subject to and affected by the same conduct. The claims are based on form contracts and uniform loan modification processing requirements. There are questions of law and fact that are common to the Class that are subject to common proof and predominate over any questions affecting only individual members of the Class. These questions include, but are not limited to the following:

a.      Whether Wells Fargo's TPP Agreements required Wells Fargo to extend modification agreements or otherwise offer permanent loan modifications when its pre-verified borrowers complied with the requirements of the TPP

11

Agreements;

b.      Whether Wells Fargo breached an express term of its TPP Agreements with Plaintiff and the members of the Class by failing to extend offers for permanent modification to Plaintiff and the members of the Class;

c.      Whether Wells Fargo breached an implied term of its TPP Agreements by failing to extend offers for permanent modification to Plaintiff and the members of the Class;

d.      Whether Wells Fargo breached the implied covenant of good faith and fair dealing by repeatedly requesting its borrowers produce documentation already in Wells Fargo's possession and by taking other steps to delay or prevent the extension of offers for permanent modification;

e.      Whether Plaintiff and the Class reasonably relied on the material representations made by Defendant relating to the offer of a permanent loan modification, and whether Plaintiff and the Class suffered damage as a result of their reasonable reliance;

f.      Whether the members of the Class were "pre-verified" prior to commencing their TPP Agreements and whether Wells Fargo re-evaluated their eligibility;

g.      Whether Wells Fargo made false statements of material facts and whether Plaintiff and the Class reasonably relied on such misrepresentations to their detriment;

h.      Whether Wells Fargo's false statements of material fact were made intentionally;

i.      Whether the members of the Class complied fully with their TPP Agreements;

j.      Whether the Court can order damages, and the amount of such damages;

k.      Whether an award of damages would be an adequate remedy to compensate Plaintiff for the harm caused by Defendant's conduct as alleged herein; and

l.      Whether Plaintiff and the Class are entitled to injunctive relief.

52.     The claims of the individual named Plaintiff are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that both Plaintiff and the other members of the Class were subject to the same conduct, signed the same form agreements, and were met with the same absence of any offer for permanent modification.

53.     The named Plaintiff will fairly and adequately represent the interests of the Class.

Plaintiff is committed to the vigorous prosecution of the Class' claims and has retained attorneys who are qualified to pursue this litigation and have experience in class actions.

54.     A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability. This putative class action meets the requirements of Fed. R. Civ. P. 23(b)(3).

## COUNT I
### Breach of Contract
(on behalf of Plaintiff Wigod and the Class)

55.     Plaintiff repeats and re-alleges the allegations in paragraphs 1-54 above as if set forth herein in full.

56.     Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

*Contract Formation:  Offer and Acceptance*

57.     As described above, the TPP Agreement executed by Defendant and Plaintiff Wigod constitutes a valid contract.  (*See* Ex. A.)

58.     Wells Fargo's sending of the TPP Agreement to Plaintiff Wigod was an offer, and Plaintiff accepted this offer by executing the TPP Agreement and sending it back to Wells Fargo along with any outstanding necessary documentation to verify her eligibility. In the alternative, Wells Fargo's sending of the TPP Agreement to Plaintiff Wigod was an invitation to deal. Plaintiff's execution of the TPP Agreement and sending to Defendant any outstanding necessary documentation to verify her eligibility constituted an offer.  Defendant accepted the offer by verifying her eligibility, determining she qualified for HAMP, and sending her an executed copy of the TPP Agreement on June 4, 2009 along with a letter congratulating her on her entry into the program. (*See* Ex. C.)

*Contract Formation: Consideration*

13

59.     The TPP Agreement is supported by consideration in the form of an exchange of mutual promises. In addition to making temporary trial payments on time, Plaintiff promised to open new escrow accounts, to undergo credit counseling (if asked), and to provide financial information and vouch for its truth. In exchange, Wells Fargo promised to send Plaintiff an agreement for permanent modification upon her completion of the TPP Agreement.

60.     In addition or in the alternative, the TPP Agreement is supported by further consideration in the form of each party foregoing legal obligations and rights.  Plaintiff forewent alternative avenues she could have pursued including, by way of example, bankruptcy or listing the property. Wells Fargo agreed to forego foreclosure proceedings and late fees.  Both sides benefited from the exchange in that Plaintiff was presented with an opportunity to save her home at a reduced payment and receive incentive payments from the government, while Wells Fargo enjoyed the ability to keep a paying customer, receive incentive payments for performing the modification from the government, and avoid the costs and risks associated with foreclosure.

61.     In the alternative, and explained in Count II and as incorporated fully herein, Plaintiff's justifiable reliance serves as a substitute for any lack of consideration.

*Plaintiff's Performance*

62.     Plaintiff and the members of the Class made their temporary trial payments and otherwise complied with the TPP Agreements by keeping all information and representations true and accurate in all material respects, and by taking all such other steps necessary under their respective TPP Agreements.

*Express Contract Terms*

63.     Wigod's TPP Agreement provided that "TIME IS OF THE ESSENCE under this Plan." (*See* Ex. A, ¶ 2.)

14

64. Wigod's TPP Agreement also provided that if Wigod and the Class members made their payments and otherwise complied with the terms of their TPP Agreements, then "the lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary or reflect this new payment amount and waive any unpaid late charges accrued to date." (*See id.* ¶ 3.)

*Defendant's Breach of Express Terms*

65. Rather than treat the timing of its performance under the TPP Agreement as being "OF THE ESSENCE", Defendant intentionally and systematically delayed converting TPP Agreements into permanent modifications by falsely claiming, repeatedly, that it lacked documents and information already in its possession that borrowers had mailed in multiple times, improperly re-evaluating Plaintiff's and the putative class members' eligibility, using incorrect inputs and miscalculating the "waterfall" and other factors for determining HAMP eligibility, failing to implement adequate procedures and systems to respond to inquiries and complaints, and by otherwise dragging out and delaying its extension of offers for permanent loan modification.

66. Rather than extending offers for permanent modification to Plaintiff and the members of the Class, Defendant, improperly and without justification, ultimately decided to treat the TPP Agreements as if they were null and void. Each instance where Wells Fargo dishonored the TPP Agreements of pre-verified borrowers who complied with the terms of the TPP Agreements or otherwise re-evaluated such borrowers by re-running the HAMP waterfall or NPV test constituted a breach of contract, causing each borrower to suffer damages in losing their permanent modification, a negative impact on their credit scores, late fees and other fees assessed by Wells Fargo as a result of a denial of permanent modification, lost opportunities to pursue other avenues for saving their homes, and the lost ability to collect government incentive

payments for HAMP compliance. Additionally, Defendant accepted Plaintiff's reduced payments while threatening foreclosure.

*Implied Contract Terms*

67.     In addition, Wells Fargo breached an implied term that required Wells Fargo to extend the offers for permanent modification within a reasonable period of time following Plaintiff's and the Class' performance under the TPP Agreements.

68.     The TPP Agreement, like all contracts entered into in Illinois, contained an implied duty of good faith and fair dealing.  Insofar as the TPP Agreement placed discretion and broad authority in Wells Fargo to determine HAMP eligibility and to administer the HAMP modification program, Wells Fargo had a duty to perform consistent with its duty of good faith and fair dealing.

*Defendant's Breach of Implied Terms*

69.     The Defendant routinely and regularly breached these implied duties by:

a.     failing to perform loan servicing functions consistent with its responsibilities to Plaintiff using acceptable professional standards of care;

b.     failing to properly supervise its agents and employees including, without limitation, its loss mitigation and collection personnel and its foreclosure attorneys or otherwise use individuals with suitable training, education, experience and skills to perform loan servicing functions;

c.     routinely demanding information already in its files and otherwise filing to implement an appropriate and functioning document management system;

d.     providing false justifications for refusing to extend offers for permanent modification;

e.     systematically making inaccurate calculations and determinations of Plaintiff's and the Class' eligibility for HAMP;

f.     unreasonably delaying the extension of offers for permanent modifications to borrowers who perform fully and faithfully under their TPP Agreements as described in Paragraph 67, above; and

g.      acting in a manner that otherwise constitutes an abuse of discretion or authority under the TPP Agreement or taking such other steps to frustrate Plaintiff's ability to receive the benefit of her bargain under the TPP Agreement.

*Causation and Damages*

70.     As an actual and proximate result of Wells Fargo's breaches of these express and implied contractual terms described herein, Plaintiff and the Class have suffered harm and are threatened with additional harm. Plaintiff and the Class have been damaged insofar as they have been improperly denied offers for permanent loan modifications, which they stand ready, willing, and able to accept.

71.     Plaintiff and the Class have further been damaged in the form of lost time and opportunity costs.  By entering into the TPP Agreement and making their payments both during and after the trial period, Plaintiff spent monies on a plan that could have gone towards other potential remedies that she might otherwise have pursued to save her home.  Plaintiff also lost the opportunity to restructure her debt under the bankruptcy code, sell her home on favorable terms, pursue refinancing with other lenders, take other steps to address her financial hardship and threatened loss of her home, perform efficient breaches to cut her losses, or receive program incentive payments. In addition, Plaintiff suffered negative impact on her credit score and paid late fees and other fees assessed as a result of her removal from the HAMP.

72.     On information and belief, some putative Class members have suffered additional harm and expense in the form of defending foreclosures of their homes or lost their homes altogether, when, in reality, they should have been extended offers for permanent modifications of their mortgage loans several months into their modified permanent payment plans.

73.     An award of damages may be an inadequate remedy to compensate the members of the Class for the harm caused to them by Defendant's breach of contract. As such, Plaintiff, on her own behalf and on behalf of the members of the Class, additionally seeks relief in the

17

form of an order compelling Defendant to specifically perform under its TPP Agreements and extend the members of the Class the offers for permanent modification they had been promised.

74.　　An order of specific performance may be warranted in this case because damages may not make the Plaintiff whole and the risk of under-compensation is high, the TPP Agreements are specific enough and are capable of being performed by Wells Fargo with minimal judicial supervision, according to the terms of the applicable HAMP Directives.

75.　　In the alternative, if the Court determines that an award of damages will be a sufficient remedy, Plaintiff, on her own behalf and on behalf of the members of the Class, seeks damages for Defendant's breach of contact to the maximum extent allowed by law, and, in any case, interest, costs, and attorneys' fees in an amount to be determined at trial.

**COUNT II**
**Promissory Estoppel, In the Alternative to Count I**
(on behalf of Plaintiff Wigod and the Class)

76.　　Plaintiff repeats and re-alleges the allegations of paragraphs 1-54 above as if set forth herein in full.

77.　　Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

78.　　Defendant, by way of its TPP Agreements, unambiguously promised to Plaintiff that if she made her TPP payments on time and otherwise fully complied with the terms of her TPP Agreement, she would receive an offer for permanent modification in the form of a permanent modification agreement for her signature. (*See* Ex. A.)

79.　　Defendant's promise was intended to induce Plaintiff to rely on it and make monthly TPP payments and otherwise perform.

80.　　Plaintiff indeed relied on Defendant's promise by submitting TPP payments and all necessary documentation and otherwise fully performing under her TPP Agreement.

18

81.     Given the language in the TPP Agreement, Plaintiff's reliance was reasonable.

82.     Plaintiff's reliance was to her detriment.  Plaintiff has yet to receive a permanent modification agreement for her signature or any other offer for permanent modification, has lost the value of the TPP payments, has lost the opportunity to fund other strategies to deal with her default and avoid foreclosure or perform an efficient breach to cut her losses, has experienced adverse effects on her credit scores, incurred damages while defending against unjustified foreclosure proceedings, lost government incentive payments that are provided the first 5 years of successful completion of the program, and paid late fees and other fees assessed as a result of her removal from the Program.

83.     An award of damages, however, may ultimately be an inadequate remedy to compensate the members of the Class for the harm caused to them by Defendant's breach of promises regarding extending loan modifications. As such, Plaintiff, on her own behalf and on behalf of the members of the Class, seeks relief in the form of an order compelling Defendant to honor its promises to the members of the Class and extend the members of the Class offers for permanent modification on the terms consistent with the applicable HAMP Directives.

84.     As the HAMP was specifically enacted to help struggling homeowners to stay in their homes, justice requires that Wells Fargo be ordered to deliver on its promises to the members of the Class. Minimal, if any, judicial supervision will be required with regard to the specific performance of the promises since they can be performed under the terms and conditions of the applicable HAMP Directives.

85.     In the alternative, if the Court determines that an award of damages is a sufficient remedy to make the Plaintiff whole or that the risk of under-compensation is high, Plaintiff, on her own behalf and on behalf of the members of the Class, seeks damages for Defendant's

breach of promises to extend permanent modifications to the members of the Class to the maximum extent allowed by law, as well as all interest, costs, and attorneys' fees in the amount to be determined at trial.

**Count III Fraudulent Misrepresentation**
(on behalf of Plaintiff Wigod and the Class)

86.     Plaintiff repeats and re-alleges the allegations of paragraphs 1-85 above as if set forth herein in full.

87.     In its TPP Agreement that it signed and sent to Plaintiff Wigod on June 4, 2009, Defendant intentionally misrepresented to Plaintiff that:  "If [plaintiff] compl[ied] with the requirements in Section 2 and [her] representations in Section 1 continue[d] to be true in all material respects," that Defendant would send her "a Modification Agreement for [her] signature which w[ould] modify [her] Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date."  (*See* Ex. A.)

88.     Defendant knew these representations were false at the time it sent the respective TPP Agreements to Plaintiff.  Defendant had absolutely no intention to modify Plaintiff's mortgage.  Instead, it devised and implemented a scheme whereby it stood to extract as much money as possible from defaulting homeowners for as long as possible while receiving hefty fees for servicing their loans without ever extending the promised loan modifications.

89.     These representations were also material insofar as Plaintiff would not have entered into the TPP Agreement or otherwise wasted time and recourses attempting to comply with its terms had she known Defendant had no intention to offer her a permanent modification.

90.     Defendant made these false representations to induce Plaintiff and the members of the Class to enter into the TPP Agreements and make the temporary payments for as long as possible.

20

91.     Plaintiff reasonably relied on Defendant's false representations by entering into and complying with the terms of their TPP Agreements.

92.     Plaintiff's and the members of the Class' reliance on these false statements actually and proximately caused them to suffer damages in that they never received a permanent modification of their mortgage loans, they made TPP payments using money that could have been used to pursue other avenues of relief, lost time, paid late fees and other fees assessed by Defendant after dropping Plaintiff from the Program, suffered adverse effect on their credit scores, lost incentive payments for complying with the program, and lost the opportunity to pursue other avenues for saving their home and credit.

93.     Plaintiff, on her own behalf and on behalf of the Class, seeks actual damages caused by Defendant's false misrepresentations, punitive damages, interests, costs, and attorneys' fees in the amount to be determined at trial, as well as an order compelling Defendant to extend offers for permanent modification to the members of the Class according to the terms of their TPPs and the applicable HAMP directives and to cease proceeding with respect to its TPP Agreements as if they are illusory.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

A.      Certify this case as a class action and appoint named Plaintiff to be Class representative and her counsel to be Class counsel;

B.      Award Plaintiff and the Class members actual and compensatory damages for breach of contract and breach of the implied covenant of good faith and fair dealing in an amount to be determined at trial, or, in the alternative, order Wells Fargo to specifically perform under its TPP Agreements or enjoin Wells Fargo from treating its TPP Agreements as if they impose no binding obligations on the bank;

C.       Award actual and compensatory damages and order other equitable relief as justice requires, including requiring Defendant to extend Plaintiff and the Class offers for permanent loan modifications on the theory of promissory estoppel;

D.       Award actual, compensatory, and punitive damages for Defendant's fraudulent misrepresentations of material fact, as well as interest, and attorneys' fees and costs in the amount to be determined at trial;

E.       Order specific performance of Defendant's contractual obligations together with other relief required by contract, equity and law;

F.       Award Plaintiff the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees;

G.       Enter and Order prohibiting Defendant from initiating or proceeding with any foreclosure proceeding without first fairly and accurately determining whether the borrower named in the foreclosure proceeding is eligible for a HAMP or other modification; and

H.       Grant Plaintiff and the Class such other and further relief as this Court finds necessary and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.


Respectfully submitted,

Dated: June 17, 2014                                    By: /s/ Steven L. Woodrow
                                                              One of Plaintiff's attorneys


Jay Edelson
jedelson@edelson.com
Steven L. Woodrow
swoodrow@edelson.com
Megan Lindsey (Admitted *Pro Hac Vice*)
mlindsey@edelson.com
Alicia Hwang
ahwang@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300

Chicago, Illinois 60654
Tel: 312.589.6379
Fax: 312.589.6378

*Counsel for Plaintiff and Putative Class*