**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LORI WIGOD, on behalf of herself and all others similarly situated, | Case No: 1:10-cv-2348 |
| Plaintiff, | |
| v. | Hon. Elaine E. Bucklo |
| WELLS FARGO BANK, N.A. d/b/a WELLS FARGO HOME MORTGAGE, f/k/a WACHOVIA MORTGAGE, FSB, | |
| Defendant. | |

**PLAINTIFF WIGOD'S MOTION FOR APPROVAL OF CLASS MEMBER
INCENTIVE AWARD AND REASONABLE ATTORNEYS' FEES**

Jay Edelson
jedelson@edelson.com
Steven L. Woodrow
swoodrow@edelson.com
Megan Lindsey (Admitted *Pro Hac Vice*)
mlindsey@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiff and the Settlement Class*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

I.   INTRODUCTION ...................................................................................................1

II.  FACTUAL AND PROCEDURAL BACKGROUND .................................................2

    A.  Nature of the Case ...................................................................................2

    B.  The Litigation and Work Performed for the Class's Benefit .............................4

    C.  Private Mediation and Settlement Conferences with the Honorable
        Morton Denlow (Ret.) ...............................................................................6

    D.  The Settlement ..........................................................................................7

III. ARGUMENT .........................................................................................................9

    A.  Attorneys' Fees in Class Action Settlements .............................................9

    B.  The Requested Attorneys' Fees are Reasonable Under the Lodestar
        Method ..................................................................................................10

        1.  Class Counsel's lodestar is equal to $3,232,616.88 and supports
            the requested attorneys' fees ..........................................................11

        2.  The risk and complexity posed by the litigation support the use
            of a multiplier here (which would equal only 1.064) ..........................13

    C.  The Requested Attorneys' Fees are Further Reasonable When
        Considered as a Percentage of the Benefits Being Made Available to
        the Settlement Class Members ..................................................................15

    D.  Class Counsel have Incurred $60,976.68 in Reasonable Expenses to
        Date that Should be Approved by the Court ...............................................17

    E.  The Court Should Approve an Award to Wigod in the Form of a Loan
        Modification from Wells Fargo .................................................................18

IV.  CONCLUSION ....................................................................................................19

# TABLE OF AUTHORITIES

**UNITED STATES SUPREME COURT CASES:**

*Boeing Co. v. Van Gemert,* 444 U.S. 472 (1980)....................................................15, 17

*Missouri v. Jenkins*, 491 U.S. 274 (1989)...........................................................10, 11

**UNITED STATES CIRCUIT COURT OF APPEALS CASES:**

*Americana Art China Co. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243
    (7th Cir. 2014)....................................................................................9, 10

*Cook v. Niedert,* 142 F.3d 1004 (7th Cir. 1988)..................................................13, 18

*Denius v. Dunlap*, 330 F.3d 919 (7th Cir. 2003) ......................................................11

*Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560 (7th Cir. 1994) ................................10

*Gaskill v. Gordon*, 160 F.3d 361 (7th Cir. 1998).....................................................16

*Gastineau v. Wright,* 592 F.3d 747 (7th Cir. 2010) ..............................................11, 13

*Harman v. Lyphomed, Inc.*, 945 F.2d 969 (7th Cir. 1991)................................10, 13, 15

*In re Synthroid Mktg Litig.*, 264 F.3d 712 (7th Cir. 2001) .....................................10, 18

*In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741 (7th Cir. 2011) .........................13

*Jeffboat, LLC v. Director, Office of Workers' Comp. Programs*, 553 F.3d 487
    (7th Cir. 2009).........................................................................................11

*Kirchoff v. Flynn,* 786 F.2d 320 (7th Cir. 1986) ......................................................10

*Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423 (2d Cir. 2007) ...................15

*Matter of Cont'l Ill. Sec. Litig.,* 962 F.2d 566 (7th Cir. 1992)....................................10

*Montgomery v. Aetna Plywood, Inc.,* 231 F.3d 399 (7th Cir. 2000).............................15

*Smith v. Village of Maywood,* 17 F.3d 219 (7th Cir. 1994) ......................................11

*Soto v. Adams Elevator Equip. Co.,* 941 F.2d 543 (7th Cir. 1991)..............................11

*Sutton v. Bernard*, 504 F.3d 688 (7th Cir. 2007) .....................................................10

*Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012) ................................3, 4

**UNITED STATES DISTRICT COURT CASES:**

*Beesley v. Int'l Paper Co.*, No. 06-cv-703, 2014 WL 375432 (S.D. Ill. Jan. 31, 2014) ............9, 17

*In re Kentucky Grilled Chicken Coupon Mktg. & Sales Practices Litig.,* 280 F.R.D. 364
    (N.D. Ill. 2011)....................................................................................................16

*In re Linerboard Antitrust Litig.*, No. 98-5055, 2004 WL 1221350 (E.D. Pa. June 2, 2004) .......15

*McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806 (E.D. Wis. 2009).........15, 16, 17

*Meyenburg v. Exxon Mobil Corp.*, No. 05-cv-15, 2006 WL 2191422
    (S.D. Ill. July 31, 2006)........................................................................................16

*Redman v. RadioShack Corp.*, No. 11-cv-6741, 2014 WL 497438 (N.D. Ill. Feb. 7, 2014).........13

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011)........................................10, 16

*Spicer v. Chicago Bd. Options Exch., Inc.*, 844 F. Supp. 1226 (N.D. Ill. 1993) ..........................16

**STATUTES:**

12 U.S.C. § 5219 (2010) ...................................................................................................3

Fed. R. Civ. P. 23 ............................................................................................................2

**MISCELLANEOUS:**

4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 14:6
    (4th ed. 2002)....................................................................................................15

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and their Fee
    Awards*, 7 J. Empirical Legal Stud. 811 (2010) .................................................16

Richard Posner, Economic Analysis of Law § 21.9 (3d ed. 1986)................................13

Richard Posner, Economic Analysis of Law (5th ed. 1998)........................................15

# I.    INTRODUCTION

This Court should not have any hesitation in awarding the requested attorneys' fees, case expenses, and incentive award. The Settlement achieved is the result of more than four-and-a-half years of contentious litigation that included a landmark appeal to the Seventh Circuit, the drafting of over twenty substantive briefs (including motions to dismiss and a host of discovery motions), extensive written and oral discovery, and nearly one year of negotiations in the context of private mediation sessions with the Honorable Morton Denlow (Ret.) of JAMS. (*See* Settlement Agreement ("Settlement"), attached as Exhibit 1 to Plaintiff's Motion for Preliminary Approval, Dkt. 262.) The Settlement brings an end to Plaintiff Wigod's ("Plaintiff," "Class Representative," or "Wigod") claims that Defendant Wells Fargo Bank, N.A. ("Defendant" or "Wells Fargo") (together, the "Parties") breached the terms of her Home Affordable Modification Program ("HAMP") trial payment plan ("TPP") and is an exceptional result for the Class, providing loan modifications, foreclosure relief, credit counseling, and cash to former Wachovia borrowers whose modifications were mishandled by Wells Fargo.

As part of the Settlement, which already enjoys a claims rate of **31.49%**, Wells Fargo has agreed to review Class Members who still have their loans for potential modifications. If the Class Members don't qualify for any loan modification, or where the Class Members no longer have their subject loans, Wells Fargo will provide cash payments collectively worth up to $2.8 million. Further, Class Members have received the benefits of foreclosure holds and Wells Fargo is making holistic credit counseling available. Additionally, Wells Fargo has agreed to pay the costs of notice, reasonable attorneys' fees and expenses, and for an incentive award to Wigod (*see infra*, Section III.D-E). And of course, the results obtained through the litigation itself have helped countless borrowers obtain loan modifications and save their homes.

With the relief secured for the Class as a backdrop, Plaintiff now moves the Court to approve the requested amount of attorneys' fees and expenses to Class Counsel and an incentive award in the form of a loan modification to Wigod for her service as Class Representative. The requested attorneys' fees are reasonable and fall in line with the market rate. Using the lodestar method, the fees fairly compensate Class Counsel for the time they've expended to date and will incur going forward. When weighed against the substantial risk of non-payment and the complexity of the issues, that a multiplier of only 1.064 is needed shows the fees are reasonable.

Further, given the risk assumed by Class Counsel, the amount and quality of the work performed, and the result achieved, the requested fees are also justified under the percentage of the benefit approach. The Settlement makes substantial relief available—offering over 450 Class Members the opportunity to apply for loan modifications designed to save their homes, foreclosure holds, millions in cash benefits, and credit counseling—and is more generous than the only other HAMP settlement reached to date. All told, the fee request represents a percentage of the benefits received by the Class (32.4% to 38.9%) that is consistent with the recognized market for legal services.

As such, and in accordance with Federal Rules of Civil Procedure 23(e) and (h), Plaintiff Wigod respectfully moves the Court to approve Class Counsel's request for an award of attorneys' fees and an incentive award for the Class Representative.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Nature of the Case.

This case has its roots in the financial crisis of 2008 when the already-growing tide of mortgage defaults and foreclosure actions reached a crisis point. Congress responded by passing the Emergency Economic Stabilization Act, as amended by the American Recovery and

Reinvestment Act, 12 U.S.C. § 5201 *et seq.* (2010), which authorized the Treasury Department to enter into Servicer Participation Agreements ("SPAs") with lenders and mortgage servicers to "facilitate loan modifications and prevent avoidable foreclosures." *See* 12 U.S.C. § 5219 (2010).

Treasury responded by introducing HAMP, which was designed to provide qualified borrowers with more affordable monthly mortgage payments. The process works as follows: banks (also referred to as "servicers") place homeowners into trial period plans ("TPPs") that call for three or four reduced monthly payments (down to a target of 31% of the borrowers' monthly income). (*See* Supplemental Directive 09-01, Dkt. 262, Exhibit 2.) When homeowners successfully complete their TPPs, the bank is to offer them permanent modifications.[1]

Things haven't gone as planned. Since HAMP was introduced, thousands of formal and informal complaints have been lodged—by homeowners, State Attorneys General, the Treasury Department, and others—accusing HAMP servicers of a range of abuses including: dragging out the process, making calculation errors, falsely claiming to have lost paperwork, ignoring borrower inquiries, and improperly denying modifications. (Woodrow Decl. ¶ 5.) Affected homeowners have suffered greatly.[2]

Plaintiff Wigod had a mortgage loan with Wachovia and applied for a HAMP modification early in the program. Wigod was eventually approved for a Verified TPP, and on June 4, 2009, received a TPP signed by Wachovia. (Third Amended Class Action Complaint

---

[1] When HAMP was first introduced, banks could start a TPP either *before* the borrower had submitted financial documents, based on the borrower's oral statements (a "Stated TPP") or *after* the borrower had submitted financial documents and been deemed eligible (a "Verified TPP"). *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 558 (7th Cir. 2012). The distinction is critical: verified borrowers were not to be re-evaluated after their trial plans had started, *Id.* at 562, and Wachovia *only* used verified TPPs. (Declaration of Steven L. Woodrow ("Woodrow Decl.") ¶ 8 n.1, attached as Exhibit 1.)

[2] Due to servicer errors, many borrowers lost their homes, paid more than they were required to, and spent months, if not longer, in a state of limbo—not knowing whether they would be able to save their homes. (*See* Woodrow Decl. ¶ 5.) Moreover, those borrowers who've managed to avoid foreclosure have had to rely on more expensive financing alternatives, while other borrowers have seen their credit ruined. Others still have missed HAMP incentives. (*Id.*)

("TAC") ¶ 35, Dkt. 264, Exhibit 1.) Wigod timely made each of the four required trial payments (*id.* ¶ 37), but before Wachovia modified her loan, Wachovia was bought by Wells Fargo. Wells, however, refused to recognize Wigod's TPP, informing her that she was in default. (*Id.* ¶¶ 39–42.) Through persistent phone calls over the course of months, Wigod learned that Wells had reevaluated her eligibility and had made several errors in the process. (Woodrow Decl. ¶ 33; TAC ¶ 43.) Ultimately, Wells denied her modification. (TAC ¶ 43.)

**B.      The Litigation and Work Performed for the Class's Benefit.**

Following Wells Fargo's denial of her modification, Wigod filed her class action complaint on April 15, 2010, alleging claims for breach of contract and fraud. (Dkt. 1.) On May 12, 2010, Wells Fargo moved to dismiss. (Dkt. 13.) On June 23, 2010, Wigod filed her First Amended Class Action Complaint ("FAC") setting forth additional factual support for her claims. (Dkt. 23.) On July 23, 2010, Wells Fargo again moved to dismiss, arguing that Wigod's claims represented an impermissible "end run" around HAMP's lack of a private right of action. (*See* Dkt. 29.) On January 25, 2011, Judge Manning agreed and dismissed Wigod's FAC with prejudice. (*See* Dkt. 59.)

Wigod thereafter appealed to the Seventh Circuit. On March 7, 2012, the Seventh Circuit reversed the District Court's dismissal of Wigod's FAC, allowing her claims for breach of contract, promissory estoppel, and fraud to proceed. *See Wigod*, 673 F.3d 547. In doing so, it became the first federal circuit court of appeals to recognize borrower rights under HAMP, and, since its issuance, the decision has been examined, relied on, or cited 931 times—including 327 citations by courts all across the nation upholding borrower[3] HAMP rights. (Woodrow Decl. ¶

---

[3] *See Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878 (9th Cir. 2013), *as amended on reh'g in part* (Sept. 23, 2013) (reversing dismissal of breach of contract claims based on TPP); *see also West v. JPMorgan Chase Bank, N.A.*, 154 Cal. Rptr. 3d 285, 295 (2013), *reh'g denied* (Apr. 11, 2013), *review filed* (Apr. 26, 2013) (servicer may be held liable for breach of TPP); *Young v. Wells Fargo Bank, N.A.*, 12-1405, 2013

6.) Further, banks have since converted TPPs into permanent modifications more readily. (*Id.*)

The Parties litigated the case heavily on remand. During this time, the Parties exchanged and analyzed over 200,000 pages of documents (including thousands of pages covering Wells Fargo's HAMP policies and procedures, internal and external audit results, key witness emails and ESI, and a sample of 100 complete borrower files), and counsel met and conferred over two dozen times (often conferencing for over an hour) in addition to exchanging hundreds of emails and dozens of discovery letters. (*Id.* ¶ 8.) Motion practice has been extensive as well. At last count—and not including the papers filed in support of preliminary approval of the Settlement—Plaintiff had filed over twenty significant briefs, including motions to dismiss, to strike affirmative defenses, to compel, limit, and bifurcate discovery, and for a host of other relief[4] (in addition to ten motions to file under seal and to file oversized briefs, ten agreed motions and stipulations, and four scheduling orders). (*Id.* ¶ 7.)

Additionally, the Parties also attended and participated in at least twenty Court

---

WL 2165262 (1st Cir. May 21, 2013) (same).

[4] Not including the instant brief and other papers to be filed in support of the Settlement (and not including the briefs, letters, and other materials Class Counsel was required to prepare for the mediation and subsequent negotiations), Class Counsel has drafted and filed the following briefs, each of which required significant attorneys' time: (1) Sept. 2, 2010: Response in Opposition to Motion to Dismiss and Woodrow Decl. in Support (Dkts. 42–43); (2) April 27, 2012: Motion for Leave to Serve Additional Interrogatories (Dkt. 74); (3) May 29, 2012: Motion to Strike Affirmative Defenses (Dkt. 81); (4) May 29, 2012: Motion For Leave to File Second Amended Complaint (Dkt 83); (5) May 29, 2012: Motion for Class Certification or Deferred Ruling (Dkt. 87); (6) June 13, 2012: Motion to Compel Rule 30(b)(6) Deposition (Dkt. 101); (7) June 21, 2012: Opposition to Motion for a Protective Order (Dkt. 105); (8) July 13, 2012: Response to Motion regarding Limited Bifurcation of Discovery (Dkt. 127) and the Expert Report of D. Frankenfeld in Support (Dkt.129); (9) Aug. 15, 2012: Motion to Strike Affirmative Defenses (Dkt. 133); (10) Aug. 24, 2012: Motion to Compel Response to Document Requests (Dkt. 140); (11) Sept. 10, 2012: Motion to Overrule Defendant's Claims of Privilege (Dkt. 152); (12) Sept. 11, 2012: Reply in Support of Motion to Strike Affirmative Defenses (Dkt. 156); (13) Sept. 24, 2012: Reply in Support of Motion to Overrule Defendant's Claims of Privilege (Dkt. 159); (14) Sept. 28, 2012: Motion to Compel Further Answers to Interrogatories (Dkt. 161); (15) Oct. 8, 2012: Reply in Support of Motion to Compel Response to Document Requests (Dkt. 175); (16) Nov. 12, 2012: Reply in Support of Motion to Compel Further Answers to Interrogatories (Dkt. 191); (17) Nov. 29, 2012: Objections to and Motion to Modify Magistrate Judge Order (Dkt. 201); (18) Jan 9, 2013: Reply in Support of Objections to and Motion to Modify Magistrate Judge Order (Dkt. 219); (19) Feb. 20, 2013: Motion to Compel Documents and Enlarge Depositions (Dkt. 224); and (20) May 1, 2013: Motion to Compel (Dkt. 236).

appearances, and Plaintiff issued subpoenas to the Internal Revenue Service ("IRS"), the Office of the Comptroller of the Currency ("OCC"), Fannie Mae, Freddie Mac, and Promontory Financial, Wells Fargo's reviewer under the Independent Foreclosure Review. Finally, experts have been consulted and three deponents have been produced and examined (with at least ten persons additionally noticed). (*Id.* ¶ 8.) Overall, the discovery conducted was extensive.

### C. Private Mediation and Settlement Conferences with the Honorable Morton Denlow (Ret.).

As discovery progressed, counsel for the Parties began discussing the potential for resolving the case. (*Id.* ¶ 9.) The Parties eventually agreed to engage in a formal mediation process overseen by the Honorable Morton J. Denlow (Ret.) of JAMS in Chicago. (*Id.* ¶ 10.) Counsel for the Parties engaged in three full-day mediation sessions (which took place on July 18, 2013, October 31, 2013, and March 25, 2014). Significant effort went into preparing for and engaging in the mediation process. (*Id.* ¶¶ 9-10.)[5] During these sessions, the Parties discussed the type of relief available, the current status of affected borrowers, and alternative frameworks for delivering agreed-upon relief to the Class. In addition to the formal sessions, counsel for both Parties engaged in more than a dozen telephonic conferences separately as well as together with Judge Denlow's involvement and oversight. (*Id.* ¶ 12.) The mediation process further provided an atmosphere that facilitated an informed negotiation and, armed with this data, the Parties were able to reach an agreement regarding the proposed benefits for the Settlement groups. (*Id.*)

Importantly, only after an agreement with respect to such relief was agreed to in principal did the Parties formally negotiate an incentive award for Class Representative Wigod and reasonable attorneys' fees. (*Id.*) These negotiations lasted several weeks and involved numerous

---

[5] In addition to the over twenty briefs the Parties briefed for the Court, Class Counsel submitted two comprehensive mediation briefs to Judge Denlow setting forth their positions as to the nature of the case, the prospect of settlement, and agreeable terms. (Woodrow Decl. ¶¶ 9-10.)

exchanges. Eventually the negotiations reached a standstill, and Judge Denlow ultimately bridged the impasse through a mediator's proposal that both sides accepted.[6] (*Id.* ¶ 15.)

### D. The Settlement.

The fruit of Class Counsel's effort is a Settlement that goes well beyond consumer class action settlements generally and the only other known HAMP settlement. The Settlement allows borrowers in Groups 1 and 2—the Class Members who still have their loans with Wells Fargo— to apply for permanent loan modifications. As explained by expert economist Don Frankenfeld, each modification that is granted confers a benefit of approximately $55,000 - $65,000 total on the effected Class Member and his or her family. (*See* Report of Don Frankenfeld ("Frankenfeld Report") 2, 4, attached as Exhibit 2.) For borrowers in these groups who don't ultimately qualify for a loan modification, the Settlement provides up to $800,000 in cash payments. Further, all such borrowers have received "foreclosure holds" that have prevented Wells Fargo from proceeding with any foreclosure sale during the pendency of the Settlement. Likewise, with respect to Settlement Class Members whose subject loans are no longer held by Wells (Group 3 Class Members), the Settlement provides up to $2,000,000 in cash relief.[7] In addition to this relief, the Settlement requires that Wells pay for holistic credit counseling, the costs of notice, administrative expenses, an incentive award to Wigod, and attorneys' fees. (*See* Settlement §§ 3, 5, 9.) In short, on top of the benefits conferred on the Class through the litigation, the terms of the Parties' class action Settlement are exceptional.

In the end, in order to realize the Settlement for the benefit of the Class, Class Counsel were required to spend over 6,975.76 hours litigating this case without compensation, including:

---

[6] Plaintiff's expressed preference was to have the fees decided by the Court or through binding arbitration. Wells Fargo wanted the certainty of an agreed-upon amount. (Woodrow Decl. ¶ 14.)

[7] As explained in Section III.C, *infra*, based upon the current claims rate and distribution of the filed claims among the three settlement groups, Mr. Frankenfeld projects that at least $1.91 million will be provided in cash payments through the Settlement. (Frankenfeld Report 4, (Table IV).)

- drafting and filing over twenty (20) substantive briefs and motions, including Wells Fargo's motions to dismiss, motions for additional discovery, a motion to strike affirmative defenses, a motion for class certification, motions to compel, a motion to overrule claims of privilege, a motion to modify the magistrate's discovery rulings, a motion for preliminary approval of the settlement, and the instant motion for attorneys' fees and an incentive award;

- appealing and obtaining a reversal from the Seventh Circuit Court of Appeals of the Order dismissing the case, achieving the first federal appellate decision defining the rights of HAMP borrowers and servicers;

- conducting substantial party and third-party discovery on remand, including the review and analysis of tens of thousands of documents (consisting of over 200,000 pages of material) comprising Wells Fargo's HAMP policies and procedures, audits, borrower sample files, internal communications, and processes for transferring the servicing of Wachovia loans to Wells Fargo, issuing subpoenas, conducting three depositions (including the deposition of Mark Deskus, the Wachovia Vice President in charge of overseeing the HAMP process), defending the depositions of plaintiffs, and briefing and arguing a host of discovery motions;

- achieving a strong settlement following almost a year of negotiations, including drafting two mediation statements and numerous settlement letters and proposals, engaging in three full-day mediation sessions with Judge Denlow, and conducting dozens of follow up negotiations; and

- drafting a comprehensive settlement agreement, including the class notices, several declarations, and the content of the Settlement Website (www.wigodhampsettlement.com) as well as the remaining settlement papers.

(*See* Woodrow Decl. ¶¶ 6-12, 28.) In addition, Class Counsel has devoted substantial resources to ensure that the Class Notice was as effective as possible, setting up a phone bank to personally call every Class Member. (*Id*. ¶ 17.) To accomplish this, Class Counsel designated and spent considerable time training a team of attorneys and law clerks to personally reach out to and call each Class Member, explain the terms of the Settlement, and assist the Class Member(s) in completing and submitting their claim forms. (*Id*.) This support is in addition to the phone lines that have been set up by the Settlement Administrator, (which have fielded 125 calls to date) and the Settlement Website, which has received over 9,334 page views. (*Id*. ¶ 16.)

The result of this extra effort is an already-impressive claims rate: as of the time this

petition is being filed, 263 claims have already been filed, representing **31.49%** of the Class.[8]

(Woodrow Decl. ¶ 16.) At the same time, no Settlement Class Members have objected and only

one has opted out, despite the pervasive notice. (*Id.* ¶ 18.) Given the substantial percentage of

claims already filed—and the fact that the Claims Deadline does not expire for several more

weeks (October 10, 2014)—it's clear that the terms of the Settlement and Notice have been

successfully implemented, and Class Counsel are deserving of credit for that.

Further, as set forth in Section III.D, *infra*, Class Counsel have already expended

$60,976.68 in costs associated with prosecuting the litigation and achieving the instant

Settlement. (*Id.* ¶ 31.) And further, Class Counsel will spend additional attorneys' time assisting

Class Members who have filed claims seeking to be reviewed for loan modifications with their

paperwork and any appeals, a process that the bank's own track-record has proven is laborious,

time-consuming, and best handled with the close oversight of attorneys.

As explained below, the Court should approve the request for attorneys' fees.

## III.    ARGUMENT

### A.    Attorneys' Fees in Class Action Settlements.

In the Seventh Circuit, courts analyzing fee requests in class action settlements must

determine whether the requested fee is within the range of fees that would have been set by the

market at the start of the case. *Americana Art China Co. v. Foxfire Printing & Packaging, Inc.*,

743 F.3d 243, 246 (7th Cir. 2014) ("[W]e always seek to replicate the market value of an

attorney's services"); *see also Beesley v. Int'l Paper Co.*, No. 06-cv-703, 2014 WL 375432, at *2

---

[8] This rate already far outpaces claims rates typically observed in consumer class actions. *See, e.g.,*
*Forcellati v. Hyland's, Inc.*, No. 12-cv-1983, 2014 WL 1410264, at *6 (C.D. Cal. Apr. 9, 2014) ("[T]he
prevailing rule of thumb with respect to consumer class actions is [a claims rate of] 3–5 percent") (citing
*Ferrington v. McAfee, Inc.*, 2012 U.S. Dist. LEXIS 49160, at *13, 2012 WL 1156399 (N.D. Cal. Apr. 6,
2012); *De Leon v. Bank of Am., N.A. (USA)*, No. 09-cv-1251, 2012 WL 2568142, at *14 (M.D. Fla. Apr.
20, 2012) *report and recommendation adopted*, No. 09-cv-1251, 2012 WL 2543586 (M.D. Fla. July 2,
2012) (typical claims rates in consumer class settlements range from 2% to 20%)).

(S.D. Ill. Jan. 31, 2014) (citing *In re Synthroid Mktg Litig.*, 264 F.3d 712, 718 (7th Cir. 2001));

*Sutton v. Bernard*, 504 F.3d 688, 693 (7th Cir. 2007) (district court directed on remand to consult

the market for legal services so as to arrive at a reasonable fee) (citing *Missouri v. Jenkins*, 491

U.S. 274, 285 (1989) (in determining attorneys' fees "we have consistently looked to the

marketplace as our guide to what is 'reasonable'")). "It is not the function of the judge in fee

litigation to determine the equivalent of the medieval just price. It is to determine what the

lawyer would receive if he were selling his services in the market rather than being paid by the

court." *Matter of Cont'l Ill. Sec. Litig.,* 962 F.2d 566, 568 (7th Cir. 1992). This requires the Court

to "ascertain the appropriate rate for cases of similar difficulty and risk, and of similarly limited

potential recovery." *Kirchoff v. Flynn,* 786 F.2d 320, 326 (7th Cir. 1986).

To determine the market rate *ex ante*, either the lodestar method or percentage-of-the-

recovery method may be used—"the choice of methods is discretionary." *Americana Art*, 743

F.3d at 247; *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 566 (7th Cir. 1994) ("[W]e are of

the opinion that both the lodestar approach and the percentage approach may be appropriate in

determining attorney's fee awards, depending on the circumstances."); *see Harman v. Lyphomed,*

*Inc.*, 945 F.2d 969, 974 (7th Cir. 1991) (citing *Kirchoff,* 786 F.2d at 329 n.1).

As set forth below, the Settlement's provision of $3.5 million attorneys' fees and

expenses reflects the market *ex ante* for Class Counsel's services. The case was exceedingly

complex, Class Counsel faced a considerable risk of non-payment, and the fees are reasonable

when analyzed under either the lodestar or percentage method.

**B.     The Requested Attorneys' Fees are Reasonable Under the Lodestar Method.**

First, Class Counsel's lodestar reflects the market *ex ante* for Class Counsel's work. *See*

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 598 (N.D. Ill. 2011). The first step is to

"multiply[] a reasonable hourly rate by the number of hours reasonably expended." *Gastineau v. Wright,* 592 F.3d 747, 748 (7th Cir. 2010). A reasonable rate should be in line with the prevailing rate in the "community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Jeffboat, LLC v. Dir., Office of Workers' Comp. Programs*, 553 F.3d 487, 489 (7th Cir. 2009); *see also Denius v. Dunlap*, 330 F.3d 919, 930 (7th Cir. 2003) (finding the attorney's actual billing rate to be presumptively appropriate).[9]

1. **Class Counsel's lodestar is equal to $3,232,616.88 and supports the requested attorneys' fees.**

As summarized in Section II above, Class Counsel have logged over 6,975.76 hours in uncompensated time to realize the instant Settlement, and as of the time of filing, had a base lodestar of $3,314,018.75, as is represented in the following chart:

| Attorney Name | Position | Rate | Hours | Lodestar |
|---|---|---|---|---|
| Steven Woodrow | Partner | $570 | 3,417.60 | 1,948,032.00 |
| Rafey Balabanian | Partner | $570 | 416.7 | 237,519.00 |
| Jay Edelson | Partner | $685 | 236.4 | 161,934.00 |
| Megan Lindsey | Associate | $350 | 1,360.51 | 476,178.50 |
| Alicia Hwang | Associate | $335 | 78.85 | 26,414.75 |
| Courtney Booth | Associate | $295 | 22.45 | 6,622.75 |
| David Mindell | Associate | $335 | 18.8 | 6,298.00 |
| Amir Missaghi | Associate | $295 | 188.55 | 55,622.25 |
| Law Clerks | Clerks | $215 | 244.2 | 52,503.00 |
| | | | | |
| **Formerly with Firm** | | | | |
| Jack Yamin | Associate | $295 | 54.4 | 16,048.00 |
| Irina Slavina | Associate | $345 | 905.6 | 312,432.00 |

---

[9] In cases like this that span several years, courts may use either current rates or past rates with interest when calculating the lodestar amount, *see Smith v. Village of Maywood,* 17 F.3d 219, 221 (7th Cir. 1994), because either method provides "[a]n adjustment for delay in payment [which] is . . . an appropriate factor in the determination of what constitutes a reasonable attorney's fee . . . ." *Missouri*, 491 U.S. at 284; *Soto v. Adams Elevator Equip. Co.*, 941 F.2d 543, 553 (7th Cir. 1991).

| | | | | |
|---|---|---|---|---|
| Kirt Gallatin | Associate | $295 | 15.1 | 4,454.50 |
| Steven Teppler | Partner | $600 | 16.6 | 9,960.00 |
| **BASE LODESTAR** | | | 6975.76 | $3,314,018.75 |

The attorney rates listed are the same as those that Class Counsel charges to their hourly clients and are comparable to (or less than) those charged for attorneys with similar background or experience. (*Id*. ¶ 23.) Further, these rates have been approved as reasonable by federal courts throughout the country in the context of our firm's banking class actions specifically and other consumer class action litigation more generally. (*Id*.)

Admittedly, these hours also include work done with respect to the Finlinsons, whose claims are being resolved separately. The Finlinsons were added to the case in 2012, following the appeal, and it is reasonable to exclude some of the time spent on their class claims. Given the interrelatedness of much of the work performed, Class Counsel believes it is reasonable to attribute a total discount of 10% to work devoted to litigating those class claims (*id*. ¶ 29), reducing the base lodestar from $3,314,018.75 to $2,982,616.88.

At the same time, the listed hours are under-inclusive. Over the course of the past four-and-a-half years, several attorneys and law clerks have been pulled onto the case to perform spot research or discrete assignments. (*Id*. ¶ 24.) Any attorneys who spent fewer than ten hours on the case have been omitted. (*Id*.) Also, the stated lodestar omits both the attorney time that will be required to file and present the instant petition and the papers in support of final approval and the time that will be needed to assist Settlement Class Members with gathering their loan modification paperwork and guiding them through the modification process. Significant time will further be required to help Class Members evaluate Wells Fargo's calculations or the reasons for any denial. Class Counsel anticipate needing to expend a minimum of $250,000 in additional attorney time filing such papers, assisting Class Members, and resolving any Class

Member challenges. As such, a fair lodestar equals **$3,232,616.88 (**$2,982,616.88 + $250,000)—just short of the requested fees.

### 2. The risk and complexity posed by the litigation support the use of a multiplier here (which would equal only 1.064).

The second step when calculating a lodestar requires that the Court consider the risk of non-payment Class Counsel assumed when bringing the case. *Harman*, 945 F.2d at 975-76 (reversing attorneys' fees calculation because the trial court failed to award a risk multiplier); *In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 746 (7th Cir. 2011); *see also* Richard Posner, Economic Analysis of Law § 21.9, at 534-35 (3d ed. 1986) (explaining established practice of rewarding attorneys for the risk of non-payment in contingency cases by paying them a premium over their normal hourly rates). Courts also consider "the complexity of the legal issues involved, the degree of success obtained, and the public interest advanced by the litigation." *Gastineau*, 592 F.3d at 748; *see also Cook v. Niedert,* 142 F.3d 1004, 1013 (7th Cir. 1988) (The court should make a "'a retroactive calculation of the probability of success as measured at the beginning of the litigation."); *Redman v. RadioShack Corp.*, No. 11-cv-6741, 2014 WL 497438, at *9 (N.D. Ill. Feb. 7, 2014). "Ultimately, 'the standard is whether the fees are reasonable in relation to the difficulty, stakes, and outcome of the case.'" *Id.* (quoting *Harman*, 945 F.2d at 975-76.)

Applied here, there is little question that a risk multiplier is warranted. When this case was first filed—up until the appellate decision—there was simply no indication that Wigod would be able to enforce the terms of the TPP at all. Indeed, she initially lost. Given the contingency payment structure set forth in Wigod's retainer agreement, had the case ended there Class Counsel would have received nothing at all. (Woodrow Decl. ¶ 22.)

The risk was reduced somewhat in the aftermath of the appeal, but victory remained uncertain. The Seventh Circuit itself acknowledged that Wells Fargo may have defenses. *See*

*Wigod*, 673 F.3d at 579. Moreover, Wells was committed to fighting the case tooth and nail. These risks remained potent essentially up until the Settlement papers were actually signed. Thus, the only portion of the case where Class Counsel faced a reduced risk of nonpayment is for the work that has been performed since the Settlement was finalized and executed in June 2014—meaning most of the work was done when the risk of nonpayment was clearly substantial.

And the legal issues were undoubtedly complex. HAMP was in its infancy when the case was filed and Class Counsel had to learn its complex calculations in the face of ever-changing directives. Moreover, nearly every HAMP case had been dismissed (*id.* ¶ 21), though prior to Wigod's complaint no case had differentiated between Verified and Stated TPPs. Class Counsel's efforts thus helped clarify the law amid this uncertainty.

The degree of success can't be doubted either. The Settlement provides modifications to a discrete set of the 835 Class Members, foreclosure holds allowing borrowers to live in their homes rent free, up to $2.8 million in cash, and holistic credit counseling. (Settlement § 3.) This compares favorably to the settlement reached in the Chase HAMP MDL litigation[10] where class members may apply for loan modifications, no money is awarded, and the attorneys have requested $9.5 million in attorneys' fees. Finally, the public interest advanced is self-evident. Following the appellate decision, borrowers have enjoyed much greater success receiving loan modifications, and other courts have followed suit in recognizing borrower remedies for HAMP servicer abuses. (Woodrow Decl. ¶ 6.) The result is that untold numbers of borrowers have avoided or forestalled foreclosure and/or have received loan modifications. In short, the case meaningfully promoted the public interest. (*Id.*)

After subtracting Class Counsel's $60,976.68 in costs from the $3.5 million in requested

---

[10] *See In Re: JPMorgan Chase Mortgage Modification Litig.*, No. 11-md-02290, MDL Dkt No. 2290 (D. Mass.) Chase is set to receive a release of 60,000 borrower claims. The Settlement Website URL is http://www.chasemdlsettlement.com.

fees and expenses (equaling $3,439,023.32), the lodestar would require a multiplier of only

1.064—"which is not an unreasonable risk multiplier."[11] *See Schulte*, 805 F. Supp. 2d at 598

(approving multiplier of 2.5); *In re Linerboard Antitrust Litig.*, No. 98-5055, 2004 WL 1221350,

at *14 (E.D. Pa. June 2, 2004) (recognizing that from 2001 to 2003, the average approved

multiplier was 4.35); *Harman*, 945 F.2d at 974 (noting a risk multiplier is appropriate when

counsel assume a risk of non-payment in taking the suit and "multipliers anywhere between one

and four . . . have been approved.") Indeed, 1.064 is barely higher than 1.0. As such, the

negotiated attorneys' fees of $3.5 million find firm support in Class Counsel's lodestar.

> ### C. The Requested Attorneys' Fees are Further Reasonable When Considered as a Percentage of the Benefits Being Made Available to the Settlement Class Members.

The attorneys' fees sought in this case are additionally reasonable when calculated as a

percentage of the relief made available to the Settlement Class Members.[12] *See Montgomery v.*

*Aetna Plywood, Inc.,* 231 F.3d 399, 408 (7th Cir. 2000) ("the measure of what is reasonable [as

an attorney fee] is what an attorney would receive from a paying client in a similar case.") In the

Seventh Circuit, the general market for fee awards in class actions where common benefits are

quantifiable mirror that of the market for contingency fees in general litigation: 33% to 40% of

---

[11] $3,439,023.32 / $3,232,616.88 = 1.0638

[12] Attorneys' fees are to be calculated based upon the amount made available, not the amounts ultimately claimed. *See Boeing Co. v. Van Gemert,* 444 U.S. 472, 480 (1980); 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 14:6, p. 570 (4th ed. 2002) (stating that *Boeing* settled the issue by ruling that class counsel are entitled to a reasonable fee based on the funds potentially available to be claimed, regardless of the amount actually claimed); *Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423, 437 (2d Cir. 2007) ("An allocation of fees by percentage should therefore be awarded on this basis of the total funds made available, whether claimed or not."). This helps achieve the deterrence function of class actions. *See* Richard Posner, Economic Analysis of Law 626-27 (5th ed. 1998) ("[T]he most important point from an economic standpoint is that the violator be confronted with the costs of his violation-this achieves the allocative purpose of the suit-not that he pays them to his victims."); *see also McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 815 (E.D. Wis. 2009) (awarding attorneys' fees based on $2.1 million made available "regardless of the fact that a small number of class members actually filed claims" and settlement featured a reverter) (collecting cases).

the benefits made available. *See Gaskill v. Gordon*, 160 F.3d 361, 362-63 (7th Cir. 1998) (explaining that typical contingency fees are between 33% and 40%); *see also Spicer v. Chi. Bd. Options Exch., Inc.*, 844 F. Supp. 1226, 1251-52 (N.D. Ill. 1993) (awarding 29% of a common fund); *McKinnie*, 678 F. Supp. 2d at 812 (approving a fee request of 30% of the settlement amount as "common among contingency fee arrangements and [ ] not facially unreasonable"); *Meyenburg v. Exxon Mobil Corp.*, No. 05-cv-15, 2006 WL 2191422, at *2 (S.D. Ill. July 31, 2006) ("33 1/3% to 40% (plus the cost of litigation) is the standard contingent fee percentages in this legal marketplace for comparable commercial litigation").[13]

As explained in the Motion for Preliminary Approval (Dkt. 262), the instant Settlement provides a minimum of available benefits ranging between $9,811,500 and $10,461,500 to the Settlement Class Members, including: (1) loan modifications (between $3,575,000 and $4,225,000), (2) foreclosure holds ($3,420,000), (3) holistic credit counseling ($226,500), (4) cash payments ($2,240,000), and (5) other relief including notice and administrative costs ($350,000).[14] (Mot. for Prelim. App. 34-37, Dkt. 262). These initial projections excluded the attorneys' fees themselves and Wigod's incentive award (her loan modification, which includes principal forgiveness). When these amounts are included, the available class benefits range from $13,561,500 to $14,211,500, of which the requested fee represents 24.6% (of $14,211,500) to 25.8% (of $13,561,500). Such values are plainly in line with market expectations.[15]

---

[13] An empirical study of every federal class action settlement in 2006-2007 determined that mean and median award of attorneys' fees in the Seventh Circuit were 27.4% and 29% of the settlement fund, respectively. Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. Empirical Legal Stud. 811 (2010).
[14] *See In re Kentucky Grilled Chicken Coupon Mktg. & Sales Practices Litig.*, 280 F.R.D. 364, 386 (N.D. Ill. 2011) (costs of notice and claims administration are properly considered as part of the class benefits, as are attorney fees.) (citing *Schulte*, 805 F. Supp. 2d at 582-83 (approving of $3,166,666 in attorneys' fees based upon lodestar of $1,258,385.20 and as reasonable percentage of $9.5 million fund)).
[15] Wigod's retainer agreement establishes that Wigod agreed to a percentage of at least one-third. (Woodrow Decl. ¶ 22.)

Additionally, and even though settlement benefits are more appropriately gauged based upon the amount of benefits made available and not the amounts actually redeemed by class members (*see Boeing Co.,* 444 U.S. at 480; *McKinnie,* 678 F. Supp. 2d at 815) the value of the benefits that Class Members are projected to actually receive in this case still shows that the requested fees are demonstrably reasonable. Given the current claims rate data (which were not available at the time of preliminary approval), Mr. Frankenfeld projects that the already strong claims rate of 31.49% is likely to climb to near 37% to 40% by the Claims Deadline. (Frankenfeld Report 3-4.) Given the distribution of claimants among the three Settlement Groups, Mr. Frankenfeld has provided a range of delivered benefits from $8,625,726 (baseline projection) to $10,589,000 (realistic projection), both of which result in percentages that fall within market norms: 32.4% (realistic) to 39.8% (baseline). (*Id.* 5.) As such, the fees are substantiated both as a percentage of the benefits made available as well as those actually redeemed.

The percentage method, therefore, supports the requested fees as well.

**D.  Class Counsel have Incurred $60,976.68 in Reasonable Expenses to Date that Should be Approved by the Court.**

The Court should also approve of Class Counsel's expenses. *See* Fed. R. Civ. P. 23(h) ("the court may award reasonable attorneys' fees and nontaxable costs that are authorized by law or by the parties' agreement."); *see also Beesley*, 2014 WL 375432, at *3 (counsel may seek "reimbursement of litigation costs and expenses, which includes such things as expert witness costs; computerized research; court reports; travel expense; copy, phone and facsimile expenses and mediation.") As evidenced by the attached costs invoice (*see* Exhibit B to the Woodrow Decl.), Class Counsel have expended over $60,976.68 in costs. These expenditures include

$12,000 in expert witness costs,[16] mediation fees of $17,336.70, filing and service fees and charges, travel costs and lodging, and a host of related expenses. (*Id*.) Class Counsel made every effort to keep these to a minimum. Accordingly, the Court should approve of Class Counsel's expenses of $60,976.68.

 **E. The Court Should Approve an Award to Wigod in the Form of a Loan Modification from Wells Fargo.**

 As a final matter, the Court should also approve the agreed-upon incentive award to Wigod. Because plaintiffs are essential to any class action, "[i]ncentive awards are justified when necessary to induce individuals to become named representatives." *Synthroid*, 264 F.3d at 722-23. In deciding whether an incentive award is warranted, courts look to: (1) "the actions the plaintiff has taken to protect the interests of the class"; (2) "the degree to which the class has benefitted from those actions"; and (3) "the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook*, 142 F.3d at 1016.

 The Settlement provides Ms. Wigod with a loan modification. (Settlement § 9.3.) This is the same type of relief that is being made available to other members of the Class, particularly other members of Group 1 (Wigod's Group). Wigod was one of the very first borrowers to apply for a loan modification from Wachovia and was vigilant about pursuing her HAMP modification. She attempted repeatedly to resolve her issue prior to filing suit and has admirably stood up for the putative Class ever since the initial Complaint was filed in April 2010. (Woodrow Decl. ¶ 37.) Several months following remand Wells Fargo sought to offer Wigod a permanent loan modification, which Wigod refused to accept out of a concern that it could potentially moot her ability to represent putative Class Members who were still waiting to receive their modification

---

[16] The costs do not include Mr. Frankenfeld's most recent invoice, which is approximately $5,000. Likewise the costs do not include travel associated with the final fairness hearing. When both are taken into account, the final costs are estimated to equal approximately $67,000.)

offers. (*Id.*; *see also* Feb. 26, 2013, Hearing Trans. 44:5-12, Dkt. 232.) Instead, Wigod convinced Wells Fargo to come to the settlement table and make such relief available to everyone. (Woodrow Decl. ¶ 37.) Additionally, Wigod has kept abreast of the litigation, assisted in the research of her legal claims, and has researched Wells' conduct and HAMP operations and the legal landscape surrounding HAMP litigation more generally. (*Id.* ¶¶ 35-36.)

All told, Wigod's service to the Class is deserving of a loan modification.

## IV. CONCLUSION

The requested attorney's fees and expenses sought in this case are reasonable and consistent with the market for Class Counsel's services *ex ante*. They are supported by Class Counsel's lodestar (requiring a multiplier of only 1.064) and when analyzed as a percentage of the benefits both made available (24.6% to 25.8%) and actually received (32.4% to 39.8%).

Accordingly, Plaintiff Lori Wigod respectfully requests that the Court approve the $3,500,000 in attorneys' fees and expenses, which Wells has agreed not to oppose following mediations overseen by Judge Denlow, grant the incentive award to Wigod of a loan modification, and award such other and further relief the Court deems equitable and just. Pursuant to the Settlement § 5.2(b), a copy of this memorandum shall be posted on the Settlement Website at www.wigodhampsettlement.com.


Dated: September 22, 2014     Respectfully submitted,

            **LORI WIGOD**, individually and on behalf
            of a Class of similarly situated individuals,

            By: /s/ Steven L. Woodrow
            One of Plaintiff's Attorneys

            Jay Edelson
            jedelson@edelson.com

Steven L. Woodrow
swoodrow@edelson.com
Megan Lindsey
mlindsey@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiff and the Settlement Class*

<u>**CERTIFICATE OF SERVICE**</u>

I, Steven L. Woodrow, an attorney, hereby certify that on September 22, 2014, I served the above and foregoing ***Plaintiff Wigod's Memorandum of Law in Support of Motion for Approval of Class Representative Incentive Award and Reasonable Attorneys' Fees***, by causing true and accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system, and to the Settlement Class by causing the same to be posted to the Settlement Website, www.wigodhampsettlement.com.

/s/ Steven L. Woodrow