**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LORI WIGOD, on behalf of herself and all others similarly situated, | Case No: 1:10-cv-2348 |
| Plaintiff, | |
| v. | Hon. Elaine E. Bucklo |
| WELLS FARGO BANK, N.A. d/b/a WELLS FARGO HOME MORTGAGE, f/k/a WACHOVIA MORTGAGE, FSB, | |
| Defendant. | |

## PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Jay Edelson
jedelson@edelson.com
Steven L. Woodrow
swoodrow@edelson.com
Megan Lindsey (Admitted *Pro Hac Vice*)
mlindsey@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6379
Fax: 312.589.6378

*Counsel for Plaintiff and the Settlement Class*

**TABLE OF CONTENTS**

I.   INTRODUCTION .................................................................................1

II.  NATURE OF THE LITIGATION ..................................................2

    A.   The Facts, the Law, and the Litigation History .................................2

    B.   The Mediation Process with Judge Denlow (Ret.) and the Settlement ............4

III. TERMS OF THE SETTLEMENT ....................................................5

    A.   Class Definition .................................................................5

    B.   The Settlement Benefits .........................................................6

        1.   *Relief to Settlement Group 1 Class Members* .................................6

        2.   *Relief to Settlement Group 2 Class Members* .................................7

        3.   *Relief to Settlement Group 3 Class Members* .................................7

        4.   *Foreclosure Holds for Groups 1 and 2* .......................................7

        5.   *Holistic Credit Counseling* ..................................................8

    C.   Other Relief and Pertinent Provisions ..........................................8

        1.   *Payment of Notice and Administrative Fees* ...................................8

        2.   *Payment of Attorneys' Fees and Expenses and an Incentive Award to the Class Representative* ................................................8

        3.   *Document Submission and Review Process* ...................................9

    D.   The Release .....................................................................9

IV.  THE NOTICE PLAN COMPORTS WITH DUE PROCESS ....................9

V.   THE SETTLEMENT WARRANTS FINAL APPROVAL .....................11

    A.   The Strength of Plaintiff's Case Compared to the Settlement Weighs in Favor of Granting Final Approval ............................................12

        1.   *The Value Received Versus the Value Available at Trial Supports Approval* ....................................................................13

2.     *The Percent Recovered is Particularly Impressive Given Wells Fargo's Defenses and Uncertainties in the Case* ......................................16

**B.**    **The Complexity, Length, and Expense of Continued Litigation Support Final Approval of the Settlement**............................................17

**C.**    **There Has Been No Opposition to the Settlement**.............................18

**D.**    **The Opinion of Competent Counsel Favors Approval**....................20

**E.**    **The Stage of the Proceedings and the Amount of Discovery Completed Weigh in Favor of Final Approval** ....................................................21

**F.**    **The Settlement Is Not a Product of Collusion and Does Not Suffer From "Red Flags"** ............................................................................22

**VIII.**   **CONCLUSION** ..................................................................................................24

# TABLE OF AUTHORITIES

**UNITED STATES SUPREME COURT CASES:**

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)....................................................................10

*Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305 (7th Cir.1980).....................21

**UNITED STATES CIRCUIT COURT OF APPEALS CASES:**

*Burns v. Elrod*, 757 F.2d 151 (7th Cir. 1985) ..............................................................................10

*Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014) ...............................................................12, 23

*Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998).........................................................................21

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996)............................................................................11, 21

*Safeco Ins. Co. of Am. v. Am. Int'l Grp.*, 710 F.3d 754 (7th Cir. 2013) ........................................11

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646 (7th Cir. 2006)..........................12

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978 (7th Cir. 2002)...........................12

*Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012) .........................................2 n.3, 3

*Williams v. Rohm & Haas Pension Plan,* 658 F.3d 629 (7th Cir. 2011) .......................................15

**UNITED STATES DISTRICT COURT CASES:**

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 CV 2898, 2012 WL 651727
    (N.D. Ill. Feb. 28, 2012)............................................................................11, 12, 13, 18

*Carnegie v. Household Int'l, Inc.*, 445 F. Supp. 2d 1032 (N.D. Ill. 2006) ...................................12

*City of Greenville v. Syngenta Crop Prot., Inc.*, 904 F. Supp. 2d 902 (S.D. Ill. 2012) .........19 n.20

*Clark v. Green Tree Servicing LLC*, No. 13-CV-2646 (D. Colo.)..................................................21

*De Leon v. Bank of Am., N.A. (USA)*, No. 6:09-CV-1251-ORL-28, 2012 WL 2568142
    (M.D. Fla. Apr. 20, 2012) *report and recommendation adopted,*
    6:09-CV-1251-ORL-28, 2012 WL 2543586 (M.D. Fla. July 2, 2012) ....................19 n.20

*Ferrington v. McAfee, Inc.*, No. 10-CV-01455-LHK, 2012 WL 1156399
(N.D. Cal. Apr. 6, 2012) ...................................................................................19 n.20

*Fletcher v. OneWest Bank, N.A.*, No. 10-CV-4682 (N.D. Ill.) .....................................21

*Forcellati v. Hyland's, Inc.*, No. 12-cv-1983, 2014 WL 1410264
(C.D. Cal. Apr. 9, 2014) ...................................................................................19 n.20

*Hamilton v. Wells Fargo Bank, N.A.*, No. 09-cv-04152 (N.D. Cal. May 11, 2012) ....................20

*Hispanics United v. Vill. of Addison*, 988 F. Supp. 1130 (N.D. Ill. 1997) ............................20, 22

*In re AT & T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330 (N.D. Ill. 2010) ....10, 13

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935
(N.D. Ill. 2011)....................................................................................................18

*In re: JP Morgan Chase Bank Equity Line of Credit Litig.*, No. 10-cv-03647
(N.D. Ill. July 16, 2010) .................................................................................. 20-21

*In re JPMorgan Chase Bank, N.A. Mortgage Modification Litig.*, No. 1:11-md-02290-RGS,
(D. Mass. Feb. 13, 2014)....................................................................................17

*In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.,* 733 F.Supp.2d 997
(E.D. Wis. 2010) .................................................................................................15

*In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002 (N.D. Ill. 2000) .........................17, 18

*In re Ravisent Techs., Inc. Sec. Litig.,* No. Civ. A. 00–CV–1014, 2005 WL 906361
(E.D. Pa. Apr. 18, 2005) .....................................................................................16

*In re Sw. Airlines Voucher Litig.*, No. 11-cv-8176, 2013 WL 4510197 (N.D. Ill.
Aug. 26, 2013), appeal dismissed (Jan. 3, 2014) ..........................................................13

*Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298 (S.D. Fla. 2005) ...........................................16

*Mangone v. First USA Bank*, 206 F.R.D. 222 (S.D. Ill. 2001) .....................................................10

*McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806 (E.D. Wis. 2009)............24 n.22

*Pearson v. NBTY, Inc.*, No. 11 CV 7972, 2014 WL 30676 (N.D. Ill. Jan. 3, 2014).............19 n.20

*Redman v. RadioShack Corp.*, No. 11-cv-06741, 2014 WL 497438 (N.D. Ill.
Feb. 7, 2014) .................................................................................................10, 12

*Scata v. Nationstar Mortg. LLC*, No. 14-CV-189 (D. Colo.) ......................................................21

*Schulken v. Washington Mut. Bank*, No. 09-CV-02708, 2012 WL 28099 (N.D. Cal. Jan. 5, 2012) .................................................................................................20

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011) ..........................................15, 20

**STATUTES, RULES, AND REGULATIONS:**

12 U.S.C. § 5201 ....................................................................................................................2

12 U.S.C. § 5219 ....................................................................................................................2

28 U.S.C. § 1715 ..............................................................................................................10 n.11

815 LCS 505/1 .......................................................................................................................3

Fed. R. Civ. P. 23 ........................................................................................................... 9-10, 11

Supplemental Directive 09-01 (Apr. 6, 2009), https://www.hmpadmin.com/portal/ programs/docs/hamp_servicer/sd0901.pdf .........................................................................2

**MISCELLANEOUS:**

Federal Judicial Center, *Judges Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010) .......................................................................................11

Homeownership Preservation Foundation, http://www.995hope.org/ (last visited October 16, 2014) .........................................................................................8 n.8

# I.    INTRODUCTION

After successful implementation of the Court-approved notice plan and an overwhelmingly positive response from the Class, Plaintiff Lori Wigod ("Plaintiff" or "Wigod") now moves for final approval of the settlement reached with Defendant Wells Fargo Bank, N.A. ("Defendant" or "Wells Fargo") resolving claims related to the denial of permanent loan modifications provided for by the Home Affordable Modification Program ("HAMP").[1] The Settlement—reached after extensive discovery, a watershed victory in the Seventh Circuit, and multiple mediation sessions with the Honorable Morton J. Denlow (ret.) of JAMS—provides in excess of $10 million in loan modifications, cash payments, and other relief to the Class and is greatly preferable to proceeding with further litigation, trial, and certain further appeals.

Since the Court granted preliminary approval to the Settlement on June 26, 2014 (Dkt. 269), the Parties and the settlement administrator have diligently implemented a notice plan that successfully delivered direct notice to over 98% of the Class. In addition, Class Counsel have personally spoken with 95% of Class Members to explain their rights under the Settlement. Given the exceptional relief afforded under the Settlement, it is not surprising that there have been no objections and only three individuals have chosen to be excluded. In contrast to this absence of opposition, nearly 37%[2] of the Class Members have filed claims and many will receive substantial benefits as a result of the Settlement. Because this Settlement in eminently fair and reasonable, provides an excellent value to the Class, and is superior to continuing

---

[1]     A copy of the Class Action Settlement Agreement is attached as Exhibit A.

[2]     As of the time of filing, the Settlement Administrator is still processing claims, accounting for duplicates, and pursuing further information from individuals whose claims have been flagged as requiring further information. (*See* Declaration of Steven L. Woodrow ("Woodrow Decl."), ¶ 27, attached as Exhibit B.) As such, the claims figures are the most up-to-date as of the date of filing but may be adjusted upward.

litigation, Plaintiff respectfully requests that the Court grant final approval.

## II.    NATURE OF THE LITIGATION

### A.    The Facts, the Law, and the Litigation History.

This case has its roots in the financial crisis of 2008 and ensuing meltdown of the real estate market. When the number of foreclosures reached a crisis point, Congress responded by passing the Emergency Economic Stabilization Act, as amended by the American Recovery and Reinvestment Act, 12 U.S.C. § 5201 *et seq.* (2010), which authorized the Treasury Department to enter into Servicer Participation Agreements ("SPAs") with the banks to "facilitate loan modifications and prevent avoidable foreclosures." *See* 12 U.S.C. § 5219 (2010).

The Treasury's solution was the introduction of HAMP, which was designed to make borrowers' monthly mortgage payments more affordable. The banks were to place homeowners into three or four-month trial period plans ("TPPs") that called for reduced monthly payments. *See* Supplemental Directive 09-01 (Apr. 6, 2009), https://www.hmpadmin.com/portal/programs/ docs/hamp_servicer/sd0901.pdf. When homeowners successfully completed their trials, the bank was to offer them a permanent loan modification with monthly payments at or close to the trial amount.[3] But things didn't go as the Treasury had planned: thousands of borrowers have complained that Defendant and other banks have routinely ignored HAMP rules and failed to extend permanent loan modifications as required. (Woodrow Decl. ¶ 5.)

---

[3]    When HAMP was first introduced banks could either start a TPP *before* the borrower had submitted financial documents, based on the borrower's oral statements regarding his or her financial position (a "Stated TPP") or *after* the borrower had submitted financial documents and been deemed eligible (a "Verified TPP"). *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 558 (7th Cir. 2012). The distinction is critical: borrowers in verified plans were not to be re-evaluated after the start of their trial plans. *Id.* at 562 ("Wigod signed two copies of the Plan on May 29, 2009, and returned them along with additional financial documentation to Wells Fargo. Under the terms of the TPP Agreement, then, that moment was Wells Fargo's opportunity to determine whether Wigod qualified. If she did not, it could have and should have denied her a modification on that basis."). Wachovia Bank, F.S.B. *only* used verified TPPs when processing HAMP applications. (Woodrow Decl. ¶ 4.)

Plaintiff's claims, and those of the other 835 Class Members, grew out of this landscape. Wigod had a mortgage with Wachovia and applied for a HAMP modification in early-2009. On June 4, 2009, Wigod received a TPP signed by Wachovia that promised to provide her with an offer for permanent modification in the event she complied with the terms of the TPP. (*See* [Proposed] Third Amended Class Action Complaint ("TAC"), ¶ 35, Dkt. 264-1.) Wigod timely made each of the four required trial payments (*id.* ¶ 37), but before Wachovia modified her loan, Defendant Wells Fargo purchased the mortgage from Wachovia. After acquiring Plaintiff's mortgage, Defendant refused to recognize Wigod's TPP and informed her that she was in default. (*Id.* ¶¶ 39-42.) Wigod eventually learned that after acquiring her loan from Wachovia, Defendant unilaterally reevaluated her HAMP eligibility and refused to provide a permanent loan modification. (*Id.* ¶ 43.)

On April 15, 2010, Plaintiff filed her initial class action complaint alleging claims for breach of contract, violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 LCS 505/1 *et seq*., and common law fraud against Wells Fargo related to its alleged refusal to provide her with a loan modification as promised by Wachovia. (Dkt. 1.) On January 25, 2011, the Court, the case then being assigned to Judge Manning, dismissed Wigod's claims with prejudice holding she could not bring state law claims to perform an "end run" around the fact that HAMP contained no private right of action. (*See* Dkt. 59.) On March 7, 2012, the Seventh Circuit reversed. *See Wigod*, 673 F.3d 548. Comprehensive discovery and protracted litigation followed on remand. During this time, the Parties exchanged and analyzed over 200,000 pages of documents (including thousands of pages covering Wells Fargo's HAMP policies and procedures, internal audit results, key witness emails and ESI, and a sample of 100 complete borrower files). This substantial discovery production resulted from dozens of meet

and confers, following hundreds of emails and scores of discovery-focused letters. (Woodrow Decl. ¶ 6.) Motion practice was extensive—the Parties have briefed over twenty significant motions, including motions to dismiss, to strike affirmative defenses, to compel, limit, and bifurcate discovery, and for a host of other relief. (*Id.* ¶ 7.)[4]

**B.      The Mediation Process with Judge Denlow (Ret.) and the Settlement.**

As discovery pushed forward counsel began discussing the potential for resolving the case. (*Id.* ¶ 8.) The Parties ultimately participated in three formal mediation sessions with Judge Denlow in Chicago on July 18, 2013, October 30, 2013, and March 25, 2014. (*Id.* ¶ 9.) During these sessions, the Parties discussed the type of relief available, the current status of affected borrowers, and alternative settlement structures and forms of relief. (*Id.* ¶ 9.) In addition to these formal sessions, counsel for the Parties engaged in dozens of telephonic conferences separately as well as together with Judge Denlow's involvement and oversight. (*Id.* ¶ 9.) The mediation and negotiation process facilitated an informed negotiation that included the production of additional

---

[4]      *See* (1) Sept. 2, 2010: Response in Opposition to Motion to Dismiss and Woodrow Declaration in Support (Dkts. 42-43); (2) April 27, 2012: Motion for Leave to Serve Additional Interrogatories (Dkt. 74); (3) May 29, 2012: Motion to Strike Affirmative Defenses (Dkt. 81); (4) May 29, 2012: Motion For Leave to File Second Amended Complaint (Dkt. 83); (5) May 29, 2012: Motion for Class Certification or Deferred Ruling (Dkt. 87); (6) June 13, 2012: Motion to Compel Rule 30(b)(6) Deposition (Dkt. 101); (7) June 21, 2012: Opposition to Motion by Wells Fargo for a Protective Order (Dkt. 105); (8) July 13, 2012: Response to Motion by Wells Fargo regarding Limited Bifurcation of Discovery (Dkt. 127) and the Expert Report of D. Frankenfeld in Support (Dkt.129); (9) Aug. 15, 2012: Motion to Strike Affirmative Defenses (Dkt. 133); (10) Aug. 24, 2012: Motion to Compel Response to Document Requests (Dkt. 140); (11) Sept. 10, 2012: Motion to Overrule Defendant's Claims of Privilege (Dkt. 152); (12) Sept. 11, 2012: Reply in Support of Motion to Strike Affirmation Defenses (Dkt. 156); (13) Sept. 24, 2012: Reply in Support of Motion to Overrule Defendant's Claims of Privilege (Dkt. 159); (14) Sept. 28, 2012: Motion to Compel Further Answers to Interrogatories (Dkt. 161); (15) Oct. 8, 2012: Reply in Support of Motion to Compel Response to Document Requests (Dkt. 175); (16) Nov. 12, 2012: Reply in Support of Motion to Compel Further Answers to Interrogatories (Dkt. 191); (17) Nov. 29, 2012: Objections to and Motion to Modify Magistrate Judge Order (Dkt. 201); (18) Jan 9, 2013: Reply in Support of Objections to and Motion to Modify Magistrate Judge Order (Dkt. 219); (19) Feb. 20, 2013: Motion to Compel Documents and Enlarge Depositions (Dkt. 224); and (20) May 1, 2013: Motion to Compel (Dkt. 236).

Class Member-specific data by Wells, which helped reveal further details regarding Class Member loan modification histories. (*Id.* ¶ 10.) Armed with the already produced discovery and further information from the mediation process, the Parties were able to reach an agreement regarding the relief afforded for each of the three groups that comprise the Settlement Class. (*Id.*)

Importantly, only after an agreement with respect to such relief was agreed to in principal did the Parties formally negotiate an incentive award for the Class Representative, Ms. Wigod, and reasonable attorneys' fees for Class Counsel. (*Id.* ¶ 11.) These negotiations lasted several weeks with numerous exchanges between counsel. Eventually the negotiations reached a standstill, and Judge Denlow ultimately bridged the impasse through a mediator's proposal that both sides accepted. (*Id.*)

## III.   TERMS OF THE SETTLEMENT

The terms of the Settlement preliminarily approved by the Court are set forth in the Settlement Agreement attached hereto as Exhibit A and briefly summarized as follows:

**A.     Class Definition.** The Court's order granting preliminary approval certified the following Class (the "Settlement Class"):

> All borrowers (1) who received a HAMP TPP from Wachovia/Raleigh between March 1, 2009 and October 15, 2009 based on verified financial documentation, (2) whose HAMP TPP was signed by both the borrower and Wachovia (Raleigh), (3) who made all scheduled payments and satisfied all conditions set forth in the TPP and required by HAMP, (4) whose loan was transferred to Wells Fargo Home Mortgage for servicing in October 2009, and (5) who did not receive a permanent HAMP modification at any time after the transfer of servicing.

(Dkt. 269 ¶ 3.)

**B.     The Settlement Benefits.**

The Settlement provides relief to the Settlement Class in four forms: evaluations for loan modification offers, cash payments, foreclosure holds, and holistic credit counseling. Settlement

Group 1 consists of borrowers whose loans are still with Wells Fargo and are considered either in default or at risk of default. Settlement Group 2 Class Members have loans that are still held or serviced by Wells Fargo, but they are presently considered to be "current" on those loans. Finally, Settlement Group 3 Class Members no longer have loans with Wells Fargo due to a foreclosure, deed-in-lieu, short-sale, loan payoff, or servicing transfer. The relief to each group is set forth below.

1.    *Relief to Settlement Group 1 Class Members:* Group 1 Class Members are eligible to be reviewed for a permanent loan modification. If approved, Group 1 Class Members will receive an offer for a loan modification that they may accept by signing and returning to Wells Fargo. (Ex. A § 3.1.) Class Counsel have already begun assisting Group 1 Class Members with gathering their application materials, a process that will continue should the Court grant Final Approval.

Settlement Group 1 Class Members who are deemed ineligible for any loan modification scenario will become eligible to enter into relocation agreements in exchange for a cash payment from the $700,000 fund reserved for these payments. (*Id.* § 3.1(b).) Each relocation agreement provides a cash award (a share of the $700,000) in exchange for an agreement to move within ninety days.[5] (*Id.* § 3.1(c), 8.1(a).)

As explained further below, over 20% of the Group 1 claimants have filed claims seeking loan modifications under the Settlement.

2.    *Relief to Settlement Group 2 Class Members:* Settlement Group 2 Class Members are those whose loans are still held by Wells Fargo and who were deemed to be "current" on their mortgage. (Ex. A § 1.21.) These Class Members have two avenues by which

---

[5]    Regardless of Settlement Group, all payments are subject to the per-borrower maximums set forth in the side agreement tendered to the Court during the June 26, 2014 hearing on Plaintiff's Motion for Preliminary Approval. (Dkt. 268.)

they can receive relief from the Settlement. First, they may elect to receive a streamlined monetary payment of $250. Alternatively, they can submit claim forms to be considered for permanent loan modifications. Any Group 2 Members who submit a claim for a permanent loan modification, but who are deemed ineligible or elect to reject any modification offered by Wells, will be sent a claim form through which they can claim a monetary payment to be paid from a fund of $100,000. (*Id.* § 3.2.)[6]

        3.    *Relief to Settlement Group 3 Class Members:* Settlement Group 3 consists of Class Members whose loans are no longer serviced or held by Wells Fargo as a result of a foreclosure, short sale, or deed-in-lieu of foreclosure, the transfer of the mortgage servicing rights over the loan by Wells Fargo to a new mortgage servicer, or through a payoff of the loan by the borrower. (Ex A. §§ 1.22, 1.28.) Since such Class Members no longer have loans serviced by Defendant, Wells cannot permanently modify their loans. As such, upon the submission of a simple claim form this Group will receive cash payments in a collective amount not to exceed $2,000,000. (*Id.* § 3.3.) To date, approximately 170 such claims have been filed. (Woodrow Decl. ¶ 17.)

        4.    *Foreclosure Holds for Groups 1 and 2:* For both Group 1 and Group 2 Settlement Class Members, Defendant has agreed to suspend any scheduled foreclosure sale, will not refer any loan to foreclosure, record a notice of default, notice of trustee's sale, or similar notice, move for foreclosure judgment or order of sale, or seek a foreclosure sale while the hold

---

[6]    Approximately 150 Group 2 claims have been filed, 52% of which seek the $250 cash payment while the remaining 48% has elected to be reviewed for potential loan modifications (and to receive cash in the event they are deemed ineligible or reject the terms offered). As with the Group 1 payments, these payments shall be made in accordance with the maximums set forth in the side letter provided to the Court. (Woodrow Decl. ¶ 14.)

is in place. (*See id.* §§ 1.19, 3.1(d).)[7]

5.      *Holistic Credit Counseling:* As an additional Settlement benefit, Defendant will make holistic credit counseling available to all Class Members at Wells Fargo's expense. (*Id.* § 3.4.) The counseling service will be provided through the Homeownership Preservation Foundation network[8] and is designed to help borrowers work through debt management plans, budget counseling, housing counseling, bankruptcy education, and credit report reviews. (Ex. A § 3.4.) Approximately 45 Class Members have elected to take advantage of this benefit. (Woodrow Decl.¶ 19.)

**C.      Other Relief and Pertinent Provisions.**

1.      *Payment of Notice and Administrative Fees*: In addition to the relief being afforded the Class, Defendant has agreed to cover all settlement administration expenses and costs of providing the Court-approved notice. (Ex. A § 7.3.) Wells Fargo has provided all required monies to Epiq and will continue to do so throughout the implementation process. (Woodrow Decl. ¶ 22.)

2.      *Payment of Attorneys' Fees and Expenses and an Incentive Award to the Class Representative*: The Settlement provides that in addition to the relief being afforded the Class through loan modifications and cash payments, Defendant has agreed to pay Class Counsel's attorneys' fees and expenses as determined by the Court (but not to exceed

---

[7]      When settlement negotiations first began Defendant implemented a foreclosure hold with respect to the potential Class Members to ensure that none of the Class Members whose rights were being negotiated would experience a foreclosure, thereby substantially altering the composition of the Class. As such, certain Settlement Class Members in Group 1 have benefitted from the Settlement by virtue of the fact that their scheduled or potential foreclosures have remained suspended dating back to July 2013. (Woodrow Decl. ¶ 18.)

[8]      The Homeownership Preservation Foundation is an independent national nonprofit dedicated to guiding consumers on to the path of sustainable homeownership and improving their overall financial health. *See* Homeownership Preservation Foundation, http://www.995hope.org/ (last visited October 16, 2014).

$3,500,000), as well as an incentive award to Ms. Wigod consisting of a permanent loan modification.[9] (*Ex. A* § 9.) Class Counsel has petitioned the Court separately for approval of these awards.[10] (*See* Dkt. 270.)

        3.     *Document Submission and Review Process*: The Settlement provides a mechanism for Settlement Class Members in Groups 1 and 2 to submit the paperwork necessary to be considered for a loan modification offer. Class Counsel have already begun helping claimants with this process.

    **D.**     **The Release.**

    In exchange for the relief provided above, Defendant and each of its related affiliates and entities will be released from any claims, whether known or unknown, arising out of or relating to Wells Fargo's actions in connection with HAMP and servicing of borrower loans, including its HAMP policies, systems, standards, procedures, and performance, its compliance with HAMP directives and guidelines, and its actions with respect to any HAMP trial plans, permanent modification agreements, or other paperwork. (*See* Ex. A §§ 1.37, 4, 11.3 for the full release.)

## IV.    THE NOTICE PLAN COMPORTS WITH DUE PROCESS

    Prior to granting final approval to this Settlement, the Court must first consider whether the Notice to the Settlement Class is "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); *Redman*

---

[9]     Wigod falls into Group 1, and Group 1 Class Members are generally able to apply for loan modifications. As part of her award, Wigod need not take further steps to apply for her modification, the terms of which have been finalized. (Woodrow Decl. ¶ 16.)

[10]     Subsequent to filing her petition for reasonable attorneys' fees, Class Counsel voluntarily agreed to reduce its fee and expenses request by $50,000 to $3,450,000, as a result of unanticipated and additional work necessary for Wells Fargo to complete the Settlement. (Woodrow Decl. ¶ 7 n.1.)

*v. RadioShack Corp.*, No. 11-cv-06741, 2014 WL 497438, at *2 (N.D. Ill. Feb. 7, 2014). The "best notice practicable" does not require receipt of actual notice by all class members. Rather, "notice should be mailed to the last known addresses of those who can be identified." *Mangone v. First USA Bank*, 206 F.R.D. 222, 231-32 (S.D. Ill. 2001) (citations omitted); *see Burns v. Elrod*, 757 F.2d 151, 154 (7th Cir. 1985) (noting that "Rule 23 does not require defendants to exhaust every conceivable method of identification"). In addition, the notice itself must be in easily understood language and must state the class definition, set out the claims at issue, explain that a judgment will be binding on class members unless they opt out, and inform class members that they may enter an appearance through an attorney if they wish. Fed. R. Civ. P. 23(c)(2)(B); *see In re AT & T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 351 (N.D. Ill. 2010).

The notice plan approved by the Court has been fully carried out by professional settlement administrator Epiq Systems, Inc. ("Epiq") and consisted of direct mail notice sent to every Class Member and the establishment of a settlement website. (*See* Declaration of Charles Marr ("Marr Decl"), ¶ 3, attached as Exhibit C.)[11] Following 33 re-mailings, mailed notice failed to reach only sixteen out of 835 Class Members—a mere 1.6%. (*Id.* ¶ 6.) As such, notice was disseminated by direct mail to over 98% of the Class. Further, the mail notice was written in plain English, summarized the key terms of the Settlement, and directed Class Members to the Court-approved "long form" notice that was posted on www.wigodHAMPsettlement.com. Through this website, Class Members were able to file claims online, print claim forms to be mailed and emailed to Epiq, and review documents filed with the Court in this case. (*Id.* ¶ 13.) Since going "live," there have been 1,287 unique visitor sessions on the website (with 13,331

---

[11]     Wells further caused notice to be sent to United States and state Attorneys General as required by the Class Action Fairness Act, 28 U.S.C. § 1715.

total page views). (*Id.* ¶ 15.) As the Notice Plan reached over 98% of the Class, it fully satisfies

Rule 23 and Due Process. *See* Federal Judicial Center, *Judges Class Action Notice and Claims Process Checklist and Plain Language Guide*, 3 (2010) (concluding that a notice plan that reaches at least 70% of the class is reasonable).

In addition to the formal Class Notice, Class Counsel formed and trained a special team of law clerks and attorneys who personally spoke with 95% of the Class. (Woodrow Decl. ¶ 23.) These attorneys and clerks explained the Settlement's terms and have actively assisted such borrowers with answering their questions, evaluating their personal situations, and helping them file claims and gather necessary documents. (*Id.* ¶¶ 23-24.) As explained below, this extra effort directly translated into the impressive claims rate observed with this Settlement. *See* Section V.C, *infra*.

In short, the Notice Plan satisfied due process and supports final approval.

## V.      THE SETTLEMENT WARRANTS FINAL APPROVAL

Federal Rule of Civil Procedure 23(e) mandates that "claims, issues, or defenses of a certified class may be settled . . . only with the court's approval . . . after a hearing and finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e); *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 CV 2898, 2012 WL 651727, at *1 (N.D. Ill. Feb. 28, 2012), appeal dismissed *Safeco Ins. Co. of Am. v. Am. Int'l Grp.*, 710 F.3d 754 (7th Cir. 2013). Even still, "[f]ederal courts naturally favor the settlement of class action litigation." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 578 (N.D. Ill. 2011) (citing *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996)). Given this predisposition towards favoring settlements, the Court's inquiry as to whether to grant approval "is limited to [the consideration of] whether the proposed settlement is lawful, fair, reasonable and adequate," *Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d

978, 986 (7th Cir. 2002) and the "court should not substitute its own judgment as to the best

outcomes for the litigants and their counsel," *Redman*, 2014 WL 497438, at *3.

Courts consider five factors when determining the fairness of a class action settlement:

[1] the strength of plaintiffs' case compared to the amount of defendants' settlement offer, [2] an assessment of the likely complexity, length and expense of the litigation, [3] an evaluation of the amount of opposition to settlement among affected parties, [4] the opinion of competent counsel, and [5] the stage of the proceedings and amount of discovery completed at the time of settlement.

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (citations

omitted); *accord In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d

935, 958 (N.D. Ill. 2011). Each factor in this case weighs in favor of final approval.

A.    **The Strength of Plaintiff's Case Compared to the Settlement Weighs in Favor of Granting Final Approval.**

"The most important factor relevant to the fairness of a class action settlement is the first

one listed: the strength of plaintiffs' case on the merits balanced against the amount offered in

the settlement." *Synfuel*, 463 F.3d at 653. The strength of a plaintiff's case can be quantified by

examining "the net expected value of continued litigation to the class" and then estimating "the

range of possible outcomes and ascrib[ing] a probability to each point on the range." *Am. Int'l*

*Grp., Inc.,* 2012 WL 651727, at *2 (quoting *Synfuel*, 463 F.3d at 653); *see Eubank v. Pella*

*Corp.*, 753 F.3d 718, 727 (7th Cir. 2014) (finding court should estimate the likely outcome of a

trial in order to evaluate the adequacy of the settlement); *Carnegie v. Household Int'l, Inc.*, 445

F. Supp. 2d 1032, 1034 (N.D. Ill. 2006) (The Court "must determine the litigation value of the

case and assess the settlement against that value.").

At the same time, "the Seventh Circuit recognizes that a high degree of precision cannot

be expected in these calculations" and "[i]nstead, courts are to provide a ballpark valuation of the

class's claims." *Am. Int'l Grp., Inc.,* 2012 WL 651727, at *2 (quotations omitted). "In

considering the strength of plaintiffs' case, legal uncertainties at the time of settlement favor approval." *In re Sw. Airlines Voucher Litig.*, No. 11-cv-8176, 2013 WL 4510197, at *7 (N.D. Ill. Aug. 26, 2013), appeal dismissed (Jan. 3, 2014). Finally, "[b]ecause the essence of settlement is compromise courts should not reject a settlement solely because it does not provide a complete victory to the plaintiffs." *In re AT & T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. at 346 (quotations omitted).

    1. *The Value Received Versus the Value Available at Trial Supports Approval.*

   First, the value provided to the Class under the Settlement represents a substantial percentage of the maximum damages the Class could've received at trial. Plaintiff's claims center on Wells Fargo's alleged breaches of contract. Although claims survived under the Illinois consumer fraud act, for promissory estoppel, and for a fraudulent scheme, the nationwide applicability of such claims is questionable.[12] Assuming the Class was certified and that the Settlement Class Members won at trial, and claimed and proved their damages in full, for the 835 Settlement Class Members the total would equal $44,825,722.50, plus attorneys' fees.[13] These amounts include $45,900 per missed modification, missed pay-for-performance benefits ($3,000), the addition of improper late fees (an average of $2,358.50), improper appraisal

---

[12] Further analyses can be found in the Expert Report of Don Frankenfeld in support of Plaintiff's Motion for Preliminary Approval (Dkt. 262-5) and Frankenfeld's Declaration in support of Plaintiff's Motion for Attorneys' Fees and Class Member Incentive Award (Dkt. 270-2), as well as in Plaintiff's Motion for Attorneys' Fees and Class Member Incentive Award (Dkt. 270, 16-17).

[13] As explained in Plaintiff's Motion for Preliminary Approval, all projections are made by Plaintiff and Class Counsel for the purposes of evaluating the Settlement only. Aside from the number of borrowers in each Settlement Group, none of the figures presented purports to reflect any agreement or view held by Wells Fargo, and it is likely that Wells Fargo disagrees with Plaintiff and Class Counsel's projections. These projections are further without prejudice to any argument Plaintiff may assert in the litigation should the Settlement not be approved.

charges (approximately $350), harm to borrower credit ($1,000), increased interest from the misapplication of funds ($1,000 to $3,500), mail and fax charges ($75) and other damages. When totaled, each borrower could potentially show damages of $53,683.50. (*See* Dkt. 262-5, 14.)[14]

Meanwhile, each of the forms of Settlement relief returns substantial value to the Settlement Class Members, and collectively the amount made available is between $11,443,800 and $12,583,800 (not including attorneys' fees or notice costs).

The first form of benefits, loan modifications, makes substantial relief available. All Class Members in Groups 1 and 2 were eligible to apply for loan modifications, which Frankenfeld has projected provide between $55,000 to $60,000 in value to recipients.[15] (Dkt. 270-2, 4.) Given projected approval rates (*see id.*), (80% in Group 1, 20% in Group 2), had all Group 1 and 2 Class Members claimed such benefits the Settlement would restore $4,620,000 ($55,000 x 84 modifications) to Group 1 and $3,960,000 ($55,000 x 72 modifications) to Group 2, or $8,220,000 total ($9,360,000 if the modifications are valued at $60,000).

The 20% of Group 1 Class Members who were denied modifications would be eligible thereafter for relocation agreements, which include substantial cash payments. The cash available for this subset of Group 1 would equal approximately $273,000. (Woodrow Decl. ¶ 15.) For the 80% of Group 2 Class Members denied modifications (approximately 288), they

---

[14]    Frankenfeld's estimates find support in the Expert Report of Michael S. Barr, a Professor of Law at the University of Michigan Law School, filed in support of the settlement in *In re Morgan Chase Bank, N.A. Mortgage Modification Litig.* No. 1:11-md-02290-RGS, (D. Mass. Feb. 13, 2014). Professor Barr testifies, following a similar analysis to Frankenfeld's report, that the average benefit conferred through a modification would be $49,183.20. (*Id.* ¶ 33.) Professor Barr also estimates comparable sums for foreclosure avoidance, credit counseling services, and waived late fees. (*Id.* ¶ 68.)

[15]    As Frankenfeld explains, these amounts are slightly higher than modifications to be sought at trial because, under the more recent HAMP guidelines available under the Settlement, enhanced benefits such as principal forgiveness are available for a percentage of the borrowers requesting modifications. (Dkt. 270-2, 2.)

would be able to claim cash awards collectively worth the full $100,000. (*Id.*) For Group 3, the Settlement cash benefits made available were $2,000,000 total. There are no offsets for modifications since such borrowers cannot receive such relief (because they no longer have their loans with Wells), and a full claims rate would consume the funds.

The Settlement also provides foreclosure holds to Group 1 (and to Group 2, though they are not in foreclosure) borrowers. For those borrowers in default, a percentage is also in foreclosure. Frankenfeld has projected that, assuming a scheduled monthly payment of $1,500 and an average hold duration of fifteen months, the value of a hold is $22,500 per borrower. (Dkt. 270-2, 4.) Assuming that twenty Group 1 borrowers have benefitted from the holds, this aspect of the agreement made at least $450,000 available to the Class Members. The Settlement also made holistic credit counseling available to all borrowers. At an estimated cost of $480, the total value of this relief (not including the amounts such counseling could help Class Members save in the form of reduced debt and improved credit) would equal $400,800. Adding these amounts together, the value of the Settlement Benefits—excluding attorneys' fees, the incentive award, and notice and administration expenses—equal between $11,443,800 and $12,583,800.

These amounts are plainly fair, reasonable, and adequate when judged in light of the maximum victory the Class could have received at trial. Indeed, $11,443,800 represents 25.53% of $44,825,722.50, a percentage that surpasses other recoveries approved by courts. *See, e.g., Williams v. Rohm & Haas Pension Plan,* 658 F.3d 629, 634 (7th Cir. 2011) (affirming approval of settlement awarding 24.3% of their estimated maximum recovery); *Schulte v. Fifth Third Bank*, 805 F.Supp.2d 560, 583-84 (N.D. Ill. 2011) (settlement approved where it recovered only 10% of the class's maximum possible recovery); *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F.Supp.2d 997, 1008 (E.D. Wis. 2010) (approving settlement worth

between 4.4% to 13.6% of continued litigation); *see also In re Ravisent Techs., Inc. Sec. Litig.*, No. Civ. A. 00–CV–1014, 2005 WL 906361, at *9 (E.D. Pa. Apr. 18, 2005) (approving settlement that amounted to 12.2% of damages) (internal citations omitted).

Accordingly, that the Settlement restores over 25% of the maximum relief that could've been won to Class Members strongly supports approval.

2.      *The Percent Recovered is Particularly Impressive Given Wells Fargo's Defenses and Uncertainties in the Case.*

It must be recalled that the above projections omit Wells Fargo's defenses, which include mitigation of damages (and could potentially include other defenses, such as unclean hands, should Wells seek to assert them). (Dkt. 190, 2-3.) Wells would introduce evidence that borrowers should have sought other loss mitigation alternatives that were made available. Wells would also seek to introduce evidence that certain borrowers received loan modification offers that were potentially more favorable, based upon interest rates and payment amounts. Where borrowers defaulted on the arguably superior modifications, Wells would assert that such borrowers would have failed under the less favorable terms they claimed Wachovia had promised them. Moreover, Wells would argue that certain borrower modifications would have potentially been rejected by Treasury had they been finally implemented. (Woodrow Decl. ¶ 30.)

These were genuine obstacles and were being presented vigorously by Wells's lawyers at K&L Gates, and Plaintiff would need to litigate and defeat these defenses through adversarial class certification, summary judgment, trial, and any appeals—a process that could readily take years. *See Lipuma v. Am. Express Co*., 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005) ("[I]t has been held proper to take the bird in hand instead of a prospective flock in the bush."). After

discounting for the uncertainties, the value of the claims is $10,605,765.94.[16]

As such, when discounting for Wells's defenses and uncertainties in the law, the fact that the Settlement provides between $11,443,800 and $12,583,800 in value (plus fees) is plainly demonstrative of the Settlement's fairness, reasonableness, and adequacy.[17]

In the end, because the benefits made available to the Class are substantial when viewed in light of the recovery at trial and the value of the claims, this first factor weighs decidedly in favor of final approval.

### B. The Complexity, Length, and Expense of Continued Litigation Support Final Approval of the Settlement.

The second factor also supports approval. Final approval is favored in cases like the instant one where "continued litigation would require resolution of complex issues at considerable expense and would absorb many days of trial time." *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1019 (N.D. Ill. 2000). There can be no doubt that continued litigation in this case would result in the Parties incurring further, substantial expenses, including the costs of additional expert discovery and testimony and further briefing. And should the case proceed to adversarial class certification and trial, evidence and witnesses from across the

---

[16]     As explained in the Motion for Preliminary Approval (Dkt. 262), this equals $53,683.50 (average Class Member damages) x 835 (Settlement Class Members) x .65 (likelihood of certification) x .70 (30% discount for mitigation affirmative defense) x .80 (20% discount for compliance affirmative defense) x .65 (likelihood that Class is not decertified). (Dkt. 262, 32.) This wouldn't be paid immediately, however. Assuming a rate of inflation of 3%, if paid in six to nine years the claims would be worth between $8,882,161.64 (six years) and $8,128,436.14 (if paid in nine years). (Dkt. 262, 33.)

[17]     Further, it bears noting that the instant Settlement provides benefits that are more favorable than the relief made available to the Class in the only other known HAMP Settlement. *See In re JPMorgan Chase Bank, N.A. Mortgage Modification Litig.*, No. 1:11-md-02290-RGS (D. Mass.). Under the terms of that deal, class members are merely allowed to apply for modifications—no cash is made available. While it remains to be seen what type of response that settlement receives, it is unlikely to be as favorable as the rate achieved here.

country would have to be convened, adding additional expense to the litigation. *See In re AT&T Mobility*, 789 F. Supp. 2d at 964 (recognizing that where a complex class action survives the summary judgment stage, it leads to a "lengthy and expensive" trial); (Woodrow Decl. ¶ 29.) Given the amount of potential damages at issue and the dearth of precedent on several of the relevant issues in dispute, the defeated party would certainly appeal an unfavorable certification decision or judgment on the merits, resulting in greater expenses and a further delay of the final resolution of this case. Therefore, this factor weighs in favor of finally approving the Settlement as well.

      **C.    There Has Been No Opposition to the Settlement.**

      Additionally, where a settlement has garnered few or no objectors, courts should view this as further proof that the settlement is fair and reasonable and that class members consider the settlement to be in their best interest. *Am. Int'l Grp.*, 2012 WL 651727, at *1. In those cases where there have been no objectors, or very few, courts have considered this to be "strong circumstantial evidence favoring settlement." *See In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1020-21 (finding that a settlement where "99.9% of class members have neither opted out nor filed objections . . . is strong circumstantial evidence in favor of the settlements"); *In re AT&T Mobility*, 789 F. Supp. 2d at 964-65 ("[I]t is illuminative that only a tiny fraction of the Class Members saw fit to opt out or to object.").

      No one has objected to the Settlement and the Epiq has received only three opt outs, one of which is from a Florida couple that do not fall within the Settlement Class definition and were not on the Class list. As such, the valid opt-outs reflect only 0.24% of the 835 Class Members (Woodrow Decl. ¶ 27) and there is no meaningful opposition to the Settlement from the Class.[18]

---

[18]    Additionally, one Class Member, Shelley Habetz, sent a letter to Class Counsel stating in substance that she needed more time and information to determine whether she should "refuse to

Indeed, this Settlement is noteworthy for its exceptionally high participation rate, not any opposition to its terms. Again, in addition to the direct notice and the settlement website, Class Counsel formed and trained a special team of law clerks and attorneys who personally spoke with 95% of the Class and explained the Settlement's terms and assisted with the filing of claims. (Woodrow Decl. ¶ 23.)[19] The team spent hours training, developing scripts and FAQs, and assisting Class Members with their claims. (*Id*. ¶ 24.) The result of this extra effort is an impressive claims rate—37%—that significantly surpasses typical rates in consumer class actions.[20]

As a final note here, it is worth pointing out that the calls to Settlement Class Members

---

stay in the class action." Ms. Habetz she said she "objected" to the settlement because she did not know which of the five loans that she has with Wells were involved in the settlement or the dollar amount she would potentially receive. (She did not file any formal objection with the Court or serve anything on the Settlement Administrator or Wells Fargo's counsel as required by the Preliminary Approval Order for formally objecting). Class Counsel provided Ms. Habetz with the loan number at issue and with the settlement amount for claimants in Group 3A (her group). Ms. Habetz thereafter notified Class Counsel that she wanted to opt out, and Class Counsel confirmed with Wells that it would not oppose her late opt out. Class Counsel is seeking to reconfirm that Ms. Habetz does indeed wish to opt out and expect to be able to fully inform the Court at the final approval hearing.

[19]     Class Counsel have also worked with Wells, in accordance with the Settlement § 6.4, to reclassify approximately ten Class Members into more appropriate settlement groups to fit their circumstances. For example, borrowers who are no longer in default have requested to be switched from Group 1 to Group 2, borrowers in Group 1 who no longer have their homes asked to be moved to Group 3, etc. (Woodrow Decl. ¶ 26.)

[20]     *See, e.g.*, *City of Greenville v. Syngenta Crop Prot., Inc.*, 904 F. Supp. 2d 902, 904 (S.D. Ill. 2012) (observing that "many class actions experience claims rates of less than 15%"); *see also Pearson v. NBTY, Inc.*, No. 11 CV 7972, 2014 WL 30676, at *8 (N.D. Ill. Jan. 3, 2014), appeal dismissed (Apr. 1, 2014), appeal dismissed (Apr. 2, 2014) (declining to grant requested fee award where only .25% of 12 million class members—and a mere .7% of direct notice recipients—had submitted valid claim forms); *Forcellati v. Hyland's, Inc.*, No. 12-cv-1983, 2014 WL 1410264, at *6 (C.D. Cal. Apr. 9, 2014) ("[T]he prevailing rule of thumb with respect to consumer class actions is [a claims rate of] 3–5 percent") (citing *Ferrington v. McAfee, Inc.*, No. 10-CV-01455-LHK, 2012 WL 1156399, at *12 (N.D. Cal. Apr. 6, 2012); *De Leon v. Bank of Am., N.A. (USA),* No. 6:09-CV-1251-ORL-28, 2012 WL 2568142, at *14 (M.D. Fla. Apr. 20, 2012) *report and recommendation adopted*, 6:09-CV-1251-ORL-28, 2012 WL 2543586 (M.D. Fla. July 2, 2012) (typical claims rates in consumer class settlements range from 2% to 20%)).

revealed that Class Members are overwhelmingly appreciative of the efforts that have been expended on their respective behalves to secure relief from Wells Fargo. (Woodrow Decl. ¶¶ 25, 28.) Needless to say, the vast majority of borrowers had sour experiences with Wells and never expected to receive any type of remuneration. (*Id*. ¶ 25.) Class Members viewed Wells as an insurmountable obstacle, and many expressed gratitude to Class Counsel for pursuing the case and achieving the Settlement. (*Id*.)

### D. The Opinion of Competent Counsel Favors Approval.

The third factor also supports approval. "The opinion of competent counsel is relevant to the question whether a settlement is fair, reasonable, and adequate under Rule 23." *Schulte*, 805 F. Supp. 2d at 586. This is especially true where Class Counsel are qualified, where discovery and settlement negotiations are extensive and thorough, and where there is no indication of collusion. *Id.*; *see Hispanics United v. Vill. of Addison*, 988 F. Supp. 1130, 1150 n.6 (N.D. Ill. 1997) (noting that a "strong initial presumption of fairness attaches" where the settlement is "the result of arm's length negotiations," and where plaintiff's counsel are "experienced and have engaged in adequate discovery").

Here, Class Counsel have significant experience prosecuting nationwide class actions against national banks and financial institutions. *See, e.g., Schulken v. Washington Mut. Bank*, No. 09-CV-02708, 2012 WL 28099, at *15 (N.D. Cal. Jan. 5, 2012) (Edelson PC appointed adversarial class counsel in class action challenging bank's suspensions of home equity lines of credit); *Hamilton v. Wells Fargo Bank, N.A.*, No. 09-cv-04152 (Dkt. 108) (N.D. Cal. May 11, 2012) (Edelson attorneys appointed settlement class counsel); *In re: JP Morgan Chase Bank Equity Line of Credit Litig.*, No. 10-cv-03647 (N.D. Ill. July 16, 2010) (Pallmeyer, J.) (Edelson appointed interim co-lead class counsel and settlement class counsel). And Class Counsel have served at the forefront of HAMP litigation, serving as counsel in HAMP cases against not only

Wells Fargo but against other banks and servicers as well. *See, e.g., Fletcher v. OneWest Bank, N.A.*, No. 10-CV-4682 (N.D. Ill.); *Clark v. Green Tree Servicing LLC*, No. 13-CV-2646 (D. Colo.); *Scata v. Nationstar Mortg. LLC*, No. 14-CV-189 (D. Colo.).

Such particularized experience has allowed Class Counsel to accurately pursue and evaluate the mountains of discovery received (discussed in Section E, immediately below), and weigh the merits of the Class's claims and the risks and potential rewards of further litigation against the Settlement value. Further, this Settlement was reached only after multiple settlement conferences, including three private mediation sessions with Judge Denlow and the Parties' eventual acceptance of his mediator's proposal. There isn't even a hint of collusion that could attach to the process. In the end, Class Counsel believe that this substantial and landmark recovery for the Class is preferable to further protracted litigation and the risk of obtaining nothing for the Class should any one of Wells Fargo's defenses succeed. Thus, the opinion of Class Counsel favors final approval.

E. **The Stage of the Proceedings and the Amount of Discovery Completed Weigh in Favor of Final Approval.**

The fifth factor concerning the stage of the proceedings helps determine "how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 325 (7th Cir.1980), o*verruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). This factor is satisfied where, like here, "discovery and investigation conducted by class counsel prior to entering into settlement negotiations was extensive and thorough," *Isby*, 75 F.3d at 1200, and is clearly satisfied in cases such as this where there has been "massive discovery, various legal and evidentiary pretrial rulings" and the case was headed for adversarial certification. *See Hispanics United*, 988 F. Supp. at 1170-71.

Class Counsel have engaged in sufficient discovery to allow them to objectively evaluate the Agreement's fairness, adequacy, and reasonableness. This includes formal discovery, which, not to belabor the point, included hundreds of thousands of pages of documents showing Wells Fargo's HAMP policies and procedures, and attendant internal communications regarding its implementation of HAMP guidelines and directives (which were updated semi-monthly during the first several years of the Program). (Woodrow Decl. ¶ 6.) Class Counsel also had the benefit of evaluating Wells Fargo's internal audit results and governmental audits, from which Class Counsel gained insight into the scope of Wells Fargo's own policing and quality control of its processes and procedures on a high level. (*Id*.) Class Counsel also received (after motions to compel) 100 sample borrower files containing complete loan histories, contracts, form communications, servicing notes and records, and related information. Class Counsel also took the deposition of the Vice President of Wachovia in charge of its HAMP processes. (*Id*.) Further, discovery undertaken in connection with the Parties' mediation process has provided Class Counsel with specific information from which Class Counsel can objectively calculate the payments to individual Class Members in accordance with the per group caps and individual claimant maximums set forth in the side letter the Parties presented to the Court at the preliminary approval hearing. (*Id*. ¶ 6.) Indeed, Class Counsel have a list of each Class Member broken down by grouping together with further details regarding their specific loan/modification histories. Such information has allowed Class Counsel to carefully evaluate the strength of the Class's case, the benefits of the Settlement, and the overall value to the Class.

As such, this factor also militates in favor of final approval.

**F.      The Settlement Is Not a Product of Collusion and Does Not Suffer From "Red Flags."**

Finally, the Court should not hesitate to grant final approval to the Settlement because it

raises none of the "red flags" identified by the Seventh Circuit in analyzing class settlements. In

*Eubank*, 753 F.3d 718, the Seventh Circuit identified five potential indicators of a flawed

settlement, none of which are present here. These included (i) the failure to properly establish the

size of the fund and the total class recovery, (ii) the reversion of unawarded attorneys' fees to the

defendant, (iii) substantial alterations to existing class definitions, (iv) the use of coupons, rather

than cash payments, for class compensation, and (v) overly complicated claim forms. *See*

*Eubank*, 753 F.3d at 723-29. Put simply, this Settlement does not raise those red flags,

demonstrating that final approval is all the more appropriate. The Class recovery has been

measured by an expert mathematician and economist, and the claims period has closed, thus

reducing guess-work. Further, Plaintiff hasn't substantially sought to alter the Class definition,[21]

no coupons are being offered—here the relief consists primarily of loan modifications, cash,

foreclosure holds, and credit counseling—and the claim forms were not overly complicated, as

evidenced by the substantial claims rate. While any unawarded attorneys' fees are scheduled to

simply remain the property of Wells Fargo,[22] nothing in *Pella* indicates that that weighs in favor

---

[21]     Prior to the filing of the Motion for Leave to File Third Amended Complaint (Dkt. 264) concurrently with Plaintiff's Motion for Preliminary Approval (Dkt. 262), Plaintiff's Second Amended Complaint (Dkt. 117) was filed just two-months following remand, prior to the exchange of meaningful discovery. The class definitions contained therein sought to capture, by using a cut-off date of June 1, 2010, borrowers who had Verified TPPs. The discovery process revealed however that whereas Wachovia borrowers were uniformly decisioned using Verified TPPs, Wells Fargo's process remained more varied (particularly given the Treasury's announcement in October 2009—after the sale of Wachovia to Wells—that borrowers could be put into trial plans based on stated income). (Woodrow Decl. ¶ 4.) As such, the Settlement Class is defined as Wachovia borrowers who, like Wigod, had Verified TPPs and, like the definitions contained in the Second Amended Complaint (Dkt. 117), seeks relief for borrowers with Verified TPPs. Also, no subclasses are needed as the Settlement resolves any manageability concerns underlying the shape of the pleading in July 2012. And of course, borrowers whose loans were never held by Wachovia are not compromised or released through the Settlement.

[22]     And even if the funds were to revert, which they do not, that doesn't diminish the strength of the Settlement either. *McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 813 (E.D. Wis. 2009) (approving class action settlement containing reverter, noting that

of disapproval.

Consequently, the instant Settlement is not afflicted with the warning signs that doomed the settlement in *Pella.*

## VI.     CONCLUSION

The Settlement achieved in this case provides substantial relief for the Class and is demonstrably fair, reasonable, and adequate. The Settlement provides well over $10 million worth of benefits to the Class (excluding attorneys' fees) and, like the litigation more generally, represents a significant victory in the fight for borrower rights in connection with the HAMP. This case was riddled with uncertainty when filed: at that time the legal landscape unquestionably favored the bank's defenses and HAMP borrowers routinely saw their cases dismissed on the pleadings. This litigation is directly responsible for reversing that trend— tipping the balance in firm recognition of borrower rights.

As Judge Ripple indicated in his concurrence, "Prompt resolution of this matter is necessary not only for the good of the litigants but for the good of the Country." *Wigod*, 643 F.3d at 586. The Parties have taken heed and crafted a Settlement that provides real relief to borrowers who continue to struggle, and cash payments to borrowers who've managed to get back on track. Under such circumstances, a high claims rate, while impressive, is not altogether surprising.

The Settlement should be finally approved.

WHEREFORE the Class Representative, Lori Wigod, on behalf of herself and all others similarly situated, respectfully requests that the Court grant final approval to the Settlement, enter the Judgment contemplated thereunder, and award such additional relief as the Court deems

---

reverter clauses can be "useful tools" and may prompt defendants to agree to higher settlement amount in return for possible reversion of funds).

necessary, reasonable, and just.

Respectfully submitted,

PLAINTIFF LORI WIGOD,

By: /s/ Steven L. Woodrow
      One of Plaintiff's attorneys

Jay Edelson
jedelson@edelson.com
Steven L. Woodrow
swoodrow@edelson.com
Megan Lindsey (Admitted *Pro Hac Vice*)
mlindsey@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6379
Fax: 312.589.6378

*Counsel for Plaintiff and Putative Class*

## CERTIFICATE OF SERVICE

I, Steven L. Woodrow, hereby certify that on October 17, 2014, I electronically filed the foregoing *Plaintiff's Motion for Final Approval of Class Action Settlement* with the Clerk of the Court using the CM/ECF system. Notice of this filing is sent to all counsel of record by operation of the Court's electronic filing system.

/s/ Steven L. Woodrow