# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LORI WIGOD, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, N.A. d/b/a WELLS FARGO HOME MORTGAGE, f/k/a WACHOVIA MORTGAGE, FSB,<br><br>Defendant. | Case No: 1:10-cv-2348<br><br>Hon. Elaine E. Bucklo |

### DECLARATION OF ATTORNEY STEVEN WOODROW IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Pursuant to 28 U.S.C. § 1746, I hereby declare and state as follows:

1.  I am an adult over the age of 18 and a citizen of the State of Colorado. I am a partner with the law firm of Edelson PC, licensed to practice law in the State of Illinois and before this Court. I represent Plaintiff Lori Wigod ("Plaintiff") in this matter and am one of the attorneys the Court appointed as Class Counsel in its order granting preliminary approval of the class action settlement in this case. (Dkt. 269 ¶ 2.) I have personal knowledge of the facts as set forth herein, and could competently testify to them if called upon to do so. I make this Declaration in support of Plaintiff's Motion for Final Approval of Class Action Settlement.

*Nature of the Litigation*

2.  As set out in my declarations in support of preliminary approval and Class Counsel's request for reasonable attorneys' fees, I believe that the Settlement presented in this case provides landmark relief to the Settlement Class, which consists of borrowers who had first lien mortgage loans with Wachovia Bank F.S.B. and received "Verified" trial period plans

1

("Verified TPPs") under the Home Affordable Modification Program ("HAMP"), but whose loans were then transferred to Wells Fargo Bank, N.A., which refused to honor their Verified TPPs.

3. HAMP was implemented to make borrower mortgage payments more affordable. Loan servicers were to place homeowners into trial period plans ("TPPs") that called for reduced monthly payments. (*See* Supplemental Directive 09-01.) When homeowners successfully completed their trials, the bank was to offer them permanent modifications with monthly payments at or close to the trial amount.

4. Our legal theory in this case is that borrowers with Verified TPPs were not to be reevaluated after the start of their trial plans. When HAMP was first introduced, banks could either start a TPP *before* the borrower had submitted financial documents, based on the borrower's oral statements (a "Stated TPP") or *after* the borrower had submitted financial documents and been deemed eligible (a Verified TPP). My review of discovery in this case revealed that Wachovia only used Verified TPPs prior to the acquisition of such loans by Wells. By contrast, I believe Wells Fargo's practices appear more varied.

5. Based on my review of the discovery, rather than honor the Verified TPPs it acquired from Wachovia, Wells reevaluated such borrowers, including Plaintiff Wigod. This was amid a landscape where thousands of borrowers were complaining—both legally as well as informally to attorneys, the press, and government entities and regulators—that the banks were routinely violating HAMP Directives. My firm filed this case for Ms. Wigod as a putative class action seeking specific performance and damages for breach of contract, among other theories.

6. On remand, the Parties engaged in significant discovery and protracted litigation, including extensive motion practice. Over the course of a year, the Parties exchanged over

200,000 pages of documents, consisting of thousands of pages showing Wells Fargo's HAMP policies and procedures, including internal communications regarding its implementation of HAMP guidelines and directives (which were updated semi-monthly during the first several years of the program), internal audit results and governmental audits, from which I along with other Class Counsel gained insight into the scope of Wells's internal policing and high-level quality controls, 100 sample borrower files containing the complete loan histories, contracts, form communications, servicing notes and records, and related information. This discovery was accompanied by dozens of meet-and-confers between counsel in which I participated. These calls would often last for over an hour. Additionally, my firm exchanged hundreds of emails and dozens of discovery letters with defense counsel and issued subpoenas to third parties such as Freddie Mac and Fannie Mae. I deposed the Wachovia Vice President in charge of its HAMP operations, who continued to work on these issues following the transfer of the loans over to Wells Fargo, in addition to defending other Party depositions. Wells also provided key data through the mediation process, including a list of each Class Member broken down by Settlement Group and containing details regarding their specific loan modification histories. From this information, my firm was able to determine each Class Member's share of the total monies made available to each Settlement Group, consistent with the side letter the Parties previously disclosed to the Court during the preliminary approval hearing. In short, the discovery conducted was comprehensive and detailed, and provided sufficient information to Class Counsel to allow for informed negotiations.

7. Motion practice was particularly extensive as well. The Parties filed and briefed over twenty substantial motions, including motions to dismiss, to strike affirmative defenses, to compel, limit, and bifurcate discovery, and for a host of other relief (in addition to ten motions to

file under seal and to file oversized briefs, ten agreed motions and stipulations, and at least four negotiated scheduling orders).

***The Mediation Process with Judge Denlow (Ret.) and the Settlement***

8. As discovery pushed forward, I began discussing the potential for resolving the case with defense counsel. Talks grew serious when Wells offered Plaintiff Wigod an individual modification in February 2013 and the Parties began talking about the possibility of providing the opportunity for such relief to everyone in the Class.

9. The Parties ultimately agreed to private mediation with the Honorable Morton J. Denlow (Ret.) of JAMS in Chicago. Counsel for the Parties and I engaged in three formal mediation sessions (held on July 18, 2013, October 30, 2013, and March 25, 2014). During these sessions, the Parties discussed the type of relief available under the circumstances, the current status of affected borrowers and Wells's data with respect to such borrowers, and alternative settlement structures and forms of relief. In addition to these formal sessions, counsel for the Parties engaged in dozens of telephonic conferences, both on their own and with Judge Denlow's involvement and oversight.

10. The mediation process allowed for an informed and frank negotiation that included the production of additional Class-specific data by Wells, which helped reveal further details regarding Class Member demographics and loan histories. With this information, the Parties were able to reach an agreement regarding the proposed benefits for the three settlement groups that comprise the Settlement Class.

11. Only after an agreement with respect to such relief was agreed to in principal did the Parties formally negotiate an incentive award for the Class Representative, Ms. Wigod, and reasonable attorneys' fees for Class Counsel. These negotiations lasted several weeks with

numerous exchanges between counsel. Eventually the negotiations broke down and Judge Denlow bridged the impasse through a mediator's proposal that both sides accepted.

***Settlement Benefits***

12. The Settlement benefits include loan modifications, cash payments, foreclosure holds, and credit counseling.

13. Class Members in Groups 1 (in default or at risk of default) and 2 (current) can apply for loan modifications. If granted and complied with, their loans will be modified. For those who do not qualify for Group 1, such Class members will become eligible for relocation agreements that involve vacating the property in exchange for cash. Some Group 1 Class Members have informed my firm that they are no longer in their homes, and we have worked with Wells to either categorize the borrowers as belonging in Group 3 or, where appropriate, allowing the Class Member to stay in Group 1 but avoid the loan modification application process and simply receive a relocation agreement without hassle.

14. Group 2 Settlement Class Members who either don't qualify for or who reject their modifications are eligible for cash relief. Group 2 Settlement Class Members were also eligible to simply check a box on the Group 2 Claim Form seeking $250 in cash. Approximately 150 Group 2 claims have been filed, 52% of which seek the cash payment and 48% of which have elected to be reviewed for potential loan modifications (and receive cash in the event they are deemed ineligible or reject the terms offered). As with the Group 1 payments, these payments shall be made in accordance with the maximums set forth in the side letter provided to the Court.

15. Based on our projections, if every Group 1 and 2 Class Member applied for a loan modification, the Settlement would make available $4,620,000 ($55,000 x 84 modifications) to Group 1 and $3,960,000 ($55,000 x 72 modifications) to Group 2, or $8,220,000 total (or

5

$9,360,000 if a modification is valued at $60,000 instead of $55,000). These figures are based on 80% acceptance in Group 1 and 20% in Group 2. The 20% of Group 1 Class Members who were denied modifications would be eligible thereafter for relocation agreements, which include substantial cash payments. The cash available for this subset of Group 1 would equal approximately $273,000 based upon the number of claimants and the individual maximum caps for relocation agreements in Group 1. For the 80% of Group 2 Class Members denied modifications (approximately 288), they would be able to claim cash awards collectively worth the full $100,000 made available for Group 2 claims.

16. Wigod falls into Group 1. As part of her award, Wigod need not take further steps to apply for her modification, the terms of which have been finalized.

17. Settlement Class Members in Group 3 will receive cash payments. All cash payments under the Settlement will be decided based on objective criteria, including data received from Wells that details whether the borrower previously received a modification and whether the terms of the modification were more or less favorable than the terms Wachovia had promised them. To date, approximately 170 such claims have been filed.

18. When settlement negotiations first began, Wells Fargo implemented a foreclosure hold with respect to the Settlement Class Members to ensure that none of the Class Members whose rights were being negotiated would experience a foreclosure, thereby substantially altering the composition of the Class. As such, certain Settlement Class Members in Group 1 have benefitted from the Settlement by virtue of the fact their scheduled or potential foreclosures have remained suspended dating back to July 2013.

19. The Settlement also provides holistic credit counseling, which approximately 45 class members have elected to receive. Such counseling will assist Class Members with

6

budgeting issues and debt management techniques.

20. The Settlement makes benefits available to the Settlement Class Members valued between $11,443,800 and $12,583,800—which does not include attorneys' fees or the class member incentive award.[1] When such amounts are included, the relief made available to the Class is projected as $14,893,800 - $16,033,800.[2]

21. As expert economist Don Frankenfeld has opined with respect to the Settlement, as embodied in his report filed in support of Plaintiff's Motion for Class Member Incentive Award and Reasonable Attorneys' Fees (Dkt. 270-2), the proposed agreement actually restores between $8,625,726 and $10,589,000 in value. The claims rate achieved in the case (approximately 37%) is consistent with Frankenfeld's baseline projection.

*Notice Efforts and the Class's Reaction to the Settlement*

22. Wells has indicated to me that it has and will continue to pay the administration expenses. It further appears that Wells caused notice to be sent of the Settlement to State Attorneys General and relevant federal regulator(s).

23. In addition, and under my direction, members of my firm directly called every

---

[1] Subsequent to filing her petition for reasonable attorneys' fees, Class Counsel voluntarily agreed to reduce the fees and expenses request by $50,000 to $3,450,000, as a result of unanticipated and additional work necessary for Wells Fargo to complete the settlement.

[2] At the time of filing the Motion for Class Member Incentive Award and Reasonable Attorneys' Fees, Class Counsel's expenses were reported as $60,976.68. Since that time,
[2] At the time of filing the Motion for Class Member Incentive Award and Reasonable Attorneys' Fees, Class Counsel's expenses were reported as $60,976.68. Since that time, additional expert invoices and travel expenses have been paid, bringing the total expenses to $66,624.24. When subtracted from the $3,450,000 in fees and expenses now being requested, the result is an attorney fee award of $3,383,375.76. This represents only a 1.046 multiplier over Class Counsel's reported lodestar of $3,232,616.88. (Dkt. 270, 13.) It further represents 21.1% to 22.7% of the relief made available under the Settlement to the Class, a percentage that is consistent with the market rate for attorneys' fees.

7

class member for whom a telephone number could be obtained from Wells (or, if unavailable from Wells, through other records) and personally spoke with 95% of the Class Members. To accomplish these calls, I formed a special team whose task was to call every Class Member, explain the Settlement, and assist in the claims filing process.

24. The team I put together spent over five hours in training in joint sessions to learn about the Settlement and guide Class Members through the claims process. This included sessions going over the Settlement's terms, discussions of the Settlement's structure more generally, and the drafting and editing of call scripts and FAQs (copies of which can be provided to the Court upon request). The vast majority of those called received direct advice with respect to their rights under the Settlement.

25. The feedback from Class Members has been overwhelmingly appreciative of the efforts that have been expended on their respective behalves and the relief obtained. The vast majority of borrowers spoken with had sour experiences with Wells and never expected to receive any type of remuneration—the call and Class Notice were welcome surprises. Many Class Members expressed that Wells had refused to listen to them and thanked Class Counsel for pursuing the case and achieving the Settlement.

26. During this process, and as contemplated by the Settlement § 6.4, I along with other Class Counsel worked with Wells to reclassify approximately ten Class Members into more appropriate settlement groups to fit their circumstances. For example, borrowers who are no longer in default may have requested to be switched from Group 1 to Group 2, borrowers in Group 1 who no longer have their homes asked to be moved to Group 3, and so on.

27. As of the time of filing, the Settlement Administrator is still processing claims, accounting for duplicates, and pursuing further information from individuals whose claims have

been flagged as requiring further information. Nevertheless, it appears that the result of Class Counsel's effort is an impressive claims rate, approximately 37%. This high claims rate coincides with a very low opt out rate (2/835 = 0.24%) and no objections.[3] Another opt out was received on behalf of a couple who is not part of the Class and is not included on the Class List. As such, their rights are not implicated by the Settlement.

28. All told, the reaction of the Class has been overwhelmingly positive.

***The Risks and Difficulties Posed by Virtue of Further Litigation***

29. While the relief to the Class is substantial, I believe that continued litigation in this case would result in the Parties incurring further, substantial expenses, including the costs of expert discovery and testimony, and additional briefing. Should the case proceed to adversarial class certification and trial, I believe that evidence and witnesses from across the country would have to be convened, adding additional expense to the litigation. I further believe that Wells would mount several defenses, including mitigation and potentially unclean hands. It would seek to present evidence that borrowers should have sought other loss mitigation alternatives that were available, such as bankruptcy, selling their homes, and other options.

30. I believe that Wells would also seek to introduce evidence that certain borrowers received loan modification offers that were potentially more favorable (when judged based upon the amount of the reduced interest rate and/or modified monthly payment). Where borrowers defaulted on the superior modifications, I believe that Wells would likely argue that such borrowers would have failed under the less favorable terms they claimed Wachovia had promised them. Moreover, I believe that Wells would argue that certain borrower modifications

---

[3] Class Counsel were informed by another Class Member, Shelley Habetz that she needed additional information regarding which loan was at issue in this case and information to determine whether she should stay in the class action. After Class Counsel provided the requested information, Ms. Habetz indicated she wanted to opt out. Wells indicated it does not object to the late opt out. Ms. Habetz is still considering her position.

would have potentially been rejected by Treasury had they been finally implemented.

31. At this point, Class Counsel stands ready to finalize the implementation of the Settlement by assisting claimants who have elected to be reviewed for loan modifications. Class Counsel will assist these claimants with gathering their documents in accordance with the appropriate document checklist and determining the per-claimant cash awards as set forth in the side letter previously disclosed to the Court at preliminary approval.

\* \* \*

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of October, 2014 at Denver, Colorado.

/s/ Steven L. Woodrow
Steven L. Woodrow